**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00914           )
                                          )
BENJAMIN L. GERIG,                        )
a Colorado resident,                      )
                                          )
Plaintiff,                                )
                                          )
v.                                        )
                                          )
UNIVERSITY OF DENVER,                     )
a Colorado non-profit corporation,        )
                                          )
Defendant.                                )
_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Benjamin L. Gerig ("Mr. Gerig"), through counsel, states the following as his Complaint and Jury Demand ("Complaint") against the University of Denver ("DU").

**SUMMARY OF THE ACTION**

This is a disability discrimination lawsuit, brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. §§12101 *et seq.* Mr. Gerig suffers from a condition known as Seasonal Affective Disorder ("SAD"), a recognized type of depression that usually appears in late fall or early winter and goes away during the sunnier days of spring and summer. Its symptoms, if not treated, can include depression, lack of interest, low energy, sleeping difficulties, changes in appetite or weight, feelings of sluggishness, difficulty concentrating, feelings of hopelessness or worthlessness, and thoughts of death or suicide. SAD can be managed through a combination of medicine, exercise, light therapy and – most importantly – regular exposure to natural sunlight during the autumn and winter months.

1

Mr. Gerig began working as a full time employee at DU in February 2013. From 2013 to 2016, he was given offices with external windows, which accommodated his SAD. He also received uniformly positive reviews for his work. In July 2016, Mr. Gerig transferred to the Daniels College of Business ("Daniels"), where he began doing business and program development for the Office of Executive Education. His first year of work went well, and in June 2017, he received a positive comprehensive review known as the 360-Degree Feedback Report (the "Feedback Report").

When Mr. Gerig first transferred to Daniels, he was given an office with an external window.  In April 2017, however, as part of an office change, he was moved to an office without any external windows.  As a result, in August 2017, two months after the positive Feedback Report, Mr. Gerig asked for an accommodation of an office with a window to address his SAD. (An office with an external window was available.) His request for an accommodation was denied, and within ten days his previous positive review was ignored, and he began receiving highly unfavorable comments about his work, and constant negative reviews, all of which were designed to provide a pretextual basis for discharging him.  And discharge him DU did. On January 2, 2018, after three months of unfair and unwarranted attacks designed to create a paper trail, Mr. Gerig's supervisors fired him.

## PARTIES

1.     Mr. Gerig is a Colorado resident who resides in Arapahoe County, Colorado. Mr. Gerig was employed as a full-time employee by DU from February 2013 to January 2, 2018.

2.     DU is a Colorado nonprofit corporation with its principal place of business in the City and County of Denver, Colorado.

2

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States. *See* ADA, 42 U.S.C.A. §§12101 *et seq.*

4. This action is timely because Mr. Gerig was discharged by DU on January 2, 2018, and Mr. Gerig submitted the EEOC Intake Questionnaire to the EEOC on June 6, 2018, and his Charge of Discrimination to the EEOC on June 28, 2018. June 28, 2018 is less than 300 calendar days after his discriminatory discharge on January 2, 2018.

5. This action is also timely because the EEOC issued its Notice of Right to Sue letter to Mr. Gerig on March 8, 2019, and this action has been filed within ninety days of that date.

6. Venue in ADA cases is determined either by 42 U.S.C. § 2000e–5(f), or by 28 U.S.C.A. § 1391, and venue is proper in this judicial district under either provision. *See Chubb v. Union Pac. RR. Co.*, 908 F. Supp. 853, 854 (D. Colo. 1995) (discussing split in authority, but holding that § 2000e–5(f) was the governing provision); *Borchik v. Corelogic*, 2017 WL 4407926, at *3 (D. Colo. Apr. 24, 2017) (§ 2000e–5(f) is governing provision).

## FACTUAL ALLEGATIONS

7. Mr. Gerig incorporates by reference paragraphs 1 through 6, as if fully set forth in these factual allegations.

8. Mr. Gerig suffers from a disability known as "Seasonal Affective Disorder," or "SAD." As explained in the article "Seasonal Affective Disorder," by Norman E. Rosenthal, MD, et al., published in the Archives of General Psychiatry, Vol. 41, at pp. 72-80 (Jan. 1984), "Seasonal affective disorder (SAD) is a syndrome characterized by recurrent depressions that occur annually at the same time each year." The article noted that "[n]umerous investigators have shown a strong

association between the seasons and the incidence of depression, mania, and suicides and suicide attempts . . . ." *Id.* The article also identifies several other symptoms of the disability. *See, e.g., id.* at 73, Table 2.

9. Mr. Gerig began suffering symptoms from SAD as early as 1996, but he was first diagnosed with the disability by a psychiatrist in 2000. The psychiatrist who originally diagnosed Mr. Gerig, Dr. Norman Rosenthal, lives and practices on the east coast.

10. In 2007, Mr. Gerig, moved to Denver and has been treated for SAD by an internal medicine doctor at Kaiser Permanente. Since that time, Mr. Gerig has managed his SAD successfully through a combination of medicine, exercise, light therapy and – most importantly – regular exposure to natural sunlight during the autumn and winter months.

11. In May 2012, Mr. Gerig received his Masters of Arts Degree in Journalism and Mass Communication from the University of Colorado. The following year, in February 2013, Mr. Gerig accepted a full-time Public Relations position at DU, eventually transferring into DU's Marketing and Communications Department in July of 2013, where he worked until July 2016. During his time in the Marketing and Communications Department, he was given an office with an external window.

12. In July 2016, Mr. Gerig took a new job doing business and program development at the Daniels College of Business ("Daniels"), one of twelve graduate programs at DU. The Daniels building had multiple empty offices, in the Joy Burns Building, with external windows and Mr. Gerig was initially given an office with an external window that provided him with the requisite sunlight.

13. Because he had been given an office with an external window, Mr. Gerig did not raise the issue of his SAD initially with his supervisors at Daniels.

14. In April 2017, as part of an office change, Mr. Gerig was moved to an office without any external windows. At the time of the office change, the Daniels building had multiple empty offices with external windows that could have provided Mr. Gerig with the requisite sunlight. Those offices were similar (and close) to Mr. Gerig's new office except that his office did not have external windows.

15. From July 2016 through early August 2017, Mr. Gerig received good reviews and was well-regarded by his supervisors and co-workers.

16. On June 2, 2017, for example – slightly less than a year after he began working in Executive Education at Daniels – Mr. Gerig received a comprehensive review known as the 360-Degree Feedback Report (the "Feedback Report"). It evaluated his work performance in twelve categories ranging from "Principles," to "Effective Communicator" to "Critical Thinking."

17. Mr. Gerig received very solid ratings ranging to a low of 7.7 to a high of 8.7, for an overall range of 8.3. All twelve of Mr. Gerig's ratings fell into the upper half of the second to highest ranking of "Agree."

18. In August, 2017, everything changed. On or about August 18, 2017, Mr. Gerig requested an accommodation of an office with windows. The request was made to Kelsey Johnson, the Director of Executive Education at Daniels; and Kevin Cuthbert, Ms. Johnson's supervisor. Mr. Gerig's request stated:

> Kelsey and Kevin,
> I wanted to let you know that I've been struggling with cognitive energy, focus and sleep disturbances since moving into a windowless office [in late April]. I spoke with Kelsey briefly prior to the move, however, I did a poor job of advocating for

5

myself and my need for natural light. I was diagnosed with Seasonal Affective Disorder (biological sensitivity to diminished environmental light) at the age of 15, which is why I now live in Denver.

After discussing it with Jill more readily, I've ascertained that my current windowless office is not allowing me to fully maximize my potential at work, and I would like to partner with you both on a collaborative solution. Is there any way that I could request an office change to 304 - the unused adjunct space on this floor - or another possible space with a door and window. I do not want to displace any colleagues, and I want to honor the needs of everyone else, as well.

Please let me know your thoughts at your convenience.  Best, Ben

https//www.psychologytoday.com/blog/the-athletes-way/201306/exposure-natural-light-improves-workplace-performance.

19. On August 21, 2016, Mr. Cuthbert responded to Mr. Gerig's email, stating that "[w]e will look forward to talking about it when we are all back in the office at the same time."

20. A week later, on or about August 28, 2017, Mr. Gerig met with Ms. Johnson and Mr. Cuthbert. During that meeting, the accommodation request was raised; and Mr. Gerig explained the effect his SAD had on him, and how it could be addressed by providing natural light from an external window. The supervisors stated that they would "explore options" for addressing his disability.

21. The August 28 meeting was not a positive meeting.  Most of the August 28 meeting, (which Mr. Gerig had understood was to be about his SAD), instead focused on supposed work failures. Mr. Gerig received criticisms about such subjective criteria as being insufficiently curious - as an example Ms. Johnson said Mr. Gerig should ask questions about such things as "how do we think about building custom programs" and "how do we get a better understanding of the needs of client organizations." Mr. Gerig's supervisors also suddenly expressed concern about such things as the "need to clarify roles and streamline activities with Marketing and Operations." He was also attacked for preparing an "incorrect and insufficient SOW" [Scope of Work] for a client

6

named SendGrid. In a nutshell, the August 28 meeting was contrary to, and inconsistent with, the June 360 feedback report.

22. Most of the attacks were also unwarranted or overblown. For instance, the SendGrid matter was due to a simple misunderstanding that was quickly and easily corrected.

23. Despite the unfairness of the attacks at the August 28 meeting, Mr. Gerig's response to Mr. Cuthbert's summation of the meeting was upbeat and positive. Mr. Gerig acknowledged that the synopsis that was given "matches my understanding of the conversation." He then stated that he "look[ed] forward to showing more curiosity, getting SendGrid back on track and deploying the new 50/30/20 work focus breakdown ...."

24. Mr. Gerig's efforts to respond to the criticisms and return to a good working relationship with his supervisors were futile. Both Mr. Cuthbert and Ms. Johnson began to display a marked difference in their treatment of him, and he felt as though his work environment had suddenly become hostile.

25. Mr. Gerig also was retaliated against in numerous ways, both in his day-to-day treatment and his ongoing supervision. For instance, his supervisors (particularly Ms. Johnson) would hand Mr. Gerig specific emails and documents that, on an almost weekly basis, changed his job performance duties and expectations.

26. Additionally, Ms. Johnson asked Mr. Gerig repeatedly if he had "thought carefully about whether or not [he] should be doing this work," and reiterated multiple times that he should "think really hard if this is the right job for [him]."

27. When confronted with these attacks, Mr. Gerig responded, "I like my job, I'm good at my job, and I want to stay at my job." After Mr. Gerig articulated this position to both Mr.

Cuthbert and Ms. Johnson – that he wanted to keep and improve in the job he had, not move to another job – Mr. Cuthbert agreed that he and Ms. Johnson would refrain from asking Mr. Gerig if he "really wanted to work in [his] role," any longer.  Despite this promise, however, Mr. Cuthbert and Ms. Johnson continued to badger Mr. Gerig week after week, asking him repeatedly to "think hard about if this is the role for [him]."

28.     Mr. Gerig's request for an office with an external window, a simple accommodation, was officially denied on or about September 11, 2017. The reason given was because of the supposed possibility that it might generate feelings of separation from the team. Ms. Johnson offered to obtain a small light box for Mr. Gerig's office. Ms. Johnson also said he could work in the conference room when it was not in use.

29.     On September 18, 2017, the light box arrived and Mr. Gerig began using it. Unfortunately, the light box did not provide sufficient light, and thus it made little or no impact on Mr. Gerig's SAD. Mr. Gerig communicated this fact to both Mr. Cuthbert and Ms. Johnson.

30.     Because he started work at Daniels in July 2016, Mr. Gerig was supposed to receive his formal yearly performance review in early August 2017.  For some reason, Mr. Gerig did not receive his yearly review until October 2, 2017, well after his request for an accommodation.  The belated review was scathing.  He was given an Improvement Required rating.

31.     On October 5, 2017, Mr. Gerig met with Ms. Johnson for a weekly one-on-one. At that meeting, Mr. Gerig asked Ms. Johnson for permission to paint an accent wall in his office to improve the light quality. Ms. Johnson instructed Mr. Gerig to contact Lloyd Moore in Human Resources.  Mr. Gerig contacted HR the same day, by sending a meeting request to Rufina

Hernandez, in accordance with the instructions in the University's Employee Handbook. Mr. Gerig also sent his request for a meeting with Ms. Hernandez to Ms. Johnson.

32. On October 6, 2017, Mr. Gerig met with Mr. Cuthbert and Ms. Johnson. At that meeting, Mr. Gerig told them that since he had requested an accommodation because of his SAD, made on August 18, 2017, he had experienced increasing levels of retaliation. When Mr. Cuthbert requested examples, Mr. Gerig gave him several including: his poor performance review, a denial of his reasonable office change request; not being permitted to attend Corporate Partners meetings any longer; not being allowed to attend the annual CMED conference in November; and not being allowed to complete his Team-Building event planning commitments to the Executive Education team.

33. Mr. Cuthbert did not deny that Mr. Gerig was correctly interpreting his experiences. Indeed, Mr. Cuthbert stated that he could see how the events Mr. Gerig described "would feel like retaliation." Nonetheless, he did not offer or agree to take steps to end the retaliation against Mr. Gerig.

34. Shortly thereafter, Mr. Gerig met with HR. At that meeting, he was told that he needed to submit, with his request for accommodation, an ADA Physician Questionnaire document.

35. On or about October 9, 2017, HR sent Mr. Gerig the Physician Questionnaire documents, which he submitted to two of his doctors (an Optometrist and a Physician).

36. On October 17, 2017, Mr. Gerig returned the two Physician Questionnaires to HR. In the first, Mr. Gerig's Internal Medicine Doctor, identified the following:

- Impairment—Seasonal Affective Disorder

- Major Life Activity substantially limited—Concentrating
- Suggested accommodation: "Office with window/natural light"

37. The second doctor, his Optometrist, stated the following:

- Impairment—Severe Visual Impairment in the right eye
- Major Life Activity substantially limited—Seeing
- Suggested accommodation: "Sufficient light needed and possibly larger monitor."

38. On October 23, 2017, HR spoke with Ms. Johnson who still refused to grant the requested accommodation. Subsequently, HR began aggressively demanding information from Mr. Gerig, including copies of the Physician Questionnaire document and evidence that a major life function was impacted.

39. After Mr. Gerig provided the demanded documents and information, HR scheduled an in-person meeting with Mr. Gerig, Ms. Johnson, and Mr. Cuthbert, to discuss the possibility of a reasonable accommodation. At that meeting, HR took the side of Mr. Gerig's supervisors. Lloyd Moore, the HR Director of Benefits for DU was particularly hostile, haranguing Mr. Gerig about whether he could perform his job responsibilities with or without an accommodation; and what "major life functions" he was claiming were adversely impacted by no access to natural light. At the end of the meeting, HR said it would contact Mr. Gerig about a subsequent meeting.

40. Mr. Gerig found it hard to comprehend why such a fuss was being made about his request for an accommodation. All he was asking for was to move to an empty office with a window that was near the office he had been assigned.

41. On November 9, 2017, Mr. Gerig met yet again with HR, Mr. Cuthbert, and Ms. Johnson to discuss his SAD, and his request for a reasonable accommodation.

42. On November 13, 2017, four months after Mr. Gerig first requested a reasonable accommodation – an office with an external window – his request was finally granted and he was permitted to move to the vacant office he had requested.

43. Mr. Gerig quickly learned that winning the reasonable accommodation battle was different than winning the employment war. Three days after he was granted the requested accommodation, on November 16, 2017, he was supposed to have a meeting with Ms. Johnson. Instead, she took him to a surprise meeting with her and Mr. Cuthbert in his office.

44. In that meeting, Mr. Cuthbert informed Mr. Gerig that he (Mr. Cuthbert) did not think Mr. Gerig's job was a good fit for him and Mr. Cuthbert wanted Mr. Gerig to think harder about whether he wanted to be there. After Mr. Gerig explained that he liked his job and wanted to continue working, Mr. Cuthbert and Ms. Johnson proceeded to threaten Mr. Gerig with termination in January of 2018.

45. Mr. Cuthbert and Ms. Johnson then proposed an alternative: to have Mr. Gerig take a "buy out" through HR to leave immediately but be paid through Dec. 2017. Mr. Gerig rejected this offer and again indicated that he wanted to stay in his job and perform it to the best of his ability.

46. Mr. Cuthbert and Ms. Johnson responded by giving Mr. Gerig two choices: take a "negotiated resignation" or continue on and the issue would be revisited in January 2018. The supervisors left little doubt about what would occur when the issue was revisited: Mr. Gerig would be discharged.

11

47. Mr. Gerig left the meeting shaken and unclear about the appropriate way to have a transparent performance analysis (and performance improvement, if one were needed). He was a productive and valuable employee until his supervisors, for some unknown reason, reacted badly to his request for a simple accommodation. After Mr. Gerig was finally granted the requested accommodation, four months after it was requested, his supervisors' hostility increased exponentially, and they essentially told him to quit (with six week's severance and no unemployment) or get fired.

48. Mr. Gerig did not want to quit. He loved the work he was doing, and he needed the job to take care of himself and his wife.

49. Not knowing what to do, Mr. Gerig continued to work hard at his job and keep his head down to avoid angering his supervisors.

50. His efforts did not work. Approximately three weeks later, on or about December 6, 2017, Mr. Gerig was given a four paged, single spaced "Final Written Warning."

51. Mr. Gerig requested a meeting on December 11, 2017, to discuss the document he had been given. At the meeting, he provided a memorandum that rebutted the criticisms made about him. The rebuttal fell on deaf ears.

52. On December 22, 2017, Mr. Gerig requested an investigation into discrimination by DU's Equal Opportunity Office, through Rufina Hernandez.

53. Eleven days later, on the morning of January 2, 2018, Mr. Gerig was fired at a surprise meeting with Mr. Cuthbert, Ms. Johnson and a DU HR representative. In the three and a half months following his request for an accommodation, Mr. Gerig was discriminated, harassed, and retaliated against, going from a valued and performing employee to a discharged one.

**FIRST CLAIM FOR RELIEF**
**(Violation of the ADA, 42 U.S.C.A. §§12101 *et seq.*)**

54. Mr. Gerig incorporates by reference the allegations set forth in paragraphs 1 through 53 as if fully set forth in this Claim for Relief.

55. Mr. Gerig is an individual who suffers from a disability, as that term is defined in 42 U.S.C. § 12102, in that he suffers from SAD.

56. SAD is a physical or mental impairment that substantially limits one or more major life activities, including concentrating.

57. DU is an employer, as that term is defined in 42 U.S.C. § 12111(5)(A), with, upon information and belief, more than 500 employees.

58. The ADA, 42 U.S.C.A. §12112(a) provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

59. The allegations set forth in this Complaint allege a prima facie case of disability discrimination in that they allege and show that:

   a. Mr. Gerig is a disabled person, as defined by the ADA;
   b. Mr. Gerig was qualified, with reasonable accommodation, to perform the essential functions of the job he held;
   c. Mr. Gerig suffered discrimination by DU because of his disability in that he was harassed and discriminated against, and then discharged.

60. DU's discrimination against, and harassment of, Mr. Gerig was intentional.

61. Because of DU's discrimination and harassment, Mr. Gerig suffered economic and compensatory damages, including emotional distress damages, in an amount to be proven at trial.

62. Mr. Gerig is also entitled to punitive damages for DU's malicious or reckless act of discrimination and harassment against him.

## SECOND CLAIM FOR RELIEF
**(Retaliation for Exercising Rights Under the ADA, 42 U.S.C.A. §§12101 *et seq.*)**

63. Mr. Gerig incorporates by reference the allegations set forth in paragraphs 1 through 62 as if fully set forth in this Claim for Relief.

64. Mr. Gerig engaged in protected actions in seeking an accommodation because of his disability, in refusing to quit his job, and in requesting an investigation into discrimination by DU's Equal Opportunity Office.

65. As set forth above, almost immediately after his protected activity, DU subjected Mr. Gerig to severe adverse employment actions, ending in his discharge.

66. The adverse employment actions by DU were causally connected and due to Mr. Gerig's protected actions.

67. DU's adverse employment actions were intentional.

68. Because of DU's retaliation, Mr. Gerig suffered economic and compensatory damages, including emotional distress damages, in an amount to be proven at trial.

69. Mr. Gerig is also entitled to punitive damages because DU's retaliatory acts were malicious or reckless.

70. Mr. Gerig has also suffered damages for which equitable relief is available. The nature or amount of such equitable relief is to be proven at trial.

## JURY DEMAND

Mr. Gerig demands a jury trial on all claims or issues so triable.

## PRAYER FOR RELIEF

ACCORDINGLY, Mr. Gerig requests judgment in his favor, and against DU for the following:

A. Back pay, including but not limited to wages, salaries, bonuses, and benefits, to be adjusted for tax consequences of receiving a lump-sum back pay in a single year;

B. Reinstatement and restoration of benefits;

C. Front pay;

D. Compensatory damages recoverable under the ADA;

E. Pre- and post-judgment interest at the statutory rate;

F. Under the ADA, costs, expenses, and attorney fees incurred in connection with this action;

G. Punitive damages;

H. Equitable relief, not otherwise requested in this Prayer for Relief;

I. Affirmative relief such as expunging adverse material from Mr. Gerig's personnel files, and providing positive letters of recommendation; and

J. Such other and further relief as this Court deems just and proper.

Respectfully submitted this 27th day of March, 2019.

ANDERSON BARKLEY, LLC

*A duly signed copy is on file at the offices of Anderson Barkley, LLC*

s/ Jeanine M. Anderson
*Jeanine M. Anderson*
Anderson Barkley, LLC

3900 E. Mexico Ave., Suite 300
Denver, CO 80210
(720) 506-1766
Jeanine@AndersonBarkleyLaw.com
Attorney for Plaintiff


s/ Richard P. Barkley
*Richard P. Barkley*
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, CO 80210
(720) 506-1767
richardbarkleylaw@comcast.net
Attorney for Plaintiff

16