**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00914-CMA-KLM

BENJAMIN L. GERIG,

Plaintiff,

v.

UNIVERSITY OF DENVER,

Defendant.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant University of Denver ("DU"), through its attorneys Constangy, Brooks, Smith & Prophete, LLP, hereby moves for summary judgment on all of the Plaintiff Benjamin L. Gerig's ("Plaintiff") claims.

## I. STATEMENT OF UNDISPUTED MATERIAL FACTS

1. DU hired Gerig into a full-time Public Relations position in February of 2013. Compl., ¶11; Movant's Appendix ("Mov. App.) p.153.

2. Gerig worked for DU in a number of different capacities before he transferred to the Executive Education Department within DU's Daniels College of Business in or around June of 2016 and began working as a Program Developer. *E.g.*, Compl., (Dkt. 4), ¶12; Mov. App. p.2-Plaintiff ("Pl.") Depo., at 51:12-15, 52:18-25.

3. As a Program Developer, Gerig's job responsibilities included generating business for the Executive Education Department, selling custom programs, and meeting sales goals. *E.g.*, Mov. App. pp.79-81; Mov. App. pp.3-4-Pl. Depo., at 69:9-70:8.

4. Kelsey Johnson, the Director of Executive Education, was Gerig's supervisor. Johnson reported to Kevin Cuthbert, the Assistant Dean for Education. Mov. App. p.5-Pl. Depo., at 94:22-95:18; Mov. App. pp.32-35, Kelsey Johnson ("KJ") Depo., at 20:15-22, 28:15-29:14, 37:23-38:4.

5. By March or April of 2017, Johnson believed that Gerig was not happy working in Executive Education and that he was looking for other jobs. Mov. App. p.55-KJ Depo., at 249:13-250:11; *see also* Mov. App. pp.19-21-Pl. Depo., at 234:18-235:16, 235:25-237:7, 237:23-242:13; Mov. App. pp.133-134; Mov. App. p.135.

6. On June 3, 2017, Gerig applied for a Director of Alumni Engagement position in DU's Morgridge College of Education. Mov. App. p.135; *see also* Mov. App. pp.19-20-Pl. Depo., at 237:21-241:22.

7. In June of 2017, Gerig received a 360-degree feedback report as part of the leadership development program in which he had enrolled at DU. The 360-degree feedback report was not a performance review, but instead primarily evaluated Gerig's interpersonal and leadership skills. In the feedback report, Gerig's performance was evaluated anonymously by both his peers and his supervisors. *E.g.*, Compl., ¶16; Mov. App. p.55-KJ Depo., at 250:12-251:16; Mov. App. pp.81-106; Mov. App., p.63–Kevin Cuthbert ("KC") Depo.,at 93:7-95:1; Mov. App. p.6-Pl. Depo., at 102:1-105:7.

8. The feedback that Gerig received in this 360-degree feedback report included the following:

a. "Since Ben is somewhat new to this role, it is not yet 100% clear if he sees this work as truly his passion and purpose. Some investigation into why this work is

meaningful to him and identification of how it helps fulfill his personal and professional purpose could be very helpful."

b. "Now that he's more familiar with how programs are built, etc. it would be beneficial for our clients and the team if her took a bit more of an active role in bringing faculty and program managers together to get a program off the ground."

c. "He operates on his own most of the time so the rest of the team doesn't always know what he's doing, his challenges or where he needs help." Mov. App. pp.81-106.

9. In late July or early August of 2017, Sodaro, Johnson, and Cuthbert met and discussed ongoing problems with Gerig's performance. Mov. App. p.78-Ashley Sodaro ("AS") 9/22 Depo., at 33:2-35:10; Mov. App. p.76-AS 7/20 Depo., at 162:17-163:22; Mov. App., pp.61, 70-71–KC Depo., at 69:4-21, 184:21-185:3; *see also* Mov. App. p.54-KJ Depo., at 247:2-248:15.

10. Gerig continued to apply for other positions at DU. On August 4, 2017, he submitted an application for an Assistant Director of Hospitality position within DU's Fritz Knoebel School of Hospitality. Mov. App. p.135; Mov. App. pp.19-20-Pl. Depo., at 237:21:241:22.

11. On August 18, 2017, Gerig emailed Johnson and Cuthbert and disclosed for the first time that he had seasonal affective disorder. He stated that he had done a "poor job of advocating for [him]self and [his] need for natural light," but explained that he believed that his current windowless office was not allowing him to maximize his potential. He asked whether he could request to move to office 304, which was located in adjunct space

on the floor. He noted that he did not want to "displace" any of his colleagues and wanted to honor everyone else's needs. Mov. App. p.136.

12. Office 304 was outside the suite where the Executive Education team worked. *E.g.*, Mov. App. p.39-KJ Depo., at 120:2-15; Mov. App. p.22-Pl. Depo., at 251:10-252:9.

13. On August 21, 2017, Cuthbert responded that he was sorry to hear about the disturbances that Gerig was experiencing and that he and Johnson looked forward to talking with Gerig once they were all back in the office. Mov. App. p.136; *see also* Mov. App., pp.64-65-KC Depo., at 100:14-101:8.

14. On August 22, 2017, Cuthbert reviewed a proposal that Gerig drafted for the company SendGrid and identified a number of problems with it. Cuthbert stated that he was "very confused" by Gerig's proposal, as SendGrid had requested a leadership development program for their high-achieving employees whom the company believed could be future senior leaders, while Gerig had prepared a proposal designed to address a dysfunctional executive leadership team. Mov. App. pp.112-115; Mov. App. pp.7-8-Pl. Depo., at 161:7-167:25; Mov. App., pp.65-66, 72-74–KC Depo., at 104:4-8, 105:10-16, 242:14-243:5, 243:25-244:25, 288:4-289:25. These errors were so egregious---particularly given how long Gerig had been in his role--that Cuthbert testified that they might have resulted in Gerig's immediate termination had he worked for a different organization. Mov. App., pp.73-74-KC Depo., at 288:4-289:25 (explaining that Gerig's proposal indicated that Gerig had learned almost nothing about even the basics of Executive Education's work).

15. Once Johnson had returned from vacation, she, Cuthbert, and Gerig met on or

around August 28, 2017 and discussed Gerig's office change request. Because the office Gerig was requesting was located outside the Executive Education's office suite, they discussed whether there were any possible alternative options that could address Gerig's condition. *E.g.*, Mov. App. pp.137-145; Mov. App. pp.42-47-KJ Depo., at 131:1-133:14, 146:14-152:5, 154:18-158:2; *see also* Mov. App. pp.24-25-Pl. Depo., at 259:1-263:14; Mov. App., pp.66-69–KC Depo., at 120:17-126:8.

16. During this meeting, Johnson also expressed her surprise at Gerig's request because her understanding up until that point had been that he was unhappy in Executive Education and that he was seeking other jobs. Mov. App. pp.44-45-KJ Depo., at 146:6-151:4; *see also* Mov. App. pp.19-20-Pl. Depo., at 237:21:241:22; Mov. App. pp.137-145.

17. Gerig responded that he was "recommitting" to his work in Executive Education. Johnson and Cuthbert then discussed the errors in Gerig's SendGrid proposal, and the need for Gerig to express more curiosity and better understand the needs of their clients. They also discussed their expectation that he devote at least 50% of his time to targeting business with new clients, with a target of setting up four meetings each month with new companies. *See, e.g.*, Mov. App. pp.137-145; Mov. App. pp.44-45-KJ Depo., at 146:17-149:10; Mov. App., pp.60-62 –KC Depo., at 67:11-69:3, 70:17-73:9; Mov. App. p.116.

18. That same day, Johnson emailed Gerig and again explained her expectations regarding how he should allocate his time. She also requested that he provide any of his proposals containing pricing information to her for her review before he sent them out to clients. Mov. App. p.116; Mov. App. pp.36-38-KJ Depo., at 68:19-73:16

19. Gerig and Johnson subsequently discussed his seasonal affective disorder in more

detail, as well as possible alternatives that could help with his condition but would not involve him relocating to an office outside of the Executive Education Office suite, and away from the team. The possible alternatives they discussed included moving Gerig to a cubicle space that was near a large window, allowing him to take breaks during the day to go outside, and allowing him to work out of a conference room (which had a window) within the office suite, or in Johnson or Cuthbert's offices when they were available. Gerig proposed instead to have Johnson purchase a sunlight lamp for him. Mov. App. pp.40-43, 47-49-KJ Depo., at 124:10-127:5, 132:21-133:14, 160:2-166:3; Mov. App. pp.23-25-Pl. Depo., at 254:17-263:14; Mov. App. pp.137-145, at 2-3; Mov. App. pp.183-184.

20. Johnson agreed, and on September 11, 2017, Gerig emailed her a link to a sunlight lamp that he had selected. Johnson ordered it the next day, and Gerig began using it when it arrived shortly thereafter. Mov. App. p.49-KJ Depo., at 166:5-167:22; Mov. App. p.25-Pl. Depo., at 263:3-14; Mov. App. pp.180-181.

21. On September 25, 2017, Cuthbert emailed Molly Rossi from DU's Human Resources Department to detail Gerig's ongoing performance issues and the fact that he was not improving. Mov. App. p.185.

22. In October of 2017, Johnson and Cuthbert began discussing whether they should offer Gerig a negotiated resignation, as he was not improving despite having been provided with specific expectations regarding his performance and the number of meetings that he needed to set up each month. Mov. App. p.50-KJ Depo., at 213:1-214:25.

23. In early October of 2017, Gerig received his annual performance review, in which

Johnson rated his overall performance as "Improvement Required." In the review, Johnson provided the following comments:

a. "I have found that there are still some areas of the business where I don't feel confident that [Gerig] has the knowledge to succeed in this position."

b. "I do sometimes struggle to understand [Gerig's] idea or thoughts on a subject and I am concerned that his communication to clients is not always clear when he is trying to sell them on our capabilities."

c. "Overall, I do not think that [Gerig] is a good fit for this position. We need someone in this role who is able to secure multiple meetings a month with new potential clients and who can turn those initial meetings into revenue generating programs."

d. "At the end of August, I asked [Gerig] to be more focused on business development and to spend 50% of his time getting at least 4 meetings with new companies. 1 out of 4 of these meetings happened in September."

Mov. App. pp.107-111; Mov. App. p.52-KJ Depo., at 223:9-12.

24. Following the performance evaluation, Johnson began working with Cristina Valencia in DU's Human Resources Department regarding how best to manage Gerig's ongoing performance problems. Mov. App. pp.51-53-KJ Depo., at 219:7-225:5.

25. Valencia recommended that Johnson and Cuthbert increase the number of conversations and meetings they were having with Gerig regarding his performance, as well as continuing to document with specificity the errors he was making and his failure to meet performance metrics. Mov. App. pp.51-53-KJ Depo., at 219:7-225:5.

26. On October 5, 2017, Johnson provided Gerig with more detailed expectations regarding his business development efforts. She stated that, on October 8, 2017, he needed to begin having two meetings (whether in person or over the phone) per week with new companies or prospects, and ensure that he was logging his communications with prospective clients in the Salesforce system. *E.g.*, Mov. App. p.148; *see also* Mov. App. p.10-Pl. Depo., at 179:7-180:22.

27. On October 9, 2017, Gerig again pursued a potential exit from his position with Executive Education and submitted an application for a Director of Development position within DU's Advancement Department. Mov. App. p.135; Mov. App. pp.19-20-Pl. Depo., at 237:21-241:22.

28. On October 5, 2017, Gerig contacted Rufina Hernandez, the Interim Director of Equal Opportunity, asking to meet with her to request information regarding accommodations under the ADA. Mov. App. pp.164-166.

29. After meeting with Gerig, Hernandez asked Lloyd Moore, the Director of Benefits Compliance and Operations, on October 10, 2017 to provide Gerig with information regarding disability accommodations. Mov. App. p.164. That same day, Moore sent Gerig his ADA rights and responsibilities, as well as copies of the paperwork that Gerig would need to submit. Mov. App. pp.163-164.

30. In mid-October, Gerig's physicians submitted three sets of paperwork in support of Gerig's request for accommodations. *See* Mov. App. pp.154-160.

31. In the first set of paperwork, Gerig's physician wrote "N/A" in the section where he was asked to indicate which of Gerig's major life activities were affected by his seasonal

affective disorder. Mov. App. pp.155-156. In the second set of paperwork, Gerig's physician wrote that Gerig's seasonal affective disorder affected his ability to concentrate, and the physician suggested the accommodation of providing Gerig with an office with a window or natural light. Mov. App. pp.157-158. In the final set of paperwork, Gerig's physician wrote that Gerig had a severe visual impairment in his right eye and suggested the accommodation of providing Gerig with sufficient light and possibly a larger monitor. Mov. App. pp.159-160; *see also* Mov. App. pp.26-27-Pl. Depo., at 266:5-272:17.

32. Moore and Elizabeth Cha, the Benefits Program Manager, set up a phone conference with Gerig on October 24, 2017 to discuss his accommodation request. Mov. App. p.186.

33. On November 5, 2017, Gerig applied for a Director of Development position with DU's Graduate School of Social Work. Mov. App. pp.133-134.

34. On November 9, 2017, Gerig met with Johnson, Cuthbert, Moore, and Cha to discuss his accommodation request. *E.g.*, Compl., ¶41; Mov. App. p.28-Pl. Depo., at 274:2-8.

35. The next day, Johnson and Cuthbert approved Gerig's request to move to office 304. *E.g.*, Mov. App. p.175.

36. Gerig emailed Moore and Cha to thank them for facilitating the interactive process and to let them know that he had been granted his requested accommodation of moving to office 304. Mov. App. p.162; Mov. App. p.28-Pl. Depo., at 275:18-276:16; *see also* Mov. App. p.161.

37. Despite having requested (and received) this accommodation, Gerig testified that

there were no aspects of his job that he was unable to perform as the result of his condition, even during the time period in which he had not yet been provided with an office with a window. Mov. App. pp.25, 30-Pl. Depo., at 264:19-265:11, 303:16-304:1.

38. On November 10, 2017, Johnson emailed Gerig and noted that he was still not meeting his performance goal regarding setting up meetings with new companies. Mov. App. pp.117-118; *see also* Mov. App. pp.10-12-Pl. Depo., at 181:25-188:12.

39. On November 16, 2017, Cuthbert emailed Valencia to provide an update on Gerig's performance, explaining that he did not believe that Gerig was picking up on important parts of the job and that Gerig was continuing to make mistakes in areas for which he had already received coaching. Cuthbert noted that they had discussed with Gerig the possibility of a negotiated resignation, but Gerig wanted to continue "working the plan." Mov. App. p.146; *see also* Mov. App. pp.57-58-KJ Depo., at 302:24-305:3; *see also* Mov. App. p.182.

40. On December 5, 2017, Johnson provided Gerig with a Final Written Warning, detailing Gerig's failure to meet the specific performance expectations that had been previously detailed for him. This included his failure to fulfill the expectations regarding the number of meetings he needed to schedule with new companies, despite Johnson and Cuthbert's active coaching. The Final Warning states:

> Despite [Cuthbert] and my repeated efforts to help you succeed, you continue to fail in meeting the job expectations for your position. The consequences have been verbal feedback, written performance feedback, and the implementation of progress tracking and plans. This is your final warning and you are expected to immediately comply with these performance expectations. A failure to do so may result in further discipline, up to and including termination.

Mov. App. pp.119-122; *see also* Mov. App. pp.13-15-Pl. Depo., at 207:18-216:1.

41. On December 11, 2017, Gerig emailed Hernandez to request another meeting with her about his rights under the ADA. Hernandez offered to meet later that same week. Mov. App. p.167.

42. Also on December 11, 2017, Johnson emailed Cuthbert to let him know that, contrary to their explicit directives, Gerig had not had meetings with any new companies in the past two weeks. Mov. App. p.123; *see also* Mov. App. pp.15-16-Pl. Depo., at 216:2-220:22.

43. On December 14, 2017, Johnson documented additional problems that had arisen with Gerig's performance after he had been provided with the Final Warning. She noted that, in addition to Gerig's failure to set up any meetings with new organizations from November 27 to December 8, 2017, Gerig had also recently provided a draft of a proposal for Enterprise which was confusing and contained several fundamental problems. For example, while Enterprise had requested a proposal for two different programs for two different levels of employees, Gerig's proposal was drafted as if there were only going to be one program. Gerig also reported having recently sent a different proposal to a client without having it first reviewed by Cuthbert or Johnson. The proposal Gerig sent out contained a number of typos and incorrect pricing information. Johnson explained that Gerig's recent mistakes could negatively impact the Department's reputation and result possible revenue loss. Mov. App. p.130; Mov. App. p.56-KJ Depo., at 286:22-288:25; *see also* Mov. App. pp.15-17, 18-Pl. Depo., at 216:2-225:5 (admitting that he failed to send the proposal to his supervisors before providing it to the client), 227:3-228:16.

44. On December 15, 2017, Cuthbert emailed Gerig regarding Gerig's Enterprise draft proposal. Cuthbert stated he was "surprised that [Gerig's] first draft did not contain hardly anything that was reflective of the conversation with [the client] earlier in the week," and that he hoped Gerig's next draft would reflect improvements. Mov. App. p.131.

45. On December 22, 2017, Gerig emailed Hernandez to request an investigation into Johnson and Cuthbert's alleged discrimination. Mov. App. pp.168-169.

46. Herandez emailed Gerig on January 2, 2018 and informed him that they would proceed with the investigation now that everyone had returned from break. She assigned Maria DeHowitt as the investigator. Mov. App. p.168.

47. Due to Gerig's continued failure to improve his performance and meet the detailed expectations that had been provided to him in the Final Written Warning, Johnson, Cuthbert, and Valencia met with Gerig on January 2, 2018 and terminated his employment. Compl., ¶52; Mov. App. p.132.

48. After Gerig's termination, DU continued its investigation into his complaint of discrimination. *E.g.*, Mov. App. pp.170-172; Mov. App. p.174.

49. On January 25, 2018, before DU concluded its investigation, Gerig submitted an internal grievance. He directed it to Cuthbert. In his grievance, he restated his allegations of discrimination and retaliation and requested to have his employee designation changed from "terminated" to "resigned," as well as help finding reassignment to a comparable position at DU. Mov. App. pp.176-177.

50. Cuthbert responded that he was no longer a DU employee, so he was forwarding Gerig's grievance to Johnson and Yee-Ann Cho, the Associate Dean and Chief Operating

Officer at the Daniels College of Business. Mov. App. p.178.

51. On January 26, 2018, Hernandez emailed Gerig to confirm that, at his request, they were closing his Equal Opportunity complaint, as he had elected to pursue a grievance instead. Hernandez stated that Gerig was free to reopen the complaint process at any time. Mov. App. p.173; Mov. App. p.29-Pl. Depo., at 297:1-25.

52. On February 5, 2018, Cho provided a response to Gerig's grievance. As detailed in DU's Employee Handbook, Cho explained that Gerig's allegations of discrimination and retaliation could be investigated only by DU's Office of Equal Opportunity through the complaint procedures Gerig had originally pursued but then voluntarily withdrawn. Nevertheless, she explained that Gerig's performance history confirmed that he had been coached regarding his performance verbally and in writing on numerous occasions, and that he had received an Improvement Required performance evaluation and a Final Written Warning. Nevertheless, she stated that DU would be willing to change his separation code from "terminated" to "resigned," and suggested that he follow DU's guidelines should he wish to continue the grievance process. Mov. App. p.179.

## II. ARGUMENT AND AUTHORITIES

### A. Summary Judgment Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). The Court must view the evidence in the light most favorable to the non-moving party. *Id.* at 839-40. However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). Where, as here, the movant does not bear the ultimate burden of persuasion at trial, the movant does not need to disprove the other party's claim. *Id.* Instead, the movant need simply point to a lack of evidence for the other party on an essential element of that party's claim. *Id.* Once the movant has met its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *Id.* The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* The nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.*

### B. Gerig's ADA Discrimination Claim Fails Because He Cannot Establish That DU's Legitimate, Non-Discriminatory Reason for Terminating Him Was Pretextual.

In the absence of direct evidence of discrimination, a prima facie case of ADA discriminatory discharge requires the plaintiff to show that: (1) he is a disabled person within the meaning of the ADA; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) his employer terminated his

employment under circumstances giving rise to an inference that the action was based on his disability. *See, e.g., Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1191-92 (10th Cir. 2018); *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1259 (10th Cir. 2001).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the termination. *E.g.*, *Selenke*, 248 F.3d at 1259. The burden is "exceedingly light." *See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997). If the defendant articulates a legitimate reason for the termination, establishing a prima facie case is not sufficient to avoid summary judgment. *Selenke*, 248 F.3d at 1260. Instead, the plaintiff must then offer evidence demonstrating that the defendant's proffered reason is a pretext for discrimination. *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1397 (10th Cir. 1997). "[A] plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'" *See, e.g.*, *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (alteration in original).

When evaluating pretext, the Court assesses the facts "as they appear to the person making the decision to terminate [the] plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). The Court may not second guess the employer's business judgment. *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015). The relevant question is whether the reason given by the employer was the real reason for the termination. *Selenke*, 248 F.3d at 1261.

Even assuming that Gerig could establish a prima facie case of disability

discrimination, his claim would nevertheless fail because he cannot establish that DU's legitimate, non-discriminatory reason for terminating him due to his extensively documented pattern of poor performance was pretextual. As an initial matter, Gerig cannot dispute that his supervisors had begun discussing problems with his performance *before* he ever requested an accommodation. Specifically, in late July or early August of 2017, Cuthbert met with Johnson and Sodaro to discuss an ongoing problem with Gerig's performance. *E.g.*, Mov. App. p.76-AS 7/20 Depo., at 162:17-163:22; Mov. App. p.78-AS 9/22 Depo., at 33:2-34:7; Mov. App., p.61–KC Depo., at 69:4-21. Gerig did not request an accommodation until August 18, 2017, weeks after Cuthbert had already expressed concerns about Gerig's underperformance. Mov. App. p.152; *see also McWilliams v. Jefferson Cty*., 463 F.3d 1113, 1117 (10th Cir. 2006) ("A causal connection between Plaintiff's exercise of FMLA leaves and her eventual termination is not supported by the record. The County's stated reason for Plaintiff's termination . . . is documented beginning . . . (two years prior to Plaintiff's extended FMLA leaves.").

Further, after having identified problems with Gerig's performance, his supervisors provided him with detailed written feedback over the course of several months and gave him every opportunity to improve. On August 28, 2017, Johnson detailed for Gerig her specific expectations regarding his business development efforts, including the exact minimum number of meetings that he needed to schedule with new companies each month. She also stated that he needed to submit his proposals for her review before sending them out to clients. Mov. App. p.116; Mov. App. pp.36-38-KJ Depo., at 68:19-73:13. During this same time period, Gerig also received coaching from Cuthbert after

Cuthbert identified egregious mistakes in a proposal that Gerig had submitted for his review. Mov. App. pp.112-115; Mov. App. pp.7-9-Pl. Depo., at 161:7-167:25; Mov. App., pp.65-66, 72-74–KC Depo., at 104:4-8, 105:10-16, 242:14-243:5, 243:25-244:25, 288:4-289:25.

Despite receiving this extensive feedback, Gerig did not improve his performance. For example, while Johnson told Gerig in writing on August 28, 2017 that he was expected to schedule at least four meetings with new companies each month, Gerig scheduled only one such meeting for the entirety of the following month. *See, e.g.*, Mov. App., at 110; Mov. App. pp.11-12-Pl. Depo., at 182:8-188:12 (Gerig unable to offer any evidence to dispute Johnson's statement that he met with only one company in September of 2017); *see also* Mov. App. pp.117-118. Johnson explicitly noted Gerig's failure to meet this expectation in the Improvement Required performance review that she gave to Gerig in October of 2017. Mov. App. pp.107-111. Neither Johnson's feedback nor the negative performance rating he received in his annual review spurred Gerig to begin improving his performance and meeting his supervisors' expectations. From November 27, 2017 through December 8, 2017, Gerig did not document a single meeting with a new company. *E.g.*, Mov. App. p.130; Mov. App. pp.15-16-Pl. Depo., at 216:2-218:23. Given Gerig's lack of improvement despite the clarity with which his managers' expectations had been communicated to him, Johnson issued Gerig a Final Written Warning on December 5, 2017. Mov. App. pp.119-122. In the Final Warning, Johnson explained that Gerig was at risk of being terminated if he did not immediately comply with the expectations she detailed in the document, including the requirement that he set up two meetings with new

organizations per week and submit his client proposals (which needed to be at least 95% accurate) to her or Cuthbert for their review before sending them out to clients. *Id.*, at 122.

Gerig's performance only declined after he received the Final Written Warning. In addition to failing to document any meetings with new companies from December 4, 2017 through December 8, 2017, Gerig informed Johnson on December 14, 2017 that he had also sent out a proposal to a client without having her or Cuthbert review it first, in direct violation of the expectations that had been given to him roughly a week beforehand in the Final Written Warning. The proposal he sent to the client without any review contained a number of typos and, worse still, incorrect pricing information. Mov. App. p.130; Mov. App. p.56-KJ Depo., at 286:22-288:25; *see also* Mov. App. p.17-Pl. Depo., at 223:8-225:5. On December 14, 2017, Gerig also provided Johnson and Cuthbert with a proposal he drafted, which—rather than meeting the expectation of being at least 95% accurate—was confusing and reflected a number of fundamental problems. *Id.* Given Gerig's abject failure to improve his performance and meet the requirements detailed in the Final Written Warning, Cuthbert, Johnson, and Valencia met with Gerig on January 2, 2017 and terminated his employment. *E.g.*, Mov. App. p.132.

As detailed above, DU's decision to terminate Gerig due to his poor performance is extensively documented. Gerig's self-serving personal opinion that his performance did not in fact warrant termination is not supported by the record, and is further irrelevant under well-established caselaw applying the business judgment rule. *E.g., Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988) (explaining that it is the decision

maker's perception which is relevant, not the plaintiff's perception of herself).

### C. DU is Entitled to Summary Judgment on Gerig's Claim of ADA Retaliation.

Where there is no direct evidence of retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework to evaluate an ADA retaliation claim*. See Dickman v. LaHood*, 600 F. App'x 611, 613 (10th Cir. 2015)*.* Initially, the plaintiff must show that: (1) he engaged in protected activity; (2) he suffered a materially adverse action as defined by the ADA; and (3) a causal connection exists between the protected activity and the adverse action. *See id.* If the plaintiff establishes a prima facie case, the burden shifts to the employer to proffer a legitimate, non-retaliatory reason for its decision. *See id.* at 613-14. If the employer offers a legitimate reason for its decision, the burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.*

Gerig is unable to establish any causal connection between his protected activity and his termination. His retaliation claim is premised upon the request for accommodations that he made on August 18, 2017 (which he later renewed in mid-October of 2017), as well as his December 22, 2017 request for DU to investigate what he believed to be Johnson and Cuthbert's retaliatory behavior. *E.g.*, Compl., ¶64; Mov. App. p.152; Mov. App. p.168. As detailed above, there can be no dispute that Gerig's supervisors had already begun expressing concerns with Gerig's performance *before* he requested an accommodation. These initial discussions regarding his performance similarly pre-dated his December 2017 request for an investigation by several months. This undercuts any argument that his supervisors merely manufactured problems with his performance in order to retaliate against him for his subsequent accommodation requests

or his request that DU investigate his allegations of discrimination. *See, e.g.*, *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324-25 (10th Cir. 1997) (affirming dismissal of retaliation claim because the disciplinary actions at issue "simply completed the disciplinary process already set in motion" before the plaintiff engaged in protected activity).

Even further, it is undisputed that Gerig's supervisors provided specific, detailed expectations regarding how Gerig needed to improve, and that Gerig utterly failed to satisfy these expectations. *E.g.*, Mov. App. pp.119-122; Mov. App. pp.123-129; Mov. App. p.130; Mov. App. pp.13-17-Pl. Depo., at 207:16-225:5. This is true even after their expectations were provided to Gerig in the December 2017 Final Warning, which explained that Gerig could be terminated if he did not immediately begin fulfilling these expectations. Thus, Gerig's unsupported assertion that his termination was the result of retaliation rather than his extensively documented failure to meet objective performance criteria is meritless and should be rejected.

## III. CONCLUSION

For these reasons, DU respectfully requests that the Court grant its Motion for Summary Judgment, dismiss Gerig's claims with prejudice, and award it the costs and fees it incurred in bringing this Motion.

Dated this 3rd day of November, 2020.

**CONSTANGY, BROOKS, SMITH & PROPHETE, LLP**

*s/ Jim Goh*
Jim Goh
Rayner Mangum
600 17th Street, Suite 2700S
Denver, CO 80202
Telephone: 720.343.7560
Facsimile: 720.343.7559
jgoh@constangy.com
rmangum@constangy.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November, 2020, I electronically filed the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Jeanine M. Anderson
Jeanine@AndersonBarkleyLaw.com

Richard P. Barkley
richardbarkleylaw@comcast.net

*Attorneys for Plaintiff*

s/ Hannah Owen
***Hannah Owen,*** Paralegal