Movant's Appendix 1

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-00914-CMA-KLM

---

Plaintiff(s):

BENJAMIN L. GERIG

v. ^COURT USE ONLY^

Defendant(s):

UNIVERSITY OF DENVER

---

DEPOSITION OF BENJAMIN LEE GERIG

January 31, 2020

---



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

director of communications. And Kim cycled out due to -- well, I don't -- various reasons, at which time Will was my direct -- Well, Will was always my direct supervisor while he was there.
Q You said "various reasons." Do you know what reasons those were?
MR. BARKLEY: Objection; form.
A Can you restate the question.
Q (By Mr. Goh) Yeah. You're talking about this person named Jill, who cycled out, in your words, for various reasons. I just want to know what those reasons were.
A What name did you give?
MR. BARKLEY: Yeah. Object to form.
MR. GOH: Okay. I may have gotten the name wrong.
Q (By Mr. Goh) But who was that person you mentioned who cycled out?
A Kim DeVigil --
Q Sorry. Kim.
A -- left the University.
Q Jill's your wife; right?
A She is.
Q I got that confused somewhere.
A Also my sister. It's very confusing.



Q Okay. So Kim. What was the reason, to your knowledge, for Kim's departure from MarComm?
A I remember a conversation that Kim had with our team, which consisted of me, Will, Jan, Teresa, and Katie; so internal and external communications team.
And it was in regards to an inadvertent e-mail that Kevin Carroll had sent, indicating that Kim was underperforming at her job and that her team -- he didn't like their strategies and tactics.
Q Okay. So around June 2016, you left MarComm?
A I was promoted again to be a program developer for Executive Education.
Q Okay. Why did you consider that a promotion?
A My salary increased and my responsibilities expanded.
Q What were you making at -- while you were at -- sorry -- while you were in MarComm?
A It depends. Can you be more specific?
Q Yeah. What was your salary?
A My starting salary in MarComm was 41,700, if I remember correctly. And I got merit



increases annually, cost of living. I think they also -- One year, there was a freeze for those purposes.
I believe I capped out -- I got a raise from Kevin; I made $49,000 a year before I left MarComm.
Q Okay. And when you left MarComm to join Executive Education, what was your salary?
A I jumped -- I started at 57,000 a year.
Q Okay. And was that the only reason why you view that as a promotion?
A The expanded responsibilities as well.
Q But in terms of job classification, did you see a difference between MarComm and Executive Education?
A I don't understand the question.
Q Your job title when you moved to -- to Exec- --
"ExecEd" is what that's referred to; right?
A Executive Education.
Q Okay. So in Executive Ed, what was your job title?
A Program developer.



Q Did you see that as a higher category of classification than PR specialist?
A I don't know that I thought of it in those terms. I saw the expanded responsibilities and the salary bump as what I would interpret as a promotion.
Q Okay. Why did you leave MarComm other than this promotion that you talked about?
A Yeah. The -- Why did I leave MarComm?
There was pretty regular churn in the leadership levels between -- Under Kevin Carroll's tenure, there were a number of people who defected and left, for whatever reason. Kim DeVigil left; that changed the dynamics.
I continued to perform, got salary bumps from Kevin. Will Jones gave me exemplary performance reviews. And Will Jones transitioned out.
And I felt that I wasn't able to grow and develop anymore after I lost my supervisor.
MR. GOH: We've been going for more than an hour. Why don't we take a five-minute break.
THE DEPONENT: Okay.
(Recess from 10:13 a.m. to 10:23 a.m.)

Movant's Appendix 3



calendar years, or were they based on the number of months you were there?
A I don't know. I -- I don't know.
Q In other words, were they based on your tenure -- which is, okay, your first 12 months and your second 12 months -- or was it based on fiscal year or calendar year?
A Oh. Fiscal year; so that that review year -- The fiscal year for DU runs summer -- July to -- It's not -- It's not calendar.
Q Okay. So your first fiscal year would have been summer of 2016, June, when you started, through June/July of 2017? That would be your first fiscal year?
A First 12 months I was in Executive Education, yes.
Q Right. And then the second fiscal year would run from June 2017, thereabouts, through July of 2018?
A (Deponent examined exhibit.)
Yeah; correct.
Q Was there also a requirement for you to have a certain number of meetings with new clients per week or per month?
A Can you be more specific?



Q Yeah. Was there a goal set or requirement imposed by your supervisor as to how many calls -- sales calls you were supposed to make per week?
A Not in the original, up-front goal-setting, there was not, no.
Q Okay. What about subsequent to that?
A Can you be more specific?
Q Yeah. At any point in time while you were employed with Executive Education, did your supervisors impose any kind of requirement as to the number of sales calls you were supposed to make per week or per month?
A So no. From my time of hire, July of '16, to the first full calendar year, there -- there were no criteria like that. It was: Do special projects. Work on custom programs. Work on public programs, as assigned. And I did.
On August 28th, I got an e-mail message from Kelsey that said, We would like you to have four meetings, on average, a month. And it said, It doesn't necessarily have to be one per week, were the criteria; and that she was moving towards -- Yeah, she's moving towards more -- She wanted to give me that benchmark of four.



And the second bullet, as I recall, it was: It doesn't have to be necessarily one per week; but over the course of a month, have four meetings.
Q In other words, you were supposed to average out to four meetings per month?
A That was my understanding.
Q Okay. Did that number change at some point in time to a requirement that you make two sales calls per week?
I'm using "sales calls" for lack of a better term. You can correct me if there's a better term that you're aware of.
A Yeah. I -- Can you rephrase that.
Q Yeah. Did that requirement change from four meetings per month, on average, to two meetings per week, on average?
A So I remember in early November -- November 5, if I'm correct -- there was another e-mail message that said --
So in that first message, it said, We would like you to -- to have four, you know, meetings per month. And then I believe it said two meetings per week. So over --
Between August 28th and a month later,



so early November, the e-mail message, which I was surprised about, said, We'd like you to do two per week. So if you extrapolate that out, that would be double the four per month originally instructed.
Q You mentioned August. Now, what year are we talking about?
A (Deponent examined exhibit.)
The final year that I was there: 2017.
MR. GOH: And as a housekeeping measure, let me give you Exhibit 2 here.
(Exhibit 2 marked.)
Q (By Mr. Goh) Take a minute to review this document; and tell me if you recognize it.
A (Deponent examined exhibit.)
This is the job description that accompanied the job posting for the program developer position when I applied for it.
Q Okay. And if you look at the first line of Exhibit 2, in terms of the Position Summary, it says that the person in this position is, quote:
Responsible for developing a pipeline of profitable new business for Executive Education programs . . .
Do you see that?



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

A (Deponent examined exhibit.)
Yeah. The first sentence?
Q Yeah.
A I do.
Q Do you agree with that as the mission of your job?
A (Deponent examined exhibit.)
I do.
Q We'll talk more about your Executive Education job; but in terms of the chronology, you left DU in January 2018.
And from there, where did you go?
A Right across the street (indicating). 2U, Inc., is the name of the company.
Q It's called 2U?
A Number 2, letter U, comma, Inc.
Q All right. And I think, you know, you're referring to the -- the latest job description on your resume.
A Harvard Business Analytics Program.
Q Right.
A When I was hired by 2U, I was assigned to the Harvard Business Analytics program and directed by my supervisor to -- on my LinkedIn profile and other documentation, that for all



intents and purposes, I worked for the Harvard Business Analytics program.
Q But the employer who signs your paycheck is 2U?
A That's what it said on my paycheck, yeah.
Q Okay. I'm just trying to get the name of your program.
Harvard Analytics program, is that a corporate entity or is it just a program?
MR. BARKLEY: Objection; form.
A Can you restate the question.
Q (By Mr. Goh) Yeah. Who is your employer presently?
A Arapahoe Community College.
Q That's -- Okay. So there's something beyond 2U?
A Yeah. This isn't an up-to-date document.
Q Okay. I assumed it was, but -- All right. We'll get there.
Let's talk about your -- your 2U position right now. On your resume, you know, you say your position was -- or your job title was Student Success Adviser; and that's for the Harvard



Business Analytics Program.
But I'm starting to hear that Harvard Business Analytics program was not -- or is not your employer, but 2U is your employer.
A 2U hired and employed me, yes.
Q Okay. So tell me about the Harvard Business Analytics program and its relation with 2U.
A It's a partnership between the two institutions where Harvard provides the faculty members and the curriculum; and 2U, Inc., provides a suite of services, including student success advising, which is what I did.
Q Okay. So tell me about your job duties for 2U, Inc.
A (Deponent examined exhibit.)
Let's see. I managed a caseload of over 120-plus Harvard students. They were primarily distance students; but that said, we went to campus quarterly for a face-to-face "immersion," we called it, on campus, so we got to meet and interact.
I was using Salesforce almost daily to track number of calls, to track outreach, to track the amount of time I was on the phone, who I talked



to, when I talked to them. It was for the purposes of hitting a total volume of -- of time relating to your students, to provide them any support that they need to complete the program.
Q Now, you're using past tense. Are you still employed with 2U, Inc.?
A I'm not.
Q Okay. When did you leave?
A I resigned in October of 2019.
Q Why did you leave?
A I got a job at Arapahoe Community College.
Q Doing what?
A I am a work-based learning coordinator.
Q What does that entail?
A So we have a work-based and community programs office that we are expanding the apprenticeship program opportunities.
So students have internship opportunities sometimes in their department. My department focuses on, more specifically, apprenticeships where you earn while you learn, essentially.
So if you work at Centura Health as a medical assistant, you're able to be employed by



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Movant's Appendix 5



are engaged in with your wife?
A Correct.
Q Where you've earned a total of -- did you say $3,000 over the last year?
A Yeah. After expenses, that's what we've earned.
Q Okay. Anything else you wanted to add or subtract from your testimony this morning?
A I mean, the only thing I can think of is you asked about the designation of the Harvard Analytics program while 2U, Inc., was on my paycheck.
It strikes me that it was akin to Colorado Seminary being on my paycheck at DU; but DU is -- everyone always puts "DU" on their resume.
Q Okay. Let's talk about your -- your job at the Daniels College in the Executive Education department, for lack of a better term.
Is that a department or program?
A It's a division within Daniels College, yeah.
Q Okay. You mentioned Kelsey as one of your supervisors. Is this Kelsey Johnson?
A It is, yeah.
Q Okay. She was your supervisor?



A She was, yeah.
Q Okay. What was her job title?
A Kelsey was the director of Executive Education, to my knowledge.
Q Okay. Now, you also reported to a Kevin Cuth- -- Cuthbert? Am I saying his name correctly?
A Kelsey reported to Kevin. I did not report directly to Kevin.
Q Okay. But Kevin was one of the managers of the program; right?
A Yeah. He was Kelsey's boss.
Q Okay. Do you know his job title at the time?
A Associate dean for Executive -- It's either assistant dean or associate dean of Executive Education. It shifted halfway through; he -- he got promoted at some point.
Q Okay. Can you spell Cuthbert.
A Yes. C-u-t-h-b-e-r-t.
THE COURT REPORTER: Thank you.
Q (By Mr. Goh) He was the assistant dean, was he not?
A At what point in time?
Q When you were employed at Executive



Education -- Education.
A I want to say I don't recall. I -- I know it shifted at some point. I don't know what it -- his title was when I first started.
Q I know you said that your direct report -- you directly reported to Kelsey Johnson.
But you had interactions with Kevin too -- right? -- in the course of your work?
A I collaborated with Kevin on some projects, yes.
Q And you understood that he was one of the managers you reported to?
A Yeah. I understood that he was Kelsey's boss; so therefore, our department's boss.
Q Now, when you started with Executive Education, were you receiving feedback on your job performance?
A No. When I first started, I didn't receive any feedback until June of -- almost a whole year after I was there.
I did a 360 degree feedback tool that, you know, business consultants use to -- to gauge how your supervisors and colleagues feel about your -- quality of your work, the extent that you're competent in your job; and I -- I got rave



reviews.
And it's anonymous. You can tell that -- If it's under the Supervisor category, the only two people that could have been would be Kelsey or Kevin.
So I read through all those and felt good about the feedback.
Q Okay. We'll talk more about that later.
But are you telling me that you received no feedback whatsoever on your performance until the 360 degree feedback program?
A No negative feedback.
Q Okay. That wasn't what I asked.
Any feedback at all? What were you getting --
A Yeah.
Q -- in the first few months of your employment?
A Kevin gave me affirmation that he was glad to have me on board. He was happy that I was able to help bolster the public programs that I was assigned.
My other colleagues expressed appreciation for the recruiting and the business



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Movant's Appendix 6



(Exhibit 4 marked.)
Q (By Mr. Goh) You can quickly flip through this document; but let me know if you are familiar with it.
A (Deponent examined exhibit.)
Yeah. I would have received this over two years ago; so June of '16. Is that right? Does it have a date on it?
Q Well, if you look at the first page, at the top of it, it says: Compiled 2 June, 2017.
A Okay.
Q Does that sound right to you?
A Yeah, it does.
Q Now, isn't it true that this feedback was -- was part of a course that you were taking at the time?
A It was.
Q What course was that?
A Denver Leadership Experience was a week-long leadership-development course.
Q This was -- This was some exercise that was part of the course?
A It was, yeah.
Q Did you get any kind of credit or grading on this?



A Other than what's in the document?
Q No. I mean in terms of your course.
A Oh, I did get -- So as a DU employee, you have to take it for credit; so I think I got a single credit -- master's-level credit for taking the class. The class met for, roughly, seven hours a day for the course of five days in a row.
And this was one of the elements in the class. We had other deliverables as well. I think we -- Yeah. So this was part of it.
Q Did you understand the purpose of that exercise?
A The person -- The purpose of this exercise (indicating)?
Q Yeah.
A How do you mean?
Q Do you understand why you were required in that course to -- to participate in this kind of feedback?
A Yeah. It's a tool that our faculty experts use with a variety of companies, not unlike the -- a lot of performance metric tools; right?
And so they said they wanted us to experience 360 degrees -- by, you know, the very nature of the report; right? -- so your peers, your



superiors, and everyone that works with you.
So they explained it very well: That if you've never done one of these before, you should do one to get a holistic view of how you interact with a team.
Q So you would agree that this was not a -- an official DU performance appraisal; right?
MR. BARKLEY: Objection; form.
A It was not -- It was not a part of the annual appraisal process that -- DU had a different system for that.
According to my research in the role, there are some companies that use this in lieu of another tool; so I know that it is done. DU does not do it.
Q (By Mr. Goh) Right. I understand that.
But you had an official performance appraisal done a little bit later; right?
A The official appraisal, yes, was submitted October, I believe --
Q Okay.
A -- or given to me in October.
Q So this -- this 360 feedback was designed specifically for your -- your class that



you were taking at the time?
A Yeah. It was a professional-development tool as a part of the for-credit class.
Q You said this was anonymous in nature; isn't that right?
A Yeah. The -- The construct of the tool is that the names don't appear.
And what we were taught was ideally you would have an open dialogue with your teammates, superiors, colleagues, otherwise, if they felt comfortable; right? So some people said, I don't have to be anonymous; and if you would like to talk about this, they open that to us.
But yeah, there -- there are no names attached to these comments.
Q Okay. And did you take this document to contain meaningful assessments of your performance at the time?
A I took it to be a robust affirmation of the strengths and potential that I had as a high-performing individual in Executive Education.
Q Okay.
A I -- Yeah.
Q You mentioned that this was anonymous. But you could tell from the categories whether it



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Movant's Appendix 7



So the revenue that was generated for Finance for Non-Financial Managers was $21,262; so that was the profit. The expense was 6,846. And so the margin or what -- our take was 14,415.47.
MR. GOH: Can I see your copy?
(Deponent handed exhibit to Mr. Goh.)
MR. GOH: Okay.
Q (By Mr. Goh) So that's --
You are looking at the first page of Exhibit 8; right?
A Yeah, I'm looking at the top -- top sheet.
Q Okay. So what about the last page; what do these numbers mean?
A (Deponent examined exhibit.)
Which numbers?
Q The ones that are in handwritten form.
A So these are the numbers that we already have run down via this document (indicating).
Q Yeah. But I'm seeing different numbers; so, you know, bear with me.
On the last page of this document, I see something in writing, which you're saying was in your writing -- your writing. There is a net number of 139,819.



Do you see that?
A (Deponent examined exhibit.)
Yeah. At the bottom.
Q And if you reference this with the prior exhibit, Exhibit 6, I see a number, 145,819. So the -819 is a constant within those two numbers; but there's a variation of about $6,000. Can you explain that?
A (Deponent examined exhibits.)
Well, this was an iterative document that was in draft form. And I had started my calculations.
Q Okay.
A And whatever I e-mailed to Kelsey and/or presented to her, which was presumably this (indicating), was what I arrived at.
Q And for the record, when you say "this," you're referring to Exhibit 6?
A (Deponent examined exhibit.)
Yeah. In my e-mail to Kelsey, did I speak in generalities?
(Deponent examined exhibit.)
Kelsey, I used 150K . . .
MR. GOH: You probably don't want to -- you don't want to think out loud because she's



going to have to type it all down.
THE DEPONENT: Okay. Sorry.
A (Deponent examined exhibit.)
Yeah. So it looks like -- Yeah.
I was never instructed how to calculate revenue contributions; so when I got her e-mail, I had the financial analyst's book, and I did my best to articulate my contributions.
Q (By Mr. Goh) Okay. I'm just trying to find out if Exhibit 8 was just a sort of work-in-progress calculation on your part.
A (Deponent examined exhibit.)
Sorry. Which exhibit?
MR. BARKLEY: 8.
THE DEPONENT: 8.
A (Deponent examined exhibit.)
Yeah, I imagine. It shows notes that I took to try and get Kelsey the information she was requesting.
Q (By Mr. Goh) Okay. So in terms of the revenue you generated, Exhibit 6 would be more accurate; is that right?
A (Deponent examined exhibits.)
Yeah. In my e-mail to her, I said: "I added the" -- I even said: "I added the



participant revenue from my contributions to" these programs: Emerging Leaders Program, Enterprise Risk Management, and Denver Leadership Experience.
I failed to call out Strategic Finance in my e-mail; so I don't know if that accounts for any differences.
THE COURT REPORTER: No. 9.
(Exhibit 9 marked.)
A (Deponent examined exhibit.)
Q (By Mr. Goh) So Exhibit 9 seems to relate to some issue concerning SendGrid. What is SendGrid?
A It's that company that -- They're immediately across the street (indicating) from you guys, I believe. E-mail marketing tech company.
Q Okay. So what happened here?
A In what capacity?
Q All right. You -- Starting at the bottom of this exhibit, at the last page, it looks like you sent an e-mail to Kevin to ask him to take a look at your work product and to let you know if it needed any changes. Right?
A (Deponent examined exhibit.)
Yes, on August 21st.
Q Okay. And then there's an exchange



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

about how you were off the grid.
But on August 28th, Kevin wrote an e-mail to you and said: Please --
MR. BARKLEY: I'm sorry. What page are you on?
MR. GOH: Page 3.
Q (By Mr. Goh) It says:
"Please take a crack at getting it right, perhaps with some input from Kelsey."
Do you see that?
A (Deponent examined exhibit.)
On August 28th?
Q Right.
A I do.
Q So what was it that you got wrong?
A As I recall --
So statement of work is typically a more formal document that outlines the proposed leadership topics that we meant to provide for a particular company; SendGrid in this case.
Some clients request these and some don't. Most of the ones I had worked with heretofore had not requested them. There was one other program, a Chamber program, that I worked on



an SOW for.
So this one in particular, Kevin and I attended the meeting at SendGrid to have -- to do a -- an assessment; and I -- I took handwritten notes.
And my understanding after that meeting with Pattie Money, the chief human resources officer, was to put together a statement of the work that we could provide, whether that was innovation design thinking, digital marketing, whatever skill sets that I had -- I had heard Pattie reflect back to Kevin and I. And it was based on my notes.
And it seems to me that Kevin and I had a -- a slight discrepancy in what proposed statement of work items or scope of work were to be communicated to Pattie.
And so I understood this to be an iterative -- iterative process between Kevin and I. And when I got back off the grid, it appears that he wanted me to synch up with Kelsey, who was not at the meeting with Pattie and did not know what Pattie said, to adjust the statement of work.
And I did my best to do that and, once I got the approval, send it off.



Q Okay. If you look at the first page of this exhibit, there are a couple of responses from Kevin with respect to your SendGrid scope of work -- or statement of work. And if you look at the e-mail on the lower half of the first page, Kevin says to you:
"Hi Ben, The upfront language of the attachment [does] not reflect the situation as I understand it."
Do you see that?
A (Deponent examined exhibit.)
Yeah. The first sentence.
Q Okay. And then he follows that up a day later and says:
"Just re-read your proposed SOW . . ."
Now, does that stand for statement of work or scope of work?
A Statement of work.
Q Okay. So he just reread your proposed statement of work. And he says, quote:
. . . it really really does not reflect our original pitch to them as we are not going team effectiveness work with them.



Do you know what that means?
A No. That sentence doesn't make sense.
Q Okay. At the time you received it, did you understand what it meant?
MR. BARKLEY: Objection; form.
A (Deponent examined exhibit.)
". . . our original pitch to them as we are not going team effectiveness work . . ."
I took it to mean that he wanted me to tweak and redraft the original -- the first draft of the statement of work; that his notes reflected back something that I did -- did not capture in my handwritten notes from the meeting with Pattie Money, and so he wanted me to incorporate that in.
Q (By Mr. Goh) Okay. He ends the e-mail by saying:
"Very confused on this Ben and it would be great to connect soon."
Did you connect with him to find out what his confusion was?
A What was my response?
(Deponent examined exhibit.)
Monday, August 28th, is that following the point in time?



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Q That seems to be the next e-mail in the sequence.
A So it says:
"Sorry Kevin, I was off the Grid."
So I -- I didn't have Internet access or phone access to see his request.
Q Okay. You described this as a, quote, slight discrepancy, earlier. But isn't it true that the result was that the department lost out on the SendGrid work?
A I don't know if they ever secured that client or not. I know that we had an initial discussion with Pattie and that the sales cycle typically takes weeks, if not months.
I was taken off this project -- well, effectively January 2nd, when I was no longer with the University.
Q Okay. So if Kevin Cuthbert were to testify that they lost this account, you -- you would have no reason to dispute that; right?
A I would have a lot of reasons to dispute that.
It wasn't a singular effort. He was at the exec meeting. Whatever was sent to the client would have been in conjunction with my



understanding of the work flow.
MR. GOH: You're trying to read between the lines of my question; but my question was actually more straightforward than that.
Would you please read that back.
(The following record was read:
"Q So if Kevin Cuthbert were to testify that they lost this account, you would have no reason to dispute that; right?")
A I would have every reason to dispute that.
Q (By Mr. Goh) I did not ask you if Kevin Cuthbert were to say they lost the business because, and only because, of you.
I said: Ultimately, the outcome was you did not get that business; isn't that true?
A I have no idea. They could be working with them even as we speak.
Q Okay. So you have no reason to dispute that proposition?
A I cannot confirm or deny their business interactions, financially or otherwise, with SendGrid.
MR. GOH: Thank you.



THE COURT REPORTER: No. 10.
(Exhibit 10 marked.)
A (Deponent examined exhibit.)
Q (By Mr. Goh) So, Mr. Gerig, do you recall receiving this e-mail?
A I recall reading it in the discovery materials, yeah. In terms of the exact day and time, it doesn't stick out.
Q No, I didn't ask you about the exact day and time.
You made a reference earlier to a 50, 30, 20 structure. Do you recall that?
A In today's meeting?
Q Yeah.
A Yes.
Q Okay. And here I see the 50, 30, 20 percent reference here. Are we talking about the same thing here?
A Yeah. I think I stated at the time, on August 28th --
Q Okay.
A -- I had it articulated this way for the first time in my entire tenure in Executive Education.
Q So help me understand: What's the



allocation? What -- What does that mean in terms of your job description or job duties?
A What does what mean?
Q Okay. 50 percent of your time was supposed to go towards what?
A (Deponent examined exhibit.)
". . . a target of 4 meetings per month with new companies - ones we haven't done custom programs for but who may have sent people to public workshops."
Q Okay.
A Okay. So that means of the archive of repeat and return customers, she wanted me to meet with people who had not booked a custom program with us.
However, if there were people like Comcast or DISH Network or SendGrid, who had sent their employees to our Strategic Finance program, Denver Leadership Experience, one of our seven or eight public programs, that those companies were in play.
Q Okay. And you were supposed to devote 50 percent of your time towards that effort; is that right?
A (Deponent examined exhibit.)



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

minute to review this document.
A (Deponent examined exhibit.)
Q So let me focus your attention to the third paragraph of that first e-mail.
A Can I have just a second to finish . . .
Q Oh, sure. I thought you were done. Sorry.
A (Deponent examined exhibit.) Okay.
Q Now, referring you to the third paragraph of that first e-mail, your supervisor is telling you, quote:

. . . you are not so far achieving what we want in terms of meetings, et cetera.

Do you see that?
A (Deponent examined exhibit.) Third paragraph. Okay.
Q Yeah. And then she goes on to provide some specifics. She said:

"In September you had 1" -- I take that to mean one meeting -- "we had planned on 4."

What do you say to that?



A (Deponent examined exhibit.) Well, I would have to go through my e-mail that's on the next page and add them up real quick.
MR. GOH: Let me give you another exhibit, which may help.
THE COURT REPORTER: No. 12.
(Exhibit 12 marked.)
A (Deponent examined exhibit.)
Q (By Mr. Goh) So can you identify for me Exhibit 12. What is it?
A (Deponent examined exhibit.) Business Development Activity Report - Fall of 2017. This looks like a report run in Salesforce of the current inputted data for those time periods.
Q Yeah. Were you supposed to input your activities into this -- into this program?
A To Salesforce? The e-mail that Kelsey sent on 11-5 stipulated that, I believe.
So on August 28th, the meeting quota expectation was one meeting a week, four on average -- per se, she said -- four total a month.
Fast-forward to 11-5, approximately a month later, that quota jumped to eight meetings a



month, which would equate to, on average, two -- I believe she even said two per week, which would equate to double the previous quota; so eight on average.
And I remember having a conversation that said: Some weeks I would have one meeting; some weeks, three. So by the end of the month, I would do my best to get to these rapidly accelerating targets that were being fired at me.
So in that 11-5 e-mail, I think a sub-bullet was: Every week, please update your business-development activities that include phone calls, outreach meetings, notes from those meetings.
And I -- I did my best to work that into my workflow. And I inputted everything that I could, and may have left one or two out. If I did leave one or two out, I would have communicated that to Kelsey.
But the report, it's frozen in time whenever she runs it; right? So if I added it a day late, it doesn't appear here (indicating).
Q Now, when the number of meetings were ratcheted up, isn't it true that your other duties were reduced?



A How do you mean?
Q Your other -- Well, other duties of the job. Was there a reduction in any other aspect of your job when the number of meetings increased?
A No reduction. I believe there was a reallocation; and it was annotated as --
So the first time, August 28th, it was -- what? -- 50, 30, 20, which was the first I had seen or heard of that.
Then November 5th, that shifted to 90, 5, 5. And I think she listed out what those 5s were. Was it special projects and -- I would have to see the e-mail again.
Q Okay.
A It was 90, 5, 5.
Q So there was at least a reallocation where the other two categories went down to 5 percent and 5 percent; right?
A Yeah. But that was not a reduction in work --
Q I understand.
A -- to any degree.
Q It was still a full-time job; right?
A It was.
Q Now, I don't know whether Exhibit 12



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Movant's Appendix 11



has anything to do with 11; but let me just focus on Exhibit 11 for now.

On the same paragraph -- you mention this November 15th (verbatim) date as the day when certain things happened -- but here your supervisor is talking about the number of meetings you had prior to November 15th.

So when she says, In September, you had one meeting and we had planned on four, do you agree or disagree with that?

A (Deponent examined exhibit.)

There was one meeting that was memorialized in the Salesforce reports (indicating).

Q And you're looking at Exhibit 12 now. So point me to where that meeting is . . .

A Well, I presume that's what she means in that sentence: "In September you had 1, we had planned on 4."

(Deponent examined exhibit.)

So October is not represented in this -- Or September is not represented in this report --

Q Right.

A -- so I have no idea if her assessment is accurate.



Q Well, earlier you said you would have to look at the e-mail below that where you listed your number of contacts.

So why don't you take a look at that and tell me whether or not you agree with your supervisor's statement that in September you had one meeting as opposed to four.

A "In September you had 1" --

Q And don't read out loud because it makes it tough for her (indicating).

THE DEPONENT: Sorry. Sorry.

A (Deponent examined exhibit.)

I count four: Enterprise, number one; CSG International; Shannon Sisler at Crocs, number three.

Brownstein wasn't happening until . . .

Oh, Barrett Chow with FareHarbor, four.

Q (By Mr. Goh) I don't see the last . . .

A Barrett Chow. So the top of the second page: November . . . in progress.

"FareHarbor: Connected with Barrett Chow, HR Lead, via LinkedIn. Scheduled in person meeting with Barrett."

Q So FayeHarbor was the --



A FareHarbor, yeah.

Q So you identify Enterprise, CSG, Crocs, and FareHarbor; is that right?

A Yeah. It doesn't say in here if the meeting occurred between October 1 and October 31 or not --

Q Right. That's the problem.

A -- but I composed this on November 2.

Q Okay. I'm trying to understand --

Well, I'm asking you to identify meetings that you had in the month of September 2017 that you can recall.

A (Deponent examined exhibit.)

Well, those meetings that I just mentioned, I was articulating that I had executed those meetings.

Q Okay. Well, your e-mail does not contain dates -- or dates of meetings; so it's a little hard for me to understand when those meetings took place.

So I want to ask you, based on your recollection: This meeting with Enterprise, when did that happen?

A (Deponent examined exhibit.)

I . . . I don't know.



Q Because what you say is:

"Collaborate with Kate S. to connect with Brian" -- I don't know how to pronounce his name -- "via email."

A Brian Chaput.

Q Okay. So that's not a meeting; right?

A (Deponent examined exhibit.)

I . . . It depends when it was scheduled. Without the date attached to it, I -- I don't know when it happened.

Q Okay.

A It was in process.

Q Okay. And look at Crocs. Your entry here was:

"Emailed Shannon Sisler. Set up in person meeting . . ."

A (Deponent examined exhibit.)

Okay. So that reads as though that meeting was forthcoming.

Q Right. So sitting here today, can you tell me based on your e-mail which meeting actually took place in September?

A (Deponent examined exhibit.)

I -- I don't see where she gets the one number from. "In September you had 1 . . ."



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Where does she -- Where does she demonstrate that?
I see October. I . . . I don't know where she got that number.
Q Okay. At the time you received this e-mail on November 10th, did you ask her where she got the number from?
A I don't remember.
Q Were you not curious?
MR. BARKLEY: Objection; form.
A Was I not curious?
I was doing my best to keep up with her rapidly accelerating expectations.
Some of the meetings were scheduled on my Outlook calendar. If I had access to that, I could pull exact dates. Salesforce meetings, again, she had requested that I process deadline by -- weekly updates by every Friday, as of November 5th. So that would have not been happening as of my November 2 e-mail. So I would have had personal records, handwritten notes.
I would have verbally told Kelsey what I was up to at our one-on-one meetings. She would have been very privy to the meetings that I had in the pipeline.
Q (By Mr. Goh) I understand.



And what -- Based on the information that she may have had, she's saying in this e-mail: In September, you only had one meeting.
So my question to you, Mr. Gerig: Sitting here today, do you admit or deny this statement?
A (Deponent examined exhibit.)
Neither. My assessment is that that statement was based on an anonymous Salesforce report that she pulled independently to determine that, prior to her new instructions to me to input all of my business-development activities into Salesforce so that we could both count them simultaneously.
Q Right. Part of your job responsibilities was to account for your activities; right?
A Not before November 5th.
Q Okay. But as of that time frame at least, you were supposed to input your activities so that your supervisor could tell what you were up to or what you were doing; right?
A That was the instruction in the November 5th e-mail, yes.
Q Okay. So back to my prior question:



Sitting here today, you cannot agree or disagree with her statement that in September you had only one meeting; true?
A (Deponent examined exhibit.)
I would disagree with that.
My recollection is that I had -- I don't know if it was exactly four, and I don't know if it was in Salesforce. But I don't agree with -- that I would have only met with one person, if that --
I guess the answer is: I don't know. I don't know.
Q Okay.
A I would add that the -- the rolling nature of business development is that some weeks is a blizzard; some weeks is a famine.
And when I would get these new quotas from Kelsey, I would do my best to hit those quotas. Sometimes I could get ahold of a senior-level executive and set up a meeting and sometimes I couldn't; but I did the best I could.
Q Right. And isn't that why your supervisor told you it doesn't have to be one per week; it could be whatever number adding up to four per month? Right?



A That was the initial quota on August 28th.
Q And then she goes on to say that -- In that last line of that same paragraph, she says -- the last two lines, quote:
The outreach emails listed in Salesforce for last week (October 30 through November 3) were 1 for a meeting and 1 follow up to a previous meeting and there were no meetings that happened.
Do you see that sentence?
A (Deponent examined exhibit.)
I -- I do.
Q Do you agree or disagree with that proposition?
A I don't know what it means. I -- The words "there were no meetings that happened" -- According to what record?
Q Well, according to what you know, according to what you recollect, was there or was there not a meeting that took place in the week October 30th through November 3rd?
A (Deponent examined exhibit.)
This is saying: Listed in the Salesforce report, there was a meeting listed -- I



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

in there does it say the word "proposal."
Q (By Mr. Goh) Mr. Gerig, with all due respect, did I ask you whether or not you put in your best effort or did your best? That wasn't the question.
A Repeat the question.
MR. GOH: Will you please read the question back.
THE COURT REPORTER: The previous question is:
(The following record was read:
"Q So you would agree with my statement?")
THE COURT REPORTER: Before that:
(The following record was read:
"Q But at least your understanding, based on what you read in this e-mail, was that you were supposed to run those elements by your supervisors before you send them out to the clients; isn't that right?")
A (Deponent examined exhibit.)
My understanding at the point in which I read this e-mail on August 28, 2017, is that we were going to discuss that evolving expectation,



yes.
Q (By Mr. Goh) So this line that says, "I'd like to review them before we send to clients," what did that mean to you?
A That she was going to explain to me exactly how that process looked. And that conversation never happened.
Q But you understood that was to be a requirement; right?
A I understood that we were going to implement a process for review of those elements before being sent to a client, yes.
Q And I think you said you followed that process going forward.
A To the best of my ability.
THE COURT REPORTER: So we're going to redo 14; correct?
MR. GOH: Right. So this is 14.
(Exhibit 14 re-marked.)
A (Deponent examined exhibit.)
Q (By Mr. Goh) Have you now had a chance to review this document?
A Sorry. I have a few more sentences.
Q Go ahead.
A (Deponent examined exhibit.)



Q Now, I don't want to go through this document line by line.
But this, based on your understanding, is a final written warning issued to you; correct?
A (Deponent examined exhibit.)
It was issued to me on December 5th, yes.
Q Yes. And the conclusion of your supervisors is that you had not met the fundamental expectations of the position.
Do you see that, the second line of this document?
A (Deponent examined exhibit.)
That was their opinion.
Q I understand that.
Turn with me to the second page. The second half of -- The lower half of this page details meetings that you had with potential clients. And your supervisor points out that for the week of October 2, 2017, you only had two meetings.
Do you see that?
A (Deponent examined exhibit.)
I see October 9th. Where are you at?
Q In the first box.



MR. BARKLEY: (Indicating.)
A Oh, at the top.
(Deponent examined exhibit.)
Sorry. Can you repeat that.
Q (By Mr. Goh) Yeah. So she's stating that for that particular week you only -- you had two meetings: with Wheeler Trigg and Holland & Hart. Right?
A As according to Salesforce, yes.
Q Okay. And then --
So when you say that, are you saying that you actually had more; but you just didn't enter those activities into Salesforce?
A I'm saying I don't think this a hundred percent reflects my business-development activities.
Q Okay. And at that particular point in time, as you mentioned earlier, you had already been instructed to enter your activities into Salesforce; right?
A I was given that mandate via e-mail -- what? -- on -- When was it? October 8th? I'm sorry. November 8th, as I recall.
Q So in looking at the --
A So there would have been -- There

might have been some omissions, not -- you know, innocently, prior to that date, knowing that they needed to be polished and finalized weekly on Friday.
I got those instructions on November 8th.
Q Okay. And in terms of your supervisor's calculation of the meetings on Page 2, spilling into Page 3, do you have any reason to dispute any of these?
A (Deponent examined exhibit.)
Sorry. One more time.
Q Do you have any reason to dispute the accuracy of the numbers that she set forth on Pages 2 and 3?
A (Deponent examined exhibit.)
In the weekly log?
Q Correct.
A These are what she pulled at a point in time in Salesforce. If I entered two minutes after she pulled, they won't be reflected.
So when she pulled this, this is what she saw in Salesforce, yes.
Q Well, sitting here today, you don't know of any potential clients that you had entered



two minutes after she pulled this report, do you?
MR. BARKLEY: Objection; form.
A I can't recall with that specificity.
Q (By Mr. Goh) Her conclusion, if you look at the middle of Page 3, was that you had a total of 11 meetings over the course of seven weeks, which did not meet the established expectation of 14 meetings.
First of all, do you see the sentence?
A (Deponent examined exhibit.)
Yeah. Yes, I do.
Q And do you agree or disagree with that proposition?
A I don't know what week she started counting from. Was she counting from October 4th?
(Deponent examined exhibit.)
Okay. Yeah. So what she pulled in Salesforce for those specific seven weeks, there were input these 11 meetings; correct.
Q If you look down at the last paragraph on the same page, there's a reference to NTT Security. I'm looking at the third line in that last paragraph.
A (Deponent examined exhibit.)
Okay.



Q Now, earlier you had said that you didn't understand what the problem was with NTT Security.
And here I see that your supervisor was telling you that with respect to the SendGrid and NTT Security, you were, quote, not able to represent the type of work we were capable of doing with clients.
A (Deponent examined exhibit.)
Sorry. What line is that? What part of the paragraph?
Q That's the middle of the paragraph -- actually, the third line and the fourth line.
A Thank you.
(Deponent examined exhibit.)
Yes. So what's your question?
Q So do you agree with that assessment?
A No.
Q Okay. Do you know what they were talking about specifically with respect to NTT Security? Does this ring a bell?
A It -- It says -- Her opinion was that I was redundant.
Q And you're seeing that where?
A A few lines below. "In my most



recent" -- Sorry.
(Deponent examined exhibit.)
Q Okay. You're referring to the last line -- last sentence of that paragraph?
A It says: NTT Security proposal . . . content was repetitive.
Q Right. It goes on to say more than that; right?
A (Deponent examined exhibit.)
Yeah. She has additional language.
Q Okay. And then the next page talks about the SCL -- SCL Health program. Do you know if something was amiss there?
A I imagine what happened is the e-mail didn't get properly attached to the Salesforce record.
So there's an add-on that happens in Outlook called "Salesforce to Outlook plug-in." So when you send an e-mail from your DU-issued e-mail account in Outlook, it will automatically synch into the requisite Salesforce record or contact, if you will, of the client.
I had installed that multiple times. There were times that it crashed on more than one occasion; and I would have to reinstall.



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

So there may have been a time that I pressed Attach; and it -- it didn't attach or it did not function.
Q I mean, do you recall that happening, or are you just speculating?
A I recall sending SCL what they requested because SCL booked with us and the -- the program was executed.
Q Okay. Whatever it was that you sent to the client, whether it was with all the attachments or not, you sent it on to the client without having your supervisor review that work; right?
A That was a misunderstanding, to my recollection. I perhaps misheard in a verbal meeting. I hoped that I didn't; but sometimes that happens.
Q And if you move on to the next paragraph, starting with "Finally," she says, quote:
. . . I have provided training multiple times over the past 16 months and more recently in September and October on the way we need to track Activities in Salesforce . . .
Do you see that?



A Uh-huh.
Q Do you agree with her statement that she had provided training on this multiple times?
A I disagree with the totality of the statement that "I . . . provided training multiple times over the past 16 months."
She may have provided one or two trainings in September and October on her new expectations to upload client activity in Salesforce, per her e-mail instructions to that effect.
I do not recall any trainings in regards to Salesforce tracking. There might have been -- There might have been cursory discussions of looking at Salesforce activities; but there was never any: You have to follow this workflow protocol.
Q Okay. So you're saying prior to September and October, there was no such training provided to you?
A Correct.
Q Okay. And the training that was provided in September and October, was it just one-on-one to you or was it to the group?
A That's a good question.



I honestly don't recall.
THE COURT REPORTER: No. 15.
(Exhibit 15 marked.)
A (Deponent examined exhibit.)
Q (By Mr. Goh) This may not have been a document you've seen before. This is an e-mail from Kelsey to Kevin about your -- your revenue targets and meetings with clients. She says --
This is dated December 11, 2017, a week after you received your final written warning.
Would you at least agree with me on that timeline?
A (Deponent examined exhibits.)
So I received my final written warning on the 6th? I received it in my physical e-mail on the 6th. Okay. Yes.
Q Okay. And in Exhibit 15, Kelsey says that you had zero meetings with new companies for the past two weeks.
Do you agree with that or disagree with that?
A (Deponent examined exhibit.)
For the weeks -- past two weeks from . . . So the first few weeks of December and . . .



Boy, I -- I recall working with a SCL Health custom program around that time, running their program operations. I communicated that to Kelsey via my response to their final written warning.
I detailed -- I responded to everything that I possibly could in their final written warning. I -- I never got a reply from either Kevin or Kelsey on that message that I sent. So I imagine my explanation was embedded in that document.
Q Well, this is in the aftermath after you were told in your final written warning that you were required to enter your activities into Salesforce.
At least in terms of chronology, you would agree with me; right?
A (Deponent examined exhibit.)
Well, I agree in the -- in the table that we looked at, there were some weeks that I had one meeting; some weeks I had three; some weeks, none.
She had articulated that over the months of October, over the slice that she had sliced out.



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Q So let's test the accuracy of her statement that you had zero meetings with new companies in the last two weeks.
If you would turn with me to the second-to-last page of this exhibit. I see two sections: the earlier one being the week of November 27 through December 1st; and then the subsequent one being the week of December 4th through the 8th.
Do you see any meetings logged during those weeks?
A (Deponent examined exhibit.)
I don't see any face-to-face meetings. I see correspondence following up with pending clients.
Q In fact, if you look at the week of December 4th through the 8th, with respect to your entries, there were no face-to-face meetings and there were not even any phone calls logged; all you had were e-mails. Right?
A (Deponent examined exhibit.)
Again, I responded to that accusation in my response to the final written warning.
Q Okay. Going back to the first page of this exhibit, Kelsey also says that you had met



$56,775 out of the $300,000 target in the period from July through December.
First of all, do you see that?
A (Deponent examined exhibit.)
Yeah.
Q And if I would have -- If you would turn with me to the last page of this exhibit, it shows that same number: 56,775.
Do you see that at the bottom of the page?
A (Deponent examined exhibit.)
Yes, I do.
Q And does that represent the total amount of the revenues you generated during that time period?
A I have no idea. This is the first time I'm seeing this.
(Deponent examined exhibit.)
I mean, I can go through and try to pick out what she was assigning value to.
Q Sure. Let's do that.
MR. BARKLEY: You can't get one that's actually large enough to read, can you?
MR. GOH: I can blow it up, I think. Do you want to do that?



MR. BARKLEY: Yeah, if you wouldn't mind because I can't -- Yeah.
THE DEPONENT: I'm blind in one eye; but that's fine.
MR. GOH: Let's take three minutes. Let's do that.
(Recess from 3:35 p.m. to 3:52 p.m.)
Q (By Mr. Goh) So my question to you, Mr. Gerig, is: Based on your review of this page while we were on the break, I see that on various line entries, there is the initials "BG."
Now, that refers to you; right?
A Yes.
Q And you would agree that on those lines where your initials were listed, those were accounts that you were handling at the time; true?
A Yes; correct.
Q And we don't have to do the math add-up. But at least what this document purports to say is that the revenue that you generated in that time period was $56,775?
A Yeah. That's how it reads.
MR. GOH: Okay.
(Exhibit 16 marked.)
THE COURT REPORTER: No. 16.



Q (By Mr. Goh) Okay. Mr. Gerig, let me have you review Exhibit 16, which was just handed to you.
A (Deponent examined exhibit.)
Q Mr. Gerig, there is a reference --
First of all, you've seen this document before, I gather.
A No.
Q Okay.
A First time.
Q This is the first time you've seen this? Okay.
This document makes reference to an entity called Enterprise. This is the third bullet point.
A (Deponent examined exhibit.)
Okay. On top. Yep.
Q Do you -- Do you recall working on a proposal for Enterprise?
A I recall Kevin and I attending an initial meeting with three of their middle managers at Starbucks. And I took notes; I don't recall that Kevin did.
And I began the early conversations with them to draft a leadership program based on



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

the feedback that they gave us.
Q Right. Okay. So in the -- the draft that you did, your supervisor identifies deficiencies and errors.
Do you disagree with her?
A I think we have a different perspective, as I was at the meeting in person and had a firsthand account of what they were requesting.
Q Well, let's take this, for example. The first bullet point -- second bullet point says, quote:
They had identified a need for 2 different programs for 2 different levels of employee and yet the proposal read as if there were one.
Did this actually happen?
A I don't -- I don't recall that differentiation in terms of what they originally requested and -- and . . .
Q Okay.
A I don't know.
Q All right. Sitting here today, you just don't recall the specifics of -- of that particular proposal?



A Yeah. I put together the draft proposal based on the firsthand notes that I took at the face-to-face meeting that Kelsey was not at.
And where Kelsey independently decided that it was inaccurate is beyond my scope of -- of awareness.
Q Okay. Fair enough.
The second part of this document makes a reference to Brownstein Hyatt. And your supervisor says here -- Or somebody who wrote this says that you had sent the proposal to the -- to this client before having your supervisors review the proposal.
Did that happen?
A (Deponent examined exhibit.)
I recall that the initial draft, I -- I think that's correct, yes.
Q So -- So why did you do that?
A I would say innocent mistake, with ever-changing expectations being thrown at me and trying to juggle program management with being short-staffed and just a misstep.
Q Okay. And towards the lower portion of this paragraph, this document details particular errors that were made, like typos, incorrect



pricing, that meals were not included, and the cost of a 360 feedback report and insights were incorrect.
Do you recall if that's accurate or not?
A That, I disagree with.
I was using rates as they were given to me my entire time in the role. And I remember in Kelsey's 8-28 e-mail message saying we were to discuss rate hikes and changes and pricing tweaks. That new master document was never presented to me.
Q Now, I suppose that problem could have been avoided if you had run your proposal by your supervisors before sending it out to Brownstein Hyatt.
MR. BARKLEY: Object to form.
Q (By Mr. Goh) Would you agree?
MR. BARKLEY: Object to form.
A (Deponent examined exhibit.)
Where does it say pricing with Brownstein was not accurate?
Q (By Mr. Goh) Look at the last two sentences of that paragraph.
A Okay. (Deponent examined exhibit.)
I don't know what draft Kelsey is



referencing and if she ever saw the actual attached draft that I sent.
Q Okay. So sitting here today, you don't know whether this is accurate or not?
A Correct.
MR. GOH: Okay.
THE COURT REPORTER: No. 17.
(Exhibit 17 marked.)
Q (By Mr. Goh) Now, I don't need you to take a lot of time reading this. But take a look at the e-mail from Kelsey Johnson to you, dated December 14th, the first couple of lines.
A (Deponent examined exhibit.)
Q And if you're reading along, she says, quote:
. . . I found several incorrect entries and wondering if you can fix them.
A (Deponent examined exhibit.)
Okay.
Q And then she details some of the errors, at least, you know, in her opinion.
Your -- My question is: In your response to her, you said, quote:
Kelsey, And take a look and fix them, asap. Ben.



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

I'm trying to understand. Your supervisor is telling you to -- to correct certain incorrect entries. And your response was to have her fix those incorrect entries?
A (Deponent examined exhibit.)
I . . .
MR. BARKLEY: I'm going to object.
Can we go off the record for just a second?
MR. GOH: Sure.
(Discussion off the record.)
Q (By Mr. Goh) Go ahead.
A Yeah. I have no idea what the full e-mail said.
Q So you think there's an intervening e-mail here that's somehow not reproduced in this copy?
A Potentially. Additionally, the first word might have been a typo. I could have -- could have meant, I'll take a look at them.
Q Okay.
A I -- I don't know.
Was that the full e-mail? There's a hole punched.
MR. GOH: That's fine. If you don't



know, that's fine. We won't take the time to speculate.
THE COURT REPORTER: No. 18.
(Exhibit 18 marked.)
Q (By Mr. Goh) So this is an e-mail from Kevin to you, dated December 15th; and he references the Enterprise Draft proposal.
What Kevin is saying to you is that he was, quote, honestly surprised, close quotes, that your first draft did not contain any of what was reflected in the conversation you had with Brian.
Do you see that?
MR. BARKLEY: Object to form.
Q (By Mr. Goh) I'm paraphrasing. But do you see that?
A His e-mail -- Yes. I'm reading along.
Q Okay. Who's Brian?
A Brian was one of the three Enterprise middle managers that we met face to face with at Starbucks.
Q Okay. So do you recall --
Do you have an understanding as to what Kevin was referring to in terms of the disconnect between the conversation with this potential client and your draft?



A I don't know that he took notes. I'm quite certain he did not. I did take notes, which is what I used as source material for my proposal.
So if he was going off of his memory --
If he does have notes and we heard overlapping or disparate feedback from the client, I would have to go back and look at his notes and my notes.
Q Okay. Did you ever go to Kevin and ask him to elaborate on what was the problem here?
A I tried, yeah.
(Deponent examined exhibit.)
My response: "Let's make" -- That was sent to him. He wrote back.
Yeah, I tried. He was hard to schedule meetings with at this point.
THE COURT REPORTER: No. 19.
(Exhibit 19 marked.)
Q (By Mr. Goh) Now, you can tell I'm trying to go through the documents as quickly as I can; so I don't need to ask you about this document line by line.
But this is your termination notice; would you agree?
A I would.



Q Tell me how it came about that you received this -- this memo or this notice.
A This was a surprise meeting the day after our three-week holiday vacation that I was pulled into, again unexpectedly.
Q And who were in attendance --
A In --
Q -- at that meeting?
A Sorry. In fact, we had another meeting on the books for just me and Kevin in his office, where I had hoped to clear up some of those -- some of those collaborative issues that we were discussing.
And that meeting was preempted by this one; meaning, I was headed to that meeting, fully expected to have a conversation with Kevin, and was pulled into a completely different meeting.
And Cristina Valencia --
(Deponent examined exhibit.)
"Please make arrangements . . ."
So Cristina Valencia was the HR rep; and Kevin and Kelsey and myself.
Q So what transpired during that meeting?
A Cristina presented me this document and said, Please read it and let me know if you have



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

opinion but from the opinion of my peers and coworkers; so I did not conclude that in isolation.
-- and -- and said, I love what I do and I want to stick with it.
So I was very surprised.
Q This meeting you talked about where you were told that you were not a good fit for the job, when did that occur?
A Oh, I -- I think November 17th.
There was another surprise meeting that I was pulled into. Kevin and Kelsey said: We will buy you out if you leave, quote/unquote, voluntarily and probably sign, you know, a nondisclosure of some kind.
And I said: No. I think I'm meeting your expectations; and I would like to continue to do so.
Q Now, isn't it true that during your time with Executive Education you had been looking for another job?
A I had kept my options open.
At DU, especially when I was in Marketing and Communications for three years, my vice-chancellor, Kevin Carroll, encouraged us to scan potential job opportunities across the



University, mostly because, he said, you know: Certain areas have only a certain amount of opportunities. And so it behooves you to keep -- cast your net as wide as possible.
Q And while you were still employed at DU, how many other jobs did you apply for?
A From what time to what time?
Q During your entire period at DU.
A Oh, multiple.
Q Okay. Let's focus on the time when you were with Executive Ed.
A With Executive Ed, I believe I was a finalist for a director of fundraising and advancement job with the Graduate School of Social Work. So I was one of three finalists in that interview process.
Q Did you at any point in time tell either Kelsey or Kevin that you were looking for another position?
A I did not.
Q That never occurred?
A I didn't want them to discriminate against me.
MR. GOH: Okay.
THE COURT REPORTER: No. 20.



(Exhibit 20 marked.)
Q (By Mr. Goh) So here we have what looks like an application that you had tendered to -- I don't know the department; but it looks like advancement.
No. Actually, I stand corrected. It looks like you were applying for a position with the Graduate School of Social Work. Is that right?
A Yeah. I think I mentioned that just a few minutes ago.
Q Right. And the position you were seeking was what? Director of development?
A Yeah. ". . . my interest in the Director of Development, Leadership, Annual Giving . . ."
Q Okay. And you made this application around November 5, 2017?
A (Deponent examined exhibit.)
Yeah. It was dated for November 5th.
Q Okay. Isn't it true that you submitted this application because you saw the handwriting on the wall with respect to your job at Executive Ed?
A Not necessarily.
Q When you say "not necessarily," I'm not quite sure what you mean by that.



A Throughout my time at DU, I would, as encouraged by Kevin Carroll and others, on a somewhat regular interval scan for possible opportunities and throw my hat in the ring.
Some of them developed; some of them didn't. The fact that I was a finalist for this one was quite encouraging.
Q Did you ever express to any of your supervisors that you were unhappy at your job with Executive Ed?
A When they asked me if I wanted to be there, I said, Yeah, I did; I wanted to be there.
Their retaliation and escalating aggression made me realize that this was one opportunity among many; and I'll stick with it as long as I can.
Q But the question was: Did you ever convey to your supervisors that you were unhappy at your job and you were looking around?
A No. I told them I like my job.
THE COURT REPORTER: No. 21.
(Exhibit 21 marked.)
MR. GOH: 21.
Q (By Mr. Goh) So Exhibit 21 appears to be a log of jobs for which you applied while at DU.

Would you agree with that?
A (Deponent examined exhibit.)
Yes, that's what it states.
Q Okay. And focusing on 2017, I see at least four jobs that you applied for. Is that right?
MR. BARKLEY: Objection; form.
Q (By Mr. Goh) One, two, three, four.
A (Deponent examined exhibit.)
I -- I don't recall the director of alumni engagement for the College of Education. Was that prior to my start in Executive Education? Yeah, it looks like it was.
Q Right. And I think that I may be mistaken, limiting it to 2017.
There's an entry here showing a date of April 25, 2016. That reminded me; was that prior to your stint at Executive Ed?
A Where do you see -- Oh. April 25th.
(Deponent examined exhibit.)
Program developer. That was the job that I held for three years. Oh, sorry. Program developer was my Executive Education job.
Q I see. That was the job that you --
A That I applied for and had with Kevin



and Kelsey for 1.5 years.
Q Okay. So in terms of -- of other positions that you were seeking while employed with Executive Ed, is the sum total the four jobs?
A It looks like the three -- enter date.
So the top three: hospitality and career services; director of development for Daniels, I was encouraged by an internal colleague to apply for that; and director of development, also encouraged by an internal colleague.
Q Okay. Well, this shows that as early as June 2017 you were looking for another job, this one being a position -- a director of alumni engagement position with the College of Education. Is that right?
A Right. I -- I don't know the overlapping job search timelines for these; so it could have been that I submitted that before I knew that I was picked up by Executive Education.
Q Okay. Well, then move on to the next entry, which is August 2017. That, we know you were already employed at Executive Ed; right?
A (Deponent examined exhibit.)
Yeah, I was in Executive Ed at that point.



Q Yeah. And isn't the same true; as of June 2017, you had been there about a year at Executive Ed?
A Yeah.
Q Okay. So -- So I'm correct that these four top entries show other positions that you applied for while you were employed with Executive Ed?
MR. BARKLEY: Objection; form.
A (Deponent examined exhibit.)
No. The top three, I would have been employed as a program developer.
The fourth one, as I just communicated, on June 3rd -- Yeah, I don't recall the application date for that.
Q (By Mr. Goh) Do you recall applying to the College of Education for a director of alumni engagement position?
A The final one? Director of development . . .
Sorry. Say the title again.
Q I'm referring to the fourth entry on Exhibit 21.
A (Deponent examined exhibit.)
Honestly, I don't remember that



timeline.
Q Do you remember applying for a position as assistant director of hospitality career services with the Fritz Knoebel School of Hospitality?
A I do. That was the building we were housed in; the Executive Education people rented the space from the Hospitality School. So I was encouraged to apply.
Q Do you also recall applying for a position as director of development with University Advancement?
A Is that the top one?
Q Actually, they're both -- They have different dates for the same job, it looks like.
A Two different jobs. One was raising money for the Daniels College of Business. And one was raising money for the School of Social Work.
Q So you do agree --
So you do remember applying for those positions?
A I do.
Q And you're telling me that you submitted those applications even though you were happy where you were in Executive Ed?



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

A Yeah. I remember thinking if I cast a net and there were certain positions that people were -- expressed interest at a higher director level, that I could potentially have that conversation with whoever I'm employed with.
And if -- if there's a potential expanded set of opportunities or if I can get a pay bump in my current role, then that would allow me to at least have that conversation.
Q If you were so committed to your success at Executive Education, why did you apply to those other positions?
A For the reasons I just communicated.
Q Okay. Let's talk about your office space configuration while you were at Executive Ed.
Now, I understand that at some point in time while you were working for Executive Ed there was an office move. Is that right?
A There was.
Q When did that happen?
A If I recall, it was the subsequent April, after I started.
Q So April 2017?
A Correct.
Q And the move was from where to where?



A Just opposite side of the building, essentially; so, yeah, catty-corner across the building.
Q Within the same building, same floor?
A Same building, same floor.
Q Okay. And do you understand what the purpose was in having that relocation?
A No. Honestly, I thought we were highly functional; and people had been in the current location for many, many years. So I don't know what the onus for the switch was.
Q Do you know if any other department moved into the space that you had at the time?
A You mean, after we vacated?
Q Correct.
A Eventually the advancement team did; but not for -- There was a gap.
Q Okay. And the space that you moved into, that was a suite -- correct? -- a suite of offices?
A Yes. It was a different configuration from where we had been. But yes, there was a common bullpen area with, you know, yeah, open seating; and then there were private offices. So yeah, a suite.



Q Okay. I'm probably using the wrong terminology. But wasn't it sort of a self-contained suite or unit that your entire group moved into?
A It wasn't any more self-contained from where we moved from.
Q Okay. When you --
Where you were before that, was it also another suite?
A It was, yeah.
Q Did you have employees in that Executive Ed department who were officing in various other places, other offices, other floors?
A We were spread throughout that suite. We shared that suite with the hospitality faculty and director. So there was shuffling that happens all the time.
So there was a vestibule or section where some of us were; and then across the suite, around an L, there were some of us that -- we were kind of staggered.
Q Okay. Yeah. And wasn't that the purpose of the office relocation, which was to allow your department to have its own space without having to share it with any other department?



MR. BARKLEY: Object to form.
A I don't know why the decision was made.
Q (By Mr. Goh) If you don't know, that's fine. I'm just trying to find out the purpose for the relocation.
But it is true that once you made that move into the new space, you were no longer sharing space with any other departments or groups?
A It's true to the extent that the hospitality professors were not officing in our suite.
We did have a share policy for our conference room. There was a conference room embedded; whereas prior there was a larger conference room that, essentially, we did have to -- Well, we had pretty exclusive rights to it; meaning, it wasn't used otherwise.
So to answer your question: It's not entirely true. There were other people that came into our suite.
THE COURT REPORTER: No. 22.
(Exhibit 22 marked.)
Q (By Mr. Goh) Now, in connection with the office relocation, you were given the opportunity to state your office preference; right?



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Q Okay. So this is the first time you disclosed to your supervisors your SAD diagnosis; is that right?
A (Deponent examined exhibit.)
This was the first time I gave them details what my health concerns were.
Q Yeah. If you look at that last sentence in that first paragraph, you say, quote:
I was diagnosed with Seasonal Affective Disorder . . . at the age of 15 . . .
That's the first time you disclosed that to your supervisors; correct?
A (Deponent examined exhibit.)
I'm trying to think. I mean, I -- I had honest conversations with my colleagues, like Ashley Sodaro and others along the way.
And I'm trying to think if I ever expressly said to Kevin and Kelsey that I experienced over a decade of incapacitating major depressive disorder vis-a-vis seasonal affective disorder.
Q What --
A I don't -- It wasn't something I tried to hide. I -- I don't recall having that express



conversation with Kevin or Kelsey prior to this point in time (indicating).
Q Right. If you had disclosed that to Kelsey or Kevin, you wouldn't have had to say that you did a poor job advocating for yourself prior to this time period; right?
A Well, again, I think that line was in reference to what I described. I wished I would have extended the conversation the first time.
Q Okay. And so the request you were making here is to move to Office 304; is that right?
A (Deponent examined exhibit.)
Yes.
Q So tell me about Office 304. Was it -- Was it located within the suite that the department occupied?
A So it was just outside; so maybe 25 feet away, 30 feet away from the front door to our suite.
Q Okay. Did any of your other team members office outside of the suite at the time?
A Kevin did for an extended period of time; but at . . .
(Deponent examined exhibit.)



On August 18th, I'm quite certain he was back, which is why we had to juggle the request for rooms.
Q Let me rephrase. Did any of your peers office outside of the suite?
A Not at this time.
Q Or at any time at all after the move to the new space.
A No, not that I know of.
MR. GOH: Let me have you do this: Will you just rip off the first page. That will be Exhibit 23. And then the remaining pages will be Exhibit 24. That will make things clearer.
If you want to put a marker on it.
(Exhibit 24 marked.)
Q (By Mr. Goh) Now, I don't want to -- In the interest of time, I don't want to go through this in any detail; but I would like you to authenticate these documents, if you agree with that.
Take a look at it and tell me if these are e-mails that you recognize or if there's anything here that you don't recognize.
A The entire document?
Q Yeah.



A (Deponent examined exhibit.)
The only thing that is a surprise to me is the correspondence between myself, October 3rd, and Mia Elizardi, which I did not see disclosed in the discovery material.
Q And you're talking about the fourth page?
A Yes, Page 4, where I reach out to Mia, who was in HR. She was in -- I think, staff support and development.
Q And if you're looking at the --
If you look at the bottom of the page -- that is what we call a "Bates number" -- are you referring to Gerig - 00105?
A -104. And I guess our subsequent correspondence on -105.
Q Okay. And this purports to be an e-mail from you to Mia and from Mia back to you. And I will represent to you that we received this in the production from your side.
A Okay.
Q But are you saying that you never received this e-mail string?
A It could have been in there and I overlooked it in that 400-page scroll that I did.

I'm just noticing it in this packet for the first time.
Q Okay. And who is Mia Elizardi?
A She was a staff support professional in human resources; so she was tasked with assisting us with professional-development opportunities and -- and coaching.
Q Okay. And other than that, which you did not recall, there's nothing amiss about the documents in Exhibit 24; right?
A No.
Q So let's look at the second page.
MR. BARKLEY: You're talking about authentication when you say that?
MR. GOH: Correct.
MR. BARKLEY: Okay.
Q (By Mr. Goh) Let's look at the third page.
A Is that -103?
Q Correct. Now, in the -- in terms of the timeline, after you disclosed to Kelsey your condition and made a request for Office 304, yeah, about a month later there's a follow-up from you, it looks like, where you actually provided her with a link to a desk lamp, with a request that -- that



the office buy it for you. Is that right?
A (Deponent examined exhibit.)
Yeah. It looks like in the preceding e-mail that was dated August 31st: Here's a few things Kelsey would like to cover: Self-appraisal, Initial thoughts, Office and natural light options.
So to my recollection, a light box was one of the options.
Q Right. And you went so far as to provide a particular link to a particular product that you wanted them to provide to you; right?
A Yeah. When they denied my -- what I thought was a reasonable accommodation to relocate 20, 30 feet down the hallway, I was -- I had a few remaining options to explore. This is one of the ones I opted to explore.
Q And did they provide you with an explanation as to why they denied your request for Office 304?
A Sorry. I'm trying to remember the timeline.
(Deponent examined exhibit.)
So I made the request on the 18th.
Q Of August.
A Of August. And Kevin sent me a note on



the 21st: I'm sorry to hear about your disturbances. He looks forward to talking about it.
I'm trying to find when we talked about it.
(Deponent examined exhibit.)
The summary from the meeting on August 29th . . .
Q What page are you looking at?
A -101. Kevin's bulleted summary --
"We talked about Ben's need for more natural light and will explore options to that end."
-- dated Tuesday, August 29th.
Q Okay.
A So yeah, again, part of that conversation was: You are not allowed to go to 304.
I believe the cursory explanation was they didn't want to disrupt team dynamics. And that was as far as it went at that point in time.
Q And -- And by that, they were referring to the fact that your move to Office 304 would have meant you moving outside of the suite; right?



MR. BARKLEY: Object to form.
A I -- I disagreed at the time with the assessment that it would be disruptive to team dynamics.
Q (By Mr. Goh) Okay. Putting aside whether you agree or not, in terms of the explanation that was provided to you when they were talking about the team dynamics, what was your understanding of that?
A I didn't understand it.
Q Okay. The fact of the matter is your move to -- to Office 304 would have entailed you moving outside the suite; true?
A There was a front door to the suite. And this office was 25, 30 feet down the hallway on the same floor.
Q Outside the suite?
A So I would have been outside the front door, yes.
Q Outside the suite?
A Sure.
Q So September 11th, you have -- you had this e-mail where you provided a link to a sunlamp as a solution to your -- your condition.
MR. BARKLEY: Object to form.



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Q (By Mr. Goh) Did -- Okay. When you provided this link, what was the purpose of you doing so?
A It was one of a few remaining options.
If -- If I didn't have access to natural light for my seasonal affective disorder, which had proven over the course of a decade-plus to be debilitating --
If I didn't have requisite access to natural light, my fear that moving from an office with prolific natural light for the first year -- not -- the first bit I was in Executive Education had complete exposure.
And that's why I requested originally, when asked, an office with natural light. I wasn't granted it.
And as we got closer to the point in the calendar year -- August, September, October -- as the days diminish in amount of light, I was concerned that I would be at risk of having a mental breakdown.
Q And you thought that the sunlamp might be a viable solution?
A I was hopeful that it would be part of a solution.



Q Okay. Now, in terms of the office space, didn't your supervisors propose that you occupy one of the empty conference rooms, which had external windows?
A Yeah. I think there was discussion of: We're not going to grant your reasonable accommodation request, for team dynamic reasons. Our alternative suggestions are -- You know, light therapy seems to be a thing that people do that they were tangentially aware of. If the conference room is available, you're welcome to use it.
I tried that on several occasions. I used it for extended periods of time. I would use the adjacent classroom. And I was thankful for that flexibility.
The adjacent classroom was actually right next to the office that I requested and they declined in my reasonable accommodation request. And when I told them I was going over to the office to work, I never had a problem with that.
So the difficulty that I experienced -- and I communicated to Kevin and Kelsey -- was that I was away from my landline phone, unable to access my business-related voice mails and messages. If there was a private conversation or a sensitive



conversation that I was having with a client, I was in a public -- public space; and -- and that hampered my ability to conduct those meetings.
Q Now -- And you said that there were occasions when you used the conference rooms as well as the classroom.
Were you ever prevented from doing so?
A There were times that it was booked and, you know, I would go and try and work in there and was unable to.
Q That was a bad question on my part.
Did your supervisors ever say no, you could not do that?
A That was among their solutions. In lieu of not granting the request, they said, Please use alternative space.
Q Other than the alternatives of using the conference room or the classroom, did they propose any other alternatives?
A I think they might have provided the option to move into the bullpen area -- what is it called? -- with flexible desks. Yeah. It was an open office concept, essentially.
There was a door around the corner from the bullpen, and there was a window around the



corner from the bullpen; there were no external-facing windows in the bullpen. So that didn't seem like a viable solution.
Q And up to this point in time, you're talking about you having direct discussions with your supervisors about what could be done to accommodate your condition; right?
In other words, you had not involved HR or any other persons?
A Up to this point . . . Let's see.
(Deponent examined exhibit.)
I didn't reach out to HR until October 5th; so correct.
Q Okay. So there's this exploration of alternatives for you. And then the next thing we see is you making a suggestion involving this -- this desk lamp; is that right?
A (Deponent examined exhibit.)
I don't know whether it was a suggestion. It was one of the remaining options afforded to me.
Sorry. I'm trying to find it.
Q It's the third page of this exhibit.
A Yeah. Okay. Thank you.
(Deponent examined exhibit.)



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

So "Office and natural light options." It was one of the, quote/unquote, options.

And I -- Sun box is what I use at home for my personal regimen. The sun boxes that I use are probably -- It's a bank of them; there's multiple. So two of those pictures (indicating) on the wall in size. I can't do those dimensions. They're large.

The sunlight box was a standard desk lamp (indicating), you know. And I was hopeful that it would provide some relief.

Q Okay. Prior to this e-mail of September 11th, I see an e-mail from Kelsey, dated August 31st. And as you pointed out a minute ago, there was this entry of, quote, Office and natural light options, in this e-mail.

So it seems like there was a discussion that she had with you about options for you -- is that right? -- at least as of this date, August 31st.

A (Deponent examined exhibit.)

Yeah. That's how it reads to me.

Q Okay. And then my understanding is that the next time you had this conversation was this e-mail from you where you sent this -- this



link to the -- the sun box.

A (Deponent examined exhibit.)

Yeah. I don't know if ongoing discussions were had not in e-mail format; but this was the next alternative sunlight option that we explored digitally.

Q So the bottom line is you sent this link to them -- to Kelsey. And DU purchased that lamp for you; right?

A Yeah. I don't know how it was purchased. I assume . . .

Q Okay. That lamp showed up; you had that lamp?

A Yeah. I -- I used the lamp.

Q Yeah. Whether DU purchased it or stole it from someone, you had that lamp; right?

A They might have stolen it. I did; I used the lamp.

Q The same lamp that is designated in that link that you sent?

A Oh, boy.

(Deponent examined exhibit.)

I do -- I presume so. I would have to go to the URL.

MR. GOH: That's fine.



I asked you a couple minutes ago about your involving other people at DU in your accommodation discussions; so let me give you this next exhibit.

(Exhibit 25 marked.)

MR. GOH: 25?

THE COURT REPORTER: Yes.

A (Deponent examined exhibit.)

Q (By Mr. Goh) Now, I understand that at some point in time you were allowed to move to Office 304.

A Yeah. I don't remember when that was granted.

Q That's fine.

A November 17th, maybe.

Q I have a document that will help you out, in a minute.

A Okay.

Q But prior to that time, from the time you started with Executive Ed up until the time you moved to an office with an external window, were you able to perform your job?

A Sorry. Say that one more time.

Q Yeah. In that time prior to you moving to that office with the external window --



A Oh.

Q -- were you able to perform the functions of your job?

A From April -- When we moved suites and I was without a window; is that what you mean?

Q In all the time that you were at Executive Ed.

A Yes.

Q Were there aspects of the job that you could not perform because of your condition?

A No.

Q So in terms of other persons beyond your supervisors that were involved in your requests for an accommodation, do you recall a gentleman by the name of Lloyd Moore?

A I do.

Q Okay. Was he the person you worked with in trying to get the relocation to Office 304?

A He was one of several. I think Rufina Hernández was the first person I reached out to.

Q Okay. Who did you talk to first? Rufina; is that right?

A Yeah. On October 5 or 6, I believe, after I had received a scathing, unexpected performance appraisal, I was surprised and reeling.



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

And when we were in our original office suite, we were encouraged to -- to paint an accent wall. So I did, a bright blue color.

This is going somewhere.

So at our next suite where I had an office with zero windows, in early October, I requested to Kelsey in e-mail form, May I -- May I paint my accent wall just like I did -- Well, I didn't say "just like I did"; but I meant . . .

I didn't hear back. And I believe we had a face-to-face, one-on-one shortly thereafter. She said: Absolutely not. Talk to Lloyd Moore if you -- if you need accommodations like that.

Q Was this before or after the -- the sun box request that you sent?

A I believe after.

Q Okay. And so it was Kelsey who referred you to Lloyd Moore; is that right?

A She said the name "Lloyd Moore" in the moment.

And minutes later, after the meeting was over, I went to my office and looked up the DU employee handbook for the reasonable accommodation process. As published, it said, Please reach out to the director of EEOC, who was Rufina Hernández.



And I did so; and I cc'd Kelsey on that.

Q And did Rufina tell you to work with Lloyd Moore?

A She did.

Q And your purpose for reaching out to Rufina was to ask for an accommodation?

A It was per Kelsey's direction.

Q Okay. So looking at Exhibit 25 here, the first page appears to be filled out by you; is that right?

A (Deponent examined exhibit.)

That's correct.

Q And you were making a request for "any comparable office with an external facing window"; right?

A (Deponent examined exhibit.)

Yeah, that's what I -- that's what I wrote.

Q Okay. As part of that process, you were instructed to get some sort of physician's certification; right?

A Yeah. So then when Lloyd reached out to me, at Rufina's direction, he said: As a part of the process, you have to get official medical



paperwork submitted; so please do so.

Q Okay.

A I don't know the date of that conversation.

Q That's fine. And I understand you went to Kaiser and -- and saw some physician who filled out the first questionnaire.

A Yeah. So Daniel Jones, I think.

And I -- So I don't know -- Kaiser -- I had physicians, and they would depart; so I've had a handful. I'd seen Daniel maybe once or twice for just routine medical physicals. So this meeting was actually not in person.

So what happened was Lloyd said, You need to get the medical documentation to get this process rolling. And I had the impression that it was as soon as possible; it was fairly urgent.

So I made a -- an appointment through the digital portal, which they assign you whoever's available. They did not have an appointment for me.

So I e-mailed Daniel Jones, my assigned physician at the time, and said: Here's the context. And I'm going to bring a hard-copy form over; and can you please fill it out for me.



I didn't provide much instruction past what's on the form.

So I dropped it off at the front desk and returned a day later to -- to collect it. And this (indicating) was said form. And it looks like he misfilled it out.

So he said --

Q What part did he misfill?

A So under b., he said --

You have to be substantially limited, I believe. Well, so -- Let me get my understanding straight.

(Deponent examined exhibit.)

You have to have a major life activity that's impacted by your disability in order to qualify for a reasonable accommodation under the ADA. And so he overlooked that entire grid and didn't check off anything.

And so Lloyd pointed --

Q Let me stop you there.

In fact, he did more than that; right? He wrote "not applicable" in terms of any kind of life activities that were impacted; isn't that right?

A (Deponent examined exhibit.)



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

Page 270

He wrote "N/A," yeah. I assume that's what it stands for.
Q Okay. And so when you took this form to -- to Lloyd, what did he tell you?
A He said: The doctor needs to check off one, if not more. Major life activities has to be substantially limited. And if that's the case, you -- we need to have that proper documentation.
So I made an appointment -- so 10-13, just a few days later -- with whoever was available. And Lauren Cox examined me and examined my medical history, my medical prescriptions.
And she, per my medical history in the system, said: Yes, you're substantially limited because of your seasonal affective disorder; and it's -- The major life activity, as you can see, is concentrating.
So I resubmitted this form to Lloyd Moore, presumably on the 13th.
Q Okay. And how did it come about that there was -- or there is a third form?
A (Deponent examined exhibit.)
Just trying to be as thorough as possible --
I have an optometrist that I see about

Page 271

every six months because I had a retinal detachment when I was 15, around the onset of my seasonal affective disorder, as a high school individual.
And there is medical evidence that connects retinal injuries and diminished sensitivity to the severity of -- if you don't get enough natural light, the biological consequences of that.
So to be as thorough as possible, I went to the optometrist. And they looked at the major life activities and selected "Seeing," because I'm blind in one eye -- legally blind in one eye, and then wrote the description here: Sufficient light needed and possibly larger monitor.
Q Okay. In terms of your vision, you say you're legally blind in your right eye; is that right?
A In my right eye.
Q Okay. And your left eye is perfectly fine?
A Well, that's a stretch. It's -- It allows me to drive and -- Yeah, I . . . With the function of my left eye, I'm able to do most things.

Page 272

Q Are you wearing contacts or glasses?
A No. I -- I wear glasses for distance -- for driving.
MR. GOH: So you're better off than I am.
THE DEPONENT: Sorry?
MR. GOH: You're better off than I am.
MR. BARKLEY: And me.
THE DEPONENT: I don't know, guys. It's rough.
Q (By Mr. Goh) So after you submitted the second form related to your seasonal affective disorder, did Lloyd Moore tell you that that wasn't good enough; you had to go get some more?
A No. I was simultaneously reaching out to my optometrist as well as general practitioner, again to be as thorough as possible.
So Lloyd said, Whatever medical documentation you have of your disability, please bring it. So that's what I did.
Q Okay. And focusing on the second form, that was filled out by Dr. Cox, the major life activity that was impacted here was concentration; right?
A (Deponent examined exhibit.)

Page 273

Correct.
Q Okay. And you believe that's a function of your seasonal affective disorder?
A It's the most disruptive and the first sort of debilitating impact of seasonal affective disorder: inability to concentrate on homework, written material, e-mails. It's why I dropped out of school on four different occasions: because I could not concentrate.
Q Were there other things going on in your life that was affecting your concentration?
A No. I was newly married and in a very happy relationship. We were house shopping; things were well.
Q So after you submitted these forms, what happened?
A Oh, I imagine the timeline helps.
(Deponent examined exhibit.)
Yeah. At some point -- Yeah. After I -- I submitted these, I was hopeful that they would reconsider my relocation request.
And Lloyd just said, We'll get back to you. Eventually, he set up -- So I think he and Kelsey connected; but that -- I was not privy to that conversation. All I knew is I was not being

granted the relocation.
Eventually, in November -- early November, Lloyd set up a face-to-face to begin -- or continue the interactive process.
Q Okay. So there was a meeting that you had with Lloyd Moore and perhaps others?
A Lloyd, Elizabeth Cha, Kevin, and Kelsey.
Q Okay. And when did that meeting take place?
A I want to say November 15, 16, approximately.
Q So what happened in that meeting?
A So I remember Lloyd asking, you know, what significant activity is impacted by my seasonal affective disorder.
And I reiterated that concentrating and seeing, per my doctor's explanation, ability to analyze -- I think it's on here, on the final page.
(Deponent examined exhibit.)
Essential functions of my job that --
Lloyd was -- His line of questioning was: What are the essential functions of your job that are impacted by your disability? And my



response was: Concentrating, analysis of written and electronic material, and attendance.
Q Okay. And after you submitted this response on October 17, 2017, is it your testimony that the next conversation or discussion you had was that joint meeting with Lloyd and the others?
A It's my recollection the next time I discussed the reasonable accommodation request in this context with Lloyd was several weeks later; again, mid-November.
Q Okay. You don't recall any intervening discussions?
A With Lloyd?
Q With Lloyd or anybody about your request for this office relocation.
A Yeah, and the conversations we've already talked about. No.
Q At some point in time, you were granted your request to relocate to this office with the external window; right?
A Eventually.
Q And do you recall when that happened?
A In or around November 21st.
MR. GOH: Take a look at this exhibit.
THE COURT REPORTER: No. 26.



(Exhibit 26 marked.)
THE DEPONENT: Thanks.
A (Deponent examined exhibit.)
Oh, excuse me. November 14th.
Q (By Mr. Goh) Okay. That was when you received approval to -- to relocate; right?
A I'm trying to read.
(Deponent examined exhibit.)
Yeah. It looks like I notified Lloyd and Elizabeth that Kelsey and Kevin had had a change of heart.
Q Okay. By that, you mean Kelsey and Kevin ultimately approved that move; right?
A (Deponent examined exhibit.)
They allowed me to move to Office 304, my original request.
THE COURT REPORTER: No. 27.
(Exhibit 27 marked.)
A (Deponent examined exhibit.)
Q (By Mr. Goh) Exhibit 27 is an e-mail that you sent to what looks like your peers. Tell me the reason you wrote this e-mail.
A This was at the request of Kevin and Kelsey, to provide context to my fellow coworkers about my shift to a different office.



Q And it was also to provide -- to ensure that you had connectivity with your colleagues; right?
A Correct.
Q And these protocols would not have been necessary if you had stayed within the suite; isn't that true?
MR. BARKLEY: Objection; form.
A (Deponent examined exhibit.)
What do you mean?
Q (By Mr. Goh) Well, if you had remained within the suite, you would not have to tell your colleagues that, you know, you would be available for collaboration and team meeting purposes -- right? -- or that they're welcome to use your office phone extension as an intercom?
MR. BARKLEY: Objection; form.
A (Deponent examined exhibit.)
Again, this was at the behest of Kevin and Kelsey. They said, We would prefer if you not just remove your items from your current windowless office and put them somewhere else without looping everyone else in. So this was my attempt to do that.
Q (By Mr. Goh) And this was to address



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

MR. GOH: This is a little unorthodox --
MR. BARKLEY: I'm sorry.
MR. GOH: -- but I'm fine with it if you want to clarify the dates. I don't want to trap anybody on the timeline.
THE DEPONENT: Yeah. It was -- The same mistake, I believe, was made in the correspondence from your office as well. So I apologize.
Q (By Mr. Goh) So you started at your job with Executive Ed in June of 2016?
A Correct. So this is dated December 2017.
(Deponent examined exhibit.)
So --
MR. BARKLEY: A month before you were fired.
THE DEPONENT: A month before I was fired; correct.
Q (By Mr. Goh) So help me understand: The first conference that you attended was when?
A It would have been November of 2016.
Q Okay. Okay. Now, it makes more sense. So the next one --



A I apologize.
Q -- would have been November of 2017?
A Correct.
Q And that was the one you were not allowed to attend?
A Correct.
Q But didn't you also say that you were not intending to request to attend that conference?
A I had not requested, other than being awarded the opportunity to be one of the guest speakers. Yeah. I was waiting for permission to attend.
Q Did you plan to attend?
A I had tentatively planned to attend, yes.
THE COURT REPORTER: No. 29.
(Exhibit 29 marked.)
Q (By Mr. Goh) If you just flip through real quickly here, let me know if you think that there is some issue with the authenticity of any of these documents.
MR. BARKLEY: I'm going to object to authenticity on this one because it says, "Please see my responses in green to your question"; and I don't see anything in green.



MR. GOH: Oh. I'm sorry. Because the original had . . .
MR. BARKLEY: Because it seems like there's missing spaces too; so I was wondering whether the green didn't copy or something.
MR. GOH: Duly noted. But the witness can tell me if there's something amiss about this exhibit.
A (Deponent examined exhibit.)
Q (By Mr. Goh) Any issues with the authenticity with this document -- or this exhibit?
A What do you mean by "authenticity"?
Q Well, do you look at any of these pages and say: Well, this doesn't seem right? I don't think I wrote this, or I don't think I received it?
A (Deponent examined exhibit.)
No.
Q Now, do you understand the difference at DU between a complaint filed with the Office of Equal Opportunity versus a grievance?
A Partially.
MR. GOH: Let me see if this helps.
(Exhibit 30 marked.)
THE COURT REPORTER: No. 30.
A (Deponent examined exhibit.)



Q (By Mr. Goh) So this is an e-mail from Rufina to you where she states, quote:
This email is to confirm our conversation this morning in which you advised me that you are choosing to pursue a grievance rather than a complaint in the Office of Equal Opportunity.
You see that; right?
A Yeah.
Q So what do you know about this? What can you tell me about this?
A (Deponent examined exhibit.)
So my understanding is that the -- the complaint that she was referring to is what I submitted prior to my termination; so in mid- to late December, prior to my termination.
After my termination -- In my termination letter, it said, If you would like to pursue the grievance process as an ex-employee, please contact Ken Pinnock.
And so I believe I got -- I had outreach to my personal e-mail account, asking me if I wanted to continue the process with Rufina. And I said, Well, as an ex-employee, I would prefer not to.



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

A -- in terms of my sliding into a very profound, debilitating depression.
Q Okay. I understand you now.
You're talking about the potential that that could have happened had you not been provided the solution -- right? -- ultimately?
A Correct.
Q And ultimately, you were provided a solution that prevented that -- that sliding to occur?
A Three months after I brought it to their attention, I was located to an office with a window.
Q Right. And so the -- the nightmare scenario that you're talking about never occurred; right?
A I never experienced debilitating depression. I was trying to prevent that eventuality; and I was rigorously trying to prevent that eventuality.
I had struggled seriously as a graduate student my second year at CU, Boulder: difficulty concentrating, difficulty getting out of bed, difficulty attending classes. So I -- I sought Dr. Rosenthal's professional expertise.



And so there was a precedent set that nowhere am I safe from having a major depressive episode, even in Colorado.
Q Okay. And again, my question is: Perhaps because of the ultimate provision of the accommodation you requested, you -- you never experienced the -- the -- I forget what term you used -- the --
A Debilitating and profound major depressive episode --
Q Thank you.
A -- where I could not get out of bed.
I was able to function --
Q Okay.
A -- throughout that period.
Q Yeah. Earlier you told me that you were able to perform your job and, in your mind, you did it well. Right?
A (Deponent nodded head.)
Q We're talking about DU now; correct?
A Sorry. Say that one more time.
Q Yeah. It was a compound question.
Earlier you testified that you were able to perform your job at DU and, in your view, you did it well; right?



A Correct.
Q Okay. So -- So given your testimony that you didn't slip into this oblivion, this debilitation while you were at DU, what is it that you are faulting DU for in terms of your emotional distress?
A Joblessness, lack of income, instability, with potential foreclosure on a house.
Q Yeah. I'm talking more in terms of your mental state because we're talking about, you know, your claim for emotional distress.
Can you tell me what, if any, manifestations you had that you would attribute to emotional distress resulting from your termination.
A Sleep -- Difficulty sleeping; difficulty keeping to my regimen of -- I mean, that -- a domino effect: hard to get out of bed in the morning, at which point hard to maintain my light therapy regimen. My meditation frequency was impacted. My -- My routine was completely impacted.
I -- I was as vigilant as possible to -- Despite the aftershock and the trauma of being jobless directly after my three-week Christmas vacation, I -- I did my best to -- to



seek help.
Q Okay. And all those manifestations you talked about were a result of being out of a job; right?
A They were, in my view, directly related to being unemployed, yes.
Q Yeah. And based on your testimony, you found another job within 40 days; true?
A Yes. I began at 2U (indicating) mid-February.
Q Right. So whatever manifestations you're talking about, are we talking about a period of about 40 days?
A I don't know that they instantly evaporated once I began working full-time. I -- I don't have any journal to that effect.
My reentry to work life was a challenge, to say the least, in terms of learning a new system, being in a for-profit corporation. So yeah, there was distress with having to start all over.
Q Okay. And that's true for anybody starting a new job; would you agree?
A I don't -- I presume everybody -- change is difficult for most people.



e054c7c5-9e8d-4cc6-b089-7311b30ee1f2

# *GERIG*

# *VS.*

# *UNIVERSITY OF DENVER*

**Deposition**

## *KELSEY JOHNSON*

*07/15/2020*

---

***AB Court Reporting & Video***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

A. My role expanded to be more focused on some program development, so not just the coordination of the programs but the creation of the programs, helping the faculty create the programs and more responsibility, I would say, with marketing in terms of helping to design our brochures and establish the product offerings and manage more complex budgets, get the financials for the whole department kind of in order.

**Q. Did you have a business development role when you were the assistant director?**

A. I wouldn't say it was official, but it was an element of my job.

**Q. Did you have folks reporting to you in the position of assistant director?**

A. Yes.

**Q. How many people reported to you when you were the assistant director or under the assistant director ?**

A. I don't remember exactly how many, but I remember having, I think, two, and it shifted over time. So sometimes I had one or two program coordinators and sometimes I had -- you know, at times I had one, sometimes I had multiple student workers.

**Q. Like interns?**

A. Well, they're called work studies -- yeah, like interns.



**Q. The positions of the people you supervised, they were program coordinators?**

A. Program coordinators.

**Q. As the assistant director did you supervise any of the business development folks?**

A. There was a time, and I think it was before I was the director, that as the assistant director I was asked to take on sort of a sales manager role, and I did -- I wouldn't say the other people that were the business developers, John Lathrop was one of them, several other people came into those positions, or into a position like that.

They didn't report to me directly in a hierarchy, but I was in charge of making sure that the discipline and, you know, the tracking of who we're talking to and, you know, the way we're handling and making everything very consistent in terms of pricing and things like that, that was sort of under my purview.

It was sort of a special project the executive director at the time asked me to do, and I do believe that was before I became a director.

**Q. To whom did you report when you were the assistant director?**

A. I think the leadership changed there, and we -- a woman left -- the woman who had been the head of it was



Carolyn Shadle and she left and a gentleman by the name of Bill Silver became the director, or the executive director. I don't remember his exact title. He might have been an assistant dean.

**Q. I know that -- well, even just looking at your resume, for a period of time you were the Director of Executive Education, and for another period of time you were the Interim Executive Director, correct?**

A. Yes.

**Q. And you talked kind of loosely about director, you know, executive director, and then also assistant dean, correct?**

A. Uh-huh.

**Q. And did titles just change of who was running the department?**

A. Yeah. They -- depending on the level of the person that they had, what I would call the head of the department, they -- depending on whether or not they were faculty or tenured or those types of things, they would have different titles.

**Q. So when you were the director, did you -- and you were the director for a long time, did you report to an executive director at any point?**

A. Yes.

**Q. What point in time when you the director did you**



**report to an executive director?**

A. I don't remember the specific dates that that person -- you know, there were several different people that were in that position. So I think one of them was an executive director, Scott McLagan, one of them -- Bill Silver was prior to him, and he was either an assistant dean or an executive director through the college.

And then after that there was -- our department was sort of put under the Executive MBA, the same person who was the head of the Executive MBA, and I believe she was an assistant dean but I'm not 100 percent sure.

And then we hired Kevin Cuthbert, who was the executive director to start -- when he first started with Executive Education.

**Q. Kevin Cuthbert at one point was an executive director over Executive Education.**

A. Yes. That's how he was hired into the university.

**Q. And then he was promoted at some point to the assistant dean and he continued to be in charge of the Executive Education program.**

A. Uh-huh -- yes.

**Q. So the assistant dean is a higher level position or higher level in the university than the executive director positions.**

**accommodation?**

A. I was given the information on who to contact about that, if that had been -- if that had come up.

**Q. So the training you received with respect to how to handle a request for accommodation was to contact someone that deals with requests for accommodation; is that correct?**

A. Yes.

**Q. And who were you instructed to contact should an employee request an accommodation?**

A. I don't remember the specific name at the time that I went to any of those sessions, but it was the office -- there was an office that I would have found on the Internet, the internal website. I don't remember the name of the person.

**Q. Right. And I'm more curious as to the office that you were instructed to contact and then also the position of the people that were handling Americans With Disabilities Act request for accommodations.**

**You described -- let me start with this: What was the name of the office you were instructed to contact if an employee were to request an accommodation?**

A. I don't remember the specific name of it.

**Q. And how would you go about finding that office if the need were to arise?**



A. I would ask either somebody at the Daniels College who was in a position to -- about facilities or administration or human resources, or I would have gone to the Internet, the inner -- it was like a PioneerWeb, something internal where you had access to resources for things, or I would have called the hot line for the HR Department.

**Q. And you received the initial training on the Americans With Disabilities Act when you became the assistant director?**

A. Uh-huh -- yes.

**Q. What additional training did you receive with respect to handling requests for accommodations during your time with DU?**

A. Each year we had an update on the legal, or we had the same legal training, HR, risk, all those areas I mentioned before. So each year I received that training.

**Q. Did the process change during your tenure with DU as to how you were to handle a request for accommodation?**

A. I don't believe so.

**Q. So the entire time you were employed by DU, you understood that as a manager if an employee were to come to you and request an accommodation, you were to turn around and direct that request for accommodation to a third party.**



A. I understood that I would need to take steps to make sure that that was -- the accommodation was met.

**Q. And my question was: Earlier you testified that if a request for accommodation was made to you, you were instructed to call someone about the request for accommodation, correct?**

A. I don't remember exactly if they asked us to call, or if they asked us to -- they were providing that as a resource. Like I don't remember saying you were mandated as a supervisor to call the office if this request is made. I remember them telling me that those -- like the ergonomic options and resources were available to me.

**Q. Okay. And then I'm going to have to back up a little bit and make sure I cover this.**

**What training did you receive as to how to handle a request for accommodation that was made to you as a manager at DU?**

A. I received a legal -- like a four-hour training session where a lot of different information about the policies and resources of the university was presented to me and here's how to handle these situations. I don't remember the specific details of those training sessions.

**Q. Well, my question for you is, is how were you instructed to handle a request for accommodation?**



A. I don't remember if I was specifically asked to call an office, or if I was given that office's name and information and told that those were resources. I do not recall which one. It was one of those two.

**Q. Except for Mr. Gerig, did you ever have an employee make a request for accommodation to you while you were employed by DU?**

A. No.

**Q. So this wasn't something you dealt with frequently.**

A. No.

**Q. And you were with DU 18 years?**

A. I mean, it was almost 19 years by the time I left, yeah.

**Q. And you were in your role as the assistant director for approximately two-and-a-half years; does that sound about right?**

A. Yeah.

**Q. And then you received a promotion to the position of director?**

A. Yes.

**Q. Was that a promotion or is it something you applied for separately?**

A. It was a promotion.

**Q. So you did not apply for that position.**

A. No.
**Q. Who promoted you into the position of director in 2005?**
A. Bill Silver.
**Q. And was he the executive director at the time?**
A. I'm not -- I don't remember what his exact title was at the time.
**Q. So he could have been either the executive director or an assistant dean.**
A. Or something else that is like professor/COO. Like, they had changed a lot of titles there.
**Q. Did you report to Mr. Silver when you started as the director of Executive Education?**
A. Yes.
**Q. How long did you report to Mr. Silver in that role?**
A. I don't remember the exact date when he left the university.
**Q. Approximately how long did you report to Mr. Silver?**
A. Probably three or four years.
**Q. And after Mr. Silver left the university to whom did you report as director?**
A. Scott McLagan.
**Q. And how long did you report to Mr. McLagan?**



A. That I believe was two to three years.
**Q. And what happened to Mr. McLagan?**
A. He decided to step out of his role and focus 100 percent on teaching.
**Q. So he was a professor, as well?**
A. Yes.
**Q. And to whom did you report after Mr. McLagan went back to teaching exclusively?**
A. I reported to Barbara Chrisman.
**Q. How long did you report to Ms. Chrisman?**
A. Dr. Chrisman for two years, maybe 18 months.
**Q. And what was Ms. Chrisman's position with DU?**
A. I don't remember her specific title, but I think she was the assistant dean and oversaw the Executive MBA and Executive Education.
**Q. And is the Executive MBA a separate department at DU?**
A. Yes.
**Q. So Ms. Chrisman was supervising two separate departments, the Executive MBA Department and also the Executive Education Department.**
A. Yes.
**Q. And did that stay the same until you left DU?**
A. No, then Kevin Cuthbert was hired.
**Q. And what I meant was, did you continue to have**



**the Executive Education Department separate from the Executive MBA Department -- they were two separate departments.**
A. They were separate when Scott McLagan was in charge, and then they were together when Barb Chrisman was in charge, and then they were separated again when Kevin Cuthbert was in charge, and then Kevin became the head of both as well, and then they were separated again.
**Q. Why did Ms. Chrisman leave her position in charge, directing, or whatever her title was as executive education and Executive MBA?**
A. She didn't leave that position. The senior leaders of the Daniels College of Business decided they wanted to have more of an intense focus on Executive Education and needed to hire an executive director to focus just in that area and not also over the Executive MBA.
**Q. And is that when Mr. Cuthbert became the executive director or the assistant dean over Executive Education?**
MS. SHEYKO: Object to form.
A. He became the executive director.
**Q. (By Ms. Anderson) And was later promoted to the assistant dean.**
A. Yes.



**Q. But continued to manage the Executive Education Department.**
A. Yes.
**Q. How did your job responsibilities change when you were promoted from the assistant director position to the director position?**
A. At the time we made a shift, Bill Silver and myself and another gentleman who was a leader there worked with some faculty to shift the structure of the department. So we split things into a real -- a focus on business development for both public and custom programs and we had another team of people working on the operations or the sort of delivery of the program.
So I became in charge of the business development, and people -- as well as the person who was in charge of the Executive MBA recruiting.
So all of the people who were recruiting or doing business development for programs, be it the degree, the MBA, the certificates we had running, the public programs or custom programs that we were building for companies, all of that area was under my -- I was the leader of that structure. And another gentleman who was my peer was the leader of the operations side.
**Q. So you were in charge -- when you became director, you became responsible for business development**

that needed to shift and kind of do whatever was necessary to meet client's needs kind of thing.

**Q. Okay. So in approximately 2006 you started focusing as the executive director on the custom programs.**

A. I had always done a lot of work in the custom programs, but I would say I had a period of time where that was more of my focus, and then it changed when Barbara -- when Scott left, Barbara Chrisman took the department, it shifted again.

I at that point was kind of overseeing the whole Executive Education from business development to operations to marketing, administration.

**Q. And did you continue to, kind of, manage the entire Executive Education Department after Barbara left?**

A. When Kevin Cuthbert was hired and Barbara did not have our department under her anymore, then I shifted to more of a focus again on business development. And we had another person in my office in the Executive Education office, Ashley Sodaro, who became more of the operations person and marketing.

**Q. And that was under Kevin.**

A. Yes.

**Q. And for what period of time did you report to Kevin?**

A. I believe Kevin was hired in 2016, in the summer



of 2016 or the spring. Whenever his hire date was, was when I reported to him.

**Q. And when did he leave?**

A. He left in January of '18.

**Q. And he was hired from the outside when he came in in 2016?**

A. Yes.

**Q. So he was there for less than two years?**

A. I guess if that's the time -- yes.

**Q. Based on what you're telling me, he came in in the spring or summer of 2016, and he left in January of 2018, correct?**

A. I'm not 100 percent sure about his hire date.

**Q. But it was probably less than two years or around two years that Mr. Cuthbert was employed by DU?**

A. I'm not sure how long he was employed by DU.

**Q. And what is your understanding of why Mr. Cuthbert left DU?**

A. My understanding is he got a great offer for a principal role at a consulting firm that he wanted to work for.

**Q. So Mr. Cuthbert was not asked to leave DU.**

A. No.

**Q. And he didn't receive a severance package of any kind.**



A. Not that I know of.

**Q. What is your understanding based on, Mr. Cuthbert's departure from DU?**

A. Conversations with Kevin.

**Q. Mr. Cuthbert is the one that told you this.**

A. Yes.

**Q. And at the point that Mr. Cuthbert left to take this consulting gig, were you promoted to the executive director?**

A. No. I was asked to take an interim executive director role.

**Q. And that would have been in January of 2018.**

A. Yes.

**Q. And that was kind of to replace Kevin, at least temporarily.**

A. Yes.

**Q. How long did you hold the interim role as executive director?**

A. Until I left the university in August -- or I think three days before I left we hired a new executive director. And I think they changed my title the three days before I left.

**Q. Back to director.**

A. Yes, because it was a temporary position.

**Q. And who was hired as the new executive director?**



A. His name was David Morelli.

**Q. Did you know Mr. Morelli prior to him being hired in that position?**

A. Yes.

**Q. Did he work in the university?**

A. He has been a student of the Executive MBA and he was an adjunct faculty for the Executive Education program.

**Q. Did you apply for the position of executive director in the summer of 2018?**

A. No.

**Q. Did you apply for that position, at all?**

A. No.

**Q. Why did you leave DU?**

A. I was offered a role as a business developer for a small boutique consulting firm that did the type of leadership development. It was somebody who had been a previous client and an adjunct faculty for us. And she asked me to come head up the sales and marketing office -- you know, sales and marketing focus for their consulting firm.

**Q. And did you receive a raise when you took that role?**

A. I did.

**Q. How much were you getting paid when you left DU?**

**together to set goals for the next year; is that correct?**
A. Yes -- well, the fiscal year was July to June. We did performance appraisals in October. And I believe we typically also put in the goals in the October, fall time frame for the next year. But they would have been goals that technically started July, so three months prior.
But the system and the process where we would enter those into a system did not happen until the fall.
**Q. I believe you had testified earlier that by the end of the year 2016 you had a goal with Mr. Gerig of 300,000 in revenue, correct?**
A. Yeah, that would happen by June of '17.
**Q. So even though you didn't put it in until the end of the year, he was supposed to have already generated half of that by the time you put the goal in?**
A. It would -- we talked about those goals, but they didn't -- weren't recorded in a system.
**Q. And when was this $300,000 revenue goal recorded in a system?**
A. Sometime between October of 2016 and -- I don't remember the actual date -- before the end of '16.
**Q. So between October 2016 and the end of December of 2016?**
A. Yes.



**Q. And these goals were ones that had already started to play out. In other words, if you set a revenue goal of 300,000, his year is going to end six months from December of 2016 in June of 2017, correct?**
A. That's when the year would end, but we had conversations about that dollar amount when he was first hired in the summer.
**Q. And these goals, they show up on performance appraisals; is that correct?**
A. Yes.
**Q. So in other words, if you set a goal of 300,000 in revenue and you set that goal by the end of 2016, when you get reviewed in the September, October of 2017 time period, there is going to be a part of appraisal that addresses whether or not you met that particular goal.**
A. Yes.
**Q. And so you said you provided the revenue. And how was revenue to be calculated?**
A. By attributing the -- you know, the gross revenue of programs that he had worked on, builds brought in, as well as any individuals he brought into the public programs.
**Q. And it's gross revenues.**
A. Yes.
**Q. What other goals did you set for him in the 2016**



**time period?**
A. We had goals identified around his development as a leader. He was really interested in taking more leadership programs, so we supported him in that, and that was one of his development goals.
And the -- I believe there was other goals around contributing to the planning and operations as it pertained -- I don't remember specifically his other goals. If I saw his review, I would recognize those other goals.
**Q. We'll talk about his review later, but I'm just trying to get a sense of, kind of, both the goals that you set for him that are part of the review process and also the goals that you may have set for him that were not part of the review process, and I want to make sure we cover everything you dealt with in 2016.**
A. Uh-huh.
**Q. Can you think of anything else?**
A. No.
**Q. And you said in 2017 you added goals related to number of client meetings, correct?**
A. Yes.
**Q. Any other types of goals that were added in 2017?**
A. Client meetings -- I wouldn't call them goals, but we shifted an expectation of how much time he would



spend on certain projects that were not the direct type of meetings we wanted him to get, so we wanted him to decrease those.
**Q. And this, I believe you previously testified, occurred in August of 2017.**
A. Yes.
**Q. And he wouldn't have done his goals that are entered in the system until later in 2017, correct?**
A. Correct.
**Q. So the only goals that were in the system were the ones he did in 2016, correct?**
A. Yes, I believe that's correct.
**Q. Did you change the expectations with respect to revenue generation in 2017?**
A. No.
MS. SHEYKO: Object to form.
MS. ANDERSON: Did you understand my question?
THE DEPONENT: Yes.
**Q. (By Ms. Anderson) I am handing you what has previously been labeled as Deposition Exhibit No. 10.**
**Do you recognize this document?**
A. I do.
**Q. What is it?**
A. It is an e-mail from me to Ben Gerig and Kevin Cuthbert copied, an e-mail letting Ben know that we --

would you like me to read the e-mail?
**Q. A summary is fine. I'll ask you specific questions.**
A. This is where we were -- I was trying to communicate with him about the need for all of us to dial up our activities and make sure we had a more disciplined approach to business development and were tracking things a little bit more clearly and were focused in the right area.
**Q. And when did you send this e-mail?**
A. Monday, August 28th, 2017.
**Q. And is this what you're referring to with respect to the additional goals that came into play in August of 2018?**
A. Yes -- no, 2017.
**Q. 2017.**
A. Yes.
**Q. Sorry. Did you discuss this e-mail with Mr. Cuthbert prior to sending it?**
A. Yes.
**Q. Tell me about that discussion.**
A. This e-mail was sent after I returned from a vacation and had been out of the office for a week or so. He came back from -- to be 100 percent focused on executive education earlier in the summer.



**Q. And when you say "he," you're talking about --**
A. Kevin, Mr. Cuthbert. And we said, "Yeah, I think we need a more disciplined approach to tracking and making sure we're getting enough meetings. Let's put some metrics around the meetings, and let's decrease the focus of his time -- you know, on all of ours times on to the things that matter the most and not -- so that he has the most available time to get the kind of meeting that we knew would lead to revenue."
**Q. How was Mr. Gerig's use of time to be tracked to assure compliance with these new standards?**
A. I asked him to, as we had always been, tracking meetings that we had and e-mails and any other forms of out reach phone calls in the Salesforce.com system.
**Q. But would that track his time with respect to what you should spend, according to this, 50 percent of your time on meetings per month, 30 percent on special projects and 20 percent for overflow? You see those goals?**
A. Yes, I do.
**Q. How would the Salesforce software track time like that?**
A. This was not intended for him to track his time, but to give him a general sense of how much time, roughly, he should be spending in these areas. Never would we want



to track actual hours on things.
**Q. So there was no way to track whether he was spending exactly 50 percent of him time doing one thing or another.**
A. No.
**Q. The one thing you were tracking through the Salesforce software was the number of meetings.**
A. Number of meetings, e-mails, phone calls.
**Q. And you also say in the third paragraph towards the bottom that you would like to review them before we send them to clients.**
**Do you see that?**
A. Review what?
**Q. I think proposals. If you go to the third paragraph here that you drafted, what you were asking Mr. Gerig to review before they went to clients in this paragraph?**
A. I was asking to review the pricing, faculty pay, and overall program budgets before we sent them to clients.
**Q. So not the actual proposals.**
A. The pricing and information was all part of a proposal.
**Q. So were you essentially asking to review proposals prior to the proposals going to clients?**



A. Yes.
**Q. And was that something that you had done previously with Mr. Gerig's proposals?**
A. I don't know if I -- I don't believe I reviewed every single proposal that he sent, but I was always cognizant of checking in with him to make sure he felt comfortable with what needed to be included and was always willing and interested in reviewing them before they would go out, if he felt uncomfortable with anything he was sending.
**Q. And I guess my question for you is, was this particular request, that you be permitted to review pricing and other things that are contained in a proposal before they went out, something that was a new request of Mr. Gerig?**
A. I think it was more a formal of a request. And prior to this I would have in a more informal way said, "Hey, can I look at that before you send it?"
**Q. And you may have done that sometimes and not done it sometimes.**
A. Yes.
**Q. And I believe you indicated that you would review his proposals if, for example, he was struggling with a proposal or he had questions about a certain proposal, correct?**

A. Yes.
**Q. So if he needed your help, you were happy to help him.**
A. Always.
**Q. But he was sending some proposals out that you weren't reviewing, correct?**
A. I believe so.
**Q. And as of August 28th, 2017, you didn't want him to send out proposals that you had not reviewed, correct?**
A. If they hadn't included pricing. Because a lot of our proposals were templates that were -- had been approved by me prior. But I wanted to see the proposal if there was ever any pricing included in it.
**Q. Which would be included in any kind of, you know, final proposal, correct?**
A. Yes, exactly.
**Q. Did you review Mr. Gerig's proposal that he submitted to Dish Network in October of 2017?**
A. I don't recall whether or not I reviewed it or not.
**Q. And was this a custom proposal?**
A. Yes.
**Q. And it was successful, correct?**
A. It was a reorder or a renewal on an existing program we had run before.



**Q. But Dish Network did, in fact, do a custom program with you guys after Mr. Gerig submitted that.**
A. Yes.
**Q. Did you review the proposal Mr. Gerig submitted to ISEC in February of 2017?**
A. I don't recall whether or not I reviewed that proposal.
**Q. And that was also a custom proposal.**
A. Yes.
**Q. And that was successful, as well, in that they accepted the proposal.**
A. Yes.
**Q. Did you review a proposal Mr. Gerig submitted to U.S. Engineering in April of 2017?**
A. I don't recall if I reviewed that one.
**Q. Was that a custom proposal?**
A. Yes.
**Q. And was that proposal successful?**
A. I don't know if it was or not. I don't remember that one.
**Q. You don't remember U.S. Engineering?**
A. I remember the company, but I don't remember whether or not that actual program happened.
**Q. Did you review a proposal Mr. Gerig submitted to JRF Ortho in May of 2017?**



A. I don't recall whether or not I reviewed that proposal.
**Q. And that was a custom proposal?**
A. Yeah.
**Q. And it was successful.**
A. I believe so, but I would have to see a list of things to confirm that -- a list of programs that we ran.
**Q. Did you review a proposal Mr. Gerig submitted to SCL Health in July of 2017?**
A. Yes, I did review that proposal.
**Q. How do you remember that you received it?**
A. Because I remember having a back-and-forth with Ben about the content of that proposal, and SCL Health was a very, very big client of ours -- potential client. They hadn't been a client yet, I don't think.
**Q. And that was a custom proposal?**
A. Yes.
**Q. And you were successful in getting SCL as a client, correct? In other words, they accepted a proposal.**
A. I, again, would have to see the list of what we did to confirm. I don't remember doing a program for SCL Health -- or if we did, it was very small.
**Q. Did you review a proposal Mr. Gerig submitted to Associates III in July of 2017?**



A. I don't recall whether or not I received that proposal.
**Q. And that was a custom proposal.**
A. Yes.
**Q. And it was successful.**
A. Yes.
**Q. During the -- well, let's talk more generally. One of the goals that actually went on Mr. Gerig's performance appraisal had to do with revenue expectations, correct?**
A. Yes.
**Q. Was revenue expectations a goal with respect to the other business development employees that worked for you?**
A. Yes.
**Q. So -- and who were those, again, that would have had revenue expectations?**
A. Roberta Nicknish, Lisa Wuthrich, and then later Molly Robertson. Those aren't entered into any formal system.
**Q. Why not?**
A. Because they're part-time, not benefited employees.
**Q. So they don't get reviewed?**
A. No.

that I had never heard about this before.
**Q. You had never heard of seasonal affective disorder?**
A. I heard of seasonal affective. I have never heard that he had it before. But it started to make sense for me that he was taking walks outside.
**Q. Okay. So what else about Mr. Gerig's behavior it made sense in light of his telling you about his diagnosis with seasonal affective disorder?**
A. It was really just taking walks outside, and oftentimes when we had team meetings we all sort of wanted to be, like, "Let's go outside and do this meeting."
And I remember Ben especially wanted to do those outside. I remember one or two that he was, like -- we used to shift the responsibility for the meetings, and he would pick an outdoor location.
**Q. Was there anything else about Mr. Gerig's behaviors that made sense in light of you learning that he had seasonal affective disorder?**
A. No -- just that he liked to be outside. And like on the weekends he was always hiking, and he's just an outdoors person.
**Q. And also -- I mean, we previously discussed he asked about painting a wall.**



A. Yeah.
**Q. But you didn't associate that with the seasonal affective disorder until you learned of that diagnosis?**
A. Well, the wall -- the request to repaint the second office wall did not happen under after this.
**Q. Right. But his first office wall was also painted blue.**
A. That I believe was part of a process where everybody was getting their office painted, and he picked his color and somebody picked a hot pink and somebody picked a brown color.
I kind of remember now that Ashley handled all of that stuff, but I remember people getting to choose which color they wanted.
**Q. Did you have any other thoughts that came to your head when Mr. Gerig told you about his seasonal affective disorder?**
A. I felt bad for him, I felt like a little bit of empathy because I feel that way when Denver has more than three days of no sunshine. I'm like, "Wow, Denver, you're not supposed to do this to us." So I had had a very mild, mild version of what I assume was much more intense for him, so I felt very bad for him.
**Q. What did you know about seasonal affective disorder at the time you received Mr. Gerig's initial**



**August of '17 request for accommodation?**
A. Until I had read this article, and I don't remember reading it -- like I don't remember it word for word or anything -- I knew that it existed as a condition that some people can suffer and that it could affect your mood and make it very difficult to focus.
**Q. Did you know anything else about it?**
A. No, not really.
**Q. Did you know anyone who suffers from seasonal affective disorder?**
A. No.
**Q. Were you aware that it could cause serious depression?**
A. I wasn't aware it caused serious depression, no. That was not listed here.
**Q. I'm just asking whether you're aware that it causes depression.**
A. I was not aware of that.
**Q. And you still are not aware of that.**
A. No -- until you just told me.
**Q. Did you think that his request that he be reassigned to the Office 304 was a reasonable request given his medical condition?**
A. I did feel it was reasonable.
**Q. You did feel that it was reasonable?**



A. Yeah.
**Q. And Office 304 was on the same floor of the building, correct?**
A. Yes.
**Q. It was just down the hall?**
A. It was out of our suite and then around the corner down the hall, yes.
**Q. How long did it take you to walk from your suite to Office 304?**
A. Maybe a minute and a half.
**Q. You think it would take a full minute and a half?**
A. A minute -- I don't know.
**Q. And that Office 304 was vacant at the time, correct?**
A. Uh-huh -- yes, it was.
**Q. When Mr. Gerig sent this e-mail on August 18th, 2017, did you view it as being a request under the Americans with Disabilities Act for an accommodation?**
MS. SHEYKO: Object to the form.
THE DEPONENT: Can you rephrase that question?
**Q. (By Ms. Anderson) When you received Mr. Gerig's e-mail on August 18th, 2017, did you view his request as a request for an accommodation under the Americans with Disabilities Act?**
MS. SHEYKO: Same objection.

A. I did not. I viewed it as the first time he had told us that he had this disorder and that he was asking for our help in figuring out a way to make his work space the most productive as possible.

**Q. (By Ms. Anderson) We talked at the beginning of today about your training on Americans with Disabilities Act and request for an accommodation, and I'm just trying to find out that when you received this e-mail, did you say, "Mr. Gerig is requesting an accommodation under the Americans with Disabilities Act?"**

A. No, that did not register with me.

**Q. So you didn't go -- did you go review the Employee Handbook on how you're supposed to deal with a request for an accommodation?**

A. No, because I didn't read this as a request for accommodation.

(Deposition Exhibit 32 was marked.)

**Q. (By Ms. Anderson) I am handing you what has been labeled Deposition Exhibit 32.**

**Do you recognize this document?**

A. Yes.

**Q. I believe I asked you this question earlier, but I want to make sure that I did.**

**During your time with DU, had you ever dealt with a request for an accommodation under the Americans with**



**Disabilities Act?**

A. No.

**Q. So Mr. Gerig's request was the first time you dealt with a request for accommodation at DU.**

A. Yes.

**Q. And had you ever dealt with a request for an accommodation at any previous job you had held?**

A. No.

**Q. And DU does, in fact, have policies that address how a supervisor is supposed to move forward if that supervisor receives a request for an accommodation from an employee, correct?**

A. I don't know if they have policies or not about how a supervisor should handle that.

**Q. Okay. Well, turn to the Exhibit 32, at the bottom it's labeled Gerig - 00125.**

A. Okay.

**Q. Have you read this Disability Accommodation policy in the Employee Handbook that's at the top of Gerig-00125?**

A. I read it sometime after I received this notice.

**Q. After you received the e-mail, Exhibit 23?**

A. Exhibit 23, yeah.

**Q. Why did you read it after you received Exhibit 23?**



A. I didn't review it right after I received this (indicating). I am not sure when I reviewed it, but at sometime in the months I have read this before.

**Q. But prior to Mr. Gerig making his request for an accommodation as contained in Exhibit 23, you had not read the Disability Accommodation policy in the DU Employee Handbook?**

MS. SHEYKO: Object to form.

A. I might have read it at some point in my career there. I don't recall if I have or not.

**Q. (By Ms. Anderson) Per DU's policies as supervisor, what are you directed to do if you receive a request for an accommodation?**

A. I wasn't directed -- I don't recall ever being directed to contact an office or do anything. I was told there was offices available if we needed help with an accommodation -- that might be needed for an employee.

**Q. If you were uncertain as to how to handle a request for accommodation, what were you instructed to do by DUI?**

A. To contact somebody in Human Resources.

**Q. Did you contact someone in Human Resources after you received Mr. Gerig's e-mail that's Exhibit 23.**

A. On the day that I received this?

**Q. Within a few days after you received it.**



A. No. I went on vacation the next week after this.

**Q. Okay. When did you first contact Human Resources to discuss Mr. Gerig's e-mail of August 18th, 2017?**

A. I believe the first time I was contacted by the office.

**Q. By what office?**

A. The office of the ADA.

**Q. You didn't contact them?**

A. No.

**Q. And you didn't contact anyone to discuss how to handle Mr. Gerig's request?**

MS. SHEYKO: Object to form.

A. Ben and I worked together to figure out a solution, and I asked him if he wanted to check in and have somebody at the university evaluate the type of accommodation we should create for him. And we talked a lot about a lot of different options -- moving to a cube that was right in front of a glass window, having him work more out of the office, having him take breaks and walk when he needed to.

And he indicated to me that he had also a light box at home that had helped him quite a bit, and I said, "You" -- I remember saying in our conversation, "I'm happy to do whatever you think is going to work best for you. I will talk to Kevin about the office move," and then I

said, "While I'm on vacation think about" -- and I believe he was going on vacation this next week, too -- "think about what would be your best solution for this and we'll make it happen."

**Q. (By Ms. Anderson) But he already proposed that he move to Office 304, correct?**

A. Yeah. That's why I said I'm going to talk to Kevin. I don't know how Kevin will feel about it. I said, "I don't want to have to lose you from our team office space right here, but we'll do what we need to do."

**Q. And when did you have that discussion with Mr. Gerig?**

A. It was in the afternoon here, because I left on vacation right after that, and I was gone this next week. I was not back in the office on Monday, what would be the 22nd.

**Q. So you think it was the afternoon of August 18th that you had the discussion with Mr. Gerig about his e-mail?**

A. Yes -- like a standing, not formal discussion about that, yeah.

(Deposition Exhibit 33 was marked.)

**Q. (By Ms. Anderson) I've just handed you what's been labeled Deposition Exhibit 33.**

**Do you recognize this document?**



A. I do.

**Q. What is it?**

A. It is my forwarding of the e-mail that Ben had sent about his seasonal affective disorder to Kevin Cuthbert on the next day, Saturday, August 19th, telling him that I didn't get a chance to chat with Ben about this, at all. Told him I had seen the e-mail and we'd work something out.

**Q. So does this refresh your recollection as to whether or not you had a discussion with Mr. Gerig about possible solutions on August 18th when Mr. Gerig made his request?**

A. Yes.

**Q. So you didn't have that discussion with Mr. Gerig on August 18, 2017?**

MS. SHEYKO: Object to form.

A. I thought I had but apparently I did not.

**Q. (By Ms. Anderson) You did tell Mr. Gerig that you had seen his e-mail and would work something out.**

A. Yes.

**Q. And that's what you were relating to Mr. Cuthbert.**

A. Yeah. So I would say my conversation, this short conversation that I had with him, that I said, "We got your e-mail, we're definitely going to look into whatever



solution makes sense for you, and start thinking about what that would be."

But I didn't go into the whole details of we can have this option or that option or this option or that option.

**Q. And that came after you got back from vacation.**

A. Yes.

**Q. Just to close a door, this Employee Handbook that's Exhibit 33 back to page -- or 32 back to page Gerig-125 and particularly the Disability Accommodation policy, there is a bunch of resources listed in the Disability Accommodation policy, is there not?**

A. Yes.

**Q. And it indicates that "University employees who are uncertain about how to respond to an accommodation request may also contact the above resources for consultation and assistance with the provision of reasonable accommodations."**

**Do you see that?**

A. Yes.

**Q. You didn't do that, did you?**

A. I understood that to mean that his -- he would -- that the employee would need to do that. It's the responsibility of the person with the disability to make the timely accommodation request.



**Q. Right. And it says that that would be made to a supervisor, correct?**

A. Yes.

**Q. And Mr. Gerig sent you an e-mail on August 18th explaining that he had a health condition and asking that he be moved to another office, correct?**

A. Yes.

**Q. That was his request for an accommodation to his supervisor, you, correct?**

MS. SHEYKO: Object to form.

A. He did not use the word "accommodation" in the e-mail that he sent to us. He asked for another office.

**Q. (By Ms. Anderson) After explaining that he had a medical condition, right?**

A. Yes.

**Q. And you did not view that as a request for an accommodation.**

A. I wouldn't have put those terms on it.

**Q. But my question for you isn't that. It actually says on here that "University employees who are uncertain about how to respond to an accommodation request may also contact the above resources for consultation and assistance with the provision of reasonable accommodation."**

**Now, did you take advantage of any of the**

**resources listed in the Disability Accommodation policy when you received Mr. Gerig's e-mail?**

MS. SHEYKO: Object to form.

A. I did not take advantage of any of those resources until I had felt like we had exhausted -- until he requested them. He requested it -- he went to them first.

**Q. (By Ms. Anderson) Right. You didn't call them to find out how to handle Mr. Gerig's request.**

A. No.

**Q. Mr. Gerig when he was dissatisfied with your response to his request, he then elevated it to Human Resources.**

MS. SHEYKO: Object to form.

A. Yes, without telling me.

**Q. (By Ms. Anderson) Oh, is there something inappropriate about him going to Human Resources to request an accommodation?**

A. No, he can do that for sure.

**Q. Were you upset that he did that without telling you since you made that comment?**

A. I wasn't upset. I was a little surprised that I was getting a call from that office, because I thought we had had an open communication about how to -- that I was perfectly willing to make different offices happen or



different light boxes happen or whatever he felt he needed.

**Q. At the time you received Mr. Gerig's request on August 18, 2017, did you contact Mr. Cuthbert to discuss it?**

A. I had sent him this e-mail.

**Q. Well, this e-mail --**

A. I forwarded him this e-mail saying that I didn't get a chance to talk with him about it.

**Q. Prior to sending this e-mail to Mr. Cuthbert, had you talked to Mr. Cuthbert about this request?**

A. No.

**Q. And Mr. Gerig sent his request to both you and Mr. Cuthbert, correct?**

A. Yes.

**Q. But you did not talk to Mr. Cuthbert after you received the request and before you sent this e-mail on Saturday.**

A. No.

**Q. When did you first discuss Mr. Gerig's request with Mr. Cuthbert?**

A. I don't know the specific day, but I was on vacation for the next week or so, and then I was out of the office with an illness that prevented me from going to the office.



**Q. So how long were you out total after Mr. Gerig made his request? What was the first business day that you returned to the office after Mr. Gerig made his request?**

A. I don't recall three years ago, but -- I don't know. Probably there is -- I think there is another e-mail that might say when we had a specific phone call.

I might have been back in the office sometime for a day or so, but then I got this horrible throat thing and then I worked from home.

**Q. How long were you on vacation?**

A. For about a week.

**Q. Did you talk to Mr. Cuthbert at any time while you were on vacation about Mr. Gerig's request?**

A. No.

**Q. When was the first time you spoke to Mr. Cuthbert about Mr. Gerig's request?**

A. I don't recall a specific date but sometime a week after I returned from vacation.

**Q. When you were sick?**

A. Yeah, we might have had a phone call over the phone, a short one.

**Q. Do you recall having a discussion with Mr. Cuthbert about Mr. Gerig's request?**

A. Yes.



**Q. What do you recall about that?**

A. I recall saying I'll talk with him as soon as I can, when I'm back in the office healthy or when we're able to talk, and that I would find out what would be the most helpful thing for him.

**Q. What did Mr. Cuthbert say about Mr. Gerig's request?**

A. He said that would be great, find out what he wants, make it happen.

**Q. What else did he say?**

A. I don't remember anything else about that.

**Q. You don't remember anything else he said about his request?**

A. No.

**Q. Did he ask you what you knew about seasonal affective disorder?**

A. No.

**Q. Did he say anything about seasonal affective disorder?**

A. No.

**Q. Did he say anything about the request to move to a different office that Mr. Gerig made?**

A. I think we talked briefly about whether or not he should go into the 304, and I said, "I don't really care if he does or not. I'd prefer, you know, him to be in the

cube closest to me where there is natural light because then I can still have, you know, quick conversations or hear -- you know, he can hear what I'm talking to clients about, I can hear what he's talking to clients about."

And Kevin said, "You know, I really don't -- I want the team to be all together. Now that we're all back together and in one suite, I really would like us to stay together as a team."

**Q. So Mr. Cuthbert expressed to you that he didn't want Mr. Gerig to move to the one available windowed office that also had the door.**

A. Yes.

**Q. He said he didn't want him to move.**

A. Yes.

**Q. Mr. Cuthbert had been gone for an extended period of time over the summer of 2017, correct?**

A. Yes.

**Q. So he himself wasn't in the new office suite for several months.**

A. Yes. And that's what we felt was part of the problem of why we had lost some focus on business development. I mean, Kevin was a big part of that and having him so far away made it really difficult.

**Q. Did you have further discussions with Mr. Cuthbert about Mr. Gerig's request prior to meeting**



**with Mr. Gerig?**

A. I don't recall if I did or not.

**Q. Do you recall the contents of anything else that was said by Mr. Cuthbert in conversation you had with him about Mr. Gerig's request?**

A. No -- everything I just told you.

**Q. And that's it?**

A. Uh-huh.

**Q. And you don't remember anything else.**

A. No.

**Q. Did you discuss Mr. Gerig's request with anyone else?**

MS. SHEYKO: Object to form.

A. I don't remember speaking about it with anybody else. I only spoke with Kevin about it, I think.

**Q. (By Ms. Anderson) Did you talk to Ashley Sodaro about it?**

A. I don't remember if I did or not.

**Q. Were you aware that Mr. Cuthbert forwarded Mr. Gerig's e-mail requesting an accommodation to his wife?**

A. To whose wife?

MS. SHEYKO: Object to form.

**Q. (By Ms. Anderson) To Kevin Cuthbert's wife.**

A. Kevin forwarded it to his own wife. No, I had



not.

**Q. Did Mr. Cuthbert's wife work at DU?**

A. No.

**Q. Does she work in a medical field?**

A. I don't know.

**Q. Do you know what she does?**

A. I don't.

**Q. Do you know if she is employed?**

A. I don't know if she is employed.

**Q. Do you know whether she was employed at the time?**

A. I don't believe she was. I don't know.

**Q. Do you think she stayed at home?**

A. I don't know.

**Q. Do you know her?**

A. I met her at a cocktail party or two -- briefly.

**Q. Mr. Cuthbert in all the time you worked with him, he never kind of mentioned what his wife did for a living?**

MS. SHEYKO: Object to form.

A. We never talked about that, no.

**Q. (By Ms. Anderson) Can you think of any legitimate reason why Mr. Cuthbert would have shared Mr. Gerig's e-mail with his wife?**

MS. SHEYKO: Object to the form.

A. I have no idea why.

**Q. (By Ms. Anderson) Did you share Mr. Gerig's**



**request for accommodation with your husband?**

A. I did not.

**Q. Did you share it with any of your friends?**

A. No.

**Q. Did you discuss Mr. Gerig's request for an accommodation with anyone who is not employed by DU?**

A. I probably told my husband about it.

**Q. Well, I think I asked you, did you share Mr. Gerig's request for accommodation?**

A. I didn't share the e-mail is what I thought you were asking.

**Q. Why would you have talked to your husband about Mr. Gerig's request?**

A. Because I spoke with my husband about just about everything that happened in my days at DU, my days at work because it helped me, kind of, release from the day.

**Q. While you were at DU what was your understanding as to the confidentiality associated with accommodation requests?**

A. I understood that -- I don't think I understood any confidentiality with that.

**Q. So you didn't understand that the ADA requires that things be confidential to the extent possible for requests for accommodations?**

MS. SHEYKO: Object to form.

A. Yes.
**Q. Was Mr. Gerig provided with notice of the scheduled meeting to discuss his request?**
A. I'm sure he was.
**Q. Do you recall providing him with notice of a meeting to discuss this request?**
A. I don't recall.
**Q. I am handing you what's been labeled Deposition Exhibit 24. And you see it's an e-mail from Mr. Cuthbert to you and Ben on August 29th.**
A. Yes.
**Q. And that's that e-mail on the front page of this document, it's a multi-page document, correct?**
A. Yes.
**Q. The first sentence of this e-mail says, "Kels - thanks for getting this ball rolling."**
**Do you see that?**
A. Yes.
**Q. What was your understanding as to what Mr. Cuthbert was referring to when he said "thanks for getting the ball rolling"?**
A. I'm not 100 percent sure what he meant by that, but I think it's the conversation between Ben and Kevin and I about the sort of refocus and re-engagement of the work we do.



**Q. So it wasn't getting the ball rolling on Mr. Gerig's request for an accommodation.**
A. It could have also been that.
**Q. But you don't know that.**
A. I don't know which one it was about.
**Q. And this meeting you had on August -- this e-mail is dated August 29th.**
**Do you see that?**
A. Yes.
**Q. And in this e-mail it says, "Thanks for our meeting yesterday."**
**Do you see that?**
A. Yes.
**Q. So do you assume from that e-mail that you met on August 28th?**
A. Yes.
**Q. And you met with Mr. Cuthbert and Mr. Gerig?**
A. Yes -- I was on the phone though.
**Q. You were on the phone because you were sick.**
A. Yeah.
**Q. What happened during that meeting?**
A. We discussed -- I don't remember the sequence and the exact order of different things we discussed, but at one point I remember Kevin asking something -- asking Ben something about "I'm not sure if you're fully engaged in



this work." He might have said something like, "We're not even sure if you really like doing this job or like doing this work."
And I said -- and Kevin asked me maybe if I had something to share about that too, and I had sort of said, "You know, Ben, I've gotten a sense over the past several months that you were looking for another position. I thought we were pretty clear that you were looking for a different position outside of Executive Education."
And at that point Ben said very clearly, "I am 100 percent recommitting to my work at Executive Education. And I was surprised. I really thought that he was going someplace else, was interviewing with someplace else -- had talked to me about talking to people in Advancement about positions over there, and I had advised him that those other opportunities might be good for him to pursue.
**Q. What else can you recall from that meeting on the 28th of August?**
A. We -- after Ben said that he was 100 percent recommitting to the work we did at Executive Education, we didn't talk in depth about the options. I don't remember us talking in depth about the options for how to get natural light to be more part of his day, but we said we'll figure out whatever we needed to figure out with



that. That doesn't seem even, kind of, relevant to what we're talking about in terms of all of us, sort of, re-engaging and, you know, focusing on getting more meetings and really battling out the outreach in the development for the department.
And I just sort of -- because I was kind of caught off guard because honestly I thought we were about to have a conversation about Ben saying, "I'm looking for another position," and I was ready to support him in doing that.
And instead I said, "Well, I guess if I would want anything different to go forward, I would really hope for some more curiosity from Ben. That most of the time when I asked him questions he had good answers. Most of the time I, kind of, was checking in about how things were going. I got a lot of "I'm fine, I'm good, all things are good, moving along, all things are great."
So I thought he was kind of feeling pretty comfortable in things, but I wasn't necessarily seeing the work that I -- you know, the results and the work I needed to see.
So we -- and I believe that earlier before the vacation had even happened we had, sort of, refocused his time and effort to be more on getting meetings with new companies and making sure that he was, you know, doing --

focusing as much time as he could on the types of things that were going to be revenue generating for Executive Education, as opposed to some of these other projects that might have taken longer to get to a revenue state.

And I think Kevin talked about some more of the things in terms of understanding, you know, how we build programs and stuff -- not how we build programs, but how we -- you know, what leadership kind of content and stuff like -- more of the leadership content that we teach and how he could double up his knowledge of that.

**Q. I guess I'm a little confused. Can you recall anything else from the August 28th meeting?**

A. Yes. That he -- Ben also had said he was struggling with -- you know, he didn't go into detail about how he was struggling because of his disorder, but he said something about the fact that there had been several meetings that I had canceled with him and that it was really hard for him to get time with me to ask questions and things like that.

So I felt horrible. And, like, there has been some meetings we've had to cancel, I've been sick, there were some that clients would have been pushed off, and I said, you know, "I always want to be available to you. If I have to cancel something, let's immediately reschedule it. It's really important to me that, you know, you know



you can come asking questions whenever."

And, you know, I'm a pretty hands-off kind of boss and definitely not a micromanager sort of person, and so I trusted that if he had questions or was concerned about stuff or struggling with things any time in the past when he had expressed that, we had sort of rejiggered things, refocused, pulled a little -- you know, "Hey, let's do that to this, let's do more of that," and that's how we had kind of, you know, always maneuvered that in the past.

And it just was getting -- at this point it was getting very -- I was pretty unclear what he was trying to do, but in my mind he was out the door, he was gone. We had had a conversation in April where he stood in my office door and I said, "If you were my brother, I would tell you to go earn -- find a position that you can earn as much money as young as possible because it will change the trajectory of your career. "

I remember saying -- I can see him standing in my office, and he had talked about -- you know, he had been to Armene who was the head of Advancement for the whole university, which is a person who you can't really just go have a meeting with, and I was like, wow, Ben can get a meeting with the head -- the vice chancellor of whatever.

I was, like, that is exactly how he rolled, like



he's just capable of getting those kinds of meetings. And I just was, like, how come you can't -- in my head I'm thinking, how come he can't get those meetings with the, you know, companies that we're working with?

**Q. Can you recall anything else? I just want to make sure I've closed the door on that particular, the August 28th meeting that you had with Mr. Gerig and Mr. Cuthbert. And this is the first meeting you have with them after Mr. Gerig told you about his medical condition, seasonal affective disorder, and that he needed a new office to have access to natural light, correct?**

A. I don't know if it was the first meeting or not. I somehow feel like we might have had a conversation, because -- my best recollection, and I don't remember every detail of this time frame, and it would help if I could see a calendar, if that's possible, because that would really help me kind of track when my vacation was, when I got sick.

Because I was out -- I might have been back for a day or so from vacation, and then I went home sick and I was out for, like, another week because I just couldn't --

**Q. Well, the timeline is, he made his request on the 18th, and so this is a Friday that you have a meeting.**

A. So that's ten days. Okay, so it was my one week of vacation -- thanks for helping with that calendar.



Yeah, I think this was probably the first conversation -- the first that all three of us had had, and Ben and I might have had another conversation or an e-mail exchange about the light and what his options were. But that might have also happened after this meeting.

**Q. So on August 18th Mr. Gerig contacts you and your boss, Mr. Cuthbert, and says he has seasonal affective disorder and needs an accommodation, he would like to be moved to a new office, correct?**

A. He didn't request an accommodation. He said he would like to be moved to a new office.

**Q. Right. But isn't that an accommodation for the seasonal affective disorder that --**

A. I wouldn't --

MS. SHEYKO: Hold on, object to form.

COURT REPORTER: Could you just repeat your question, because I just got part of it.

**Q. (By Ms. Anderson) When Mr. Gerig disclosed a medical condition to you and says in order for him to be effective in his job he needs to move to an office that has natural light, you did not view that as a request to accommodate his seasonal affective disorder.**

MS. SHEYKO: Object to form and asked and answered.

A. I wouldn't have used the term "accommodation" --

I wouldn't have used that term, and I didn't click in my head is that's what that was a request for. He was requesting an office move.

**Q. (By Ms. Anderson) Right. As a result of a medical condition.**

A. As a result of a medical condition.

**Q. But you didn't connect those dots.**

A. I did not.

**Q. Did Mr. Cuthbert connect those dots?**

MS. SHEYKO: Object to form.

A. I don't know if Kevin was connecting them or not.

**Q. (By Ms. Anderson) Well, what did Mr. Cuthbert express to you that he understood this to be Mr. Gerig's request for an accommodation?**

A. He didn't say anything to me about an accommodation.

**Q. And Mr. Cuthbert tells Mr. Gerig on the 21st of August that we'll meet about his request when everyone is back in the office -- if you'll look to the bottom of Exhibit 23.**

A. Yes.

**Q. And then the very first meeting you have with Mr. Cuthberg and Mr. Gerig is this meeting on August 28th that we just discussed, correct?**

A. Yes.



**Q. And that really had much more to do with all these, you know, how you were going to move forward in business development, correct?**

MS. SHEYKO: Object to form.

A. It was initially -- the first part of the conversation was about Ben's need for natural light, and I think we all agreed to figure out the right accommodation for that.

And then we also talked -- I think Kevin might have just also opened the conversation to a bigger picture, a conversation about Ben's role in the state of Executive Education and what we need to focus on. You know, sort of a re- -- like a -- Kevin was when he came back to focus just on Executive Education he was very clear that he needed to do more to get the whole team, kind of, ramped up in terms of our efforts and our outlook. So this was his first attempt to do that.

**Q. (By Ms. Anderson) Was the meeting on August 28th, 2017, a meeting that was scheduled?**

A. I don't recall if it was scheduled or not.

**Q. How is Mr. Gerig notified of this meeting?**

A. I'm assuming he had a calendar invite, but I don't know if he had a calendar invite for this particular meeting or not. I don't recall how it was set up.

**Q. Did you set it up?**



A. I might have.

**Q. But you don't recall setting it up.**

A. Not from three years ago.

**Q. Do you -- well, it's kind of an important meeting.**

**Was Mr. Gerig notified as to what the agenda for this meeting was?**

A. I don't know if there was an agenda or if he was notified.

I feel like there might be another e-mail where I -- no, it wasn't about this meeting. I was returning from vacation. This was -- I had been at the doctor all night, I wasn't able to talk because I had these things in the back of my throat.

And so I said, "I can do this meeting, I'm not coming in for it, if you can dial me in that would be great because I have a half an hour window where I can put Lidocaine back there and I can actually talk" -- because otherwise I couldn't talk.

**Q. Did Mr. Cuthbert, kind of, run this meeting?**

A. He started it, yes.

**Q. And it was probably something that he scheduled with Mr. Gerig?**

A. I'm not sure who scheduled it.

**Q. But you were at home.**



A. But I could easily have scheduled from my laptop, but I don't remember who scheduled it or not.

**Q. Did you discuss an agenda for this meeting with Mr. Cuthbert?**

A. I don't remember discussing an agenda for this meeting.

**Q. Who directed the meeting?**

A. I think Kevin did.

**Q. And you said that Mr. Gerig's request for an office with natural light was discussed in this meeting, correct?**

A. I think we did discuss that, yes.

**Q. Do you recall that part of the discussion? You've given me a lot about this meeting. What do you recall about the discussion on natural light and his request for a new office?**

A. I remember us saying, "Of course, we're going to figure out the right thing for you for that. Let us know what it should be. Think about what you want and you and Kelsey can talk about different options of what will be possible."

And I do think he said, "I really want to keep the team together in the" -- that might have been the first time Kevin had told me that keeping team part together prior, and I think this might have been the first

Page 157

time that Kevin said, "You know, I really want to keep the whole team together in the office so that we can learn from each other and stuff like that."

**Q. But Mr. Gerig had already made clear what he wanted, Office 304, correct?**

MS. SHEYKO: Object to form.

A. Yes.

**Q. (By Ms.Anderson) And you're telling him scratch 304, come up with something else that might help you.**

MS. SHEYKO: Object to form.

A. We didn't say, "Scratch 304." We said, "We'd rather have you stay in the suite, and we think it's important for the whole team to be together, is there other things that would help?"

**Q. So you didn't tell him that he could not move to 304.**

A. No.

**Q. Was getting Mr. Gerig a lamp something that was discussed during that meeting?**

A. No.

**Q. What else was discussed with respect to his request to move to Office 304?**

A. I don't think we discussed much more -- anything more than that because we moved kind of quickly to the other -- Kevin sort of asked this other bigger question.

Page 158

**Q. Was his medical condition discussed?**

A. No.

**Q. Was he asked to explain how his medical condition impacted his day-to-day activities?**

A. I don't remember whether or not we asked him what he needed or how it is affected. I don't remember if we asked him that or not.

**Q. Did you request any documentation for him in connection with his medical condition?**

A. No.

**Q. How long was this meeting in total?**

A. It probably was about a half an hour, because I had trouble talking.

**Q. So you think it was about 30 minutes.**

A. Yeah.

**Q. How much of the time was spent talking about his request -- his medical condition and his request to move to a new office?**

A. I wouldn't be able to quantify it besides just the -- I mean a general guess is maybe a third.

**Q. So you think 10 minutes of that 30-minute meeting was spent talking about his need for natural light?**

A. That seems reasonable.

**Q. You said that when Mr. Gerig sent his initial e-mail and he attached a link to a discussion about**

Page 159

**seasonal affective disorder, you clicked on that link and read it.**

A. I remember scanning it, reading it, yes.

**Q. You read it?**

A. Yes.

**Q. Before you met with Mr. Gerig on the 28th to discuss his request, what attempts did you make to learn more about seasonal affective disorder?**

A. I didn't make any attempts. I was on vacation.

**Q. Did you think it was important to understand how seasonal affective disorder might be impacting Mr. Gerig's performance?**

MS. SHEYKO: Object to form.

A. I felt like from reading the article I understood enough to be able to know that it could affect people in a variety of different ways, and that some people have eye problems, I kind of recall, and some of the people have depression as a symptom, or some people have -- I just remember reading it could show up in somebody's -- the actual symptoms of it could show up in a lot of different ways for people.

**Q. (By Ms. Anderson) You didn't think you needed to know more about seasonal affective disorder than what that article provided?**

A. No, I didn't think I needed to know more than

Page 160

that.

**Q. My questions have been directed towards your efforts to learn more about seasonal affective disorder prior to the August 28th meeting with Mr. Gerig.**

**At any time after that meeting did you attempt to learn more about seasonal affective disorder?**

A. I remember having conversations about -- when Ben and I had conversations about the options and light boxes and cubicles with windows and all those options we talked about, I remember asking him sort of what helps him the most.

And I remember asking him, "What -- you know, is it something that was all the time?" Like I asked him -- I probed him a little bit more on, you know, the history of how long he sort of felt this way, and how, you know -- I remember him saying it's kind of why he chose to move to Denver because it was so much sunnier here, 300 days of sunshine.

And I remember asking him, you know, did it make it harder, I don't know, like to sleep, or how was it at home and, you know, did it have a flow -- like if it was something that was sort of all the time, or if it was only in the winter or, you know, stuff like that.

**Q. And what do you recall Mr. Gerig telling you about how it impacted him?**

A. Yeah. I remember him telling me that it was sort of a seasonal thing for him in some ways, that sometimes it was worse -- obviously in the winter it was worse, and that is why he loves to camp, why he loves to hike.

He had just done this massive hike right when we first hired him. It was like, you know, an ultra -- "How can you be outside for that long," and he was like, "I loved it, I loved it."

And I remember him telling me that he has this light box at home that is -- was like half the size of the room or something. And I was like, "Wow, I didn't know such a thing had existed."

And that was in the midst of us talking about, you know, like -- so what would be the most helpful to you. Kevin seemed to feel pretty strong about this office, that you stay in this office. I would really like you to stay in terms of keeping together with the team.

And there is this cube like right outside my office that is directly in front, and it stops three-quarters, two-thirds of the way up the wall -- or up in space, and it has a huge -- I'm like, "Wouldn't that make you feel so much better?"

I remember sort of asking him, "Why didn't you want to move to that spot in the first place when we moved over here in March?" And I remember him saying, of



course, he wanted his office with a door.

**Q. Right. And when you have conversations on the phone, it's kind of nice to be able to shut your door, wouldn't you agree?**

A. I do. And also I have experienced a lot of people -- everybody else that was in that pit of cubicles were business developer people, recruiters, program developers who were on the phones just as much as Ben was.

**Q. Right, except that they were part-time. He was a full-time employee.**

A. Yes, that's true.

**Q. And the others were part-time employees.**

A. Yes. And there had been another person who has been in that spot who was a full-time employee who was 100 percent an outreach person.

**Q. And how we got talking about this was in the context of what opportunity to learn more about seasonal affective disorder after you had the August 28th meeting with Mr. Gerig, and you told me that you had a long discussion, sounds like, with Mr. Gerig about seasonal affective disorder and how it impacted him personally, correct?**

A. I wouldn't say it was a long discussion, but it was a discussion.

**Q. Okay. And did Mr. Gerig tell you during that**



**conversation the best thing you can do for it is give him access to natural light?**

A. He did.

**Q. After the meeting on August 28th, did you follow up with Mr. Gerig regarding his request for an accommodation?**

A. Well, I followed up with him about the natural light. That was the conversation I just described, was the follow-up after this meeting.

**Q. And did he tell you that he would look into other options?**

A. So I said, I understood the natural light -- an office with natural light was the best, that that was what he wanted the most. And I said, "Are there other options that would work considering what Kevin saying about the team aspects of keeping us all in the same office?"

And he said, "Well" -- that's when the light box came up at home. And I said, "Would it be -- you know, is there one that would work in an office?" And he said, "I can look into it, and I'll" -- you know, I said, "Well look into that, and if you want to move into this other cubicle, I fully support that. And if you want to take more walks, I support it, you know -- or take your laptop outside and go -- you know, work outside for a bit. If you want to work in a conference room, if you wanted to



work in my office or Kevin's office whenever we weren't there, he was more than welcome to do that."

And we both sort of said, "Yeah, it's hard to just pick up your stuff and, you know, not have your whole system set up and stuff like that." And that's why I was really kind of urging him to take a cubicle spot where -- because it was so -- it was the sunniest spot in the entire office.

**Q. But, again, it's an office without a door.**

A. Yes. And there is a lot of other people working in there, it's a cubicle.

**Q. And it's distracting to have people talking all over the place.**

A. There were a lot of other people making phone calls in that same --

**Q. But you can understand --**

**COURT REPORTER: There was an objection. Was it to this question or the prior question.**

MS. SHEYKO: The prior question.

**Q. (By Ms. Anderson) But you can appreciate why someone who is in a position where they're on the phone a lot might want to get to shut the door so they can concentrate on their calls, correct?**

A. I could understand that somebody would then be making a decision to care more about having a door closed

than whether or not natural light will help them be more productive. So to me he was making a choice saying, it's more important that I have a closed door then it is that I have light.

So I kind of took that also to mean the lamp will do, and he doesn't feel that the lack of natural light is hurting him so badly that he wants to move out of the office.

**Q. Right. But you guys were making a choice that his condition didn't warrant moving down the hall into an office that offered him natural light and privacy to have discussions on the phone.**

MS. SHEYKO: Object to form.

**Q. (By Ms. Anderson) That was a choice you and Mr. Cuthbert made when you told him he couldn't move to 304 which was down the hall.**

MS. SHEYKO: Same objection.

A. We didn't tell him he couldn't. We said we prefer you not too, are there other options that would make you feel comfortable?

**Q. (By Ms. Anderson) Right. And he told you that the best option was the office with the natural light.**

A. Correct.

MS. SHEYKO: Object to form.

**Q. (By Ms. Anderson) I mean, I think you already**



**said that.**

A. He said that would be the best option, but I'd be happy to have the light in my office.

(Deposition Exhibit 34 was marked.)

**Q. (By Ms. Anderson) I'm handing you what has been marked as Exhibit 34.**

**Do you recognize this exchange of e-mails with Mr. Gerig?**

A. Yes.

**Q. What's it about?**

A. It is about ordering of the sun lamp for his office -- sun box light.

**Q. And so on September 11th Mr. Gerig sent you an e-mail with a link to a lamp that he thought might work for his office.**

A. Yes.

**Q. And you told him on the 12th that you would order it for him.**

A. Uh-huh. That it was ordered and it was back-ordered.

**Q. Right. Do you know when Mr. Gerig received his lamp?**

A. On the 18th I e-mailed Ben and said that it looks like the sun box is on its way, and that was attached to a shipment detail that the sun box company had given me for



a scheduled delivery of September 21st.

**Q. Do you believe that it arrived on or before September 21st then?**

A. I believe it did.

**Q. After it arrived, did you follow up with Mr. Gerig as to whether it was helping him deal with his seasonal affective disorder?**

A. Yes. I asked him at least on one occasion in one of our one-on-one meetings, "How is the lamp working out?"

**Q. And do you recall when that discussion took place?**

A. I don't.

**Q. Would it have been shortly after the lamp arrived?**

A. Within a week or two.

**Q. What did Mr. Gerig tell you when you asked him that question?**

A. He said it's not as good as the one at home, but it's helping -- is what I recall.

**Q. Did you have any other discussions with him concerning the lamp?**

A. No.

**Q. That was the one and only discussion you had with him concerning the effectiveness of the lamp?**

A. If he ever had a problem with it, I expected him



to come back and tell me there was an issue with it.

**Q. But you didn't have any additional conversations with him concerning the lamp?**

A. No.

**Q. And on October 5th, 2017, Mr. Gerig contacted Rufina Hernandez to schedule a meeting to discuss the request for an accommodation of his disability, correct?**

A. Yes.

**Q. And at that he used the term "request for accommodation," correct?**

A. I believe he did. I wasn't -- yeah.

**Q. But you were --**

A. I was copied on that e-mail, yes, but I don't --

(Deposition Exhibit 35 was marked.)

**Q. (By Ms. Anderson) I'm handing you what has been labeled Deposition Exhibit 35.**

**Do you recognize this document?**

A. Yes, I recognize it.

**Q. And the e-mail that came from Ben Gerig to Rufina Hernandez copying you went out on October 5th, correct?**

A. Yes.

**Q. And in that e-mail Mr. Gerig specifically said, "Is there a time that works for you to get together with Kelsey and I to discuss reasonable accommodations available to me at DU with respect to the ADA."**

**Q. When did you and Mr. Cuthbert first start discussing whether you should try to get Mr. Gerig to accept some kind of resignation?**

MS. SHEYKO: Object to form.

A. I don't remember the specific date that or meeting when we ever talked about whether or not we might want to offer him that as an option.

**Q. (By Ms. Anderson) You don't remember when that happened?**

A. It must have happened sometime in October, because we had set new standards in September -- in August we had set some new standards, and then we started to track it more closely, and Kevin was asking me more on a weekly basis what meetings he had had and stuff like that in September, and we -- I wasn't seeing the number of meetings we were hoping he would do and that I had asked him to use as his target.

And I was starting to experience just not, you know -- I was trying to get more clear in September that it wasn't -- it was hard for him to get meetings, or that he just wasn't getting the ones that we -- you know, like his four meetings a month.

And so we started to talk more about strategies. To get meetings I said to list the people to call. I was, like, how can we help you? Do you need to do more



networking, can I help you get this other stuff off your plate?

The South Metro Chamber and this Cannabis Summit were sucking up a lot of his time, and in the past he had asked me -- or sort of said, you know, it's hard when I'm trying to do so many projects at once and I'm, like, "Yeah, it can be really difficult sometimes to try and sell custom programs and also try to fill public programs."

So we, sort of, shifted that responsibility off his plate, you know, just trying to get meetings for potential custom programs, and really trying to get meetings to sell anything, you know. Like just so that people outside, you know, would know that DU and Executive Education even exists.

**Q. Right. And my question really had to do with when did you first discuss with Mr. Cuthbert perhaps asking Mr. Gerig whether he would be interested in resigning with some kind of severance package?**

A. I feel like we started talking about that maybe in October sometime, because in September we not seen any improvement in his ability to get meetings, and same in -- so sometime in October we started to, sort of, discuss whether or not, you know, this was going to work out for him.



**Q. And this was during the process for requesting an accommodation, correct?**

A. Yeah. I think a lot of it -- yes.

**Q. Because, in fact, he had contacted Ms. Hernandez on October 5th, correct?**

A. Yes.

**Q. Asking for an accommodation.**

A. Yes.

**Q. And the process was very, very busy during the October, early November time frame with respect to his attempts to get an accommodation, correct?**

MS. SHEYKO: Object to form.

A. No, I think he asked for -- I don't know how involved the process was for him.

**Q. (By Ms. Anderson) Okay. Well, he had meetings he initiated with Rufina Hernandez on October 5th; he had to get doctor's information to Lloyd Moore during the month of October; he got the lamp; he sent you information on the lamp in September; he got the lamp the end of September; eventually he was able to have the meeting with Lloyd Moore and Elizabeth Cha, as well as you and Kevin on November 9th.**

**This all happened in a, kind of, five- or six-week period, correct?**

MS. SHEYKO: Object to form.



A. Yes.

**Q. (By Ms. Anderson) And this was during the period when you and Mr. Cuthbert started discussing asking him if he wanted to resign?**

A. I believe Kevin and I spoke about that in October sometime.

**Q. So on November 10th you tell Mr. --**

THE DEPONENT: May I take a quick break? Sorry.

(Recess taken 4:20 p.m. to 4:26 p.m.)

(Deposition Exhibit 40 was marked.)

**Q. (By Ms. Anderson) Mrs. Johnson, I'm handing you what's been labeled Deposition Exhibit 40.**

**Do you recognize this document?**

A. Yes.

**Q. And at the bottom of this page is an e-mail from Mr. Gerig to you and Mr. Cuthbert providing talking points to use with teammates regarding his move to 304, correct?**

A. Yes.

**Q. And these are the talking points you said you guys wanted because you weren't sure how much you wanted to reveal about his condition and you wanted to be careful with everything, correct?**

A. Yes.

**Q. Are these the -- did you ultimately use these talking points for adjusting Mr. Gerig's move with his**

**colleagues?**
A. I believe that Ben sent this to the team in an e-mail, but I'm not 100 percent sure how he communicated. I think he had some one-on-one conversations with people.
**Q. And this was sent to you guys on November 13th, correct?**
A. Yes.
**Q. And both of you thought it looked fine.**
A. Yes.
**Q. Did the move ultimately create any problems for the members of the Executive Education team?**
A. Not that any were expressed to me.
**Q. None that anyone expressed to you?**
A. Exactly.
(Deposition Exhibit 41 was marked.)
**Q. (By Ms. Anderson) Ms. Johnson, you've just been handed what has been labeled Deposition Exhibit 41.**
**Do you recognize this document?**
A. I do.
**Q. And this is Mr. Cuthbert's e-mail to Mr. Moore and Ms. Cha telling them that Mr. Gerig had been offered their accommodation, correct?**
A. Yes.
**Q. "And his moving to Suite 304 is in the process."**
**What did that mean, do you know?**



A. That he was in the process of moving to Suite 304, that he was moving his stuff from his existing office to the next office, moving phones and changing his computer login stuff.
**Q. And as of November 16th, Mr. Gerig had not yet moved to the office, had he?**
MS. SHEYKO: Object to form.
A. I don't remember when he moved to the new office. It might have already started.
**Q. (By Ms. Anderson) You don't know when he moved into the new office?**
A. I don't know when he moved into the new office.
**Q. Would it surprise you if he didn't move into the new office until the week of the 27th?**
MS. SHEYKO: Object to form.
A. Of?
**Q. (By Ms. Anderson) Of November, November 27th.**
A. Wouldn't that have been Thanksgiving week?
**Q. I don't know. I'm pretty sure that that was the week that he moved, and that's why I'm asking you if --**
A. That would be surprising to me.
You're saying he didn't move into the office until the week of November 27th.
**Q. I was saying that, and I was asking if that would surprise you and then you told me that it would.**



A. Got it.
**Q. You don't remember there being that, kind of, delay from the time you approved the move until he actually moved into the new office.**
A. No.
(Deposition Exhibit 42 was marked.)
**Q. (By Ms. Anderson) I am handing you what has been labeled Deposition Exhibit 42.**
**What is this document?**
A. This looks to me like an e-mail to Cristina Valencia that I was copied on that Kevin Cuthbert sent on Thursday, November 16th. And it looks like a follow-up e-mail to a previous e-mail where Kevin is sharing some information with Cristina about the fact that Ben was still not picking up on some important parts of his job. Kind of, just, you know, giving her an update on his performance.
**Q. This was sent on November 16th, 2017, correct?**
A. Yes.
**Q. That was same day as Mr. Cuthbert notified Mr. Moore and Ms. Cha that you had decided to grant the requested office move, correct?**
A. Yes.
**Q. Who is Cristina Valencia?**
A. Cristina Valencia, I believe, is somebody in



Human Resources.
**Q. Did she report to Rufina Hernandez?**
A. I don't believe so.
**Q. Why did you tell Ms. Valencia about this situation with Mr. Gerig?**
A. Back earlier we weren't talking to Cristina about his accommodation, but I mean we -- I don't know if Kevin had had a previous conversation with Cristina separately but sometime in the September time frame, maybe in October, I talked to Cristina Valencia and Kevin might have also talked to Cristina about our concerns with Ben not being able to perform his job.
**Q. So you started talking to Ms. Valencia in October about Mr. Gerig.**
A. Yes -- I believe.
**Q. And what was the point of going to Ms. Valencia about Mr. Gerig?**
A. Because she was the HR representative assigned to help with how we may deal with -- you know, handle somebody who needed to be kind of set up on a performance plan in order to, you know, decide whether or not, you know, he was doing his job up to the standards we needed him too, and whether or not -- she was to help us figure out whether or not -- what our options were in terms of his future employment.

Page 221

**Q. Right. And so in October you went to Ms. Valencia to learn how to set Mr. Gerig up on a performance improvement plan?**

A. I went to her to get information about how we might need to document things on a performance plan once we set it up. Not the specifics of the performance plan, but how many detail we needed to document in order to be able to potentially terminate him if he wasn't willing to move on.

**Q. So in October you went to Ms. Valencia to ask Ms. Valencia how to document performance issues with Mr. Gerig?**

A. Yes.

**Q. And did she give you advice as to how to document performance issues with Mr. Gerig?**

A. She did.

**Q. What did she tell you?**

A. She told me that it was -- if there hadn't been -- if we needed to track things like if he was hitting metrics or not hitting metrics and whether or not he -- if there was any issues with specific clients, that we should, you know, keep track of those. Like if there was some miscommunication or mistakes that had been sent clients, that we should hold on to those.

**Q. So just how to document to set him up for**

Page 222

**termination?**

MS. SHEYKO: Object to form.

A. Yeah, how to document any shortages in his performance.

**Q. (By Ms. Anderson) Right. And that's what you wanted to know from Ms. Valencia?**

A. Yes.

**Q. Okay. Did you ask her about progressive discipline?**

A. I asked her, yeah, about what sort of our options were in terms of, you know, the -- what's the process of somebody who's not performing. And I had never had to terminate somebody before, or felt like their performance was in a place where I needed to, so I wanted to get clear on the process of is there warnings, do I have a warning that's verbal, do I have a warning that's in person?

Because at this point -- I think it was around the time of the performance appraisal, and she also, sort of, advised for me to put, you know, anything that I was concerned about in the performance appraisal. And I said that will be documented in his performance appraisal, and then --

**Q. So you talked to her before you did his performance appraisal?**

Page 223

A. I'm not sure if I did talk to her before or after that.

**Q. Okay. Well, how did you know to put in the performance appraisal if you had not talked to her prior to the performance appraisal?**

A. I don't remember if that was something -- she might have said that to me, or I don't recall whether or not she for sure did. Sorry, if I misspoke about that.

**Q. Okay. Well, Mr. Gerig received his performance appraisal on October 2nd, 2017.**

**Do you recall that?**

A. I do.

**Q. So are you telling me you talked to Ms. Valencia prior to October 2nd, 2017 about Mr. Gerig?**

A. No. I don't believe that's what the case is, no. I think I talked to her after.

**Q. Well, what did she advise you with respect to how to document discipline issues?**

A. She just asked me about whether or not it had been documented in his performance appraisal.

**Q. Okay. Well, tell me what she advised you with respect to how to -- you said you asked about verbals and writtens and those -- typically part of a progressive discipline system.**

**What did she advise you with respect to the**

Page 224

**discipline system at DU?**

A. She advised that we increase the number of conversations and set meetings; she advised that we -- I should document, like, every situation that I saw that was not meeting performance standards; and she asked me to, you know, just keep copies of e-mails and to just start taking some notes about what I was observing that was not meeting standards.

**Q. What else did she advise you?**

A. I think that's all she advised me.

**Q. Okay. She didn't tell you how to do a written warning or a verbal warning or final written warnings?**

A. No. At some point I asked her if we had to have a written warning and I don't recall if -- I think there was one written warning, but it wasn't -- she said it didn't need to be officially called that. It could be in an e-mail. Like it didn't need to be on a separate thing. It could be an e-mail that we send that just says, you know, this is to let you know that you're going on a plan essentially, or words to that effect.

And then she said at another stage we will -- if you feel it's necessary and the improvements are not there, then you would write a more formal Final Written Warning.

And so I said we're not there. We have -- you

know, we've put some things in place and we're going to see how it works out.

**Q. What do you mean "you put some things in place"?**

A. We put the new expectations or more clear expectations in place.

**Q. How did you get the ball rolling on Ms. Valencia?**

A. I called her up.

**Q. Did you schedule an in-person meeting?**

A. I think I did.

**Q. Do you recall meeting with her in person to discuss Mr. Gerig?**

A. Yes.

**Q. Was Mr. Cuthbert in that meeting?**

A. I don't think he was, no.

**Q. Did you ever meet with Ms. Valencia and Mr. Cuthbert?**

A. I don't recall if I did or not.

**Q. How many times did you meet with Ms. Valencia?**

A. I had one in-person meeting with her and then one phone call -- at least one other phone call with her.

**Q. And did you have any e-mail exchanges with Ms. Valencia?**

A. Possibly.

**Q. You don't know if you did or you didn't?**

A. No.



**Q. You know you had this one, Exhibit 42.**

A. It would be this one.

**Q. And you don't know if you have any others.**

A. I don't recall from that time whether or not I had more e-mails with her, but I imagine you guys have some -- or maybe not.

**Q. Maybe not. I'm just asking if they exist.**

**In this e-mail of November 16th, 2017, the -- and this e-mail, by the way, was from Mr. Cuthbert to Ms. Valencia, correct?**

A. Are you talking about the Thursday, November 16th?

**Q. Yes.**

A. So it looks to me that this e-mail to Cristina Valencia on the 16th of November was Kevin forwarding the follow-up meeting to Lloyd and Elizabeth.

**Q. I'm looking at the top one. It's to Cristina but it looks like it's from Mr. Cuthbert.**

A. Yes. That's what I'm talking about, yeah.

**Q. And how did Mr. Cuthbert get involved with Ms. Valencia if you were the one that was dealing with her?**

A. Kevin was my boss, so I spoke with him about the conversations I was having with Cristina.

**Q. How many conversations did you have with**



**Ms. Valencia about Mr. Gerig?**

A. I think I had an in-person meeting and possibly one -- I can recall one other phone conversation with her in this time frame.

**Q. And you told Mr. Cuthbert about those meetings?**

A. Yes.

**Q. And so do you know why Mr. Cuthbert reached out to Ms. Valencia?**

A. I think he was ready to move forward with more formal documentation about the ways that Ben was not -- hadn't been meeting his performance standards.

**Q. Well, it seems like he had gone even a little farther than that. If you go to the third one sentence paragraph on the bottom, it said, "We shared this with him today and also talked about the possibility of a negotiated resignation."**

**Do you see that?**

A. Yes.

**Q. So as of the day that you notified the ADA people that Mr. Gerig was going to be allowed to move offices, you also were talking to Mr. Gerig about a negotiated resignation, correct?**

MS. SHEYKO: Object to form.

A. Let me think. I believe that we told Ben that he was going to get the office on November 10th. Kevin, I



believe, in catching up on some old e-mails, didn't send any confirmation to Lloyd and Elizabeth until November 16th, so six days later. But Ben had already known that he was getting the -- was moving to 304.

And I think in that same day Kevin was -- yeah, I don't see any coincidence or any connection between the two e-mails.

**Q. (By Ms. Anderson) So Kevin shoots out an e-mail to Mr. Moore and Ms. Cha saying "Mr. Gerig is going to be allowed to move into the new office," and on the same day he sends an e-mail to the HR person saying that we talked about a negotiated resignation with Mr. Gerig.**

A. Yes.

(Deposition Exhibit 43 was marked.)

**Q. (By Ms. Anderson) You've just been handed what's been labeled Exhibit 43.**

**Do you recognize Exhibit 43?**

A. Yes.

**Q. And one thing I didn't know when we were talking about Exhibit 42 was, Mr. Gerig told Mr. Cuthbert when the negotiated resignation was brought up that Ben, Mr. Gerig, wanted to try and keep working the plan, correct?**

MS. SHEYKO: Object to form.

A. Yes.

**Q. (By Ms. Anderson) So Mr. Gerig told you and**

**Q. But the first step -- let me just see if I got this, what you were advised by Ms. Valencia.**
**The first step was to outline performance expectations, correct?**
A. Yes.
**Q. And then the next step was to document any areas in which Mr. Gerig was not complying with his performance expectations after the expectations had been defined for him.**
A. Yes.
**Q. And then the next step -- what was the next step in the progressions?**
A. She explained it to me not so much as steps, but as different elements that needed to happen in order to have enough --
**Q. To terminate.**
A. Yes, to terminate.
**Q. And she provided you with this outline of what you needed to do back in October, correct?**
A. I don't recall exactly the time frame when she gave me that information.
**Q. And after you documented performance deficiencies where performance was not meeting the specifically defined expectation, what was the next step?**
A. It was not so much a step but advice from her to



keep track of the different pieces -- moments when things were not hitting those standards.
**Q. And create a writing documenting those areas in which Mr. Gerig was not meeting the standards.**
A. Yes.
**Q. And she provided a timeline for how soon after giving a final warning you could terminate, correct?**
MS. SHEYKO: Object to form.
A. I believe she provided a timeline. It wasn't like how long until we could terminate. It was -- I don't recall how -- I remember her telling me a certain number of weeks, but I don't remember how many weeks, and I don't remember why she was telling me the number of weeks.
**Q. (By Ms. Anderson) Did you express any dissatisfaction with Mr. Gerig's work prior to late August 2017?**
A. I over the course of many -- in any of our conversations with him I was always focused on what help he needed and how I could help strategize to do more and do better.
I would never have said, "I'm disappointed in your work." I never said that to him.
**Q. So prior to -- well, August 2017 you did express that you didn't think he was meeting what you wanted him to meet, correct?**



A. On August 28th or prior to?
**Q. Come August 28th, 2017, you told Mr. Gerig that there were things that needed to improve, correct?**
A. On August 28th?
**Q. Yes.**
A. Yes.
**Q. And that was the first time you've done that to Mr. Gerig.**
A. No. We had talked about refocusing his efforts in different areas, not working as much on the Cannabis Summit. We had talked about him not -- you know, I just said -- I was always sort of coaching and trying to encourage him to always get more meetings and suggesting to him that we really needed to dial up, you know, new clients and spend less time working on things like the Cannabis Summit and the South Metro Chamber program.
**Q. Prior to August 28, 2017, did you express dissatisfaction in the work that Mr. Gerig had done for you?**
A. I would have given him feedback about the fact that he needed to do more, but I never would have used the word "dissatisfaction."
**Q. Okay. Well, what feedback did you give him that he needed to do more?**
**Let me scratch that question.**



**Is there any reason Mr. Gerig would have suspected that you were unhappy with his performance prior to August 28th, 2017?**
MS. SHEYKO: Object to form.
A. He could have felt some sense of frustration on my part in terms of hoping he would be getting more meetings or hoping that he would get things moving quickly with some of these other projects.
I would ask questions to him about how -- why things weren't moving faster with a certain program or why things weren't -- you know, this wasn't getting done, and he would always come back going, "Yep, I'm working on it, I'm pushing through it, I'm getting it, I'm working on it" and would sort of -- I didn't know how he felt about that feedback, at all.
**Q. (By Ms. Anderson) You don't know how he felt.**
A. I meant it to be "We need to dial this up." And it was probably more cheer leader mentality and, like, how can we get this better, how can we -- what else do you need to -- you know, "Can I get you lists? Can I get" -- you know, I was always just wanting to feed him some better opportunities so that he could get more meetings to happen and be, like, you know, what other ideas do we have?
I was definitely -- I am definitely more of a

cheer leader type leader than a hold people's feet to the fire. That made me very uncomfortable to hold people's feet to the fire so I always took a, you know, "What else do you need, how can be make this better" kind of approach.

**Q. And you're talking about an employee that come August of 2017 had been with you guys no more than 15 months.**

A. Yeah.

**Q. So it wasn't like he had sitting there for five years not doing a good job, correct?**

MS. SHEYKO: Object to form.

**Q. (By Ms. Anderson) He was a new employee.**

A. I wouldn't call him new after a year. He was definitely established there.

But it was also clear to me as of March, April that he was looking for another job and was not happy in Executive Education and was probably going to leave.

**Q. Don't people look for new opportunities all the time?**

MS. SHEYKO: Object to form.

**Q. (By Ms. Anderson) You've brought that up a number of times and I find that kind of interesting, because I think go-getters, people that are kind of ambitious are constantly looking for a better opportunity.**



**Do you not view it that way?**

MS. SHEYKO: Object to form.

A. I don't view it that way because I got a very strong sense from him from conversations that I had with him that he would be happier someplace else.

And when somebody I -- I feel when somebody has got a foot out the door and another opportunity to do something different, that they're done, they shut off. And I've experienced that with him. That he, you know, was sort of just not as engaged with Executive Education anymore.

**Q. (By Ms. Anderson) I mean, we spent a long time earlier talking about the 360 Review that you gave in June of 2017 of Mr. Gerig, correct?**

A. We did talk about that and it was not a review.

**Q. But it was, in fact, comments on his performance, correct?**

A. It was comments on his leadership abilities and his characteristics of a leader. It was part of a leadership program and in no way is that document ever to be thought of or used as a performance review document.

It's not about his performance. It's about his participation in a leadership program.

**Q. And also his attitude?**

A. And his attitude and --



**Q. And his skills?**

A. Yes, in June, May.

**Q. Right. That was in June of 2017.**

A. Yes.

**Q. That provided that feedback regarding Mr. Gerig.**

A. Yes. And there was some -- the feedback in that 360 Review that was not positive and was really hoping to encourage him to improve in some areas. So I had given him some of that feedback in that, as well.

We didn't cover it when we were looking at it before, but there was some statements in that 360 Review that I had included about becoming more of a leader in taking charge of the faculty teams and trying to, you know, run the sort of process of building custom programs. More as a leader and less as a, you know, sort of a bystander.

**Q. On or about -- and we briefly touched on this. But on or about October 2nd, 2017, you provided a performance evaluation of Mr. Gerig, correct?**

A. Yes.

**Q. And I'm handing you what has previously been labeled as Deposition Exhibit 5.**

**Is this the performance evaluation you provided to Mr. Gerig on or about October 2nd, 2017?**

A. Yes.



**Q. And the Created On deadline, we talked about this earlier, that's the date when the document was finalized?**

A. I believe that's the case, I'm not sure.

**Q. Did others beside yourself have input into this document?**

A. I likely spoke with Kevin about it.

**Q. Do you recall speaking to Kevin about it?**

A. I do recall speaking to Kevin about it for sure after it was completed, or after Ben had set up his -- put in his comments.

So it would be helpful to understand the process. So the document had -- we had established goals before, there was an opportunity to change some of those things along the course of time, and that sort of closed back in the fall of 2016.

And then at the point when we were doing this evaluation, the first step is for the employee to go in and self-rate and self-comment, and then we would go in and rate and comment as the supervisor.

**Q. So at some point after Mr. Gerig entered his own self-evaluation, you discussed the performance evaluation with Mr. Cuthbert.**

A. Yes.

**Q. I'm handing you what has been labeled Deposition Exhibit 7.**

**he had never received a written warning, had he?**

A. I believe there was a written e-mail where the word "warning" may not have been used, but it was clear that these were the new expectations he was supposed to meet.

**Q. And you consider that to be a written warning?**

A. I would consider that to be a warning that was in an e-mail so, therefore, written, yes.

**Q. Because Ms. Valencia had told you to kind of set forth your expectations in writing and then document when he failed to meet them, correct?**

A. Yeah.

**Q. But earlier you told me that you didn't think it was a warning because he didn't say this is what's going to happen if you don't meet them. And you never did advise Mr. Gerig in written form prior to the Final Written Warning what was going to happen if he failed to meet any expectations, did you?**

A. I believe there was an e-mail.

THE DEPONENT: If I could review this for a second (indicating), that would be really helpful.

MS. ANDERSON: You may, of course.

THE DEPONENT: I think this was the first.

**Q. (By Ms. Anderson) Which exhibit are you looking at?**



A. I am looking at Exhibit 14. I think this was the first written document that he received that had indicated that if he failed to meet these criteria, further discipline, up and including termination.

**Q. This Final Written Warning document, correct?**

A. Yes.

**Q. And that was the first one that said that.**

A. Yeah. I don't know if that was the first one that said that or not, but it says it in this one.

**Q. Right. But I was asking about any documents prior to that.**

A. I don't recall whether or not any of them had described what would happen.

**Q. There's not a single performance complaint on this final warning that came before Mr. Gerig requested an accommodation, is there?**

A. Can you restate that?

**Q. There is not a single performance complaint on this Final Written Warning before Mr. Gerig requested an accommodation, is there?**

A. No.

**Q. I'm handing you what has been labeled Deposition Exhibit 16.**

**Who prepared Exhibit 16?**

A. I wrote this document.



**Q. Why did you prepare it?**

A. I prepared it to potentially give to somebody in HR about to help us continue the process to separate with Ben.

**Q. To terminate Ben.**

A. Yes.

**Q. And did you give this to Ms. Valencia?**

A. I don't recall whether or not I gave this to her.

**Q. Did you give it to anyone in HR?**

A. I don't recall if I did or did not.

**Q. Did you discuss the issues with Mr. Gerig?**

A. Yes.

**Q. When did you discuss the issues contained in Exhibit 16 with Mr. Gerig?**

A. During this time frame we had weekly meetings or sometimes special program meetings. And during the weeks, you know, off and on midweek I'd sort of say, "Hey, I'd like to make sure you got everything you want to submit in Salesforce and, you know, if you're having any issues with that, feel free to just drop the list on my desk and I'll make note of them that way."

We had talked on, kind of, a regular basis about different possibilities he had for meetings. So we had talked about the meeting stuff.

And then during our check-in meeting, we had



specifically worked on -- or Kevin and Ben had been to a meeting with Enterprise and they had worked on a proposal. And then in our check-in meeting we kind of dove into the details of that and tried to make some sense of it and, you know, get it into a condition that we could send it to our clients.

**Q. Did you discuss with Mr. Gerig in the hope that you could him, coach him to help improve his performance?**

A. That was my intent.

**Q. Despite the fact that you prepared it Ms. Valencia said you needed to make sure you were documenting performance issues, correct?**

**You said you prepared it for HR, correct?**

A. Prepared this document (indicating) for HR.

**Q. Exhibit 16.**

A. Yes. But we had talked about these things in the meeting that I had with him on the 14th.

**Q. But the reason you prepared the document because it was part of the process of setting Mr. Gerig up to be terminated, correct?**

MS. SHEYKO: Object to form.

A. I submitted it to them as the mechanism by which we would provide the evidence that we needed to move to the next stage of -- yes, to terminate or separating with Ben.

my Team-Building event planning were things that we had removed from his plate so that he would have enough time to focus on what we really needed him to do, which was get meetings to build -- to create revenue generating programs.

**Q. So you took these things away, and the reason you took them away, at least how you're explaining it to me, is you felt it would give him more time for other things.**

A. More time to focus on the things we wanted, the new standards we were putting in place in terms of numbers of meetings.

**Q. And did Kevin respond to what Mr. Gerig explained to him by saying, "I can see how that would feel like retaliation?"**

A. Yes.

**Q. And on October 17th do you know whether that was when Ben submitted two completed physician questionnaires to Lloyd for reasonable accommodation under the ADA?**

MS. SHEYKO: Object to form.

A. I don't know.

**Q. (By Ms. Anderson) And he says here, "As the desk lamp option was proving insufficient compared to Ben's medical needs for natural light."**

**Do you see that?**

A. Yes.



**Q. And it's been your testimony here today that Ben didn't tell you that it was insufficient.**

A. That's right.

**Q. He did tell you it was insufficient in the meeting with Mr. Moore and Ms. Cha.**

A. Yes.

**Q. So at some point he did tell you that it was insufficient.**

A. In November, yeah.

**Q. Right, November 9th.**

A. Yeah.

**Q. Turn to DU-Gerig 296 in the November 16th timeline event.**

**And did you bring Mr. Gerig into a surprise meeting with Kevin in Kevin's office instead of a preplanned one-on-one?**

A. I don't -- I wouldn't characterize it as a surprise meeting but -- can I look at another document?

I do recall a meeting that we had where Ben and I had a scheduled one-on-one, and I said to him, "You know, Kevin and I would love to talk to you about some other issues that we're seeing with your performance -- you know, let's go pop into his office."

**Q. Okay. And did you during that meeting threaten Ben with termination in January of 2018?**



A. I would not characterize it as a threat. I would characterize it as a very empathetic offer to resign with a very generous severance package.

**Q. Did you threaten to terminate him if he refused to accept the buyout that would pay him through December of 2017?**

A. We offered him the ability to resign and still be able to get other jobs at the University of Denver, and he would get a severance, but if he didn't want that, we would have to be moving towards termination.

**Q. And you told him that on November 16th, 2017.**

A. Yes.

**Q. Before he moved into his office.**

A. Yes.

**Q. And did Ben express surprise and indicate that he wanted to stay in his job and work up to Kelsey and Kevin's performance standards as to the best of his ability?**

A. I do remember him expressing a mild surprise and that he wanted to stay in his job and continue to try to work on the standards.

**Q. And did you and Kevin suggest to Mr. Gerig that it was very unlikely that you were going to feel differently about him working in Executive Education past January of 2018?**



A. We shared with him, again, the list of meetings and the qualifications we had, those criteria we had for how many meetings he was supposed to have a week. And I remember talking to him about the fact that there wasn't enough pipeline in that, there weren't enough e-mails or calls -- you know, e-mails to try to even get phone calls or meetings to happen to yield the results that he had to get in order to continue his job.

So if he wasn't putting out at any feelers to try to get meetings, we didn't -- I was like I don't see how you're going to make these meetings happen if you haven't started, you know, to try to get on people's calendars or try to set up phone calls with people.

There had been no activity that showed us that he was putting any effort -- you know, enough effort into getting the meetings that he wanted, and we had pulled away every other aspect of what -- you know, other things that were on his plate.

**Q. Right. And this meeting where you told him you didn't think that you would feel differently about him working there in January of 2018, that occurred on November 16th, 2017?**

A. I don't recall us saying that we would feel any different about him working there. I recall talking to him about whether or not he had any chance of meeting

these standards, given the existing amount -- I asked him, "Do you have a pipeline of people that you're going to be able to get these meetings with?"

**Q. But this was before --**

MS. SHEYKO: Were you finished with your question -- or your answer?

THE DEPONENT: Yes.

**Q. (By Ms. Anderson) But this meeting occurred prior to him having the opportunity to work in an environment that would have been more conducive to him being productive, given that it would meet some of his needs with the seasonal affective disorder, correct?**

MS. SHEYKO: Object to form.

A. He was allowed to move into that office as of November 11th, I think.

**Q. (By Ms. Anderson) Oh, good, so he could have had five days there by this November 16th meeting, but he didn't have five days there because he hadn't moved in because he didn't have a phone, correct?**

A. Well, he could have used his cell phone, as I stated previously.

**Q. So I was asking you whether you gave him any opportunity before you're telling him he's going to be terminated in January to operate after having received his accommodation that he requested.**



A. Again, I think I stated this before, but I always got the impression from him in early -- in September that the lamp would be enough until I heard it was not enough on November 9th. So from September 21st all through October I heard no complaints about whether or not the sun lamp was not going to be enough, and his performance was suffering in that month of October horribly. He wasn't able to do --

**Q. Right. But he told that you on November 9th. He told you that the lamp wasn't working, and he really needed the accommodation in order to do his job effectively, correct?**

MS. SHEYKO: Object to form.

A. So I would say any delay in amount of time that he had an opportunity to improve his performance was delayed by him by not telling us that he was having issues with the sun lamp not being enough.

He worked for an entire month and two weeks without telling us that it was affecting his performance, and we were measuring and tracking his performance in that time, and I had no indication from him.

Every time I checked with him he was like "I'm working on it, I'm working on it, I'm working on it." I'm like, "Anything I can do to help, how can I help?"

And he wasn't meeting all those standards in



September or October or November.

**Q. (By Ms. Anderson) Did Ben submit -- or Mr. Gerig submit annual goals to the university by the December 1 deadline?**

MS. SHEYKO: Object to form.

A. I wasn't aware there was a December 1 deadline for the 2017-18?

**Q. (By Ms. Anderson) Didn't Mr. Gerig submit his goals by the appropriate deadline in the fail of 2017?**

A. I don't know if he submitted any goals for 2017 -- in December of 2017.

**Q. Wouldn't you have been aware of that -- I mean, as his supervisor?**

A. Well, he was in the process of being separated and on a performance basis.

**Q. If he submitted them by December 1, he wasn't in the process of being separated on December 1.**

A. He was in the process of being in our performance plan.

**Q. No, he wasn't, his Final Written Warning wasn't until December 5th.**

MS. SHEYKO: Object to form. There is no question pending.

**Q. (By Ms. Anderson) My question -- I don't know what you're talking about. As of December 1, 2017, when**



**he had submitted his performance goals for the following year, he wasn't on anything. What was he on?**

A. We had several conversations starting in August, September, October about the increased expectations for his performance, and I don't know -- to answer your question more directly, I don't know if he submitted those goals or not.

**Q. You didn't look.**

A. I don't remember if I looked or not.

**Q. And that's because you had been planning on pushing him out anyway, you didn't need to see his goals.**

MS. SHEYKO: Object to form.

A. No.

**Q. (By Ms. Anderson) I'm a little troubled by the fact that he doesn't even get a Final Written Warning until December 5th, and you told me he had all of this time to make improvements and yet you're saying why would I be looking at his goals because he wasn't going to be around, we were in the process of separating with him.**

**What do you mean you're in the process of separating with him on December 1?**

A. We were --

**Q. Were you in the process of separating with him on December 1?**

MS. SHEYKO: Object to form. Give her a chance

# *GERIG*

# *VS.*

# *UNIVERSITY OF DENVER*

**Deposition**

## *KEVIN CUTHBERT*

*07/24/2020*

---

***AB Court Reporting & Video***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

**Q question. And that's because you're saying, Of course I talked to him about how to develop, you know, and grow business, correct?**

A Right. And it was the fundamental reason for his job. It was what the job was all about. So that was from the very first time -- before even the formal interviewing process. Like we need somebody to -- we need help growing revenue. We need somebody who's a seller.

**Q And you thought Mr. Gerig could develop into a seller?**

A I did.

**Q And you thought that the 300,000 gross revenue number was a realistic goal for a new business development employee in executive education?**

A Yes.

**Q And the revenue goal -- you said that typically goals are set during the kind of performance appraisal goal-setting timeframe, which is the late summer, early fall of a year, correct?**

A That's correct.

**Q So would Mr. Gerig's goals have been part of his performance evaluation? In other words, in the goal part of the appraisal, would the revenue goal have been one of his goals?**



A Yes.

**Q And who actually drafts goals? Is it the employee or the employee's supervisor?**

A It's a combination. And usually there -- well, not usually. During my tenure there, there was back and forth and then agreement and then input of that agreement into the system.

**Q And who would input that agreement that -- what they agreed on into the system?**

A I think that -- that could have varied. And I don't know in this case who actually input it into the system.

**Q With respect to revenue generation, do you know whether Mr. Gerig's goals changed during his employment with DU?**

A The revenue goal did not change.

**Q It was always 300,000?**

A That's correct.

**Q But there were some additional goals added during Mr. Gerig's tenure with DU?**

A That is possible. Some of the goals ended up in his formal goals document. I don't know that they all happened, so let me say this. There were times when something would come up after the formal goal-setting process saying, Oh, I'd like to do this,



or, Oh, we think you should do that, that then get added. I don't believe that happened in Mr. Gerig's case, and I don't know for sure.

None of those would have been anything to do with revenue. They would have been other more personal/professional development activities.

**Q Right. Like attend a particular training course.**

A Right. Get certified in Insights, for example.

**Q I am handing you what has been previously labeled Deposition Exhibit Number 10.**

**Do you recognize Deposition --**

A I do.

**Q -- Exhibit 10?**

A I do.

**Q And this is something Ms. Johnson drafted, correct?**

A Yes.

**Q And you were copied on?**

A That's correct.

**Q Did you discuss the content of this email with Ms. Johnson before it went out?**

A I did.

**Q What can you recall from that discussion?**



A What I recall from this discussion is that the context was that we thought at this point we should be seeing more sales from Ben, and we weren't. And so we needed to be more prescriptive in terms of how he was spending his time so that he could get closer to those goals.

**Q And that discussion with Ms. Johnson became this email to Mr. Gerig?**

A That is correct.

**Q And in that discussion, did you specifically address the time to be spent in various areas? Like if you look to the bullets, there's --**

A Uh-huh. 50/30/20.

**Q -- the first bullet says, 50 percent of your time/effort towards a target of four meetings per month.**

**Do you see that?**

A I do.

**Q Do you recall having those specific discussions with Ms. Johnson?**

A Yes.

**Q And do you recall when you had that meeting? This is dated August 28th, 2017. Do you recall when you had the meeting with Ms. Johnson when that was discussed?**

A I don't know on what date it happened. I'm assuming it was in pretty close proximity to this date.

**Q Would anyone else have been involved in that meeting?**

A Maybe. And the reason I'm hedging is that it was sometime late July, early August when I was kind of fully and formally back just in the exec ed role that I sat Ashley and Kelsey down and said, We've got to try to turn this ship around.

And we had a discussion about the talent and the performance of the people on both of their teams. And we came out of that -- I don't know if it was one or a couple of discussions -- saying that Ben, who worked for Kelsey, and Maria, who worked for Ashley, were underperforming.

And so sometime between that discussion and this, Kelsey and I would have had a meeting to detail these. It could very well be that Ashley was present for a discussion like that, and I honestly don't remember.

**Q Do you recall whether you had other -- you described this initial meeting you had with Ms. Sodaro and Ms. Johnson to discuss kind of turning the ship around, as you described it.**



A Yeah.

**Q Was it a separate discussion from your more specific discussion with Ms. Johnson concerning goals for Mr. Gerig?**

A I think that it was.

**Q You think it was a specific discussion?**

A Yeah.

**Q And you're not sure whether Ms. Sodaro would have been involved in that one?**

A In the discussion that arrived at this document, that's correct. I don't remember if she was or was not.

**Q And you believe the discussion where these goals were defined for Mr. Gerig was a discussion that occurred in close proximity to August 28, 2017?**

A I do.

**Q Did the proposed structure that's set forth in Exhibit 10, was it something that came from you?**

A No. I wouldn't say so. I would have contributed to it. Kelsey and I would have come to this together. So if your question is did I dictate this, the answer is no. Kelsey and I co-created it.

**Q What was being requested of Mr. Gerig with respect to how he spent his time?**



A Well, I think it's implicit in what's written here. And the way I would summarize it is, Be more focused and have more meetings with potential buyers.

**Q And spend less time on special projects, for example?**

A On things that were either completely non-revenue generating or that weren't pretty directly related to revenue generation.

**Q And this references Ashley being back.**

**Do you know when Ms. Sodaro came back from maternity leave?**

A I do not. But I believe it was sometime mid to late summer. And I honestly don't remember.

**Q Was there a way for you or Kelsey to track whether or not Mr. Gerig was spending his time as dictated by this email?**

A Yes.

**Q How?**

A By having him report on what he did or didn't do.

**Q And did you guys do that?**

A I -- that would be a better question for Kelsey, which I'm imagining you've already asked her. And I don't know. I know that as we got later in the



timeframe here, I did see some things where he was reporting. I don't know in this earlier part of this timeframe if he was doing that or not.

**Q It also says that Ms. Johnson -- in the paragraph below the bullets, Ms. Johnson says that she'd like to review proposals before they were sent to clients.**

**Do you see that? It's the second line in that paragraph -- sentence, I should say.**

A Oh, in the second sentence. I'm sorry, I'm still not seeing it.

**Q I'll just read it. So as I revise that pricing cheat sheet, we can also dive deeper to how the pricing, faculty pay and overall program budgets need to be set up. And I'd like to review them before we send them to clients.**

**I guess my first question would be is, does that mean Ms. Johnson wanted to review proposals before Mr. Gerig sent them to clients?**

A Yes.

**Q And did you discuss this review of proposals with Ms. Johnson?**

A Yes.

**Q What do you recall about that part of the discussion?**

A So what I recall is -- and I don't know -- I don't remember the timing on this. I do remember there were some instances where Ben -- I'm sure we'll talk about this one, SendGrid is the same of the prospect. There were others where it became clear to us that Ben wasn't accurately portraying what we do in draft proposals or in proposals. And so we asked him to make sure that one of us reviewed them before they were sent.

**Q Would that have been what was being requested all the way back in August 28th of 2017?**

A It --

**Q And the reason I ask that question is, is the way I read this is Ms. Johnson was instructing Mr. Gerig to have -- to see proposals at that time because some pricing things had changed.**

A Pricing things did not change during Ben's tenure.

**Q Well, she says in the first line that, Kevin and I spoke about custom program pricing briefly, and I think we are going to bring our custom rates up a bit this year. And then she goes on to say, I want to review your proposals.**

**And I certainly read that to mean that she wanted to review the proposals to make sure that the pricing was what she wanted to be offering?**



A That may have been her intent in writing that. I don't know.

**Q And do you recall -- you don't think custom pricing changed in the kind of August of 2017 time period?**

A Not in any kind of a policy way, no. Kelsey and I had ongoing discussions about prices. And while we may have made decisions different from our norm for specific client situations, we didn't have a kind of wholesale increase in prices.

**Q Do you know whether Mr. Gerig was told that another reason you guys wanted to review his proposals is because you were concerned that there were errors in those proposals?**

A This, I don't remember because of the timing of this.

**Q So you know at some point Mr. Gerig was told that?**

A For sure.

**Q But you don't know whether any --**

A I know -- I can see from this he was told that, and we could -- we could not know the full reason Kelsey made that request. But we do know that as of this time, she asked him to have proposals reviewed formally. And there were other subsequent discussions where that same request was made.



**Q And prior to August 28th of 2017, had you or Kelsey been reviewing the proposals Mr. Gerig was sending out?**

A I would not have been, unless SendGrid happened before this. I remember reviewing SendGrid, NTT Security, Enterprise. Those are the ones I remember reviewing.

**Q TT Security?**

A NTT Security.

**Q So the three proposals of Mr. Gerig's that you recall reviewing are SendGrid, Enterprise and NTT Security?**

A That's correct.

**Q And you don't recall reviewing any other proposals of Mr. Gerig's?**

A That's correct.

**Q And do you recall when you reviewed SendGrid?**

A I don't recall exactly when I did that, no.

**Q Would it have been fall of 2017?**

A Yes.

**Q What about Enterprise? When did you review the Enterprise proposal?**



A Enterprise would have been after -- to my recollection, Enterprise was after SendGrid. And NTT was around the same time as Enterprise, as I recall it.

**Q Okay. So fall to early winter of 2017?**

A Yeah. Yes.

**Q And prior to that time, you had not reviewed any of Mr. Gerig's proposals?**

A I don't believe that I did.

**Q And you don't know what proposals Ms. Johnson was reviewing of Mr. Gerig's prior to August of 2017?**

A That's correct.

**Q In the late August 2017 timeframe, did executive education send business generation expectations -- let me scratch that. I'm going to start this question over.**

**In the late August, early September 2017 timeframe, did executive education send similar emails to other persons involved in business development with respect to how their time should be spent?**

A I did not. I don't know if Kelsey did or did not.

imagine who the third person was, if it wasn't her.
**Q Could it have been a faculty member?**
A It could have, yes. And I'm trying to like run through my mind about who that might be.
**Q Okay.**
A And I just don't know.
**Q Did you discuss this 360 with Mr. Gerig?**
A I did not. I shouldn't say that. So this was administered in the context of one of our developmental programs called the Denver Leadership Experience. And there was another person who debriefed Ben on this report. Not me.
I do remember that Ben shared with me that he had found value in the 360 process. And I never saw the report at that point.
**Q And so the only conversation you had with Mr. Gerig about it was Mr. Gerig sharing with you that he thought it was a valuable process?**
A Yes.
**Q And who debriefed Ben on the results of the 360?**
A I don't know. It might have been Ali Boyd, who was one of our chief faculty members for this program. And I can't remember who our other faculty were.



**Q And you never reviewed the responses of the other folks that responded to this 360?**
A At the time, I did not.
**Q And have you since?**
A Yes.
**Q In connection with this litigation?**
A Yes.
**Q Prior to terminating Mr. Gerig, had you reviewed the contents of this 360 report on Mr. Gerig?**
A No.
**Q So you did not review the 360 report until after Mr. Gerig was terminated?**
A That's correct.
**Q You could have reviewed this report if you had wanted to, correct?**
A That's correct. And I had no interest in doing that because this is not a performance management tool. This is an individual leadership development tool.
So it doesn't measure performance on the job. It measures how you go about your job, how you relate to other people. Important things, to be sure, but it doesn't measure how well you perform your job. And so it really had no bearing on what



was to come.
**Q We talked briefly about an office move that happened in executive education in the spring of 2017.**
**Why did the executive education team move in approximately April 2017?**
A We were forced to move.
**Q You were forced to move?**
A Yeah.
**Q And why was that?**
A Andrea Matousek was kind of the COO of the college of business at the time. And she was -- she decided she wanted to move things around, which involved us having to move.
**Q And the offices stayed on the same floor of the Joy Burns building, correct?**
A Yes, that's correct.
**Q And I believe you testified earlier that you didn't -- you thought you came back to executive education full time sometime around the time of the office move?**
A I fully moved back in after the office move. I don't remember how long after.
**Q Before the office move, Mr. Gerig had an office with an external window, correct?**



A That is correct.
**Q And after the office move, Mr. Gerig did not have an office with an external window, correct?**
A That is correct. Until he did, but that was much further on.
**Q Between the period of April 2017 when you moved offices in that Joy Burns building and November of 2017, did Mr. Gerig have an office with an external window?**
A He did not.
**Q In -- well, I'll give you a precise date. On August 18, 2017, did Mr. Gerig send you an email notifying you of a medical condition and requesting that he be allowed to move offices to have natural light?**
A He did.
**Q I'm handing you what has been labeled Deposition Exhibit 23.**
**Mr. Cuthbert, have you seen Deposition Exhibit 23 before?**
A I have.
**Q And what is it?**
A It's Ben's acknowledgment of a medical condition and his request to move to a specific office outside of our suite.

**Q An office he requested to move to was taken at the time, correct?**

A It was taken, yes. Although the king of the Joy Burns Center had designs on that space but wasn't sure about them. So pretty shortly after this, I asked David Corsun if we might be able to get that space, and he said, I can't give you an answer on that right now.

**Q And that was after Mr. Gerig sent his August 18th email to you and Ms. Johnson?**

A That's right.

**Q And David Corsun, what was his position?**

A He only got -- he essentially runs the Fritz Knoebel School of Hospitality, tourism and other things. His title is one of the longest at Daniels.

In addition to that, you know, the Joy Burns Center is his building. He had a lot of public events in there and whatnot. He controlled the space in that building. I'm imagining his name will come up again.

**Q And when you asked him shortly after Mr. Gerig sent you his August 18 email, he said that he couldn't make that office --**

A He couldn't -- he couldn't --



**Q -- available to you at that time?**

A He could not promise it. He wasn't sure.

**Q And did you believe that Mr. Gerig's -- you have a lot of -- you've said that you have a lot of experience in human resources before you came to DU, correct?**

A Yes.

**Q That would include experiences with requests for -- accommodations requests; is that correct?**

A Yes.

**Q And you understand the Americans with Disabilities Act and what it requires of employers?**

A I do. I am not an expert in that, I have a working understanding of it.

**Q So when you received Mr. Gerig's email on August 18, 2017, did you understand Mr. Gerig to be requesting an accommodation of his Seasonal Affective Disorder?**

A No, that's not how I would say it. He did not use that terminology, and I didn't put it in that category, rightly or wrongly, at the time. This seemed to be -- it was an admission -- there was no mention of the act or the use of the word "accommodation." To me, this was Ben, you know,



sharing that he had this condition and asking for something that he felt would be better for him. I did not, at the time, see it in the technical light of ADA.

**Q Okay. And that's despite the fact that Mr. Gerig disclosed to you a medical condition --**

A Yes.

**Q -- seasonal affective disorder, correct?**

A Correct.

**Q And he asked, as a result of his seasonal affective disorder, that he be allowed to move to a different office so he had natural light, correct?**

A That's correct.

**Q But you didn't put those two things together and say, This is a request for accommodation under the ADA?**

A I put those two things together. I didn't put the third thing together.

**Q Right. You didn't draw from him identifying a medical condition and asking to move as a result of a medical condition. You didn't draw the conclusion that he was making a request for a accommodation under the ADA?**

A That is correct.

**Q And that's despite all the time you spent**



**doing HR work?**

A You know, that's correct. And if you think about the timing of when I had those HR roles, they were both pre ADA.

**Q Okay. When did you have your HR roles?**

A At Swissôtel and at Business Logic Corporation, which I think has changed its name and -- yeah. It's reflected as Next Capital on my resume. So that was around the turn of the century, well before I think the ADA was in place.

**Q So the ADA wasn't something you focused on in your HR roles?**

A No.

**Q How did you react when you received Exhibit 23 from Mr. Gerig?**

A I would say my first reaction was one of empathy. So I have never chosen to get a technical diagnosis and am pretty sure that I have the same condition. So I used to live in Chicago, which has far fewer days of sunshine. And about six months after I moved here, I was talking to a friend from Chicago and he said, Can I ask -- Kevin, can I ask you a personal question? I said of course. We're friends.

Like, you know, are you on medication?

And I said, No. Why do you ask? And he said, You're just so much lighter and less serious. That's how you're showing up.

And so I did not move to Colorado, as apparently Mr. Gerig did, because of this condition, and I haven't been diagnosed with it, and I notice a huge difference if I don't get natural light. So my first reaction was one of empathy.

**Q You understand that with seasonal affective disorder some people may have kind of a slight case of seasonal affective disorder, and for some people it causes major depression and other issues that causes people to stay in bed.**

**You understand that there could be minor cases of seasonal affective disorder and --**

A Yes.

**Q -- extreme cases of seasonal affective disorder, correct?**

A I don't know that to be a fact. And I assume it to be true.

**Q Did you read -- if you look at this Exhibit 23, at the bottom of Mr. Gerig's email he attaches a link to an article.**

**Did you read the link -- the article that was linked to this email?**



A I don't think that I did. And I don't think I did because I -- you know, my first reaction is, I get it. I didn't know, and I get it that that must be hard.

**Q And what did you know about seasonal affective disorder at the time you received Mr. Gerig's request? I know you've described that you think you may have a slight -- but what did you know about the actual disorder of season affective disorder?**

MR. GOH: Object to the form.

**Q (BY MS. ANDERSON) I mean, what did you know about seasonal affective disorder at the time you received Mr. Gerig's email?**

A Very little, except that I thought I might have that. You know, I was vaguely aware of what it was; that it could cause varying levels of depression.

**Q Do you think that Mr. Gerig's request to be reassigned to Office 304 which had access to natural light was a reasonable request, given his seasonal affective disorder?**

A No.

**Q Why not?**

A Because I didn't see any evidence of his



performance being affected, and I think -- well, not maybe. More importantly, I had a belief at the time that I wanted us all to be together in the same suite. And because we had had some issues with Ben about kind of not knowing where he was or what he was up to, and I felt like this might exacerbate that.

So also at this time, prior to this time, you know, had had a concern, which Kelsey and Ashley and I had talked about, about Ben's performance.

**Q The first thing you said was you had seen no evidence of Mr. Gerig's performance having been affected --**

A He was not -- yeah. Sorry. I'll let you finish.

**Q My question is, is what evidence would you have expected to see of his performance being affected by seasonal -- I mean, if he was unable -- one thing you describe is he was sloppy in his proposals, correct? You think his proposals were sloppy.**

A That -- yeah, I'd use some other words.

**Q Well, use whatever words you want, and then we'll go with that. I don't want to put words in your mouth.**

**How would you describe -- the one thing in**



**particular you seem very familiar with is SendGrid, correct?**

A Yes.

**Q Tell me about the proposal that Mr. Gerig -- what the problems you had with the proposal Mr. Gerig did in SendGrid.**

A It had nothing to do with what the client asked for.

**Q Is it possible that Mr. Gerig had been unable to concentrate because of his seasonal affective disorder when he met with the SendGrid folks?**

MR. GOH: Object to form.

A I suppose that it's possible. And I find it unlikely, because Ben is a smart guy. And I just think, you know, this was a pattern where he just wasn't understanding what we do and how we do it.

**Q (BY MS. ANDERSON) But it seems to me that if you are a smart guy and he had been not impacted by a disability, he would have been -- I mean, I just -- my problem with this is, is one of the things that doctors say that Mr. Gerig was disabled in is -- as a result of seasonal affective disorder, is his ability to concentrate.**

**So you're sitting in a meeting and**

**SendGrid is going through what they need, and you feel enormously depressed and unable to concentrate, maybe you don't take effective notes.**
**Isn't that possible?**
MR. GOH: Object to form.
**Q (BY MS. ANDERSON) Or accurate notes?**
A It's possible. And Ben exhibited great attention to detail and great listening in many other instances, even -- even during this time.
**Q So what do you think? That he just messed SendGrid up for some reason?**
MR. GOH: Object to form.
A No, I had some reason. I think the reason is that he doesn't -- he didn't, even at this point, nearly 17 months in, fundamentally understand our offerings and the difference between our offerings.
**Q (BY MS. ANDERSON) And it's your testimony that that couldn't have been because he was suffering from seasonal affective disorder?**
MR. GOH: Object to form.
A And I'm not a doctor, so I can't answer that.
**Q (BY MS. ANDERSON) Did you read the reports from the doctors? Mr. Gerig --**
A I did not.



**Q You didn't?**
A No.
**Q So you don't care that he had three doctors who attached --**
A Those are --
THE REPORTER: I'm sorry, you have to let her finish asking her question.
THE DEPONENT: Thank you.
**Q (BY MS. ANDERSON) Well, it was part of an interactive ADA process, and Ms. Johnson certainly had access to it.**
**Mr. Gerig turned over three separate reports from physicians talking about his condition. You never saw those reports?**
A That is correct.
**Q And you don't know what those doctors said about how seasonal affective disorder affected Mr. Gerig particularly?**
A Yeah. I did not see those reports.
**Q And no one reported to you what the doctors said about the impact of seasonal affective disorder on Mr. Gerig?**
A Only about ability to concentrate.
**Q And how did you know that ability to concentrate?**



A It was part of a discussion I had with Kelsey.
**Q Ms. Johnson talked to you about the ability -- that it could have impacted Mr. Gerig's ability to concentrate?**
A Yes.
**Q When did you have that discussion with Ms. Johnson?**
A I don't recall. My guess is it was in the run-up to the preparation for the meeting with Ben and Lloyd and Elizabeth Cha.
**Q Did you believe it to be proper for Mr. Gerig to have raised his request for a new office based on his seasonal affective disorder with you and Ms. Johnson?**
A I'm sorry, can you ask that again.
**Q Do you have any reason to question the -- Mr. Gerig having gone to you and Ms. Johnson requesting a change of office as a result of his seasonal affective disorder?**
A If you're asking do I -- did I believe -- are you asking if I believed his request?
**Q Do you believe it was appropriate for Mr. Gerig to come to you and Ms. Johnson with his request that he be allowed to move offices as a**



**result of his seasonal affective disorder?**
A Yes. I believe it was fully appropriate for him to make this request for a different office.
**Q And you understand that under DU policies that it's appropriate for employees to raise requests for accommodations with their supervisors?**
A Yes.
**Q During your tenure with DU, did you have any other experience with a request for accommodations under the ADA?**
A Not that I recall.
**Q And prior to you coming to DU, did you have any other experience with requests for accommodations under the ADA?**
A No.
**Q Pursuant to DU's policies, what are you instructed to do if an employee comes to you requesting an accommodation?**
A I don't know.
**Q Did you look at DU's policies when Mr. Gerig came to you and said, I have this medical condition and I need --**
A I did not.
**Q -- a new office?**
A I did not.

**Q -- with a smiley face, is it?**
A No, it's not.
What's between my wife and I is light. But that's different than Ben's request and his sharing of his condition.
**Q You didn't think that Mr. Gerig's seasonal affective disorder was humorous in some way, did you?**
MR. GOH: Object to form.
A No.
**Q (BY MS. ANDERSON) Did your wife respond to this email?**
A I don't believe she did.
**Q Did you have discussions with your wife about Mr. Gerig's seasonal affective disorder after you sent this email?**
A Very likely. And if so, I don't really recall. And they would not have been long or involved.
**Q Do you recall any of the conversations you had with your wife regarding Mr. Gerig's medical condition?**
MR. GOH: Object to form. I will instruct the witness not to answer on the basis of spousal privilege.
MS. ANDERSON: I believe that by sending



the email that the privilege has been waived and the privilege regarding the communications, not just the actual -- I mean, not just the email, the surrounding conversations have -- any privilege that may have been attached to them have been waived by sending the email.
MR. GOH: We disagree.
**Q (BY MS. ANDERSON) I am handing you what has previously been labeled Deposition Exhibit 33.**
**Do you recognize this document?**
A I do.
**Q And it's an email from Ms. Johnson to you dated August 19, 2017, correct?**
A Yes.
**Q So this is the day after Mr. Gerig made his request, correct?**
A Yes.
**Q And Ms. Johnson says in this email, Didn't get a chance to chat with Ben about this at all. Told him I had seen the email and would work something out.**
**Do you see that?**
A I do.
**Q Prior to receiving this email from Ms. Johnson, did you have a discussion with**



**Ms. Johnson about Mr. Gerig's request?**
A I don't believe so.
**Q So it was your understanding that she was just keeping you in the loop as to what she had done with respect to Mr. Gerig's request when she sent this?**
A Yeah, which was nothing.
**Q Nothing?**
A But -- yeah.
**Q If you can turn back to Exhibit 23, which is Mr. Gerig's email. And at the bottom of the page of the exhibit is an email from you to Mr. Gerig, correct?**
A Yes.
**Q And that email was sent on a Monday, the 21st, correct?**
A That's right.
**Q The same day that you sent your email to your wife, correct?**
A That's right.
**Q And in your email to Mr. Gerig, you say you're sorry to hear about the disturbances you are experiencing.**
**What did you mean by the disturbances he was experiencing?**



A The fact that he had this condition.
**Q You think what he was describing when he told you he had seasonal affective disorder was a disturbance?**
A It was probably not the best choice of word, but that's the one I chose at the time. It's probably better to have said, Your condition, if I had it to rewrite.
**Q And your next sentence is, you say, We will look forward to talking about it when we are all back in the office at the same time.**
**Do you see that?**
A I do.
**Q Who was out of the office at the time you sent this email?**
A I don't remember.
**Q Did you met with Mr. Gerig to discuss his request for an accommodation at some point?**
A Yes. I don't remember when. And I know there was a time when we all met about it together. I don't remember any meetings with just me and Ben on this request.
**Q Do you recall having a meeting face-to-face with Ben during which Ms. Johnson was on the phone?**

A I don't.
**Q Do you recall Ms. Johnson being sick, I believe it was strep throat and --**
A Yes, now I do recall that, that she was.
**Q And do you recall having a meeting with Ben where Ms. Johnson participated by phone?**
A Yes.
**Q I am handing you what has previously been labeled Deposition Exhibit 24. And is this an email from you to Ms. Johnson and Mr. Gerig dated August 29, 2017?**
A Yes.
**Q And in the -- at the beginning of this email, you first say, Kels, thanks for getting this ball rolling.**
**What did you mean by that? Ball rolling what?**
A Just getting us together to have a discussion.
**Q With a particular agenda? Or thanks for getting the ball rolling, usually when you say that it's getting the ball rolling on something in particular.**
A Yeah, it was having this -- having this meeting, is my recollection.



**Q Okay. And do you know whether there was a particular agenda for that meeting that happened?**
A I think it covered all of the topics. I don't know that there was an incoming agenda. All I remember -- because it's here in black and white -- is the outcomes from the meeting that we had.
**Q So this wasn't a meeting to discuss Mr. Gerig's request to move offices as a result of his seasonal affective disorder?**
A Not solely. That was a topic that we discussed.
**Q Right.**
**And, in fact, the subject line it says, Business Development Focus, correct?**
A Right. Yeah. And so my guess is there's an earlier exhibit, and this may have been a continuing of that thread. Perhaps the one where the percentages of time spent were outlined. I don't know that for sure, but -- so we would have talked about both in this meeting. And this would have been a reflection of what we talked about and agreed to in the meeting.
**Q Okay. And the meeting took place, according to this email, on August 28th, 2017, correct?**



A Is that what it says?
**Q Well, it says -- I'm drawing --**
A Oh, meeting yesterday. Yeah. Yes.
**Q And do you recall sending this email on August 29th?**
A Yeah. I mean, there was a lot going on. I don't have an acute memory of typing the words on the page. I do remember agreeing, in part, I think, because Kelsey wasn't -- she was out, that I would take the -- that I would take the next step and capture our agreements.
**Q Do you know whether the meeting that took place on August 28th was one that had been scheduled with Mr. Gerig?**
A I do not know.
**Q Do you know how Mr. Gerig was notified of this meeting?**
A I do not.
**Q Do you know whether you notified him?**
A I don't.
**Q And you do not know when he was notified of this meeting?**
A I don't.
**Q Do you know whether Mr. Gerig was told the purpose of this meeting?**



A I don't for sure, no.
**Q Did you discuss an agenda for this meeting with Ms. Johnson prior to having a meeting on the 28th?**
A Probably. I don't have a specific recollection of it. It would be unlikely that we hadn't spent some time thinking about the meeting and talking about what we wanted to cover in the meeting.
**Q But you don't recall that meeting at all with Ms. Johnson?**
A I don't.
**Q Who directed the meeting with Mr. Gerig on the 28th?**
A I don't recall that either. I think it would have been Kelsey and I kind of equally sharing, and I don't have a specific recollection if one of us was more taking the lead or not.
**Q And for you, this was an in-person meeting, correct?**
A Yes.
**Q And you recall that?**
A I do. Ben and I together. Kelsey on the phone.
**Q And where did -- where was -- where were you and Ben?**

Page 125

A I don't remember specifically. I'm going to guess it was in my office. It could have also been in the conference room. It more likely would have been in my office.

**Q What was discussed with respect to Mr. Gerig's request that he be allowed to move to Office 304 during this meeting?**

A I don't have a specific recollection. I do know that we ended up offering Ben two options.

**Q During that meeting, you offered --**

A I don't --

**Q -- him two options?**

A I don't remember if those were -- I'm pretty sure they would have been discussed, but I don't have specific recollection that they were. What I do know is that we ended up offering Ben two options. One was to move into a more open space, not a private office, that did have natural light. And in that scenario, he would have access to our conference room, to my office, to any open office with a window if he needed to have a private conversation. So that was Option 1. And Option 2 was to stay in his current place and to get a lamp.

**Q And you don't know whether that was part of the discussion on the 28th?**

Page 126

A I don't.

**Q Do you recall discussing with Mr. Gerig the light option?**

A I don't recall having a specific discussion with him about the lamp. I recall Kelsey telling me or we agreeing that she would offer that as an option, but I don't remember having a direct discussion with Ben about a lamp.

**Q Since you just gave me the two options that you made to Mr. Gerig, I'm assuming one of the options that you made to Mr. Gerig was not moving to Office 304 that he had requested?**

A That's correct.

**Q You told him that he could not move to 304?**

A I told him that these were -- we told him at some point -- again, I don't know that it was in this meeting, but it would have been not too long afterwards we provided him with two options, not three.

**Q And -- but you never -- the request that Mr. Gerig made to you was that he move to Office 304, right?**

A That's correct.

**Q And you did not at this point allow him to**

Page 127

**move to Office 304?**

A That is correct.

**Q You, instead, presented two other alternatives to moving to 304?**

A That's correct.

Well, more likely -- if you say "you," meaning collectively Kelsey and I, yes. I don't -- I don't think I was the one who made -- who presented him with those options. I'm pretty sure that was just Kelsey.

**Q During the meeting on the 28th, was Mr. Gerig's medical condition discussed?**

A Not in any detail that I recall.

**Q Do you recall him telling you how that seasonal affective disorder impacted him?**

A I don't recall that.

**Q And before you went into the meeting on August 28th, 2017, what research had you done on seasonal affective disorder?**

A I believe I've already said none.

**Q Yeah, and I tried to ask a more specific question. I asked first if you read the article that Mr. Gerig attached to his email to you --**

A Yeah. Yeah.

**Q -- and then I said I didn't -- I didn't**

Page 128

**try to open it up broad.**

**Did you ever do any research on seasonal affective disorder in trying to get handle on what Mr. Gerig was dealing with?**

A I did not.

**Q Do you know whether Ms. Johnson did?**

A I do not.

**Q And you didn't think it was important to understand seasonal affective disorder in order to make the right decision with respect to Mr. Gerig's request?**

A I guess not.

**Q And you didn't think it was important to understand seasonal affective disorder so that you had a better understanding of how that disorder may have affected Mr. Gerig's performance?**

A No, I did not.

**Q After the meeting that you had with Mr. Gerig on or about August 28th, did you follow up with Mr. Gerig regarding his request for an accommodation?**

A I don't think that I did. I know Kelsey did at some point.

**Q And if you turn to the second page of Exhibit 24, Mr. Gerig sent an email to you on that**

**trying to figure out how many meetings Ben had in the week?**
A That's correct.
**Q And if you look to the bottom email on this page, it's an email to Ms. Johnson from Mr. Gerig dated November 2nd, 2017.**
A Uh-huh. Yes.
**Q This has a number of particular business development activities Mr. Gerig's had engaged in, correct?**
A Yes.
**Q Did Ms. Johnson forward Ben's email of November 2nd to you?**
A I do not know if she did or not.
**Q And you see the second page lists probably, you know, I don't know, 20 companies and what he was doing with respect to each of those companies; is that correct?**
A Yes.
**Q I am handing you what has previously been labeled Deposition Exhibit 40. If you look to the bottom of this page on Exhibit 40, is this the talking points Mr. Gerig prepared at your request outlining how he was going to stay engaged with the office team after the move?**



A Yes.
**Q And did Mr. Gerig ultimately send an email to the team outlining these various points?**
A I don't know or remember if he actually did. I'm assuming that he did.
**Q Do you know whether the office move was announced to the executive education team via email?**
A I do not remember.
**Q Do you recall having an in-person meeting to discuss it with the team?**
A I don't recall. It could have been either or both, and I just don't remember.
**Q Do you know whether Mr. Gerig's move ultimately created problems for members of the executive education team with respect to locating him?**
A I don't believe it did.
**Q I am handing you what has been previously labeled Deposition Exhibit 42.**
**Do you recall sending Exhibit 42 to Cristina Valencia?**
A I do.
**Q And you sent this email to Ms. Valencia on November 16th?**
A Yes.



**Q So less than a week after you had told Mr. Gerig he was going to be allowed to move offices, correct?**
A That's correct.
**Q And who is Ms. Valencia?**
A She works in university human -- or worked, maybe still does, in university human resources.
**Q So she works in the same group as Mr. Moore and Ms. Cha?**
A And Ms. Hernandez and others, yes.
**Q Why were you talking to Ms. Valencia about the situation with Mr. Gerig?**
A I do not know. I do not know why it was her and not Raphina Hernandez, who I think had been kind of our go-to beforehand. I would have assumed that it would have been her. It ended up being Cristina, and I don't know why.
**Q Prior to November 16th, were you involved in discussions with Ms. Valencia about Mr. Gerig?**
A I don't know. I don't recall.
**Q Did you have a so-called go-to person in human resources?**
A Apparently not.
**Q You didn't have one that you tended to go**



**to with any personnel problems?**
A No. We didn't have that. You know, that would be interesting. I don't know who Ashley primarily worked with in HR. I would have had some involvement with the process of developing an performance improvement plan for Maria. And I don't remember who that person was.
So I mean, it's pretty clear to me, in retrospect, that we did not have a single go-to person. And so I don't know why we ended up with Cristina on this.
**Q So you don't know whether you worked with Ms. Valencia in connection with Maria McGowan?**
A I don't.
**Q You don't remember who in HR you worked with with respect to Ms. McGowan?**
A That's right. And I wasn't the primary interface there. It would have been Ashley. And I know I would have had some involvement. And I don't know with whom she primarily worked with -- on Maria.
**Q And, you know, we've talked a lot about Maria McGowan, and you indicated that you had a meeting sometime after Ms. Sodaro got back from maternity leave in July of 2017. So sometime in July or August of 2017, you had a discussion with**

**Ms. Sodaro, Ms. Johnson about both Ms. McGowan and Mr. Gerig, correct?**
A Yes.
**Q So Ms. Johnson was aware of personnel issues with Ms. McGowan, correct?**
A Yes.
**Q She knew that Ms. McGowan was on a performance improvement plan?**
A At the point that she actually was, I'm sure Kelsey was aware of that.
**Q And does Ms. Johnson know that Ms. McGowan ultimately was offered a severance package to resign from DU?**
A Yes.
**Q And would she have known from talking to you about it?**
A And/or Ashley.
**Q Do you recall having discussions with Ms. Johnson about Ms. McGowan?**
A Yes.
**Q And what can you recall from your discussion with Ms. Johnson about Ms. McGowan?**
A Just -- you know, we had reasonably regular meetings with just the three of us -- Ms. Sodaro, Ms. Johnson and myself -- where we would



talk about what was going on in the business, this -- both of these things clearly being something that are going on in the business. And so we would have spent part of some of those times talking about both of these issues and where we were with those issues.
**Q Do you recall ever asking Ms. Johnson whether she supported Ms. McGowan being offered a severance package to resign from DU?**
A Not specifically, no.
**Q Ms. Johnson at one time was Ms. McGowan's supervisor, correct?**
A That is correct.
**Q So Ms. Johnson had knowledge of Ms. McGowan's performance, correct?**
A Yes. I think the timeline Maria would have worked for Kelsey would have been when I arrived and before I had changed the structure.
**Q Right. But it's not forever; it's like 2016, right?**
A Yeah, yeah. Yeah.
**Q Or 2015?**
A '15.
**Q '15, correct?**
**And I believe you testified that you're not aware of having discussions with Ms. Valencia**



**about Mr. Gerig prior to sending Exhibit 42?**
A That's correct.
**Q You have something to say?**
A Yeah. Although by the way it's written, I must have. Or somebody must have. Otherwise, there would have been a little more upfront context to the email. So there must have been a conversation before I sent this email, and I just don't remember it.
**Q And you just don't remember having any communications with Ms. Valencia prior to November 16th about Mr. Gerig?**
A You know, we were shuffled around like a hot potato within the HR function. So I know there were lots of conversations with a number of different people, and I just don't specifically remember the one that must have happened with Ms. Valencia.
**Q If you look to the third paragraph from the bottom of your email, it says -- and this is Exhibit 42 again. It said, We shared this with him today and also talked to him about the possibility of a negotiated resignation.**
**Do you see that?**
A I do.
**Q Was this the first time you talked to Mr. Gerig about the possibility of a negotiated**



**resignation?**
A I believe it was.
**Q And this was less than a week after you had approved Mr. Gerig's request to move to Office 304?**
A Yes, it was.
**Q And, in fact, Mr. Gerig hadn't even moved into Office 304 at the time that you talked to him about a possible, as you say, negotiated resignation?**
A I don't know. I don't know when -- I do not remember when he actually moved to 304.
**Q He told you, when you made that offer of a possibility of a negotiated resignation, that he wanted to keep trying to work to meet your expectations for him, correct?**
A Yes.
**Q And did you -- when he told you that -- give up your efforts to convince him to resign?**
A No, I don't believe I did. I'm pretty sure that I asked him -- offered this as a possibility subsequently.
**Q I'm handing you what has been previously labeled Deposition Exhibit 43.**
**Do you recall receiving Ms. Valencia's response to your email?**

the meeting.
I think we also wanted Kelsey to have a look at it. And there may have been some other reason for Kelsey also reviewing it.
**Q But it's not ordinary procedure for both you and Ms. Johnson to review a proposal from one of your business development --**
A I would say it wasn't regular, nor would I say it's abnormal. This could have been a very big opportunity with a company that is owned by a DU alum, and it could have been really a big thing for us.
**Q Are we talking about Enterprise Rental Car?**
A Yeah.
**Q And you didn't ultimately get it?**
A Yeah. And then nothing happened. They decided not to do it. Or at least they made no decision on it before I left DU. I don't know what, if anything, happened with it afterward.
**Q And then the next -- there's one here saying, During that same meeting on December 14th, I asked him about the proposal for -- my old law firm -- Brownstein Hyatt Farber Schreck, and he indicated that he had already sent it to that client.**



**What was the criticism there?**
A We had asked him on multiple occasions not to send proposals to clients without one of us having reviewed it. And he did it anyway.
**Q Okay. So that was -- you don't know whether the proposal was bad; you just know that you felt like you'd told him to make -- pass every proposal by one of the two of you and he hadn't done that with Brownstein?**
A That's correct. And I don't know about the content or the quality of the content of the proposal. Kelsey would know about that. But yes, that was not what was being highlighted here.
**Q It goes on to talk about SendGrid.**
**What was the problem going on with SendGrid?**
A So Ben and I met, not far from here, with the head of human resources for SendGrid. Her name is Pattie Money. And Pattie was interested in a high-potential leadership development program. That's a program where they identify people they think will be future more-senior leaders of the organization and want to provide them with a developmental experience to accelerate their growth.
A simpler way to say it maybe is to build



the next generation of leaders.
So that's what Pattie asked for. And the proposal that Ben was about to send that he asked me to review, fortunately, was a proposal to work with a dysfunctional executive leadership team.
**Q Did you consider whether his concentration issues could have impacted his performance in connection with SendGrid?**
A No.
**Q And but SendGrid was something that happened prior to Mr. Gerig getting into his new office, correct?**
A It did, yes.
**Q So he didn't have access to natural light during the period he was working the SendGrid case?**
A That's completely inaccurate. He had plenty access to natural light.
**Q Just not in his office.**
A Right.
**Q But you spent a lot of your day --**
A He had plenty of time to find light if he wanted light. This is 17 months into his job, and he made a pre-rookie mistake at a time when the pressure was on and he knew it. So --
**Q And you didn't consider whether his**



**seasonal affective disorder could have caused him to make, as you describe it, a pre-rookie mistake?**
A Yeah, I just don't see how that's possible, honestly. Like this is really simple stuff. And Ben and I were in the same meeting together. We talked about the meeting afterwards. And yet he got it completely wrong in a way that would have made us look like buffoons.
**Q Right.**
**But you repeatedly commented here today about how smart you think Ben is.**
A Right. But not when it comes to this stuff. Not when it comes to the fundamental core of our business. He did not have the energy or engagement or passion for what we hired him to do. He found plenty of energy and engagement and passion for other things but not for the core duties of his job.
**Q But you're saying this was a rookie mistake, is what --**
A A pre- -- it was a pre-rookie mistake.
**Q A pre-rookie mistake.**
A Yeah. This would be like somebody who knows nothing about what we do. This guy's 17 months in.

**Do you see that?**
A I do.
**Q Now, first of all, do you recall any issue with Ben Gerig's attendance during this time period?**
A I do not. I think I referenced earlier that there were some times when nobody would be aware of where he was during the day. But there were no general problems with his showing up for work and doing -- doing work.
**Q Now, with respect to Mr. Gerig's failure to conduct four meetings per week as required, did you see that as somehow connected to diminished concentration?**
A No.
**Q Did you see that as being connected to any problems with analysis of written or electronic material?**
A No.
**Q And did you see that as being connected to any attendance issues?**
A No, I didn't.
And, you know, that's why this is the first time, today, that I remember seeing this document. And I honestly wish I had seen it sooner. And I know -- now I know I had the ability to and I



wish I had, because these are really fundamentally like -- so we did see Ben -- we didn't have a problem with his attendance, in general. We didn't have -- see a problem with him concentrating on things that he was really engaged and interested in.
We did see lots of mistakes. We did see him not doing meetings. But I don't see the connection between these things that he has written and those things.
**Q Now, on a given day, did you see varying levels of engagement, passion and energy from Mr. Gerig as it related to items or tasks that he was passionate about as opposed to his core functions?**
A Yes. And I talked about these a couple of times. In particular, I saw lots of positive energy on all of the work with South Metro Chamber of Commerce. I saw a lot of energy in his work on the -- all of the different things that we tried in the cannabis space. And I saw lots of energy with respect to internal team and team-building things.
So yes, I saw consistent, positive energy sustained on those things and some others. We did not see consistent or sustained energy or adequate performance with the other things that were more central to his job.



**Q With respect to Mr. Gerig's failure to submit, for your review, his proposal to Brownstein Hyatt, did you see that as in any way being connected to diminished concentration?**
A No.
**Q Did you see that as being in any way connected to his difficulty with analysis of written or electronic materials?**
A No.
**Q And, again, was that connected to attendance in any way?**
A No.
**Q On Exhibit 16 -- in Exhibit 16 -- and you don't have to look at it. I'll just read it to you. It says here, For the week of November 27th through December 1st, 2017, he did not have any meetings with new organizations.**
**Now, was that before or after he was -- he moved to his new office?**
A That was the week that he moved to his new office.
**Q Same question with respect to the following week, which is December 4th to 8th. That was when he was in his new office, correct?**
A That is correct.



**Q And that was the same week in which he failed to have any meetings?**
A That's correct.
**Q You talked a fair amount about the SendGrid proposal.**
**What was Mr. Gerig's problem with that proposal?**
A Well, the problem with the proposal is that what he was getting ready to send to the client was not at all what the client had asked for. And so this is after he and I being in the same meeting with the client, this is after he and I talking about a structure and some of the major elements of the proposal back to them.
And what he produced was borrowed from other work that we had done for a fundamentally different offering, which was implying that SendGrid's executive leadership team was dysfunctional.
And so it was -- let me say it this way. So I've been doing this kind of work for a long time. And there are at least a few organizations where if after 17 months on the job I had made that mistake, I would have been immediately terminated on the spot. It was that egregious and that -- just -- I know I've

used this word a few other times -- surreal how he could have -- we could have been in the same meeting, we could have talked about it afterward -- and this all happened in a reasonably short span of time -- and then how he could have produced a proposal that was just so far off from what the client had asked for.

**Q I think you mentioned the term pre-rookie.**

A Yes.

**Q What did you mean by that?**

A I mean, so you know for some people -- so like we're in the neighborhood and people are like, Well, Kevin, what do you do? And I say, I'm an executive coach. And they're like, Well, what does that mean? Right. So that's a pre-rookie. They're somebody who's never done this kind of work and don't understand it.

And yet once you get into it, it's not that complex. There can be some complexity in terms of moving pieces, but the basic offerings are not that complex.

And so many months in, Ben was appearing like he hadn't learned -- on some things, almost nothing about what we do and how we do it. So that's what I meant by pre-rookie.



**Q Did you know whether or not Mr. Gerig asked HR to drop the investigation?**

A I was not aware of that. And I have to say, I'm very surprised. And I'm curious. You know, if I were in a relationship with him, I would ask him why he thought about dropping it.

MR. GOH: Thank you. That's all the questions I have.

MS. ANDERSON: Thank you.

WHEREUPON, the within proceedings were concluded at the approximate hour of 4:54 p.m. on July 24, 2020.

* * * * * *



I, KEVIN CUTHBERT, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

________________________________
Signature of Deponent

( ) No Amendments
( ) Amendments Attached

Acknowledged before me this

______ day of _______________, 2020.

Notary Public:____________________________

My commission expires_____________________

Seal:

BJD



STATE OF COLORADO)
) ss. REPORTER'S CERTIFICATE
COUNTY OF DENVER )

I, Barbara J. Davalos, do hereby certify that I am a Registered Merit Reporter, Certified Realtime Reporter and Notary Public within and for the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature this 4th day of August, 2020.

My commission expires January 19, 2021.

_____________________________
Barbara J. Davalos, RMR, CRR
216 - 16th Street, Suite 600
Denver, Colorado 80202

# *GERIG*

# *VS.*

# *UNIVERSITY OF DENVER*

**Deposition**

## *ASHLEY SODARO*

*07/20/2020*

---

***AB Court Reporting & Video***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

feeling, like an energy or a motivation or like a feeling, and it -- it didn't come across that way.

**Q Okay. And then another item you were asked about, I think you were asked when Mr. Gerig moved to the outside hallway office, you were asked if that created any problems with needing to find him.**

**But were there any problems with being able to find him before he moved out into that office in the hallway?**

A I don't recall the time frame exactly. There were definitely times where Kevin and/or Kelsey would kind of be saying, Like, Hey, has anyone seen Ben? Does anyone know where Ben is?

And it definitely, I remember, was discussed more often after he moved out to the office, but even prior to, it every once in a while came up that -- or just can someone call him, or what does his calendar say? There were a couple of times where, yes, it seemed like Kevin or Kelsey really like knew where he was. And the office culture was very much like, That's great as long as you just let somebody know kind of thing.

**Q Okay. And then you were asked about training, and you -- I think you described it as no**



**formal training. But were you available for training other people in executive education?**

A Oh, yes, definitely. I would say that there's the training plan, there's documents provided, but the training is very immersive. So it was like Ben joined Kelsey often for phone calls or conversations or biz dev meetings. I was always available. If he would ever have questions, I would happily sit with him and kind of work through how to use things, so...

**Q Did he ever ask you to show him how to do something that was in your wheelhouse?**

A Sometimes, but not that often. So I had more of the impression that he understood what he was doing. Otherwise I -- I assumed he would come to me and ask for help.

**Q Okay. And then you were asked some -- a series of questions about Maria McGowan and the performance issues you were having with her. When did that -- and I think you said that Kevin said we had the two performance issues with Maria and Ben?**

A Uh-huh.

**Q Is that correct?**

**Okay. So do you recall approximately when you returned from maternity leave, when you had --**



**when Kevin brought this up, the two performer issues?**

A It was, I would say, early August, if not late -- late July, and it was almost as if like the performance issues had been going on for a while, but he wanted to then talk about it.

**Q How much did you know about how long Ben's performance issues had been going on before that late July, early August period, if you know?**

A I -- I would say -- it's -- it's hard to describe because I guess performance issues in that case would have looked like a lack of new clients or a lack of meetings, which I guess was kind of happening. There weren't a lot of, you know, big new client deals, and it was between Kelsey and Ben and they were supposed -- you know, doing their thing, but we weren't really hearing as often about these new kind of initiatives that were taking off.

**Q And those kinds of issues were occurring before Kevin made this comment about the two performance -- two performer issues; is that what you're saying?**

A Yes.

**Q Okay. Did Ms. McGowan ever report to you that she had a disability or any medical condition?**

A No. The only thing I vaguely remember is



that coming up at the very end, that she wanted to talk with HR about health benefits, and that was the only -- and she did and talked with them, and she just said, Can I talk with them about health benefits and how long health benefits last, and that was the --

**Q You weren't part of those conversations?**

A Huh-uh.

**Q So did she bring up -- so did she not bring that up -- that's a bad question. Excuse me. Let me start over.**

**You didn't hear about that until around the time she was doing the negotiated resignation aspect?**

A That's right.

**Q Did you hear her mention anything about health during -- her health or her benefits during the performance plan that you put her on?**

A No.

**Q Okay.**

MS. SHEYKO: That's all the questions I have. Thank you.

MS. ANDERSON: I don't have any more. Thank you.

(The deposition concluded at 12:41 p.m.,

# *GERIG*

# *VS.*

# *UNIVERSITY OF DENVER*

**Deposition**

## *ASHLEY RENEE SODARO*

*09/22/2020*

---

***AB Court Reporting & Video***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

but HR was not involved at that time.

**Q After you returned from maternity leave, beginning of July and before July 23rd, did you have discussions with Mr. Cuthbert concerning Ms. McGowen's performance?**

A Yes. After I returned in July, there were discussions about...

**Q And was there a particular conversation with Mr. Cuthbert that came just before Mr. Cuthbert sent you this e-mail saying that he was going to involve HR?**

A Yes.

**Q Tell me about that discussion?**

A There was -- I remember being back in the office -- and I'll give the context of it. Kevin was our ultimate leader, executive director. I reported to Kevin and Kelsey reported to Kevin. Sometimes the three of us would meet, but he also had separate meetings with each of us as direct reports.

Most of my conversations about Maria and advice on performance issues were with him one-on-one. But I do recall there being a conversation where it was Kevin, Kelsey, and myself in the room, and he said, We have some performance issues, I think we need to address them in a more



serious and informal manner. I have been noticing them for a while, and I would like to take action on them.

**Q And that was the conversation that was just before Mr. Cuthbert sent this e-mail saying, Let's involve Molly Rossi?**

A Yes.

**Q And I don't see -- Ms. Johnson was not copied on this e-mail, correct?**

A No.

**Q This was just dealing with Ms. McGowen, correct?**

A Yes. The conversation with Kevin was about Ben and Maria, but then -- he said it out loud. But then, from that point forward, it was two very separate. Ashley and Maria are kind of one thing, and then, Ben, Kelsey, Kevin. A lot of other things were going on with them. From that conversation forward, I was no longer involved in anything except working with Maria.

**Q And why did Mr. Cuthbert tell you that he wanted to involve HR in Ms. McGowen's issues as of July 23rd, 2017?**

MS. MANGUM: Object to the form.

A Should I say, like, my perspective on it?



**Q (By Ms. Anderson) What did Mr. Cuthbert tell you as to why he wanted to involve Ms. Rossi or HR in Ms. McGowen's issues?**

A I think he felt that whatever we were doing wasn't working or making improvement. So involving HR, and seeking both advice and -- advice for conversations and formal process advice was why I think he sought out HR. It was kind of, you know, verbal check-ins, feedback, doesn't seem to be making an improvement, what else can we do?

**Q Was the goal from HR to improve Ms. McGowen's performance?**

MS. MANGUM: Object to form.

**Q (By Ms. Anderson) What was the goal in involving HR?**

A I felt, at the time, it was to truly seek their advice. What do we do if there is an employee with performance issues, and -- you know, informal conversations don't seem to be making improvement, should we take a disciplinary action, are there resources? So, you know, to seek advice on what to do.

**Q How to help Ms. McGowen improve her performance, correct?**

A Yes.



**Q When you first went to HR, did you tell HR that you intended to terminate Ms. McGowen?**

A I don't recall, but I don't believe so. And I definitely remember HR's response being very much improvement mindset. How can we help? What can we put into action? It was very much a helpful improvement way of thinking.

**Q So you didn't go to HR and say, We would like to terminate this employee, what do we need to do in order to make that happen?**

A I don't recall, but I don't think so. I mean, this e-mail mentions Andrea, which she was at Daniels at the time. Kevin and Andrea talked. He might have even talked to Molly Rossi before this. But hard to say if that was in a different conversation or not.

**Q What was Andrea's role at DU at the time?**

A Andrea was working for the University of Denver, and she was also in the Daniels College of Business. She reported to the dean, I believe, and oversaw operations and human resources for Daniels at the time. So anything HR related would be within her realm.

**Q And did Mr. Cuthbert relate to you what Ms. Matousek told him in the conversation that is**

EXHIBIT 2 Gerig 1-31-20 PENGAD 800-631-6989

Program Developer - Daniels College of Business

**Job Description**

**Position Summary**

Responsible for developing a pipeline of profitable new business for Executive Education programs with an emphasis on selling custom programs, building new public program offerings and on recruiting business professionals for public programs. The successful candidate will have experience meeting sales goals and will fosters client satisfaction with the Daniels College of Business.

**Essential Functions**

Strategic Planning

- Contribute to the development of strategic market plans and market assessments, including ongoing local, regional, national and international market assessments.
- Contribute to the development of strategic plans for Executive Education.
- Contribute to the research and creation of new and continuing program and service areas for executive education (e.g., customs programs, consulting, executive coaching, open-enrollment workshops).
- Contribute to the development and sustainability of the organizational plan to support the growth programs.

Program Marketing

- Contribute to the development and execution of integrated marketing plans and competitive positioning strategies.
- Contribute to the development of various marketing content including Web and printed support materials.
- Support the Public Relations aspect of the marketing plan by working with faculty and staff to write articles and case studies on executive programs.
- Evaluate economic and business data, and maintains superior knowledge of competitor products and capabilities along with local market trends.

Business Development

- Contribute to the development and continuous improvement of the business development process.
- Meet annual sales targets.
- Contribute to the development of an annual sales plan identifying new clients and cross-selling opportunities for existing clients.
- Follow up and qualify leads generated by marketing programs and through Daniels College contacts.
- Work with lead faculty to conduct business strategy sessions with target clients and prospective participants to assess executive and management development needs.
- Develop and execute effective sales call management strategies including pre-call planning and outcome identification, learning needs assessment, articulating education programs with corporate learning needs, managing objections, post-call follow-up and reporting using Customer Relationship Management software.
- Represent Daniels at community organizations and corporate events to cultivate relationships.
- Support the development of strategic partnerships.
- Cross-sell programs by collaborating with other faculty and staff.
- Understand corporate marketing and sales cycles.
- Perform company research and market assessments.
- Measure results of various business development strategies.

Program Development

- Work with Sr. Director and program faculty to prepare program proposals and cost/profit models to ensure appropriate contribution margins to the Daniels College.
- Work with Sr. Director to define program objectives and agenda, identify faculty, and develop needed program materials. Program Management and Evaluation
- Work with faculty, program manager and client to ensure program objectives are met.
- Oversee the delivery and outcome of executive education programs by collaborating with faculty, establishing an excellent relationship with the client, overseeing program logistics facilities and contracts, and evaluation.
- Manage the outcome of executive education programs, and assist in making course corrections as necessary.

Administration and Operations

- Manage and sustain systems for efficient business development processes.
- Oversee program budgets and expenses to ensure profitability.

**Knowledge, Skills, and Abilities**

- Excellent command of the English language.
- Articulate, succinct and accurate in both written and spoken communication.
- Ability to read, analyze, and interpret general business periodicals, professional journals, technical procedures, or governmental regulations.
- Ability to write reports, business correspondence, and procedure manuals.
- Ability to effectively present information and respond to questions from groups of executives, managers, clients, customers, and the general public.
- Ability to prepare budgets.
- Ability to understand and analyze financial statements.
- Ability to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists.
- Ability to interpret a variety of instructions furnished in written, oral, diagram, or schedule form.
- Ability to define problems, collect data, establish facts, and draw valid conclusions.

**Required Qualifications**

- Bachelor's degree.
- 4-5 years of program development or related work experience.
- Experience in a sales environment with quarterly targets and consistent process for tracking sales pipeline.
- Experience using Microsoft Office, including Word, PowerPoint, and Excel.

**Preferred Qualifications**

- MBA or equivalent degree.
- 6+ years of work experience in business development for corporate, non-profit or University.
- Experience with Salesforce.com, social media, email marketing tools, and other online applications.

**Work Schedule**

Monday - Friday 8:00 am - 4:30 pm. Possible nights and weekends.

**Application Deadline**

For best consideration, please submit your application materials by **Thursday, May 5, 2016.**

**Special Instructions**

Candidates must apply online through **https://dujobs.silkroad.com/** to be considered. Only applications submitted online will be accepted. Once within the job description online, please click New Resume/CV at the bottom of the page to begin application. If you have questions regarding this position please contact: Kevin.Cuthbert@du.edu.

The University of Denver is committed to enhancing the diversity of its faculty and staff and encourages applications from women, minorities, members of the LBGT community, people with disabilities and veterans. The University is an equal opportunity/affirmative action employer.

**Department**

Executive Education Admin

**Position Type**

Full-Time/Regular

EXHIBIT 4 Gerig 1.31.20

PANORAMIC FEEDBACK

# *Confidential 360-Degree Feedback Report*

For
Ben Gerig

Designed by
DU/Daniels College of Business
For
Daniels College of Business

**Survey opened 22 May, 2017**
**Compiled 2 June, 2017**
**Number of responses: 11**
**Supervisor(s): 3 Direct Reports: 2 Peers, Others: 5 Self: 1**

© 2017

# Understanding Your Feedback Report

## To the recipient of 360-degree feedback:

This document is a summary of the 360-degree feedback provided by your responders. It reports their replies to numerical questions in chart form, and presents their unstructured comments in their own words.

This feedback is organized under several headings; they represent the competencies considered most important for your workplace.

## Headlines Section

The first section of your report offers a "Headlines" view. The chart displays how you were rated, by showing the average for each heading in the questionnaire.

You'll notice that this report is designed to keep all feedback anonymous (except that of your manager), encouraging your responders to be frank.

## Details Section

The next section covers the same headings, but provides more detail, showing how each category of responders replied.

These charts reveal plenty of useful information. For instance, you can easily compare your self-rating with those of others. And by looking at the different ratings from various groups of responders, you can gather valuable information about whether your behavior changes depending on whom you're working with.

## Heading Pages

Zooming in for even greater detail, the next section of the report focuses on each individual heading, listing all of its behavior descriptions. (Your responders actually rated you on these behaviors; the results for headings that you saw on previous pages were averages of these behavior results.)

Throughout this report you will find unstructured comments from your responders. Comments often provide detailed feedback that cannot be communicated by numbers or graphs. They may tell you about the impact you have on others, about behaviors that are appreciated by others, and about specific changes they would welcome. All comments are displayed unedited, exactly as the responder typed them.

## Concluding Comments Section

This section displays overall comments provided by responders at the conclusion of the questionnaire.

## A Word about Receiving Feedback

People are sometimes anxious when hearing how they are perceived by those with whom they work every day. Try not to see this as a threatening situation, but as an opportunity for learning and development.

Here's a helpful suggestion. After receiving this report, talk privately with someone you trust. It is human nature, when we get feedback, to remember the critical comments and to discount the positives. Ask this person to help you focus on the appreciative parts of the report and avoid being overwhelmed by the suggestions for change.

Keep an open mind too. Even if responders have described your behavior in ways that don't match how you intend to act, this report does represent how other people experience you. So you may wish to focus on making your actions better match your intentions.

## Next Steps

Responders often find it difficult, even risky, to provide honest feedback. To increase their comfort with the process and ensure that they know their feedback has been heard, you may wish to meet with them as a group. Your coach or supervisor can help you plan this meeting.

It's an opportunity to tell your responders what you've learned, express your appreciation for their feedback, and assure them that no one will be penalized for what they say.

## Personal Planning

You'll get the maximum benefit from this report by undertaking your own personal development planning process. Use the "Guide To Creating Your Development Plan" or "Self-Development Series" provided with this report. Here too a coach or trusted mentor can offer support. You may find this outline useful:

1) Determine your personal goals, based on what you have learned through thisprocess. A goal sometimes overlooked is to maintain and enhance the behaviors that were rated positively by your responders.

2) Describe your goals in specific terms. For example, "More delegation" isvague, whereas "I intend to delegate more of the interesting new projects to my team" is clear and focused.

3) For each goal, identify specific steps you can take to support yourdevelopment. These might include: getting relevant training, working more closely with your supervisor, finding a personal coach, doing selected reading, practicing new behaviors, or asking for on-going feedback.

4) Identify specific markers that will tell you that you are progressing in yourdevelopment. For example, "I'll complete my budget plan on time." These markers will help measure your changes and build in positive reinforcement.

# Best wishes as you continue your journey of awareness and development

## HEADLINES

### Average of responses for each Heading



# DETAILS

## Average of responses for each Heading, by response category


Average
Supervisor(s)
Direct Reports, Peers, Others
Self
Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A
0 1 2 3 4 5 6 7 8 9 10
AVG
Purpose 7.7 6.9 8.1 8.0
Principles 8.7 8.4 8.9 8.5
Presence 8.5 8.1 8.7 7.8
Interpersonal 8.6 8.8 8.6 7.8
Team 8.4 8.0 8.6 6.8
Effective Communicator 8.4 8.3 8.5 7.0
Awareness 8.2 8.1 8.3 7.0
Functional/Technical/Industry Knowledge 8.3 7.4 8.6 7.5
Critical Thinking 8.4 8.5 8.4 7.2
Direction/Alignment 8.1 7.1 8.5 6.2
Builds High Engagement 8.2 8.0 8.3 7.2
Drives for Perfection/Results 7.9 7.4 8.1 6.0

Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

3 4 5 6 7 8 9 0 AVG

# DETAILS

## Average of responses for each Heading, by response category

**AVERAGE OF ABOVE RESULTS**



# Purpose

1. Is fully committed to theorganization and its mission.
2. Has a clear sense of personalmission and purpose.
3. Helps employees find meaningand purpose in their work.
4. Paints the "big picture" of whathe/she aspires to accomplish. AVERAGE OF ABOVE RESULTS




**5. Unedited Comments (random order)**

**Comments from Supervisor(s)**

Since Ben is somewhat new to this role, it is not yet 100% clear if he sees this work as truly his passion and purpose. Some investigation into why this work is meaningful to him and identification of how it helps fulfill his personal and professional purpose could be very helpful.

**Comments from Direct Reports, Peers, Others**

Ben is in a unique position with a tremendous amount of ambiguity around his position. Ben has great potential in the area in which he works. Clearer expectations, goals, and commitment from superiors would make his purpose and commitment strong. I believe he is a committed person in general and has great vision. He has been without leadership for much of his time in this role.

Ben shows that he has big visions and ideas for the organization. He may need to remember that sometimes we support an established vision, and sometimes we get to propose our own. We don't always get to focus on just the latter.

Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

3 4 5 6 7 8 9 0 AVG

## Principles

6. Does what he/she says they willdo.

7. Is honest and forthright withpeople.

8. Takes responsibility for ownmistakes; does not blame others.

9. Respects and appreciatesindividual differences.

AVERAGE OF ABOVE RESULTS



Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

4 5 6 7 8 9 0 AVG

## 10. Unedited Comments (random order)

### Comments from Supervisor(s)

Ben has very solid principles and is honest and responsible. When he does voice concerns is helps us all better understand where he's coming from and what he cares about.

### Comments from Direct Reports, Peers, Others

Ben is extremely principled, and it shows in all interactions.

Ben is a strong, forthcoming individual. He is honest and frank in our conversations. I appreciate his perspective and willingness to put his opinion out there.

Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

3 4 5 6 7 8 9 0 AVG

## Presence

11. Has a high level of confidenceand self-assurance.

12. Is aware of how his/heremotions and moods affect the organization.

13. Knows his/her strengths andlimitations.

14. Stays calm under stress.

AVERAGE OF ABOVE RESULTS




15. Unedited Comments (random order)

| | |
|---|---|
| Average<br>Supervisor(s)<br>Direct Reports, Peers, Others<br>Self<br>*Lowest response<br>*Highest response<br>*Only if 4+ responses | Scale:<br>1 to 2 : Strongly Disagree<br>3 to 5 : Disagree<br>6 to 8 : Agree<br>9 to 10 : Strongly Agree<br>N: N/A<br>4 5 6 7 8 9 0 AVG |

**Comments from Supervisor(s)**

Ben has a very easy and consistent presence. It's pretty hard to rattle him and he helps maintain a sense of calm in the office. This demeanor makes it sometimes hard to tell what really excites and energizes him - if he is trying to be cautious, that's understandable, but I think he's earned our trust and should feel free to be a bit more expressive if he likes.

Calm demeanor but at times could take a stronger approach to command more attention

**Comments from Direct Reports, Peers, Others**

Ben seems to be confident yet calm despite a lack of direction and support.

Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

3 4 5 6 7 8 9 0 AVG

## Interpersonal

16. Shows empathy and concernfor others.

17. Shares information openly andfreely.

18. Is able to work effectively withpeople from other areas.

19. Effectively deals with conflict.

AVERAGE OF ABOVE RESULTS




20. Unedited Comments (random order)
Comments from Supervisor(s)

| | |
|---|---|
| Average | Scale: |
| Supervisor(s) | 1 to 2 : Strongly Disagree |
| Direct Reports, Peers, Others | 3 to 5 : Disagree |
| Self | 6 to 8 : Agree |
| *Lowest response | 9 to 10 : Strongly Agree |
| *Highest response | N: N/A |
| *Only if 4+ responses | 4 5 6 7 8 9 0 AVG |

Ben works really well with almost anyone and makes connections with people easily. This is incredibly helpful in his current role and as a member of our pretty small team.

**Comments from Direct Reports, Peers, Others**

Though I haven't had the opportunity to watch and observe Ben in conflict, I see him as a great sharer of responsibility and information. He is willing to collaborate and expand his network.

Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

3 4 5 6 7 8 9 0 AVG

## Team

21. **Builds committed, cohesiveteams of people.**

22. **Gives timely, honest andconstructive feedback to others.**

23. **Properly balances between taskaccomplishment and interpersonal relationships.**

24. **Works collaboratively to resolveconflicts and problems.**

**AVERAGE OF ABOVE RESULTS**




**25. Unedited Comments (random order)**
**Comments from Supervisor(s)**

Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

4 5 6 7 8 9 0 AVG

I don't think Ben has had as much opportunity to build teams to work on projects - or I have not been as involved in seeing how this works for him e.g. with Program Managers and faculty for a program. Now that he's more familiar with how programs are built, etc. it would be beneficial for our clients and the team if he took a bit more of an active role in bringing faculty and program managers together as a team to get a program off the ground.

**Comments from Direct Reports, Peers, Others**

Ben is really easy to work with; I haven't experienced a time when he had conflict or had to give constructive feedback to someone. I value his perspective so I think he could speak up more when the opportunity arises. Ben is well-connected and great at doing outreach and promotion of all Exec Ed programs. I'd like him to get involved and do it sooner in the recruiting process but am grateful for his efforts!

I can't speak to Ben's ability regarding teams.

Ben is incredibly kind and helpful as a team member.

Average
Supervisor(s)
Direct Reports, Peers, Others

*Lowest response
*Highest response
*Only if 4+ responses

## Effective Communicator

8 9 0 AVG

Self

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

**26. Is a good listener.**

**27. Adapts his/her communication style to better connect with others.**

**28. Encourages others to express contrary views.**

**29. Delivers clear, well-organized and engaging presentations.**

**AVERAGE OF ABOVE RESULTS**




**30. Unedited Comments (random order)**

**Comments from Supervisor(s)**

Ben has a gift for language and has an easy communication style with a wide variety of people.

**Comments from Direct Reports, Peers, Others**

I haven't enjoyed a presentation from Ben. I find Ben to be a good conversationalist and open to any topic.

Ben is a very good listener and actively asks questions to understand others and their needs.

Ben could share more about what he is working on and ask for feedback, ideas, etc. He operates on his own most of the time so the rest of the team doesn't always know what he's doing, his challenges or where he needs help.

## Awareness

31. Seeks the perspective ofeveryone involved in a situation.

32. Is a systems thinker.

33. Anticipates trends and how theywill affect the business.

34. Asks questions to clarify asituation.

AVERAGE OF ABOVE RESULTS



Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

5 6 7 8 9 0 AVG

**35. Unedited Comments (random order)**

**Comments from Supervisor(s)**

Ben seems to be a very analytical person who is excellent at evaluating a situation, asking good questions, and problem solving in general.

**Comments from Direct Reports, Peers, Others**

Ben tends to look at a whole situation. One of his strengths is seeking out perspective and talking things through. He is forward thinking and has a capacity to formulate strategic plans.

## Functional/Technical/Industry Knowledge

Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response ▷
*Highest response ◁
*Only if 4+ responses

36. Demonstrates excellent skill and experience in his/her functional area.

37. Understands the impact & relationship of key financial indicators on the business.

38. Understands the organization's strengths and weaknesses as compared to competitors.

39. Has an in-depth understanding of competitive products and services within the marketplace.

AVERAGE OF ABOVE RESULTS




**40. Unedited Comments (random order)**

**Comments from Supervisor(s)**

Ben has learned this business pretty quickly. There can be a lot of nuances that he has yet to experience, but they will add to his knowledge and expertise.

**Comments from Direct Reports, Peers, Others**

Ben is definitely looking at the marketplace and evaluating Daniels place in it. I can't speak to his technical ability.

Average
Supervisor(s)
Direct Reports, Peers, Others
Self
*Lowest response
*Highest response
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

5 6 7 8 9 0 AVG

## Critical Thinking

**41. Deals comfortably withconcepts and complexity.**

**42. Makes tough decisions whennecessary.**

**43. Weighs the costs, benefits,risks, and chances for success, in making a decision.**

**44. Challenges status quo thinkingand assumptions.**

**AVERAGE OF ABOVE RESULTS**



**45. Unedited Comments (random order)**

**Comments from Supervisor(s)**

His analytical nature allows Ben to dig into complex situations well. He may sometimes over think things, but rarely lets this stop his progress.

Average
Supervisor(s)
Direct Reports, Peers, Others

*Lowest response
*Highest response
*Only if 4+ responses

8 9 0 AVG

## Direction/Alignment

Self

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A

**46. Sets clear goals and priorities.**

**47. Translates the organization's mission, vision, and values into day-to-day activities and behaviors.**

**48. Assigns clear accountability for actions.**

**49. Facilitates a climate of continuous improvement.**

**AVERAGE OF ABOVE RESULTS**




**50. Unedited Comments (random order)**

**Comments from Supervisor(s)**

Would be good to see how he holds people accountable in his role with the program managers and faculty as programs are being built. It can be tricky to determine who is doing what sometimes, but the program developers are generally more effective if they take a lead and not follower role - especially with faculty.

**Comments from Direct Reports, Peers, Others**

I think our organization doesn't always have clear goals and priorities and this trickles down to individuals like Ben.

Direct Reports, Peers, Others

## Builds High Engagement




**57. Unedited Comments (random order)**

**Comments from Supervisor(s)**

Ben's positive and professional attitude encourages engagement of others

Ben is a very positive person and as he gains more clarity about his role as a leader in developing new opportunities and programs, his natural skills in this area will be useful.

**Comments from Direct Reports, Peers, Others**

Average
Supervisor(s)
Direct Reports, Peers, Others

*Lowest response
*Highest response
*Only if 4+ responses

8 9 0 AVG

Ben is consistently asked to pursue new business ideas - programs, events, etc - and approaches them with openness and enthusiasm.

With my limited knowledge of Ben's engagement with the team, it appears that he is good at gathering input from different people to make decisions. He thinks outside the box, which can be a challenge given an academic setting. He remains hopeful that he will have a positive impact and the organization will meet his goals.

## Drives for Perfection/Results

Average
Supervisor(s)
Self
*Lowest response ▷
*Highest response ◁
*Only if 4+ responses

Scale:
1 to 2 : Strongly Disagree
3 to 5 : Disagree
6 to 8 : Agree
9 to 10 : Strongly Agree
N: N/A




**62. Unedited Comments (random order)**
**Comments from Supervisor(s)**

While I think the overall volume of what we need to "produce" as a team will need to increase and therefore Ben will need to be able to handle a bit more, he's been consistent in delivering on projects he's taken on. The SMCC program has been a big project for him and would be great to see that finish strong.

# QUESTIONNAIRE CONCLUSION

## 63. CONCLUDING COMMENTS (random order)

Introduction to this comment area, as it appeared in questionnaire:

Consider these guidelines:
Please think about Ben Gerig's overall contribution to the workplace. Add any suggestions below that would help him maintain his strengths and improve his skills.

### Comments from Supervisor(s)

Ben has been a great addition to the Exec Ed team. As he continues to learn the details of this business, he will be able to rely more on his experience and take more of a leadership role with program teams. We often assume faculty are "in charge" of programs, but if a program developer can in fact lead a program and take more ownership of it, they tend to run better and everyone involved is more clear. This is where Ben could really focus efforts on becoming a better leader.

Ben is enjoyable to work with - focused on his responsibilities but also bringing a sense of humor and humility. One opportunity for Ben would be to work on developing a reputation and profile for specific skills and expertise - what does he want to be known for and how can he cultivate that perception?

### Comments from Direct Reports, Peers, Others

Our organization has the practice of trying to do too much, too quickly and don't set ourselves up for success. Ben has experienced this with his programs as well. He needs to advocate for the time, resouces, deliverables needed in order to be successful.

Ben brings a high level of expertise and commitment to the work he does. His institutional knowledge is a real asset to our team. He is calm, professional and positive in his dealings with his colleagues. Ben is a nuanced communicator, which is effective in many situations. In certain situations, a more direct, clear approach might be called for.

Unfortunately I am not able to provide a tremendous amount of feedback on Ben's day-to-day activities and capabilities. He is a valued colleague and I enjoy his insights.

EXHIBIT 5 Gerig 1.31.20

# Appraisal Report

**For: Gerig, Ben L.**
**Written By: Johnson, Kelsey A.**
**Annual Performance Appraisal - 2017**
**Created On: 10/2/2017**

| | Overall Rating | |
|---|---|---|
| **Overall Rating** | Gerig, Ben L. | Solid Performance |
| | Johnson, Kelsey A. | Improvement Required |

| Job Category | Rating | | Importance |
|---|---|---|---|
| | Gerig, Ben L. | Solid Performance | 60% |
| | Johnson, Kelsey A. | Improvement Required | 60% |

| | Current Performance | |
|---|---|---|
| **Job Knowledge, Comprehension & Performance**<br>Understands, is knowledgeable of and performs the position duties and responsibilities. Utilizes techniques, skills, processes, equipment, materials and relationships necessary to perform the job. | Gerig, Ben L. | Solid Performance |
| | Johnson, Kelsey A. | Improvement Required |

**_nter Comment**

| | |
|---|---|
| Has sufficient job knowledge to perform job requirements capably. | *Gerig, Ben L.* |
| I have found that there are still some areas of the business where I don't feel confident that Ben has the knowledge to succeed in this position, e.g financial model, basics of leadership development e.g the SendGrid proposal had one version that was about developing their high potentials and then another version that was about dysfunctional teams. | *Johnson, Kelsey A.* |

| Competencies | Overall Performance | | Importance |
|---|---|---|---|
| | Gerig, Ben L. | Solid Performance | 20% |
| | Johnson, Kelsey A. | Improvement Required | 20% |

| | Current Performance | |
|---|---|---|
| **Work Quality**<br>Completes work assignments thoroughly and in an accurate, prompt, and organized manner. Identifies and corrects errors. Pays attention to detail. Utilizes feedback to improve on past work and develops skills to further future work. In addition, also welcomes constructive feedback and monitors own work to ensure quality. | Gerig, Ben L. | Solid Performance |
| | Johnson, Kelsey A. | Improvement Required |

**Enter Comment**

| | |
|---|---|
| Has learned the processes and procedure in year one necessary to increase output in year two. | *Gerig, Ben L.* |
| While I think Ben has a good grasp of most of the processes, I would not agree that he is efficient and is able to eliminate unnecessary work. He does mostly produce work at an acceptable level, but not an acceptable volume. | *Johnson, Kelsey A.* |

Current Performance

**Inclusiveness**
**Actively creates and supports an inclusive and equitable workplace by embedding diversity into all aspects of the workplace. This may include policies, procedures, training, mission, values, goals, office climate and culture, interactions with colleagues and co-workers, leadership practices, programming, hiring, marketing, evaluation, promotion, and other workplace dimensions.**

| | |
|---|---|
| Gerig, Ben L. | Exceeds Performance |
| Johnson, Kelsey A. | Solid Performance |

**Enter Comment**

Often builds knowledge of and seeks improvement in areas of cultural awareness. — *Gerig, Ben L.*

Ben is a very fair and accepting colleague. He does often build on his knowledge of and seeks improvement in areas of cultural awareness. — *Johnson, Kelsey A.*

**Current Performance**

**Communication**
**Both oral and written communications are demonstrated with proficiency and professionalism. Oral communication includes, but not limited to: listens and gets clarification, participates in group meetings, and responds well to questions. Written communication includes, but not limited to: writes clearly and informatively, proofreading prior to submission, demonstrates a variety of different writing techniques, and able to present numerical data in an efficient manner.**

| | |
|---|---|
| Gerig, Ben L. | Solid Performance |
| Johnson, Kelsey A. | Solid Performance |

**Enter Comment**

Effectively listens to others' perspectives and needs. — *Gerig, Ben L.*

Ben does a good job listening and is great at establishing rapport with others- this is one of his strongest talents. When he knows the subject, Ben is a very good writer. I do sometimes struggle to understand his ideas or thoughts on a subject and I am concerned that his communication to clients is not always clear when he is trying to sell them on our capabilities. — *Johnson, Kelsey A.*

**Current Performance**

**Dependability**
**Able to complete tasks and assignments with minimal supervision. Takes responsibility for own work. Able to be prompt and on time for the work day. Furthermore, being able to follow University policies and procedures in regards to taking time off.**

| | |
|---|---|
| Gerig, Ben L. | Solid Performance |
| Johnson, Kelsey A. | Improvem Required |

**Enter Comment**

Often formulates and follows through on own goals and work plans that support organizational objectives. — *Gerig, Ben L.*

There have been many instances over the course of the last year when I have been unclear about where Ben is or what he is working on. We have had several conversations within the department about focus and the fact that we need to know where people are so as to avoid criticism from senior leadership at Daniels. There have also been some instances where assignments were late or not completed in a timely manner, e.g. a proposal/RFP for SCL Negotiation class and identifying and reaching out to the head of HR at CDOT. — *Johnson, Kelsey A.*

**Current Performance**

**Initiative**
**Able to ask for more responsibilities and shows eagerness to learn more skills within realm of department needs and resources. Demonstrates originality and is able to generate suggestions for improving work.**

| | |
|---|---|
| Gerig, Ben L. | Solid Performance |
| Johnson, Kelsey A. | Improvement Required |

**Enter Comment**

Often takes calculated business/technical risks and makes decisions when appropriate. — *Gerig, Ben L.*

Ben is happy to help with any request I have of him, but unfortunately, we need someone in this role who will work very independently on the critical activities that drive revenue, such as getting meetings with new organizations with whom we have not met. Ben has taken some initiative, but mostly to work on things that are not as valuable to the department. — *Johnson, Kelsey A.*

**Overall Goal Rating** **Importance**

| Performance Goals | | | |
| --- | --- | --- | --- |
| ***PLEASE NOTE: If your goals are not listed here to be rated, then please click the Refresh Goals button at the bottom of this page to pull them in. If you did not set goals, there will be nothing to rate in this section.*** | Gerig, Ben L. | Exceeds Performance | 20% |
| | Johnson, Kelsey A. | Improvement Required | 20% |

**Work with ONE DU Strategic Planning Group to Launch an "Elevate DU" Leadership Development program for DU Employees.**
**Category: Organizational Goals**
**Status: Approved**
**Due Date: 9/30/2017**
**Measurement Description:**

| Current Performance | |
| --- | --- |
| Gerig, Ben L. | Solid Performance |
| Johnson, Kelsey A. | Solid Performance |

**Enter Comment**

DU Admissions, Daniels undergrad admissions and DU Senior Leadership has all enrolled in both custom and public executive education programming. — *Gerig, Ben L.*

While we have seen some additional custom and participation in our public programs from DU the original idea of this goal was very different - to create a program for director level and above employees. I can understand why this ultimately didn't happen given the climate on campus and changes in leadership in HR, and thought that the focus on internal DU possibilities went on longer than was viable and that meant there was less time devoted to new organizations. — *Johnson, Kelsey A.*

**Produce an additional $150,000 Net Profit for Executive Education through both Custom and Public Program Development.**
**Category: Departmental Goals**
**Status: Approved**
**Due Date: 9/30/2017**
**Measurement Description:**

| Current Performance | |
| --- | --- |
| Gerig, Ben L. | Exceptional Performance |
| Johnson, Kelsey A. | Unacceptable Performance |

**Enter Comment**

I was able to hit this mark between my work in both custom and public recruiting and business development. — *Gerig, Ben L.*

This goal was intended to be edited to be $300k in revenue and not focused on net, but was approved before that change was made. I think Ben was aware that revenue was the target and not net as it was represented that way in other team goal documents.

In reviewing the program reports for both custom and public programs, I calculated a total of $165,162 in revenue in FY17 - and there may have been some referrals into the leadership programs that he should also get credit for, but not enough to reach the target of $300k. Additionally a couple of the custom programs Ben was credited for were repeat programs, specifically $40k from DISH and $10k from JRF Ortho. Ben did help to increase enrollments in the public programs he recruited for - Finance for Non-Financial and Data Visualization which yielded good gross and net revenue, but he expressed some difficulty in balancing both recruiting for public programs, so we removed his responsibility for those programs so he could focus more time and attention on custom. Overall, this goal represents the main function of this position and we did not see the results we expected. — *Johnson, Kelsey A.*

**Create and direct a new Cannabusiness Professional Certificate Program through Executive Education.**
**Category: Departmental Goals**
**Status: Approved**
**Due Date: 9/30/2017**
**Measurement Description:**

| Current Performance | |
| --- | --- |
| Gerig, Ben L. | Solid Performance |
| Johnson, Kelsey A. | Solid Performance |

**Enter Comment**

I was able to make prominent inroads within the industry and have established relationship and infrastructure to design, develop and launch a Cannabis professional workshop series and/or certificate program in the fall of 2017. — *Gerig, Ben L.*

Ben has done a good job of establishing some beneficial relationships in this — *Johnson, Kelsey A.*

industry. Unfortunately, this goal was not accomplished because we shifted the focus from building a certificate program to creating a summit that did not get enough traction to run. This is an instance where Ben did what he was asked to do and there were various reasons why it didn't come to fruition.

**Complete the High Performance Leadership or DLX program.**
**Category: Individual Goals**
**Status: Approved**
**Due Date: 9/30/2017**
**Measurement Description:**

| Current Performance | |
|---|---|
| Gerig, Ben L. | Exceptior Performan |
| Johnson, Kelsey A. | Improvement Required |

**Enter Comment**

I completed this as well as recruited my wife to take this course. — *Gerig, Ben L.*

I was happy to support Ben into this program, but would have liked to see more enthusiasm and interest in bringing the lessons he learned in it to other organizations in terms of custom programs. — *Johnson, Kelsey A.*

**Become a Licensed Insights Discovery Practitioner.**
**Category: Individual Goals**
**Status: Approved**
**Due Date: 9/30/2017**
**Measurement Description:**

| Current Performance | |
|---|---|
| Gerig, Ben L. | Exceptional Performance |
| Johnson, Kelsey A. | Improvement Required |

**Enter Comment**

I completed the accreditation and am now a Licensed Insights Practitioner. I hope to begin facilitating internal DU groups in the fall of 2017. — *Gerig, Ben L.*

This is another area where I feel we supported Ben's development with the hopes that it would benefit the department through growth in new programs. As with DLX, I would liked to have seen some more activity around selling Insights to new organizations based on his now extensive knowledge of the tool. — *Johnson, Kelsey A.*

**Overall Comment**

***Gerig, Ben L.***

I have learned a great deal about custom and public program design, delivery, operations and business strategy in year one. I look forward to increasing my results in year two in order to hit our departmental targets for the expansion of custom program revenue.

***Johnson, Kelsey A.***

Overall, I do not think that Ben is good fit for this position. We need someone in this role who is able to secure multiple meetings a month with new potential clients and who can turn those initial meetings into revenue generating programs. As stated in many of the above sections, I expected to see more activity, more results and more enthusiasm for this type of work. At the end of August, I asked Ben to be more focused on business development and to spend 50% of his time getting at least 4 meetings with new companies. 1 out of 4 of these meetings happened in September.

I think Ben has an excellent attitude and is very amenable and thoughtful, but I sense that this work doesn't really resonate with him. The department is under a lot of pressure to produce increased revenue in this coming year and I am not confident that we have the time, or that it would be effective use of our time, to develop the knowledge, skills, and abilities in Ben for him to be successful.

**Acknowledgement**

I, Kelsey A. Johnson, acknowledge that the review meeting for Ben L. Gerig was held on the meeting date.

Acknowledgement Date: 10/2/2017
Meeting Date: 10/2/2017
Reviewer Role: Direct Manager



I, Ben L. Gerig, acknowledge that:

* I acknowledge that my review meeting was held on the date above and I have reviewed my final appraisal.

Acknowledgement Date: 10/2/2017

EXHIBIT 9 Gerig 1-31-20

**To:** Ben Gerig[Ben.Gerig@du.edu]
**From:** Kevin Cuthbert
**Sent:** Tue 8/22/2017 3:53:45 PM (UTC)
**Subject:** FW: SendGrid Statement of Work

Just re-read your proposed SOW, and it really really does not reflect our original pitch to them as we are not going team effectiveness work with them.
We do want to talk to their execs in building this high-potential like program.
Also – there is no money mentioned in this doc.
Very confused on this Ben and it would be great to connect soon
Thanks
Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University of Denver
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

connect

---

**From:** Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Date:** Monday, August 21, 2017 at 11:16 AM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Subject:** Re: SendGrid Statement of Work

Hi Ben,

The upfront language of the attachment not reflect the situation as I understand it.

Are you on vacation?

Do you remember when is Pattie expecting this?

Thanks

Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University of Denver
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

connect

**From:** Ben Gerig <Ben.Gerig@du.edu>
**Date:** Monday, August 21, 2017 at 10:05 AM
**To:** Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** SendGrid Statement of Work

Kevin,

Take a look at this and let me know if you need any changes. Once it looks correct, feel free to send this on to Pattie. Next steps will be to set up the Needs Assessment 1-hour interview with the SendGrid ELT—per Pattie.

Best,
Ben

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

**To:** Kevin Cuthbert[Kevin.Cuthbert@du.edu]
**Cc:** Kelsey Johnson[kjohn198@du.edu]
**From:** Ben Gerig
**Sent:** Mon 8/28/2017 5:10:04 PM (UTC)
**Subject:** RE: SendGrid Statement of Work

do. Ben

---

**From:** Kevin Cuthbert
**Sent:** Monday, August 28, 2017 10:41 AM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Cc:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** Re: SendGrid Statement of Work

Hi Ben
Thanks for the reply and our meeting just now.
Please take a crack at getting it right, perhaps with some input from Kelsey.
Once you are both good with it you can send to PMoney.
Thanks
Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University of Denver
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

connect

---

**From:** Ben Gerig <Ben.Gerig@du.edu>
**Date:** Monday, August 28, 2017 at 9:55 AM
**To:** Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** RE: SendGrid Statement of Work

Sorry Kevin, I was off the Grid. I can make any changes that you need and get it to Pattie asap today. Ben

---

**From:** Kevin Cuthbert
**Sent:** Monday, August 21, 2017 11:16 AM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Subject:** Re: SendGrid Statement of Work

Hi Ben,

The upfront language of the attachment not reflect the situation as I understand it.

you on vacation?

Do you remember when is Pattie expecting this?

Thanks

Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University of Denver
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

connect

**From:** Ben Gerig <Ben.Gerig@du.edu>
**Date:** Monday, August 21, 2017 at 10:05 AM
**To:** Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** SendGrid Statement of Work

Kevin,

Take a look at this and let me know if you need any changes. Once it looks correct, feel free to send this on to Pattie. Next steps will be to set up the Needs Assessment 1-hour interview with the SendGrid ELT—per Pattie.

Best,
Ben

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

EXHIBIT 10 Gerig 1.31.20

PENGAD 800-631-6989

**To:** Ben Gerig[Ben.Gerig@du.edu]
**Cc:** Kevin Cuthbert[Kevin.Cuthbert@du.edu]
**From:** Kelsey Johnson
**Sent:** Mon 8/28/2017 2:08:23 PM (UTC)
**Subject:** business development focus

ey Ben,

I think we would all benefit from a bit more discipline in terms of business development – I don't want to end up short of target again next year and while Kevin being back will help with that, each of us will really need to dial up our output.

So - I would like to propose the following structure for business development activities:

- 50% of your time/effort towards a target of 4 meetings per month with new companies – ones we haven't done custom programs for but who may have sent people to public workshops. Doesn't need to be 1 per week per se and phone calls count. Good test is that they now know what we are capable of when they may not have known the full extent of it before.
- 30% focused on special projects like the Cannabis Summit and workshops and CSLA – I know these things can suck up time, but hoping that Ashley being back and able to help more with the marketing elements for these 2 activities can help. I see your role in these as more directing them (dialing up those DLX leadership skills) and less doing them.
- 20% remaining for overflow from the pipeline I am working on – will probably be 1-2 a month

Kevin and I spoke about custom program pricing briefly and I think we are going to bring our custom rates up a bit this year. So as I revise that pricing cheat sheet, we can also dive in deeper to how the pricing, faculty pay, and overall program budgets need to be set up and I'd like to review them before we send to clients.

We can chat more about it when we meet this morning – I'll dial in for that so as not to spread the strep throat nightmare.
Thanks - Kels

Kelsey Johnson
Director, Executive Education
Daniels College of Business | University of Denver
Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd
Linked in profile

EXHIBIT 11 Gerig 1-31-20

**To:** Ben Gerig[Ben.Gerig@du.edu]
**Cc:** Kevin Cuthbert[Kevin.Cuthbert@du.edu]
**From:** Kelsey Johnson
**Sent:** Fri 11/10/2017 9:59:57 PM (UTC)
**Subject:** RE: strategies/tactics for meetings
2017 Exec Ed BD report Fall.xlsx

Hey there,
Will send you a meeting request as well, but Kevin and I would like to meet with you this afternoon at 4 pm today to discuss our decision on the office space as well as check in on your progress with getting meetings. Here are some initial thoughts and we don't expect a fully processed reaction to this, just wanted to make sure we are all clear on what we have seen so far.

In response to what you sent in this email...I so appreciate the effort you put into this and the detail on the target companies listed below. They are a good reflection of what we have already discussed. I want us to turn now to new or different ways of approaching these and potentially of some other companies to approach.

This because you are not so far achieving what we want in terms of meetings, etc. In September you had 1, we had planned on 4. October data is attached. The outreach emails listed in Salesforce for last week (Oct 30 – Nov 3) were 1 for a meeting and 1 follow up to a previous meeting and there were no meetings that happened.

I am wanting to hear your plans for increasing the volume and success of getting these meetings. I am looking for a short list of 3-4 specific strategies you would employ, e.g. identifying current EMBAs who work at companies we want to do business with and seeing if you could take them to lunch while they are here on class days, or attending networking events that are likely to have people from target companies attending. I think your research of the Top 100 Public and Private Companies is a great list to work from and just think the volume of outreach and connections will need to increase significantly in order to yield the 2 meetings per week. If you could provide this list of 4-5 things that would be new avenues to secure these meetings with any target company by Tuesday the 14th, that would be great!

Happy to clarify any of this when we meet.
Thanks - Kelsey

Kelsey Johnson
Director, Executive Education
Daniels College of Business | University of Denver
Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd
LinkedIn profile

---

**From:** Ben Gerig
**Sent:** Thursday, November 2, 2017 2:21 PM
**To:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** strategies/tactics for meetings

Kelsey,
Here are the strategies/ tactics used to create and expand new business development opportunities via face to face meetings and/or phone meetings with targets. I'm trying to focus more energy into new clients that we have not worked with while being strategic about expanding opportunities with companies that have a history with us. Here is a breakdown of my most recent activity in this regard:

Enterprise: Collaborate with Kate S. to connect with Brain Chaput via email. Set up in person meeting with 3 senior L&D regional officers. Kevin and Ben explore possible custom programs as well as highlight DLX. Connect Roberta with Kevin Anderson, to attend DLX. Ben is following up with Brian to discuss additional custom opportunities.
CSG International: Connected with local contact Kathleen Marvin to elect senior L&D individual at CSGI. Set up phone call with Don Jones.
Crocs: Emailed Shannon Sisler. Set up in person meeting with me, Kelsey, Kate and Shannon.

Snooze: Researched Top 100 Private Companies in Denver and then consulted activity in SF before emailing Adam Schlegel. Scheduled in person meeting with Adam.
SCL Health: Wrote RFP for 2-day Negotiation workshop last spring. Received interested from SCL in November and followed up immediately to schedule with Joe and Cindi—in progress.
FareHarbor: Connected with Barrett Chow, HR Lead, via LinkedIn. Scheduled in person meeting with Barrett. Net: DLX Leads.
Brownstein: Connected with Laura Dean at Law School to find internal alum at Brownstein. Cold called Kristin in September and she called me back and said to follow up with her in early November.
Holland & Hart: Connected with Laura Dean at Law School to find internal alum at H&H. Set up in person meeting with Misae to explore professional development opportunities in the legal industry. Sent Misae workshop agendas tailored for Women & Influence and Neuroleadership.
Wheeler, Trigg, O'Donnell: Connected with Laura Dean at Law School to find internal alum at WTO. Met in person with Casey Fenn to explore professional development opportunities in the legal industry.
Gaiam: Learned in Biz Dev meeting this week that Roberta has a contact at Gaiam. Will work with Roberta to set up a phone meeting.
Sage Hospitality: Collaborating with Kevin to set up a meeting with Lisa Donovan.
Vangst: Connected with Karson via LinkedIn. Then sent her a personal message.
Kroenke Sports: Researched L&D professional via LinkedIn and send Kate Irlando a personal message.
Western Gas: Using SF and LinkedIn to determine the appropriate L&D contact.
SmashBurger: Using SF and LinkedIn to determine the appropriate L&D contact.
Rally Software: Using SF and LinkedIn to determine the appropriate L&D contact.

Overall, my research of the Top 100 Public and Private Companies in Denver including their gross revenues, number of employees and connections with DU has yielded the best results. If I am strategic about who I reach out to using both the DU network (Kelsey, Kate, Kevin, SCOL, MarCom, etc.) and my personal research, I can typically convert 4 out 10 of my outreach efforts (phone calls, emails) into meetings with individuals that meet your criteria; eg: large enough employee base and who are in professional roles that allow them to participate in development programs more easily).

Thanks,
Ben

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

EXHIBIT 14 Gerig 1.31.20

To: Ben Gerig, Program Developer, Executive Education
From: Kelsey Johnson, Director, Executive Education
CC: Kevin Cuthbert, Assistant Dean
Date: December 5, 2017

Re: Final Written Warning

You have been in this role for over 17 months and while you have been a very enjoyable and friendly colleague, you have not met the fundamental expectations of the position. The following is a summary of my evaluation of how we have attempted to provide even more specific performance expectations for your role as a Program Developer within Executive Education.

On August 28, 2017, I sent the following structure for your business development activities:

- 50% of your time/effort towards a target of 4 meetings per month with new companies – ones we haven't done custom programs for but who may have sent people to public workshops. Doesn't need to be 1 per week per se and phone calls count. Good test is that they now know what we are capable of when they may not have known the full extent of it before.
- 30% focused on special projects like the Cannabis Summit and workshops and CSLA – I know these things can suck up time, but hoping that Ashley being back and able to help more with the marketing elements for these 2 activities can help. I see your role in these as more directing them (dialing up those DLX leadership skills) and less doing them.
- 20% remaining for overflow from the pipeline I am working on – will probably be 1-2 a month

We then had a conversation, you, me and Kevin Cuthbert on Tuesday August 29, 2017 and agreed on the following as captured in an email from Kevin:

> "Ben indicated his re-commitment/engagement to doing the work we do in ExecEd. We talked about Ben's need for more natural light and will explore options to that end. Kelsey and Ben talked about how to have more frequent and regular interaction so that Ben can continue to learn the business. Kelsey asked for more curiosity from Ben – specific examples would be "how do we think about building custom programs?" "how do we get a better understanding of a the needs of client organization? "Ben asked for more regular meetings from Kelsey. With regard to the breakdowns below – we clarified that the first category – 50% is targeted toward new business in new clients. We talked about the need to continue to clarify roles and streamline activities with Marketing and Operations.
>
> At the end we talked about SendGrid, where you recently drafted an incorrect and insufficient SOW. From emails since then it appears that you are both working on this now."

You responded to this email summary from Kevin with:

> "I think it captures my thoughts and I will commit to more regular meetings and more comprehensive knowledge sharing as well as help with marketing and operations turnover."

On September 29, 2017, I requested a list of the programs you worked on to hit your #2 goal of $300k in revenue and you provided me a list of the programs and the amount of net revenue (not gross) generated by them and then added participant gross revenue for the participants you recruited into several of the public programs. Adding gross revenue to net revenue is not a correct way to measure

this target and even if it was; the total did still not meet the goal and yet you indicated that you had hit that target amount.

On October 2, 2017, we completed your Performance Review with an overall rating of Improvement Required.

On October 5th, I provided the following more specific expectations in writing to you:

1. Follow up on recently submitted proposals or initial conversations with prospects will be updated in Salesforce by noon each Friday.
2. Starting for the week of 10/9/17, two meetings (in person or on the phone) per week with new companies (any on this list https://en.wikipedia.org/wiki/List_of_companies_with_Denver_area_operations) or dormant companies (see attached list from Salesforce). This is in addition to the follow up activities and needs to be outside of DU and with organizations who are a good potential fit; e.g. companies or organizations who have a large enough employee base and who are in professional roles that allow them to participate in development programs more easily.
3. Less than 5% of your time should be spent on CSLA and less than 5% of your time should be spent on Cannibusiness programs so that 90% of your time is available for the above.
4. Please continue to attend all team meetings that require your input and feel free to excuse yourself after topics that are relevant to you are covered. All other team activities, like scheduling the Funtastic sessions, should be on hold until the meeting expectations are met.

As of November 8, 2017, here is how you have performed against these expectations:

1. Follow up with existing proposals, prospects and entry into Salesforce has been completed as expected.
2. For the month of October, you had the following meetings that fit the criteria outlined above:

Week of 10/2-6/2017 – 2 meetings

| | | | |
|---|---|---|---|
| Wheeler Trigg O'Donnell - EE | 10/4/2017 | Ben | Meeting with Casey Fenn |
| Holland & Hart - EE | 10/6/2017 | Ben | Meeting with Misae Nishikura |

Week of 10/9-13/2017 – 1 meeting

| | | | |
|---|---|---|---|
| FareHarbor - EE | 10/9/2017 | Ben | Meet w/ Barrett Chow |

Week of 10/16-20/2017 – 1 meeting (not exactly a new client as you have met with them before)

| | | | |
|---|---|---|---|
| LivWell – EE | 10/17/2017 | Ben | Call with Matthew Givner |

Week of 10/23-27/2017

| | | | |
|---|---|---|---|
| Enterprise - CCP | 10/25/2017 | Ben and Kevin | Meeting with Brian Chaput, Casey Miller, and Kevin Anderson |

Week of 10/30-11/3/2017

No meetings live or via phone

Week of 11/6-10/2017

| | | | |
|---|---|---|---|
| Snooze Eatery - CCP | 11/8/2017 | Ben | Meeting with Adam Schlegel re: DU & Snooze Leadership Collaboration |
| CSG International - EE | 11/9/2017 | Ben | phone call with Don Jones re: CSGI Leadership Development Discussion |
| Crocs - CCP - Executive and HIPO Leadership | 11/9/2017 | Ben | Daniels & Crocs Reconnect Meeting with Shannon Sisler |

Week of 11/13-17/2017

| | | | |
|---|---|---|---|
| NTT Security-CCP | 11/13/2017 | Ben | Email to Eve McLain RE: Phone meeting 4 pm CT w/ DU |
| Brownstein - CCP - Sr. Associates | 11/15/2017 | Ben | Call: with Kristin Stork DU / Brownstein |
| Molson Coors - CCP | 11/16/2017 | Ben | Email to Thembi Machaba re: Leadership Development /Talent Mgmt. Discussion - MCBC & Daniels College of Business |

3. There have been some necessary check-ins with the SMCC program and believe these have been less than 5% of your time.
4. Ben has attended all internal meetings when appropriate.

The number of meetings – total of 11 over the course of 7 weeks did not meet the established expectation of 14 meetings. Based on the lack of any meetings for the week of Oct 30 – Nov 3 and very few emails sent to try and set up meetings, when we met on Thursday, Nov 2, we had a conversation about increasing the overall volume of outreach via email and phone to people to set these meetings up. I asked you to provide a few strategies of how you would increase this top part of the pipeline. You sent me a list of the specific things you were already doing with existing Targets and Prospects, but that was not quite what I was looking for, so in an email and in a meeting with Kevin on Nov 10, we clarified what we were looking for and we had agreed that you would provide those by Tuesday, November 14. We all met again on Thursday, November 16 and you had still not submitted those strategies.

In this meeting on Nov 16, we also discussed the issue of your fundamental understanding of the work we are engaged in with custom clients. This had come up with the SendGrid proposal and again with the proposal for NTT Security. Your performance would indicate you are not able to represent the type of work we are capable of doing with clients despite being exposed to this work in a variety of ways including specific dialogues with me about client needs and how we can specifically help them, listening in on multiple business development calls, sitting in on detailed client design meetings, and being a participant in the Denver Leadership Experience. In my most recent review of the NTT Security proposal, the content was repetitive in that you had listed the objectives on 2 different slides, you had included a list of experiential activity options, but then didn't provide slides with more description of them for all of the options listed.

Additionally, we reviewed the three documents (Agreement, Attachment, and NDA) involved in the contract process several times and most recently reviewed it again for the SCL Health program. As we looked at the Agreement, I indicated that I would get it ready, if you would complete the Attachment and if you could send it to me, I would make sure they are all consistent before sending to the client. In our meeting on Thursday Nov 16, you indicated that you had already sent it to the client without my review. I also asked if you had sent the Agreement as well and you said you sent the Attachment. I clarified my question and asked if you sent all three documents and you said that you did. I have since reviewed the email in Salesforce and it appears that you sent the Agreement to SCL on Friday after our meeting and had forgotten to include the Agreement as an Attachment. Therefore, I don't believe that you had in fact sent all three documents to the client and none of them were reviewed by me before they were sent. How you managed the SCL contracts indicates you lack a basic understanding of the contract process for custom clients despite having received prior training and were mis-representing what you had done.

Finally, I have provided training multiple times over the past 16 months and more recently in Sept and Oct on the way we need to track Activities in Salesforce in order to be able to provide a weekly report to the Corporate Engagement group and have always been available to answer questions as I know it can be a little confusing. In looking back at the Activities in Nov, there are no less than 10 situations where the data is incomplete and not attached to the correct records.

Despite Kevin and my repeated efforts to help you succeed, you continue to fail in meeting the job expectations for your position. The consequences have been verbal feedback, written performance feedback, and the implementation of progress tracking and plans. This is your final warning and you are expected to immediately comply with these performance expectations:

- 2 meetings with new organizations per week that meet the criteria as described above
- Any client proposal needs to be submitted to Kevin or myself and should be at least 95% accurate in terms of representing what the client has requested in a professional, comprehensive and not redundant manner.
- All of your outreach activities to new or existing organizations need to be entered into Salesforce by the end of each week. Each entry needs to have a clear Subject, be attached to the correct Opportunity, to the correct Contact, and have brief description of what happened in the meeting or phone call.
- Indicate on the Exec Ed board where you are and who you are meeting with, if appropriate, when you leave the building for longer than 15 minutes.

A failure to do so may result in further discipline, up to and including termination.

By signing below, I acknowledge receipt of this Written Warning.

Name/Date

EXHIBIT 15 Gerig 1.31.20

**To:** Kevin Cuthbert[Kevin.Cuthbert@du.edu]
**From:** Kelsey Johnson[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=531C80D467714215B0B382AEAD3D35D8-KELSEY JOHN]
**Sent:** Mon 12/11/2017 11:13:46 PM (UTC)
**Subject:** #s for our next meeting
[illegible] Exec Ed BD report Fall.xlsx
[illegible]om Program Rev to date.xlsx

Zero meetings with new companies for past 2 weeks
$56,775 of $300,000 target booked in custom from July - Dec

Kelsey Johnson
Director, Executive Education
Daniels College of Business | University of Denver
Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd
Linked in profile

Business Deve.  ..ent Activity Report - Fall 2017
11/2/2017

| | Opportunity | Date | Owner | Subject | Comments |
|---|---|---|---|---|---|
| | **Week of October 10/2-6/2017** | | | | |
| 1 | Albertsons - CCP - Managerial skills | 10/2/2017 | Kelsey | Call with Chris | They are interested in building a mgmt and leadership program for their Pharmacy Managers. |
| 2 | VMG 17 - CCP - Leadership | 10/3/2017 | Kelsey | Call with Scott Bernick re: VMG 17 in January 2018 | Planning call for possible upcoming 2 day session in January 2018 for 60 people. |
| new | Wheeler Trigg O'Donnell - EE | 10/4/2017 | Ben | Meeting with Casey Fenn | Met w/ Casey Fenn and she encouraged me to contact Miko Brown (Wills) and Emily Sheldon (DGS). She also said to contact DALRA and ALA, and Jaime Overland at LMA. |
| 4 | Arrow Electronics - CCP | 10/5/2017 | Kelsey | Lunch meeting with Scott Gilman and Dennis | Set up lunch with Scott Gilman and Dennis Leonard during Building a Data Driven Org. Learned about their existing leadership development programs and that we should meet with Donna Tikkanen-Davis about them. |
| 5 | Colorado Access - CCP - Leadership | 10/6/2017 | Ben | Email to Christa Peters | emailed Christa on 10/5/17 to invite her for coffee and check in on our proposal status. |
| new | Holland & Hart - EE | 10/6/2017 | Ben | Meeting with Misae Nishikura | Ben will send Misae and Katie topical areas for potential workshops at Holland and Hart for Women in Leadership, Inclusive Leadership and Neuroleadership. |
| | **Week of October 10/9-13/2017** | | | | |
| 1 | Gates - CCP - Leadership Development | 10/9/2017 | Kevin | Meeting with Roger Gaston | Had lunch with Roger who is interested in talking again about this program |
| new | FareHarbor - EE | 10/9/2017 | Ben | Meet w/ Barrett Chow | Met with Barrett and pitched DLX, HPL and ELP. Connect Barrett with Roberta to discuss programs further. FareHarbor is 2 to 3 years away from being ready for custom programs. |
| 3 | Anadarko - CCP - Leadership Series | 10/11/2017 | Kelsey | Call with Janelle and Paulina Zapata | Janelle leaving and turning over program to Paulina. Looking for new topics for 2018 series. Will send them to Catherine Kovar to determine. |
| 4 | CDOT - CCP - Leadership | 10/12/2017 | Ben | Email to Susan Rafferty re: DU and CDOT: Leadership Partnership | Trying to schedule lunch to learn more about what they do |
| 5 | University of Denver - CCP - Leadership Team | 10/12/2017 | Ben | Meeting with Chancellor, Ed, Kevin | Kevin and Ben met with Rebecca Chopp and Ed Rowe on Oct. 12 to complete a needs assessment for Kevin's half day facilitation of the DU Senior Leadership team's strategic retreat on Nov. 28. |
| 6 | Denver Start Up - Caleb Polley | 10/13/2017 | Kevin | Call with Caleb Polley | Boogaloo Beds (X-ITE pitch competition winner) Gave him options for spending his $10k |
| 7 | South Metro Denver Chamber-Leadership Program | 10/13/2017 | Ben | Call re: Centennial State Leadership | Ben and Kerry called Bob Golden and Michele McKinney to finalize info sessions for Jan and March to promote the launch of the fall 2018 Chamber leadership program |
| | **Week of October 10/16-20/2017** | | | | |
| 1 | Morton Publishing Company | 10/16/2017 | Kelsey | Call with Marta Pentecost re: leadership programs options | considering Insights and then ELP in the spring |
| 2 | Gates - CCP - Finance | 10/17/2017 | Kelsey | Email:RE: Finance Training | They are interested in a short finance program. |
| 3 | Colo Parks & Wildlife - CCP - Leadership Program | 10/17/2017 | Kelsey | Email:Any interest in Colorado Parks and Wildlife Leadership program? | To Greg Ochis to see if they have anyone for CPW program |
| 4 | SendGrid - CCP - Leadership | 10/17/2017 | Ben | Email:SendGrid & DU check-in | Trying to get meeting with Pattie Money to move custom program forward |

| | Opportunity | Date | Owner | Subject | Comments |
|---|---|---|---|---|---|
| new* | LivWell - EE | 10/17/2017 | Ben | Call with Matthew Givner | Matthew informed me that he and Neal are currently swamped with Government Relations work. Matthew is open to consulting with us as we move into developing Cannabis related workshops in 2018. |
| 6 | Zayo Group - CCP - Leadership | 10/17/2017 | Kelsey | Meeting with Tracy Cook re: custom program | Tracy looking to start with Academy group of high potentials and have us do the leadership section in Feb. |
| 7 | VSG/VMG - CCP - Meetings | 10/19/2017 | Kelsey | Call with Tom Carpenter | Discussed content for meeting in March 2018 for VMG 29 |
| 8 | Boulder County Sheriff's Department - PSLP | 10/19/2017 | Kelsey | Email w/ Jason Oehlkers | Looking to send 8-12 people to spring Public Safety program |
| 9 | City of Aurora - CCP - Mgmt Retreat | 10/19/2017 | Kelsey | Call with Vinessa Irvin re: Nov retreat | Date for session in Nov 2017 would not work for Kerry, Kevin, or Scott, so she's going to use someone they have been working with |
| 10 | EchoStar - CCP - Teambuilding | 10/19/2017 | Kelsey | Call with Nancy | Received call from Nancy in HR Denver. they are looking to possibly do a team and trust session in Nov. She is connecting me with Michelle Pearre - on east coast. |
| 11 | Pacific Life - CCP - Leadership Edge Institute | 10/19/2017 | Kelsey | Call with Colleen Spencer and Jessica Bartley | Colleen and Melanie getting to meet Jessica from CPEX and initial brainstorm about possible activity |
| 12 | Arapahoe - CCP - Public Safety Leadership | 10/20/2017 | Kelsey | Event: PSLD Alumni Refresher | About 15 alums of the program. Couple of inquiries about leadership programs |
| 13 | Kaiser Permanente - CCP - VUCA Bootcamp | 10/20/2017 | Kelsey | Meeting with Janelle Banat | learned about her role at CPMG - executive coach and may be teaching at UCOL. Could be potential faculty for us. Will be sitting in on the VUCA Bootcamp |
| 14 | Change and Innovation Agency | 10/20/2017 | Kelsey | Meeting with Brian Elms | Potential faculty. Great experience in public sector, does process improvement and innovation. Not a huge fan of design thinking |
| | **Week of October 10/23-27/2017** | | | | |
| 1 | Molson Coors - CCP | 10/23/2017 | Ben | Email:Re: checking in | Asked Mike Abbass to help with contact in HR - referred to Thembi Machaba |
| 2 | Kaiser - CCP - VUCA Bootcamp | 10/24/2017 | Kelsey | Meeting with Janelle Banat | learned about her role at CPMG - executive coach and may be teaching at UCOL. Could be potential faculty for us. Will be sitting in on the VUCA Bootcamp |
| 3 | Colo Parks & Wildlife - CCP - Leadership Program | 10/24/2017 | Kelsey | Call with Kristin Kemp | CO Land Board will have 2 people for the CPW program and also wants to send 4 people to Data Vis and 3 people to Building a Data Driven Org. |
| 4 | CSG International | 10/24/2017 | Ben | Email: to Kathleen Marvin | Asking to get contact in HR Talent Development |
| 5 | Snooze Eatery - CCP | 10/24/2017 | Ben | Email: to Adam Schlegel | Asking for meeting to discuss talent development |
| 6 | Snooze Eatery - CCP | 10/24/2017 | Ben | Email:to Brianna Borin | Asking for meeting to discuss talent development |
| 7 | Denver Police | 10/25/2017 | Kelsey | Email: to Chris Wyckoff | Asking for meeting to discuss custom analytics program |
| 8 | Vertafore - CCP - Leadership | 10/25/2017 | Kevin | Meeting with BJ Schaknowski | discussed Exec Ed offerings and coaching two potential executives |
| 9 | Molson Coors - CCP | 10/25/2017 | Ben | Email: to Thembi Machaba | Asking to get meeting with Kevin |
| 10 | CSG International - CCP | 10/25/2017 | Ben | Email: to Don Jones | Asking to get meeting to discuss talent development |
| new | Enterprise - CCP | 10/25/2017 | Ben and Kevin | Meeting with Brian Chaput, Casey Miller, and Kevin Anderson | Met to discuss possible DLX attendee and custom leadership development program |
| 12 | Liberty Global - CCP | 10/25/2017 | Kevin | Email to Kerry Scott | Trying to reschedule meeting |
| 13 | PIN | 10/26/2017 | Kevin | Call with James Wall | James connecting Kevin to Donnell Johns to discuss talent development needs |

| | L .tunity | Date | Owner | Subject | Comments |
|---|---|---|---|---|---|
| 14 | Gates - CCP - Finance | 10/26/2017 | Kelsey | Call to discuss finance program with Daniels Executive Education | Working with Mike Haen on possible 1/2 to full day fiannce session for multi product lines. |
| 15 | Vail Centre | 10/26/2017 | Kelsey and Kevin | Vail Centre / Daniels meeting with Ross Iverson | Discussed possible public programs being delivered at the Centre. |
| 16 | Encana Oil & Gas - Innovation Sessions | 10/26/2017 | Kerry Plemmons | Meeting with Kathy Varto, Hilary Rideout | Kerry met with them to discuss next round of innovation opportunities. |
| 17 | Albertsons - CCP - Pharmacy Managers | 10/26/2017 | Kelsey | Call with Daniels Executive Education and Albertsons | Phone conference with Kent Bradley and Chris I. to get more details on program objectives for Pharamacy Managers |
| 18 | Zayo Group - CCP - Leadership | 10/27/2017 | Kelsey | Email: to Tracy Cook | Sent next version of proposal to Tracy for 3.5 days as part of their Academy for high Potentials. |
| 19 | TIAA | 10/27/2017 | Kelsey | Lunch with Shawn Harris | Got better understanding of structure and may have some small 1 day custom program on Employee Engagement. Do most of their own development in house. |
| | **Week of October 30-November 3, 2017** | | | | |
| 1 | CAPNA - CCP - DA Leadership | 10/30/2017 | Kelsey | Email: w/ Frank Puccio 2018 Developing Leaders | Scheduling dates for next program |
| 2 | Denver Foundation - CCP - Insights | 10/30/2017 | Kelsey | Email: to Patrick Horvath re:Insights Discovery question | New person needs to take Insights |
| 3 | Panorama Ortho - CCP - Advanced Leadership | 10/30/2017 | Kelsey | Meeting with Terry Peltes to plan Panorama custom program | setting up mid-Jan start date |
| 4 | US Engineering - CCP - Insights for KC | 10/30/2017 | Kelsey | Email: to Rebecca David | Checking in to see if group in Kansas City wants to do Insights webinar |
| 5 | VSG/VMG - CCP - Leadership Program | 10/30/2017 | Kelsey | Email to Rebecca Kilmartin RE: 2018 Leadership Program Dates | scheduling dates for 3 2018 programs |
| 6 | Arapahoe - CCP - Public Safety Leadership | 10/31/2017 | Kelsey | Lunch with Arapahoe County Sheriffs Dept | discussed spring cohort and possible funders for scholarships |
| 7 | Crocs - CCP - Executive and HIPO Leadership | 10/31/2017 | Ben | Email to Shannon Sisler re:Daniels & Crocs Lunch Invitation | First meeting to discuss what we've done with Crocs and see if there is potential Exec Ed and projects/Corporate Partnership |
| 8 | Enterprise - CCP | 10/31/2017 | Ben | Email to Kevin Anderson, Brian Chaput, Casey Miller re::Denver Leadership Experience References | Sent DLX references - Sam and Holly to Brian |
| 9 | OGX Consulting - $ Support | 10/31/2017 | Kelsey | Call with Alvin McBorrough | Kevin and Kels spoke with Alvin. Next steps are 1) he'll update content to include digital transformation, 2) we'll have workstudy create list of gov't divisions and then share with him to fill in right person 3) looking at dates in late April or early May |
| 10 | SendGrid - CCP - Leadership | 10/31/2017 | Kevin | Email: Checking In w/ Pattie Money | Trying to schedule meeting to get custom started or some folks into DLX |
| 11 | Arrow Electronics - CCP | 11/1/2017 | Kevin | Email to Donna Tikkanen-Davis : FW: meeting | asking for meeting prior to her attending analytics workshop in Feb 2018 |
| 12 | Vail Resorts - CCP | 11/1/2017 | Kevin | Scheduling meeting with Lynanne Kunkel | Reached out via LI message to get a time scheduled |
| 13 | Vertafore - CCP - Leadership | 11/1/2017 | Kevin | Email: Re: Follow Up w/ BJ Schaknowski | Scheduling follow up meeting |
| 14 | Anadarko - CCP - Leadership Series | 11/2/2017 | Kelsey | Email to Catherine Kovar re: Leadership Series in Denver | sent proposal for 2018 topics |
| 15 | Applied Control - CCP - Insights | 11/2/2017 | Kelsey | Email to Marian Bronstetter RE: Insights training at Applied Control | sent contract for 2 upcoming Insights sessions |

| | Opportunity | Date | Owner | Subject | Comments |
|---|---|---|---|---|---|
| 16 | Ibotta - CCP | 11/2/2017 | Kevin | Meeting with Alison Meadows | Discussed various leadership development options - coaching, DLX, HPL, ELP and custom |
| 17 | RES Americas - DLX | 11/2/2017 | Kelsey | Email to Amy Maranowicz re:Denver Leadership Experience | Sent info on DLX |
| 18 | Verizon Wireless - CCP - Digital Marketing | 11/3/2017 | Kelsey | Email to Clark Edgin re: Digital Marketing session with Daniels Exec Ed | confirming Michael Myers for Dec 2 hour session for larger group |
| | **Week of November 6-10, 2017** | | | | |
| 1 | Newmont - CCP - Executive Development Program | 11/6/2017 | Kelsey | Email: to Melissa Gustafson re: Evening event for Newmont Session 1 | |
| 2 | Outreach for Strategic Finance | 11/6/2017 | Kelsey | Email: to Aerin Yates re: Strategic Finance workshop | asking for possible participants |
| 3 | Anadarko - CCP - Leadership Series | 11/6/2017 | Kelsey | Email to Paulina Zapata re: FW: Leadership Series in Denver | sent proposal again |
| 4 | Nestle Purina - CCP - Leadership | 11/7/2017 | Kelsey | Email to Kathleen Murray re: Information about Iron Chef | provided proposal for Iron Chef and team building |
| 5 | Native Roots - CCP - Coaching | 11/7/2017 | Kelsey | Email to Christina Hodgdon RE: Coaching Session Dec 14 | checking in on coaching or team building program |
| 6 | Snooze Eatery - CCP | 11/7/2017 | Ben | Email to Brianna Borin :RE: DU/Snooze Leadership Collaboration | asking for meeting for week of Nov 13 |
| 7 | | | | | |
| 8 | Colorado Access - CCP - Leadership | 11/7/2017 | Ben | Email: Christa Peters re: Greetings Christa | Checking in on proposal |
| 10 | Brownstein - CCP - Sr. Associates | 11/7/2017 | Ben | Message to Kristin Stork | Left Kristin a message to set a phone meeting time the week of Nov. 13. |
| 11 | SendGrid - CCP - Leadership | 11/7/2017 | Ben | Starting Up: Diversity & Inclusion with Pattie Money | Attended Project X-ITE event to check in with Pattie Money |
| 12 | Enterprise - CCP | 11/8/2017 | Ben | Email to Casey Miller re: DU and Enterprise Custom Leadership-next steps | asking for meeting with Casey and Brian |
| new | Snooze Eatery - CCP | 11/8/2017 | Ben | Meeting with Adam Schlegel re: DU & Snooze Leadership Collaboration | meeting with Adam to discuss Exec Ed opportunities |
| 14 | NTT Security-CCP | 11/9/2017 | Ben | Email to Eve McLain RE: Custom Leadership Session | asking to set up phone call to discuss team alignment opportunity |
| new | CSG International - EE | 11/9/2017 | Ben | phone call with Don Jones re: CSGI Leadership Development Discussion | phone call w/ Don to discuss talent dev opportunities |
| new | Crocs - CCP - Executive and HIPO Leadership | 11/9/2017 | Ben | Daniels & Crocs Reconnect Meeting with Shannon Sisler | Meeting to discuss talent dev opportunities |
| 17 | SendGrid - CCP - Leadership | 11/10/2017 | Ben | Email to Pattie Money Thank You! and next steps w/ DU | request for meeting to review proposal |
| | **Week of November 13-17, 2017** | | | | |
| new | NTT Security-CCP | 11/13/2017 | Ben | Email to Eve McLain RE: Phone meeting 4 pm CT w/ DU | meeting to discuss team alignment opportunity |
| | ISEC Executive Retreat-S3 | 11/15/2017 | Ben | ISEC/ DU Meeting with John Fritschler | discussed plans for Feb session and possible speaker for conference with larger group in the org |
| new | Brownstein - CCP - Sr. Associates | 11/15/2017 | Ben | Call: with Kristin Stork DU / Brownstein | From: KStork@BHFS.com |
| | Home Advisors - CCP | 11/16/2017 | Kevin | Email: to Shannon Garcia-Lewis re-connecting | checking in |
| | Vertafore - CCP - Leadership | 11/16/2017 | Kevin | Email: BJ Schaknowski Re: Follow Up | checking in |
| | SendGrid - CCP - Leadership | 11/16/2017 | Ben | Email:to Michelle Swager DU & SendGrid Leadership Program interviews | asking for meeting |

| | C. .tunity | Date | Owner | Subject | Comments |
|---|---|---|---|---|---|
| new | Molson Coors - CCP | 11/16/2017 | Ben | Email to Thembi Machaba re: Leadership Development /Talent Mgmt. Discussion - MCBC & Daniels College of Business | |
| | **Week of November 20-24 - Thanksgiving Holiday** | | | | |
| | | | | | |
| | **Week of November 27-December 1, 2017** | | | | |
| | VSG/VMG - CCP - Meetings | 11/27/2017 | Kelsey | Email to Pat Steele :RE: VMG Meeting in April | |
| | Denver Police Department | 11/27/2017 | Kelsey | Email to Jeannie Fankhauser:RE: Public Safety Leadership Development Program | |
| | Denver Auditor - CCP - Insights | 11/27/2017 | Kelsey | Email to Kevin Sear RE:Insights Discovery for your office | |
| f/up | SCL Health- CCP - Negotiation | 11/27/2017 | Ben | Email to Ailyn Gamboa :RE: Agreement Form | |
| f/up | Brownstein - CCP - Sr. Associates | 11/27/2017 | Ben | Email to Kristin Stork :DU-Business Acumen & Leadership Program Options/Partnership | |
| | RES Americas - DLX | 11/28/2017 | Kelsey | Email to Amy Maranowicz :RE: Denver Leadership Experience | |
| | Colo Parks & Wildlife - CCP - Leadership Program | 11/28/2017 | Kelsey | Email to Jody Grantham :RE: Leadership training program | |
| | Encana - EEE | 11/28/2017 | Kelsey | Email to Hillary Rideout :RE: Daniels Executive Education \| Encana revisit Innovation | |
| f/up | ISEC Executive Retreat-S3 | 11/28/2017 | Ben | Email to John Fritschler :RE: next DU session | |
| f/up | Enterprise - CCP | 11/28/2017 | Ben | Email to Casey Miller RE:quick check in? | |
| | Zayo Group - CCP - Leadership | 11/29/2017 | Kelsey | Email to Tracy Cook :RE: Thank you! | |
| | Comcast - CCP - Leadership Academy | 11/29/2017 | Kevin | Email to Lain Adams: Re: Employee Engagement at CTS | |
| f/up | FareHarbor - EE | 11/29/2017 | Ben | Email to Michael Schmitt :DU & FareHarbor | |
| f/up | ISEC Executive Retreat-S3 | 11/29/2017 | Ben | Email to John Fritschler :Daniels Proposal for ISEC Senior Leaders-Session 3 | |
| | VSG/VMG - CCP - Meetings | 11/29/2017 | Kelsey | Discussed VMG 19 meeting oppportunity | |
| | Denver Foundation - CCP - Insights | 11/29/2017 | Kelsey | Meeting: Kelsey Johnson and Jeff Su | |
| | Pacific Life - CCP - Leadership Edge Institute | 12/1/2017 | Kelsey | Email to Bruce Montgomery :Opportunity with Pacific Life | |
| f/up | NTT Security-CCP | 12/1/2017 | Ben | Email:Daniels & NTT Security: Proposal | |
| | Pacific Life - CCP - Leadership Edge Institute | 12/1/2017 | Kelsey | Chat about PacLife with Daniels Exec Ed | |
| f/up | Snooze Eatery - CCP | 12/1/2017 | Ben | Call with Brianna Borin Snooze | |
| | **Week of December 4-8, 2017** | | | | |
| f/up | FareHarbor - EE | 12/4/2017 | Ben | Rachel Preston | Email:RE: DU & FareHarbor |
| outreach | Oakwood Homes-EEE | 12/4/2017 | Ben | Denise Adams | Email:DU Exec. Ed. & Oakwood Partnership |
| outreach | Automattic - EEE | 12/4/2017 | Ben | Lori McLeese | Email:Greetings Lori! |
| | Centura - CCP - Leadership | 12/5/2017 | Kevin | Amy Carris | Email: Leadership Program |
| f/up | ISEC Executive Retreat-S3 | 12/6/2017 | Ben | John Fritschler | Email:ISEC Strategic Finance Workshop @ DU--Feb. 22 |
| f/up | NTT Security-CCP | 12/7/2017 | Ben | Eve McLain | Email:Greetings Eve! |
| f/up | Enterprise - CCP | 12/8/2017 | Ben | - | Email:RE: Denver Leadership Experience References |

Custom Programs by month
12/11/2017 4:07 PM

| Sum of Amount | | Subject | |
|---|---|---|---|
| Session Start | Class: Class Name | Revenue | Expense |
| Jul-17 | American Blue Ribbon - Lunch and Learns FY18 | $0.00 | $16.00 |
| | Associates3 Teambuilding | $7,000.00 | $3,780.09 |
| | CAPNA DA Leadership C2 | $30,300.00 | $11,823.42 |
| | DCP Midstream FY18 Insights Ongoing | $700.00 | $280.00 |
| | Insights for DU Employees 17-18 | $595.00 | $703.91 |
| | Kaiser Leadership Edge C964 | $27,000.00 | $12,321.50 |
| | Kaiser Leadership Edge Light C954 | $2,250.00 | $972.00 |
| | LodgeWorks Insights 2017-2018 Ongoing | $1,800.00 | $630.00 |
| | VMG 17 - CVAC - Jon Basler Insights FY18 | $350.00 | $70.00 |
| | VMG Leadership Program 2.0 C2 | $22,500.00 | $13,016.85 |
| | **Subtotal** | **$92,495.00** | **$43,613.77** |
| Aug-17 | CAPNA Leadership Program C251 | $25,775.00 | $11,764.66 |
| | Daniels Undergrad Team--Insights | $2,275.00 | $1,866.48 |
| | DCP Midstream Iron Chef | $5,625.00 | $2,627.46 |
| | Denver Foundation Insights | $3,875.00 | $2,002.50 |
| | DU Admissions Team Retreat | $6,000.00 | $3,119.94 |
| | HOPE Turnaround Leadership - S2 | $3,360.00 | $1,296.00 |
| | ISEC Executive Team Retreat S2 | $10,000.00 | $4,326.96 |
| | **Subtotal** | **$56,910.00** | **$27,004.00** |
| Sep-17 | Anadarko Leadership Series - Critical Thinking | $7,000.00 | $2,703.63 |
| | Arapahoe Public Safety Leadership C1151 | $30,000.00 | $20,677.60 |
| | Comcast Denver Leadership Academy C351 | $28,800.00 | $14,256.22 |
| | Comcast Denver Leadership Academy Design C3 | $10,000.00 | $5,184.00 |
| | DISH Climb Program - Negotiation | $9,000.00 | $2,592.00 |
| | DU Law School Insights 2017 | $335.00 | $198.75 |
| | Newmont ELDP Design | $47,500.00 | $16,304.00 |
| | Verizon Digital Marketing | $12,500.00 | $5,184.00 |
| | VMG 27 2017 Chicago Meeting | $12,000.00 | $5,391.80 |
| | VMG Leadership Program C1051 | $26,300.00 | $12,637.33 |
| | **Subtotal** | **$183,435.00** | **$95,129.45** |
| Oct-17 | Arapahoe Public Safety Leadership C1152 | $0.00 | $2,712.10 |
| | CAPNA Leadership Program C252 | $20,000.00 | $9,633.31 |
| | Comcast Denver Leadership Academy C352 | $5,000.00 | $1,921.57 |
| | HOPE Turnaround Leadership - Coaching | $16,800.00 | $8,640.00 |
| | HOPE Turnaround Leadership - S3 | $3,360.00 | $2,921.64 |
| | Pacific Life Sr. Officers Offsite 2017 | $5,000.00 | $2,962.72 |
| | Triple Crown Innovation S2 | $4,500.00 | $2,080.98 |
| | VMG 23 2017 Milwaukee Meeting | $12,000.00 | $5,231.53 |
| | VMG Leadership Program C1052 | $20,000.00 | $10,803.53 |
| | **Subtotal** | **$86,660.00** | **$46,907.58** |
| Nov-17 | Anadarko Leadership Series - Multi-Generational | $7,000.00 | $2,618.00 |
| | Applied Control Insights Session 7 | $7,400.00 | $2,696.00 |
| | Arapahoe Public Safety Leadership C1153 | $0.00 | $3,605.86 |
| | Kaiser Cohort 9 Alumni S1 | $0.00 | ($108.00) |
| | Kaiser VUCA Bootcamp | $40,500.00 | $23,587.00 |
| | University of Denver--Leadership Team | $2,500.00 | $1,248.00 |
| | **Subtotal** | **$57,400.00** | **$33,646.96** |
| Dec-17 | Applied Control Insights Session 8 | $8,800.00 | $2,696.00 |
| | Colorado Health Foundations - Insights S5 | $3,750.00 | $2,005.00 |
| | Comcast Denver Leadership Academy C353 | $5,000.00 | $1,744.24 |
| | HOPE Turnaround Leadership - S4 | $3,360.00 | $1,864.40 |
| | SCL Negotiation C1 | $20,000.00 | $9,000.00 |
| | **Subtotal** | **$40,910.00** | **$17,309.64** |
| Jan-18 | Colo Parks & Wildlife Coaching In Loveland | $3,000.00 | $1,440.00 |
| | Comcast Denver leadership Academy C354 | $5,000.00 | $1,750.00 |
| | **Subtotal** | **$8,000.00** | **$3,190.00** |
| Feb-18 | Arapahoe Public Safety Leadership C1251 | $45,000.00 | $26,455.04 |
| | Comcast Denver Leadership Academy C355 | $5,000.00 | $1,750.00 |
| | HOPE Turnaround Leadership - S5 | $3,360.00 | $1,822.00 |
| | **Subtotal** | **$53,360.00** | **$30,027.04** |
| Mar-18 | Arapahoe Public Safety Leadership C1252 | $0.00 | $3,240.00 |
| | Comcast Denver Leadership Academy C356 | $5,000.00 | $1,750.00 |
| | Newmont ELDP C151 | $47,500.00 | $21,375.00 |
| | VMG 29 2018 Scottsdale Meeting | $12,000.00 | $5,400.00 |
| | **Subtotal** | **$64,500.00** | **$31,765.00** |
| Apr-18 | Arapahoe Public Safety Leadership C1253 | $0.00 | $3,900.00 |
| | Colo Parks & Wildlife Leadership - C451 | $24,750.00 | $11,037.00 |
| | Comcast Denver Leadership Academy C357 | $5,000.00 | $1,750.00 |
| | HOPE Turnaround Leadership - S6 | $3,360.00 | $1,822.00 |
| | Pacific Life C155 | $15,000.00 | $6,450.00 |
| | VMG 35 2018 Tucson Meeting | $12,000.00 | $5,184.00 |
| | VMG Leadership Program C1151 | $26,125.00 | $12,150.00 |
| | **Subtotal** | **$86,235.00** | **$42,293.00** |
| May-18 | Colo Parks & Wildlife Leadership - C452 | $7,000.00 | $3,780.00 |
| | Comcast Denver Leadership Academy C358 | $5,000.00 | $1,500.00 |
| | HOPE Turnaround Leadership - S7 | $3,360.00 | $1,680.00 |
| | Pacific Life C255 | $22,500.00 | $5,400.00 |
| | **Subtotal** | **$37,860.00** | **$12,360.00** |
| Jun-18 | Colo Parks & Wildlife Leadership - C453 | $7,000.00 | $3,640.00 |
| | **Subtotal** | **$7,000.00** | **$3,640.00** |
| | **Grand Total** | **$774,765.00** | **$386,886.44** |
| | | $58,775.00 | |

Confidential Information - Do Not Distribute

Copyright (c) 2000-2017 salesforce.com, inc. All rights reserved.

EXHIBIT 16 Gerig 1.31.20 PENGAD 800-631-6989

Update as of December 14, 2017

Since this Final Written Warning was sent to Ben on Wednesday, December 5, 2017 the following mistakes have been made and I am concerned that they would negatively impact the reputation of Daniels Executive Education and could mean loss of potential revenue in this fiscal year.

- For the week of November 27 – December 1, 2017, he did not have any meetings with new organizations.
- For the week of December 4-8, he did not have any meetings with new organizations.
- During our check-in meeting on December 14, 2017, we reviewed proposal for Enterprise and there were several fundamental problems that I did not expect to see in even a draft version including;
    - They had identified a need for 2 different programs for 2 different levels of employee and yet the proposal read as if there were one. I asked about the goals, content, timeframe of the larger group of 120 employees and he sort of suggested that this proposal was for the top 30 VPs and he thought we'd propose a program for the group of 120 at a different time. I asked him why we would want to lose the opportunity to propose both and he seemed to realize that would be a better plan.
    - He also had provided a sample agenda of 5 different options for 3 program days and the content in each was somewhat overlapping and some of the content areas he said they wanted were not listed in any of the options.
    - The document was also in an old format with very old logos and had different fonts on some pages.
- During this same meeting on December 14, 2017, I asked him about the proposal for Brownstein, Hyatt, Farber, Schreck and he indicated that he had already sent it to the client. During the meeting with Kevin and on November 16 when we reviewed some of the issues with the SendGrid proposal, Kevin and I thought we had made it very clear that you should have one of us review proposals before they were sent to avoid this with future potential clients. The email sent to Brownstein on November 27, 2017 indicated the attached proposal was an "initial menu of options for 2 separate programs", and yet the proposal includes one set of Program Objectives. It does go on to list topics that would be in different programs, but the fact that the Program Objectives would be the same for both programs again suggests that Ben does not have basic understanding of what he is representing to our potential clients. Additionally, there are a few typos, pricing incorrectly states that meals are not included, and the cost of a 360 Feedback report and Insights are incorrect. This proposal could be very damaging to our reputation for delivering high quality, professional programs.

EXHIBIT 18 Gerig 1.31.20

**To:** Ben Gerig[Ben.Gerig@du.edu]
**From:** Kevin Cuthbert
**Sent:** Fri 12/15/2017 2:23:12 PM (UTC)
**Subject:** Re: Enterprise Draft proposal

' Ben
. look forward to your next draft later this morning.
I was honestly surprised that your first draft did not contain hardly anything that was reflective of the conversation we had with Brian earlier in the week.
I am hoping the next one does.
Thanks
Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University of Denver
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

connect

**From:** Ben Gerig <Ben.Gerig@du.edu>
**te:** Thursday, December 14, 2017 at 3:47 PM
.. Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** Enterprise Draft proposal

Let's make some notes on this.

Ben Gerig
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

connect

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

EXHIBIT 19 Gerig 1-31-20

To: Benjamin Gerig

From: Kelsey Johnson, Director and Kevin Cuthbert, Assistant Dean

Date: January 2, 2018/HAND DELIVERED

Re: *Termination of Employment*

We met today, January 2, 2018, to discuss your employment with the University of Denver. In attendance was Cristina Valencia, from Human Resources. You are being terminated for failure to perform your duties as a Program Developer with Executive Education at the Daniels School of Business effective at the close of business today.

Since August 2017, we have been meeting with you regarding your performance and have issued specific expectations for your job. In addition, your most recent overall performance rating was an "Improvement Required." On December 5, 2017, you received a Final Written Warning regarding concerns with your performance. Some of these concerns include your failure to conduct the required set of meetings, your inability to accurately represent the type of work we do to potential clients without significant revisions, and a lack of understanding of some of our core processes including those in contracting with clients. We have seen little to no improvement and you are therefore being terminated from your position as Program Developer in Executive Education.

Your final paycheck, includes all accrued and unused vacation time plus two week's salary through January 16, 2018. The check is being hand delivered to you with this letter.

Please make arrangements with Cristina Valencia to coordinate picking up of your personal items. Cristina's contact information is cristina.valencia@du.edu. Phone: 303.871.3517.

Insurance coverage continues through the end of the month in which you terminate. If you need continuation coverage (Cobra) which is administered through Rocky Mountain Reserve, please contact Jennifer Emmett or 303.871.2616. Ms. Emmett also can also respond to inquiries related to retirement account information.

The University's Employee Handbook, specifically the Employee Dispute Resolution provision, outlines your rights related to your termination from the University. http://www.du.edu/human-resources/media/documents/employee_handbook_may2013.pdf#page=17 (section I., page 13)

For further information on separating from the University, please see http://www.du.edu/human-resources/employee-support/transitions/leaving-du.html

Please contact Ken Pinnock, Employee Relations Consultant at ken.pinnock@du.edu 303.871.7511 with any questions related to your status or the University's grievance process.

EXHIBIT 20 Gerig 1.31.20

Ben Gerig
3919 S. Clarkson St., Englewood, CO 80113
303-880-1877
ben.gerig@gmail.com
November 5, 2017

Dear Ms. Feldman, Mr. Burne, Ms. Lawson, Mr. Buzbee, Ms. McBride and distinguished committee members:

I am writing to express my interest in the Director of Development, Leadership Annual Giving position with The Bridge Project at the Graduate School of Social Work. From my research of this position and my knowledge of The Bridge Project and GSSW's mission and vision, I feel the qualities you are seeking match my professional interests and experience.

I have personally raised more than $16,000 for nonprofits close to my heart, including: So All May Eat (SAME) Café, Big City Mountaineers, Wilderness Wind and Mennonite Central Committee. As the Board President for SAME Café from 2015-17, I oversaw a $225,000 operating budget, executed innovative crowd funding development strategies and pariticpated directly in the solicitation of Leadership Annual gifts. I led a board of eight professionals from fields of law, finance, marketing and nonprofit management while also raising $5,000 in gifts during my "Hike for Hunger" (Colorado Trail thru-hike) fundraising campaign.

At DU my responsibilities have allowed me to hone my donor relations skills while multi-tasking in complex, deadline-focused environments utilizing attention to detail. I have also worked in teams and independently to design and sell customized Executive Education leadership programs to Fortune 500 and 100 Companies, execute strategic marketing and communications campaigns on behalf of the University and develop personal relationships with high profile community partners in collaboration with DU senior leaders, faculty, staff, students and alumni. I have experience in:

- Fundraising
- Alumni Engagement
- Business Development
- Program Management
- Strategic Marketing
- Writing, Recruiting, Sales

Additionally, I have built lasting relationships across the business, nonprofit and higher education communities in Colorado and have acquired the tools that will allow me to contribute immediately to your team. My devotion to the vision and values of The Bridge Project and GSSW is my inspiration for applying to this role.

My wife Jill is a proud GSSW alum. I spent my first decade in Denver hiking, camping and engaging with passionate DU social work alumni—they are a spirited bunch, all instrumental in improving the educational, social and political fabric of Denver, every day. It would be my honor to serve this transformational community by supporting the dynamic, engaged and committed Bridge Project students, staff, board, donors, alumni and friends already in place—as well as expand financial support by growing and nourishing new donors throughout TBP, GSSW, DU

and Denver's diverse stakeholder circles. Through authentic and strategic relationship building, we can continue to create rich networks that support, celebrate and enhance the invaluable service that The Bridge Project offers to our Denver community—providing a positive path for local youth by facilitating the development of life skills and self-sufficiency.

I hope that this letter and my resume will encourage your serious consideration of my application. I look forward to the opportunity to discuss this position and my qualifications with you further. Thank you for your time and please do not hesitate to contact me for any additional information or clarification.

Sincerely,

Ben Gerig

Ben Gerig

| resume_id | candidate_name | enter_date | contact_info_id | job_id | job_title | stage_id | stage_of_application | posting_date | eeo_group_id |
|---|---|---|---|---|---|---|---|---|---|
| 181400 | Ben Gerig | 11/5/17 7:46 PM | 20464 | 2826 | Director of Development, Leadership Annual Giving for the Bridge Project - University Advancement | 14 | Talent Pool (consider for future) | 11/3/17 6:47 PM | 3709 |
| 177544 | Ben Gerig | 10/9/17 2:33 AM | 20464 | 2747 | Director of Development, Leadership Annual Giving for the Daniels College of Business - University Advancement | 14 | Talent Pool (consider for future) | 10/4/17 8:12 PM | 3709 |
| 169139 | Ben Gerig | 8/4/17 9:12 PM | 20464 | 2548 | Assistant Director of Hospitality Career Services, Fritz Knoebel School of Hospitality Management - Daniels College of Business | 14 | Talent Pool (consider for future) | 7/24/17 5:20 PM | 3709 |
| 161793 | Ben Gerig | 6/3/17 7:04 PM | 20464 | 2396 | Director of Alumni Engagement, Morgridge College of Education & Graduate School of Social Work - University Advancement | 14 | Talent Pool (consider for future) | 5/23/17 5:22 PM | 3709 |
| 110541 | Ben Gerig | 4/25/16 3:29 AM | 20464 | 1543 | Program Developer - Daniels College of Business | 4 | Hired - HR Use Only | 4/22/16 3:03 PM | 3709 |
| 91053 | Ben Gerig | 11/14/15 10:13 PM | 20464 | 1185 | Director, Communications & Public Relations - Daniels College of Business | 6 | Review of Materials | 11/13/15 3:10 PM | 3709 |
| 86640 | Ben Gerig | 10/8/15 7:13 PM | 20464 | 1109 | Director of Development - University Advancement | 10 | Talent Pool (consider for future) | 9/30/15 3:59 PM | 3709 |
| 84824 | Ben Gerig | 9/25/15 6:08 PM | 20464 | 1076 | Communications and Public Relations Manager - Daniels College of Business | 6 | Review of Materials | 9/21/15 5:21 PM | 3709 |
| 61611 | Ben Gerig | 4/13/15 3:58 PM | 20464 | 771 | Executive Assistant to the Chancellor | 6 | Review of Materials | 4/10/15 4:57 PM | 3709 |
| 60819 | Ben Gerig | 4/8/15 5:01 PM | 20464 | 754 | Assistant Director, Center for Professional Development | 6 | Review of Materials | 4/3/15 4:12 PM | 3709 |
| 46373 | Ben Gerig | 12/4/14 12:51 AM | 21951 | 584 | Director of Admission, 4475 | 6 | Review of Materials | 11/25/14 6:09 PM | 3717 |
| 40944 | Ben Gerig | 10/20/14 11:00 PM | 21951 | 520 | Assistant Director of Alumni Engagement and Special Events - Social Work | 10 | Talent Pool (consider for future) | 10/3/14 3:27 PM | 3709 |
| 38384 | Ben Gerig | 9/26/14 3:54 AM | 20464 | 509 | Director for Projects and Planning - Office of the Chancellor | 6 | Review of Materials | 9/23/14 3:54 PM | 3709 |
| 34632 | Ben Gerig | 8/22/14 8:27 PM | 14072 | 309 | Director, Marketing and Recruitment - Engineering and Computer Science | 1 | Talent Pool (consider for future) | 5/5/14 5:03 PM | 3709 |
| 25621 | Ben Gerig | 6/14/14 9:20 PM | 14072 | 361 | Assistant Director of Athletics and Recreation Publicity | 13 | Review of Materials | 6/10/14 9:37 PM | 3709 |
| 25620 | Ben Gerig | 6/14/14 9:00 PM | 14072 | 347 | Director of Enrollment Management | 14 | Talent Pool (consider for future) | 6/4/14 4:01 PM | 3709 |

EXHIBIT 21 Gerig 1.31.20
PENGAD 800-631-6989

EXHIBIT 23 Gerig 1.31.20

**From:** Ben Gerig
**Sent:** Friday, August 18, 2017 11:02 AM
**To:** Kelsey Johnson <kjohn198@du.edu>; Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** natural light

Kelsey and Kevin,

I wanted to let you know that I've been struggling with cognitive energy, focus and sleep disturbances since moving into a windowless office[in late April]. I spoke with Kelsey briefly prior to the move, however I did a poor job of advocating for myself and my need for natural light. I was diagnosed with Seasonal Affective Disorder (biological sensitivity to diminished environmental light) at the age of 15, which is why I now live in Denver.

After discussing it with Jill more readily, I've ascertained that my current windowless office is not allowing me to fully maximize my potential at work, and I would like to partner with you both on a collaborative solution. Is there any way that I could request an office change to 304—the unused adjunct space on this floor—or another possible space with a door and window? I do not want to displace any colleagues, and I want to honor the needs of everyone else, as well.

Please let me know your thoughts at your convenience. Best, Ben

https://www.psychologytoday.com/blog/the-athletes-way/201306/exposure-natural-light-improves-workplace-performance

***

**From:** Kevin Cuthbert
**Sent:** Monday, August 21, 2017 10:28 AM
**To:** Ben Gerig <Ben.Gerig@du.edu>; Kelsey Johnson <kjohn198@du.edu>
**Subject:** Re: natural light

Hi Ben

I appreciate you sharing this with us.

And I am very sorry to hear about the disturbances you are experiencing.

We will look forward to talking about it when we are all back in the office at the same time.

Kevin

Kevin Cuthbert

EXHIBIT 24 Gerig 1-31-20

Assistant Dean | Executive Education

Daniels College of Business | University of Denver

Joy Burns Center | 2044 E. Evans Ave. | Room 309, Denver, CO 80208

***

**From:** Kevin Cuthbert
**Sent:** Tuesday, August 29, 2017 9:49 AM
**To:** Kelsey Johnson <kjohn198@du.edu>; Ben Gerig <Ben.Gerig@du.edu>
**Subject:** Re: business development focus

Kels – thanks for getting this ball rolling

Ben and Kels – thanks for our meeting yesterday

In summary:

- Ben indication and re-commitment/engagement to doing the work we do in ExecEd.
- We talked about Ben's need for more natural light and will explore options to that end.
- Kelsey and Ben talked about how to have more frequent and regular interaction so that Ben can continue to learn the business.
    - Kelsey asked for more curiosity from Ben – specific examples would be "how do we think about building custom programs?" "how do we get a better understanding of a the needs of client organization?"
    - Ben asked for more regular meetings from Kelsey
- With regard to the breakdowns below – we clarified that the first category – 50% is targeted toward new business in new clients.
- We talked about the need to continue to clarify roles and streamline activities with Marketing and Operations.

At the end we talked about SendGrid, where Ben recently drafted an incorrect and insufficient SOW. From emails since then it appears that you are both working on this now.

I'd like each of you to respond to this email indicating how well I have (or have not) captured our meeting.

Thanks

Kevin

Kevin Cuthbert

Assistant Dean | Executive Education

Daniels College of Business | University of Denver

Joy Burns Center | 2044 E. Evans Ave. | Room 309, Denver, CO 80208

Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

***

**From:** Ben Gerig
**Sent:** Tuesday, August 29, 2017 1:54 PM
**To:** Kelsey Johnson <kjohn198@du.edu>; Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** RE: business development focus

Kevin,

This synopsis matches my understanding of the conversation. I look forward to showing more curiosity, getting SendGrid back on track and deploying the new 50/30/20 work focus breakdown, per Kelsey's email, below.

Thank you both for the additional clarity and partnership.

Best,

Ben

**Ben Gerig**

Program Developer | Executive Education

Daniels College of Business | University of Denver

Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208

Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

***

---

**From:** Kelsey Johnson
**Sent:** Thursday, August 31, 2017 9:43 AM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Subject:** RE: Check-In: Ben/Kelsey

Shall I call your office number?

Here's a few things I'd like to cover:

- Expectations for this meeting
- Self-appraisal
- Initial thoughts on new client targets for Sept.
- Office and natural light options

Thanks!!

Kels

Kelsey Johnson

Director, Executive Education

Daniels College of Business | University of Denver

Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd

<< OLE Object: Picture (Device Independent Bitmap) >>

**

**From:** Ben Gerig
**Sent:** Monday, September 11, 2017 9:59 AM
**To:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** desk lamp for Ben

Hi Kelsey,

After researching, here is the light that seems to fit the best, for my office.

http://www.sunbox.com/shop/10000-lux-bright-lights/special-new-sunbox-sunup-10000-lux-desk-lamp/

**Ben Gerig**

Program Developer | Executive Education

Daniels College of Business | University of Denver

Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208

Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

*****

**From:** Ben Gerig
**Sent:** Tuesday, October 3, 2017 2:13 PM
**To:** Mia Elizardi <Mia.Elizardi@du.edu>
**Subject:** 360 feedback

Gerig-Ben-360 DIX.docx    Gerig-Ben-360 DIX.pdf    Appraisal Report Ben.pdf

Mia,

I received the attached 360 feedback report in June. It includes ratings and responses from both of my supervisor(s) as well as 8 other office colleagues (10 total people providing anonymous feedback on my performance and effectiveness as a co-worker; my self-ratings are also in the report).

In the 360, my supervisors gave me an average score of 7.9 on a nine point scale across the categories of purpose; principles; presence; interpersonal; team; effective communicator; awareness; functional/technical/industry knowledge; critical thinking; direction/alignment; builds high engagement; and drives for perfection/results.

When I juxtapose this feedback with the appraisal Kelsey just delivered to me yesterday, I hope that my confusion and frustration is evident from the inconsistencies in both the qualitative and quantitative assessments of my 2017 performance. I don't believe that my performance dropped off a cliff in the last three months—as the appraisal report from Kelsey would suggest.

No need to reply to this, I just wanted to ground our future conversations in some empirical data points.

Warmly,

Ben

**

**From:** Mia Elizardi
**Sent:** Tuesday, October 3, 2017 9:23 AM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Subject:** RE: coaching session #3

You've got this – you can handle anything. I've got your back.

All the best,

**Mia Elizardi, MA, GCDF**

Performance and Career Development Consultant

Performance Management | People Development | Human Resources and Inclusive Community | University of Denver

Mary Reed Building | 2199 S. University Blvd., Room 430 | Denver, CO 80208

303.871.3973 Office | 303.526.8296 Cell

<< OLE Object: Picture (Device Independent Bitmap) >>

Confidentiality Notice: This e-mail message, including any attachments, is for the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender immediately by reply e-mail and destroy all copies of the original message.

---

**From:** Ben Gerig
**Sent:** Tuesday, October 03, 2017 8:31 AM
**To:** Mia Elizardi <Mia.Elizardi@du.edu>
**Subject:** RE: coaching session #3

As well as it could have…thanks for all your feedback. bg

-----Original Appointment-----
**From:** Mia Elizardi
**Sent:** Tuesday, October 3, 2017 8:29 AM
**To:** Ben Gerig
**Subject:** Accepted: coaching session #3
**When:** Tuesday, October 17, 2017 2:00 PM-3:00 PM (UTC-07:00) Mountain Time (US & Canada).
**Where:** Beans (Korbel)

This works great – how did it go yesterday? I was thinking about you and sending good vibes ☺

**

**From:** Ben Gerig
**Sent:** Thursday, October 5, 2017 12:49 PM
**To:** Rufina Hernández <Rufina.Hernandez@du.edu>
**Cc:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** meeting request

Greetings Ms. Hernandez,

Per the DU Employee Handbook, I was guided to contact you regarding my request to my supervisor Kelsey Johnson, below, on August 18.

Is there a time that works for you to get together with Kelsey and I to discuss reasonable accommodations available to me at DU, with respect to the ADA?

Many thanks,
Ben

## DISABILITY ACCOMMODATION

The University provides reasonable accommodations to the known disabilities of otherwise qualified students, applicants, participants in University activities and employees. It is the responsibility of the person with a disability to make a timely accommodation request. The request can be made directly to the provider (supervisor, program director, etc.) or the person with a disability can seek assistance. Students should contact the Disability Services Programs at 303-871-2455. Employees or applicants for employment, and participants in University activities (including students at the Fisher Early Learning Center or the Ricks Center) should contact the Director of Equal Opportunity / ADA Compliance at 303-871-7436.

University employees who are uncertain about how to respond to an accommodation request may also contact the above resources for consultation and assistance with the provision of reasonable accommodations.

***

**From:** Rufina Hernández
**Sent:** Thursday, October 5, 2017 3:11 PM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Cc:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** RE: meeting request

Absolutely Ben - let's schedule as soon as possible. Can I call you to get that set? It's usually easier by phone. Thx.

*Rufina A. Hernández, Esq.*

Interim Director of Equal Opportunity

303.871.7726

**To:** Kelsey Johnson[kjohn198@du.edu]; Kevin Cuthbert[Kevin.Cuthbert@du.edu]
**From:** Ben Gerig[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=41DB84E99B3140B6B6CCCB0586D82B4C-BEN GERIG]
**Sent:** Tue 8/29/2017 7:54:05 PM (UTC)
**Subject:** RE: business development focus

...evin,

This synopsis matches my understanding of the conversation. I look forward to showing more curiosity, getting SendGrid back on track and deploying the new 50/30/20 work focus breakdown, per Kelsey's email, below.

Thank you both for the additional clarity and partnership.

Best,
Ben

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

...m: Kelsey Johnson
**Sent:** Tuesday, August 29, 2017 1:45 PM
**To:** Ben Gerig <Ben.Gerig@du.edu>; Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** Re: business development focus

Thanks for this summary, Kevin. I think it captures my thoughts and I will commit to more regular meetings and more comprehensive knowledge sharing as well as help with marketing and operations turnover.

Thanks for the openness from both of you!
Kels

Get Outlook for Android

From: Kevin Cuthbert
Sent: Tuesday, August 29, 9:48 AM
Subject: Re: business development focus
To: Kelsey Johnson, Ben Gerig

Kels – thanks for getting this ball rolling
Ben and Kels – thanks for our meeting yesterday
...ummary:

Ben indication and re-commitment/engagement to doing the work we do in ExecEd.We talked about Ben's need for more natural light and will explore options to that end.Kelsey and Ben talked about how to have more frequent and regular interaction so that Ben can continue to learn the business. Kelsey asked for more curiosity from Ben – specific examples would be "how do we think about building custom programs?" "how do we get a better understanding of a the needs of

client organization?"Ben asked for more regular meetings from Kelsey With regard to the breakdowns below – we clarified that the first category – 50% is targeted toward new business in new clients.We talked about the need to continue to clarify roles and streamline activities with Marketing and Operations.

At the end we talked about SendGrid, where Ben recently drafted an incorrect and insufficient SOW. From emails since then it appears that you are both working on this now.

I'd like each of you to respond to this email indicating how well I have (or have not) captured our meeting.

Thanks

Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University o

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

f Denv

in

er
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

connect

**From:** Kelsey Johnson <kjohn198@du.edu>
**Date:** Monday, August 28, 2017 at 8:08 AM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Cc:** Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** business development focus

Hey Ben,

I think we would all benefit from a bit more discipline in terms of business development – I don't want to end up short of target again next year and while Kevin being back will help with that, each of us will really need to dial up our output.

**To:** Cristina Valencia[Cristina.Valencia@du.edu]
**Cc:** Kelsey Johnson[kjohn198@du.edu]
**From:** Kevin Cuthbert[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8EDC812C08F24B589482E58E04B6EBB1-KEVIN CUTHB]
**Sent:** Thur 11/16/2017 8:47:55 PM (UTC)
**Subject:** FW: Follow up

Hi Cristina

Please see below for part of our update on Ben Gerig.
You might be interested to talk with Lloyd and Elizabeth about the meeting we had.
My impression of it is that Ben does not still truly understand the accommodation process.
He and Lloyd went back and forth a few times and I think that Ben might still not fully understand it.

In more recent news: today Ben and Kelsey and I had a conversation.
I initiated this because from my vantage point Ben is still not picking up on some important parts of the job.
Even in the past couple of days he has made mistakes on areas where we have previously coached him.
It appears as if he is not understanding what we do and the differences between some of our offerings.

While we have seen more consistent activity, we are still seeing that he is missing more than we need for someone in this role.
And more than someone who has been in the role for well over a year should be.

Kelsey and I will be documenting the specifics of this and sharing them with Ben yet this week.

We shared this with him today and also talked to him about the possibility of a negotiated resignation.

He wants to try and keep working the plan.

Please let us know if you have any questions.

Thanks

Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University of Denver
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

connect

**From:** Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Date:** Thursday, November 16, 2017 at 12:46 PM
**To:** Lloyd Moore <Lloyd.Moore@du.edu>, Elizabeth Cha <Elizabeth.Cha@du.edu>
**Cc:** Kelsey Johnson <kjohn198@du.edu>, Ben Gerig <Ben.Gerig@du.edu>
**Subject:** Follow up

Lloyd, Elizabeth – sorry for the delayed follow up to our recent meeting.
The day following that, Kelsey and I decided and informed Ben that we are approving his accommodation.
And his moving to suite 504 is in process.
Please let us know if you have any questions.

EXHIBIT 42
Johnson
AGREN BLANDO REPORTING
KR 7-15-20

To: Ben Gerig, Program Developer, Executive Education
From: Kelsey Johnson, Director, Executive Education
CC: Kevin Cuthbert, Assistant Dean
Date: December 5, 2017

Re: Final Written Warning

You have been in this role for over 17 months and while you have been a very enjoyable and friendly colleague, you have not met the fundamental expectations of the position. The following is a summary of my evaluation of how we have attempted to provide even more specific performance expectations for your role as a Program Developer within Executive Education.

On August 28, 2017, I sent the following structure for your business development activities:

- 50% of your time/effort towards a target of 4 meetings per month with new companies – ones we haven't done custom programs for but who may have sent people to public workshops. Doesn't need to be 1 per week per se and phone calls count. Good test is that they now know what we are capable of when they may not have known the full extent of it before.
- 30% focused on special projects like the Cannabis Summit and workshops and CSLA – I know these things can suck up time, but hoping that Ashley being back and able to help more with the marketing elements for these 2 activities can help. I see your role in these as more directing them (dialing up those DLX leadership skills) and less doing them.
- 20% remaining for overflow from the pipeline I am working on – will probably be 1-2 a month

We then had a conversation, you, me and Kevin Cuthbert on Tuesday August 29, 2017 and agreed on the following as captured in an email from Kevin:

> "Ben indicated his re-commitment/engagement to doing the work we do in ExecEd. We talked about Ben's need for more natural light and will explore options to that end. Kelsey and Ben talked about how to have more frequent and regular interaction so that Ben can continue to learn the business. Kelsey asked for more curiosity from Ben – specific examples would be "how do we think about building custom programs?" "how do we get a better understanding of a the needs of client organization? "Ben asked for more regular meetings from Kelsey. With regard to the breakdowns below – we clarified that the first category – 50% is targeted toward new business in new clients. We talked about the need to continue to clarify roles and streamline activities with Marketing and Operations.
>
> At the end we talked about SendGrid, where you recently drafted an incorrect and insufficient SOW. From emails since then it appears that you are both working on this now."

You responded to this email summary from Kevin with:

> "I think it captures my thoughts and I will commit to more regular meetings and more comprehensive knowledge sharing as well as help with marketing and operations turnover."

On September 29, 2017, I requested a list of the programs you worked on to hit your #2 goal of $300k in revenue and you provided me a list of the programs and the amount of net revenue (not gross) generated by them and then added participant gross revenue for the participants you recruited into several of the public programs. Adding gross revenue to net revenue is not a correct way to measure

this target and even if it was, the total did still not meet the goal and yet you indicated that you had hit that target amount.

On October 2, 2017, we completed your Performance Review with an overall rating of Improvement Required.

On October 5th, I provided the following more specific expectations in writing to you:

1. Follow up on recently submitted proposals or initial conversations with prospects will be updated in Salesforce by noon each Friday.
2. Starting for the week of 10/9/17, two meetings (in person or on the phone) per week with new companies (any on this list https://en.wikipedia.org/wiki/List_of_companies_with_Denver_area_operations) or dormant companies (see attached list from Salesforce). This is in addition to the follow up activities and needs to be outside of DU and with organizations who are a good potential fit, e.g. companies or organizations who have a large enough employee base and who are in professional roles that allow them to participate in development programs more easily.
3. Less than 5% of your time should be spent on CSLA and less than 5% of your time should be spent on Cannibusiness programs so that 90% of your time is available for the above.
4. Please continue to attend all team meetings that require your input and feel free to excuse yourself after topics that are relevant to you are covered. All other team activities, like scheduling the Funtastic sessions, should be on hold until the meeting expectations are met.

As of November 8, 2017, here is how you have performed against these expectations:

1. Follow up with existing proposals, prospects and entry into Salesforce has been completed as expected.
2. For the month of October, you had the following meetings that fit the criteria outlined above:

Week of 10/2-6/2017 – 2 meetings

| | | | |
|---|---|---|---|
| Wheeler Trigg O'Donnell - EE | 10/4/2017 | Ben | Meeting with Casey Fenn |
| Holland & Hart - EE | 10/6/2017 | Ben | Meeting with Misae Nishikura |

Week of 10/9-13/2017 – 1 meeting

| | | | |
|---|---|---|---|
| FareHarbor – EE | 10/9/2017 | Ben | Meet w/ Barrett Chow |

Week of 10/16-20/2017 – 1 meeting (not exactly a new client as you have met with them before)

| | | | |
|---|---|---|---|
| LivWell – EE | 10/17/2017 | Ben | Call with Matthew Givner |

Week of 10/23-27/2017

| | | | |
|---|---|---|---|
| Enterprise - CCP | 10/25/2017 | Ben and Kevin | Meeting with Brian Chaput, Casey Miller, and Kevin Anderson |

Week of 10/30-11/3/2017

No meetings live or via phone

Week of 11/6-10/2017

| | | | |
|---|---|---|---|
| Snooze Eatery - CCP | 11/8/2017 | Ben | Meeting with Adam Schlegel re: DU & Snooze Leadership Collaboration |
| CSG International - EE | 11/9/2017 | Ben | phone call with Don Jones re: CSGI Leadership Development Discussion |
| Crocs - CCP - Executive and HIPO Leadership | 11/9/2017 | Ben | Daniels & Crocs Reconnect Meeting with Shannon Sisler |

Week of 11/13-17/2017

| | | | |
|---|---|---|---|
| NTT Security-CCP | 11/13/2017 | Ben | Email to Eve McLain RE: Phone meeting 4 pm CT w/ DU |
| Brownstein - CCP - Sr. Associates | 11/15/2017 | Ben | Call: with Kristin Stork DU / Brownstein |
| Molson Coors - CCP | 11/16/2017 | Ben | Email to Thembi Machaba re: Leadership Development /Talent Mgmt. Discussion - MCBC & Daniels College of Business |

3. There have been some necessary check-ins with the SMCC program and believe these have been less than 5% of your time.
4. Ben has attended all internal meetings when appropriate.

The number of meetings – total of 11 over the course of 7 weeks did not meet the established expectation of 14 meetings. Based on the lack of any meetings for the week of Oct 30 – Nov 3 and very few emails sent to try and set up meetings, when we met on Thursday, Nov 2, we had a conversation about increasing the overall volume of outreach via email and phone to people to set these meetings up. I asked you to provide a few strategies of how you would increase this top part of the pipeline. You sent me a list of the specific things you were already doing with existing Targets and Prospects, but that was not quite what I was looking for, so in an email and in a meeting with Kevin on Nov 10, we clarified what we were looking for and we had agreed that you would provide those by Tuesday, November 14. We all met again on Thursday, November 16 and you had still not submitted those strategies.

In this meeting on Nov 16, we also discussed the issue of your fundamental understanding of the work we are engaged in with custom clients. This had come up with the SendGrid proposal and again with the proposal for NTT Security. Your performance would indicate you are not able to represent the type of work we are capable of doing with clients despite being exposed to this work in a variety of ways including specific dialogues with me about client needs and how we can specifically help them, listening in on multiple business development calls, sitting in on detailed client design meetings, and being a participant in the Denver Leadership Experience. In my most recent review of the NTT Security proposal, the content was repetitive in that you had listed the objectives on 2 different slides, you had included a list of experiential activity options, but then didn't provide slides with more description of them for all of the options listed.

Additionally, we reviewed the three documents (Agreement, Attachment, and NDA) involved in the contract process several times and most recently reviewed it again for the SCL Health program. As we looked at the Agreement, I indicated that I would get it ready, if you would complete the Attachment and if you could send it to me, I would make sure they are all consistent before sending to the client. In our meeting on Thursday Nov 16, you indicated that you had already sent it to the client without my review. I also asked if you had sent the Agreement as well and you said you sent the Attachment. I clarified my question and asked if you sent all three documents and you said that you did. I have since reviewed the email in Salesforce and it appears that you sent the Agreement to SCL on Friday after our meeting and had forgotten to include the Agreement as an Attachment. Therefore, I don't believe that you had in fact sent all three documents to the client and none of them were reviewed by me before they were sent. How you managed the SCL contracts indicates you lack a basic understanding of the contract process for custom clients despite having received prior training and were mis-representing what you had done.

Finally, I have provided training multiple times over the past 16 months and more recently in Sept and Oct on the way we need to track Activities in Salesforce in order to be able to provide a weekly report to the Corporate Engagement group and have always been available to answer questions as I know it can be a little confusing. In looking back at the Activities in Nov, there are no less than 10 situations where the data is incomplete and not attached to the correct records.

Despite Kevin and my repeated efforts to help you succeed, you continue to fail in meeting the job expectations for your position. The consequences have been verbal feedback, written performance feedback, and the implementation of progress tracking and plans. This is your final warning and you are expected to immediately comply with these performance expectations:

- 2 meetings with new organizations per week that meet the criteria as described above
- Any client proposal needs to be submitted to Kevin or myself and should be at least 95% accurate in terms of representing what the client has requested in a professional, comprehensive and not redundant manner.
- All of your outreach activities to new or existing organizations need to be entered into Salesforce by the end of each week. Each entry needs to have a clear Subject, be attached to the correct Opportunity, to the correct Contact, and have brief description of what happened in the meeting or phone call.
- Indicate on the Exec Ed board where you are and who you are meeting with, if appropriate, when you leave the building for longer than 15 minutes.

A failure to do so may result in further discipline, up to and including termination.

By signing below, I acknowledge receipt of this Written Warning.

Name/Date

**Owen, Hannah**

**From:** Ben Gerig
**Sent:** Thursday, October 5, 2017 3:18 PM
**To:** Rufina Hernández
**Cc:** Kelsey Johnson
**Subject:** RE: meeting request

Hi Rufina,

Let me check Kelsey's calendar online and send a meeting invite. I will await acceptance from you both, in order to finalize the time. Best, Ben

---

**From:** Rufina Hernández
**Sent:** Thursday, October 5, 2017 3:11 PM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Cc:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** RE: meeting request

Absolutely Ben - let's schedule as soon as possible. Can I call you to get that set? It's usually easier by phone. Thx.

*Rufina A. Hernández, Esq.*
Interim Director of Equal Opportunity
303.871.7726

---

**From:** Ben Gerig
**Sent:** Thursday, October 05, 2017 12:49 PM
**To:** Rufina Hernández <Rufina.Hernandez@du.edu>
**Cc:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** meeting request

Greetings Ms. Hernandez,

Per the DU Employee Handbook, I was guided to contact you regarding my request to my supervisor Kelsey Johnson, below, on August 18.

Is there a time that works for you to get together with Kelsey and I to discuss reasonable accommodations available to me at DU, with respect to the ADA?

Many thanks,
Ben

**DISABILITY ACCOMMODATIO**

The University provides reasonable accommodations to the known disabilities of otherwise qualified students, applicants, participants in University activities and employees. It is the responsibility of the person with a disability to make a timely accommodation request. The request can be made directly to the provider (supervisor, program director, etc.) or the person with a disability can seek assistance. Students should contact the Disability Services Programs at 303-871-2455. Employees or applicants for employment, and participants in University activities (including students at the Fisher Early Learning Center or the Ricks Center) should contact the Director of Equal Opportunity / ADA Compliance at 303-871-7436.

University employees who are uncertain about how to respond to an accommodation request may also contact the above resources for consultation and assistance with the provision of reasonable accommodations.

---

**From:** Ben Gerig
**Sent:** Friday, August 18, 2017 11:02 AM
**To:** Kelsey Johnson <kjohn198@du.edu>; Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** natural light

Kelsey and Kevin,

I wanted to let you know that I've been struggling with cognitive energy, focus and sleep disturbances since moving into a windowless office. I spoke with Kelsey briefly prior to the move, however I did a poor job of advocating for myself and my need for natural light. I was diagnosed with Seasonal Affective Disorder (biological sensitivity to diminished environmental light) at the age of 15, which is why I now live in Denver.

After discussing it with Jill more readily, I've ascertained that my current windowless office is not allowing me to fully maximize my potential at work, and I would like to partner with you both on a collaborative solution. Is there any way that I could request an office change to 304—the unused adjunct space on this floor—or another possible space with a door and window? I do not want to displace any colleagues, and I want to honor the needs of everyone else, as well.

Please let me know your thoughts at your convenience. Best, Ben

https://www.psychologytoday.com/blog/the-athletes-way/201306/exposure-natural-light-improves-workplace-performance

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY OF DENVER
1864

RECEIVED
FEB 1 9 2013
HUMAN RESOURCES

# Staff BECR
## Benefited Employee
## New Hire/Job Change Request

Submit form on BLUE PAPER Rev. 2.09

DIVISION NAME AHSS

ECLS10

**Complete New Hire OR Current Job Change Section ONLY.**

**NEW HIRE OR TRANSFER HIRE**

Position # **004274** Hire Date **2/15/13** Title **Public Relations Assistant** DU ID **872721858**

Home Org Name Music Home Org # 131800 Check Dist Org # 131801 Timesheet Org # 131801

Months Per Year 12 Hours Per Week 37.5 Total Hours Per Year 1950.5 FTE 1

Name Benjamin Gerig SS # [redacted] Birth Date [redacted]

Mailing Address 1683 S Lafayette Street City Denver

State CO Zip Code 80210

| | | | | | | |
|---|---|---|---|---|---|---|
| Gender ☒ Male ☐ Female | | | US Citizen/Permanent Resident ☒ Yes ☐ No | | | |
| Exempt Annual Salary (MO): | | | Non-Exempt Hourly Rate (BW): | 16.01 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | Fund | 10000 | Orgn | 131801 | Acct | 601072 | % 100 |
| 2 | Fund | | Orgn | | Acct | | % |
| 3 | Fund | | Orgn | | Acct | | % |

**Is this employee working out-of-state AND holding an out-of-state residency?** ☐ **Yes** ☒ **No**

**TEMPORARY JOB CHANGE ONLY**

**Use PCR for permanent position changes (This section Not for New Hires or Transfers)**

Employee DU ID # ______ Employee Name ______

Effective Date ______ End Date ______ Position # ______

| | Change From: | Change To: |
|---|---|---|
| Months Per Year/Hours Per Week | | |
| FTE | | |
| Salary Change/Hourly Change | | |
| Temp Title Change | | |
| 1. FOA% | | |
| 2. FOA% | | |
| 3. FOA% | | |
| 4. FOA% | | |

Manager' Name Chris Wiger Manager's Position # 00414 Manager's DU ID 872755612

Form Prepared By Teri Fuller Preparer's Phone 16952

**APPROVING SIGNATURES**

Comments: Ben is moving from a part time non-benefitted postion at the Burns School at Daniel's to the Public Relations Assistant at Lamont. Ben is replacing Katherine Watt who left the postion in January, 2013.

1. Department Manager — 2/12/13 Date
2. Division Head/Budget Officer — 2/13/13 Date
3. Executive Level — 2/18/13 Date
4. OSP/Budget — 2/18/13 Date
5. Human Resources — 2/19/13 Date

**After all required signatures submit form to Human Resources for processing.**

UNIVERSITY of DENVER
HUMAN RESOURCES

## Request for Reasonable Accommodation Form

The University of Denver fully complies with the reasonable accommodation requirements of the Rehabilitation Act of 1973. Under the law, agencies must provide reasonable accommodation to qualified employees or applicants with disabilities, unless to do so would cause undue hardship.

The University is committed to providing reasonable accommodations to its employees and applicants for employment in order to assure that individuals with disabilities enjoy full access to equal employment opportunity at the University.

The University provides reasonable accommodations:

- when an applicant with a disability needs an accommodation in order to be considered for a job;
- when an employee with a disability needs an accommodation to enable him or her to perform the essential functions of the job or to gain access to the workplace; and
- when an employee with a disability needs an accommodation to enjoy equal benefits and privileges of employment.

**Name:** Ben Gerig **Contact Number:** 303.880.1877

**DU ID#:** 872721858 **Job Title:** Program Developer

**Department:** Daniels - Executive Education

**Physical Work Location:** Joy Burns Center; Suite 307; 312B

**Supervisor:** Kelsey Johnson **Contact Number:** 303.871.2370

**Accommodation Requested** *(Please be specific)*: I would like to request an office change to Joy Burns 304 or 343 — or any comparable office with an external facing window. This request is grounded in my diagnosis of Seasonal Affective Disorder. My current office is windowless.

*You must also submit a completed Physician Questionnaire*

UNIVERSITY of DENVER
HUMAN RESOURCES

## Physician Questionnaire

Dear Physician:

Ben Gerig (University of Denver Employee) has requested an accommodation in accordance with the Americans with Disabilities Act (ADA). In order to certify the disability, we need you to complete the following questionnaire in its entirety.

Under the ADA the definition of disability is: a physical or mental impairment that substantially limits one or more of an individual's major life activities.

1. What is the employee's impairment? Seasonal Affective Disorder

2. In the table below, please indicate all major life activities affected and whether or not:

   a. The employee is *unable to perform* a major life activity that the average person in the general population can perform; or

   b. The employee is *substantially limited* as to the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. N/A

| Major Life Activity | Substantially Limited | Unable To Perform |
|---|---|---|
| Walking | | |
| Seeing | | |
| Hearing | | |
| Speaking | | |
| Breathing | | |
| Learning | | |
| Working | | |
| Sitting | | |
| Standing | | |
| Lifting | | |
| Reaching | | |
| Thinking | | |
| Concentrating | | |
| Caring for oneself | | |
| Interacting with others | | |
| Performing Manual Tasks | | |

UNIVERSITY of DENVER
HUMAN RESOURCES

3. Suggested accommodation if needed or required to perform the essential job duties (see attached job description):

Exposure to sunlight can have a beneficial impact on the course + severity of this problem.

4. Other restrictions, considerations, or notes:

Member is taking prescription medication for this issue.

Based on my evaluation of the patient's condition, the above information is accurate and complete.

Daniel Jones MD
Physician Name and Credentials (Print)

10/10/2017
Date

303-338-4545
Phone Number

[signature] MD
Physician Signature

---

Please return completed form to:

Lloyd Moore
Director of Benefits
University of Denver
Mary Reed Building
2199 S. University Blvd.
Denver, CO 80208
Fax: 303.871.3656
Email: lloyd.moore@du.edu

UNIVERSITY of DENVER
HUMAN RESOURCES

## Physician Questionnaire

Dear Physician:

Ben Gerig (University of Denver Employee) has requested an accommodation in accordance with the Americans with Disabilities Act (ADA). In order to certify the disability, we need you to complete the following questionnaire in its entirety.

Under the ADA the definition of disability is: a physical or mental impairment that substantially limits one or more of an individual's major life activities.

1. What is the employee's impairment? Seasonal Affective Disorder

2. In the table below, please indicate all major life activities affected and whether or not:

   a. The employee is *unable to perform* a major life activity that the average person in the general population can perform; or

   b. The employee is *substantially limited* as to the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

| Major Life Activity | Substantially Limited | Unable To Perform |
|---|---|---|
| Walking | | |
| Seeing | | |
| Hearing | | |
| Speaking | | |
| Breathing | | |
| Learning | | |
| Working | | |
| Sitting | | |
| Standing | | |
| Lifting | | |
| Reaching | | |
| Thinking | | |
| Concentrating | ✓ | |
| Caring for oneself | | |
| Interacting with others | | |
| Performing Manual Tasks | | |

UNIVERSITY of DENVER
HUMAN RESOURCES

3. Suggested accommodation if needed or required to perform the essential job duties (see attached job description):

Office with window/natural light

4. Other restrictions, considerations, or notes:

Based on my evaluation of the patient's condition, the above information is accurate and complete.

Lauren Cox PA-C — Physician Name and Credentials (Print)
10/13/17 — Date
303 338 4545 — Phone Number

[signature] — Physician Signature

Lauren Cox, PA
2955 S. Broadway
Englewood, CO 80113
Phone: 303) 338-4545
Fax: 303) 788-1009

---

Please return completed form to:

Lloyd Moore
Director of Benefits
University of Denver
Mary Reed Building
2199 S. University Blvd.
Denver, CO 80208
Fax: 303.871.3656
Email: lloyd.moore@du.edu

UNIVERSITY of DENVER
HUMAN RESOURCES

## Physician Questionnaire

Dear Physician:

Ben Gerig (University of Denver Employee) has requested an accommodation in accordance with the Americans with Disabilities Act (ADA). In order to certify the disability, we need you to complete the following questionnaire in its entirety.

Under the ADA the definition of disability is: a physical or mental impairment that substantially limits one or more of an individual's major life activities.

1. What is the employee's impairment? SEVERE VISUAL IMPAIRMENT IN THE RIGHT EYE.

2. In the table below, please indicate all major life activities affected and whether or not:

   a. The employee is *unable to perform* a major life activity that the average person in the general population can perform; or

   b. The employee is *substantially limited* as to the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

| Major Life Activity | Substantially Limited | Unable To Perform |
|---|---|---|
| Walking | | |
| Seeing | X | |
| Hearing | | |
| Speaking | | |
| Breathing | | |
| Learning | | |
| Working | | |
| Sitting | | |
| Standing | | |
| Lifting | | |
| Reaching | | |
| Thinking | | |
| Concentrating | | |
| Caring for oneself | | |
| Interacting with others | | |
| Performing Manual Tasks | | |

UNIVERSITY of DENVER
HUMAN RESOURCES

3. Suggested accommodation if needed or required to perform the essential job duties (see attached job description):

SUFFICIENT LIGHT NEEDED & POSSIBLY LARGER MONITOR.

4. Other restrictions, considerations, or notes:

Based on my evaluation of the patient's condition, the above information is accurate and complete.

| | | |
|---|---|---|
| Wm Bruce Laurie OD | 10/17/17 | 303-282-5427 |
| Physician Name and Credentials (Print) | Date | Phone Number |

[signature] OD

Physician Signature

---

Please return completed form to:

Lloyd Moore
Director of Benefits
University of Denver
Mary Reed Building
2199 S. University Blvd.
Denver, CO 80208
Fax: 303.871.3656
Email: lloyd.moore@du.edu

**Elizabeth Cha**

| | |
|---|---|
| **From:** | Lloyd Moore |
| **Sent:** | Tuesday, November 14, 2017 2:02 PM |
| **To:** | Ben Gerig |
| **Cc:** | Elizabeth Cha |
| **Subject:** | RE: greetings and thank you |

Ben,

We are happy to know that things are working out to your satisfaction. I greatly appreciate your willingness to address our questions and concerns to help ensure that everyone has a full understanding of your circumstances, needs and requests.

Please never hesitate to contact Elizabeth or me if we can be of assistance with any ADA or benefits-related matters.

Sincerely,
Lloyd

Lloyd Moore
Director, Benefits Compliance and Operations
ADA Coordinator for Faculty and Staff
Human Resources and Inclusive Community
University of Denver

**From:** Elizabeth Cha
**Sent:** Tuesday, November 14, 2017 12:12 PM
**To:** Ben Gerig
**Cc:** Lloyd Moore
**Subject:** RE: greetings and thank you

Ben,

Please keep us posted on the implementation of your request and let us know if there is anything we can do to help.

Sincerely,
Elizabeth

**Elizabeth Cha**
**Benefits Program Manager**
2199 S. University Blvd., Room 407 | Denver, CO 80208
303.871.3549 | elizabeth.cha@du.edu

UNIVERSITY of DENVER
HUMAN RESOURCES & INCLUSIVE COMMUNITY

**From:** Ben Gerig
**Sent:** Tuesday, November 14, 2017 9:42 AM
**To:** Elizabeth Cha <Elizabeth.Cha@du.edu>; Lloyd Moore <Lloyd.Moore@du.edu>
**Subject:** greetings and thank you

Lloyd and Elizabeth,

I wanted to thank you for facilitating the interactive process last week—it was very productive and helpful.
Kelsey and Kevin recently notified me that a relocation to office 304 (with window) is in the works.

Best to you,
Ben

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

**From:** Lloyd Moore
**To:** Rufina Hernández
**Cc:** Elizabeth Cha
**Subject:** FW: ADA Rights and Responsibilities Notice
**Date:** Tuesday, October 10, 2017 11:44:51 AM
**:hments:** ADA Form A - Request for Reasonable Accommodation Form.pdf
ADA Form B - Physician Questionnaire.pdf
image002.png
image003.jpg

---

Thank you Rufina. I have spoken with Ben and emailed him the necessary and required information and forms.

Lloyd Moore
Director, Benefits Compliance and Operations
ADA Coordinator for Faculty and Staff
Human Resources and Inclusive Community
University of Denver

---

**From:** Lloyd Moore
**Sent:** Tuesday, October 10, 2017 11:41 AM
**To:** Ben Gerig
**Cc:** Elizabeth Cha
**ʕ ˈiect:** ADA Rights and Responsibilities Notice

Confidentiality Notice: This e-mail message, including any attachments, is for the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender immediately by reply e-mail and destroy all copies of the original message.

---

Dear Mr. Gerig,

This notice serves to inform you that the University of Denver fully complies with the reasonable accommodation requirements of the Americans with Disabilities Act (ADA). Under the law, agencies must provide reasonable accommodation to qualified employees or applicants with disabilities, unless to do so would cause undue hardship. The University is committed to providing reasonable accommodations to its employees and applicants for employment in order to assure that individuals with disabilities enjoy full access to equal employment opportunity at the University.

The University provides reasonable accommodations:

- when an applicant with a disability needs an accommodation in order to be considered for a job;
- when an employee with a disability needs an accommodation to enable him or her to perform the essential functions of the job or to gain access to the workplace; and
- when an employee with a disability needs an accommodation to enjoy equal benefits and privileges of employment.

Should you wish to request reasonable accommodation, please submit both a Request for Reasonable Accommodation Form and a Physician Questionnaire (attached for your convenience) to our ADA Coordinator, Elizabeth Cha at:

Mary Reed Building
2199 S. University Blvd.
Denver, CO 80208
Fax: 303.871.3656
Email: Elizabeth.Cha@du.edu

Please do not hesitate to contact me if you have questions or concerns regarding this notice or your rights and responsibilities under the ADA.

Sincerely,

Lloyd Moore
Director, Benefits Compliance and Operations
ADA Coordinator for Faculty and Staff
Human Resources and Inclusive Community
University of Denver

---

**From:** Rufina Hernández
**Sent:** Tuesday, October 10, 2017 11:37 AM
**To:** Lloyd Moore
**Cc:** Ben Gerig
**Subject:** FW: meeting request

Lloyd, after talking with Mr. Gerig, it looks like this is more appropriately in your office since Mr. Gerig is requesting accommodation for his disability.

I'm copying him on this referral so that you and he can talk directly. All the best,

*Rufina A. Hernández, Esq.*
Interim Director of Equal Opportunity
303.871.7726

---

**From:** Ben Gerig
**Sent:** Thursday, October 05, 2017 12:49 PM
**To:** Rufina Hernández <Rufina.Hernandez@du.edu>
**Cc:** Kelsey [illegible]198@du.edu>

**Subject:** meeting request

Greetings Ms. Hernandez,

_ er the DU Employee Handbook, I was guided to contact you regarding my request to my supervisor Kelsey Johnson, below, on August 18.

Is there a time that works for you to get together with Kelsey and I to discuss reasonable accommodations available to me at DU, with respect to the ADA?

Many thanks,
Ben

## DISABILITY ACCOMMODATION

The University provides reasonable accommodations to the known disabilities of otherwise qualified students, applicants, participants in University activities and employees. It is the responsibility of the person with a disability to make a timely accommodation request. The request can be made directly to the provider (supervisor, program director, etc.) or the person with a disability can seek assistance. Students should contact the Disability Services Programs 03-871-2455. Employees or applicants for employment, and participants in University acuvities (including students at the Fisher Early Learning Center or the Ricks Center) should contact the Director of Equal Opportunity / ADA Compliance at 303-871-7436.

University employees who are uncertain about how to respond to an accommodation request may also contact the above resources for consultation and assistance with the provision of reasonable accommodations.

---

**From:** Ben Gerig
**Sent:** Friday, August 18, 2017 11:02 AM
**To:** Kelsey Johnson <kjohn198@du.edu>; Kevin Cuthbert <Kevin.Cuthbert@du.edu>
**Subject:** natural light

Kelsey and Kevin,

I wanted to let you know that I've been struggling with cognitive energy, focus and sleep disturbances since moving into a windowless office. I spoke with K lsey briefly prior to the move, however I did a poor job of advocating for myself and my need for natural light. I was diagnosed with Seasonal Affective Disorder (biological sensitivity to diminished environmental light) at the age of 15, which is why I now live in Denver.

After discussing it with Jill more readily, I've ascertained that my current windowless office is not allowing me to fully maximize my potential at work, and I would like to partner with you both on a collaborative solution. Is there any way that I could request an office change to 304—the unused adjunct space on this floor—or another possible space with a door and window? I do not want to displace any colleagues, and I want to honor the needs of everyone else, as well.

Please let me know your thoughts at your convenience. Best, Ben

https://www.psychologytoday.com/blog/the-athletes-way/201306/exposure-natural-light-improves-workplace-performance

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

DCB_EE

**From:** Rufina Hernández
**Sent:** Monday, December 11, 2017 2:03 PM
**To:** Ben Gerig
**Subject:** RE: ada timeline meeting

Certainly Ben. I have some time on Thursday afternoon. Would that work?

*Rufina A. Hernández, Esq.*
Interim Director of Equal Opportunity
303.871.7726

---

**From:** Ben Gerig
**Sent:** Monday, December 11, 2017 11:31 AM
**To:** Rufina Hernández <Rufina.Hernandez@du.edu>
**Subject:** ada timeline meeting

Greetings Rufina,

May I find a time to meet with you Wednesday or Thursday of this week? I have a few questions about my rights as a DU employee under the ADA, regarding retaliatory supervisor behavior.

Ben
**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

connect

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

**'rom:** Rufina Hernández
**Sent:** Thursday, January 4, 2018 11:23 AM
**To:** 'Ben.gerig@gmail.com'
**Subject:** FW: Investigation Request

Ben, I sent this to the Du email address but just in case, I am forwarding this to your personal email as well to ensure that you get this information. Best regards,

*Rufina A. Hernández, Esq.*
Interim Director of Equal Opportunity
303.871.7726

---

**From:** Rufina Hernández
**Sent:** Tuesday, January 02, 2018 12:28 PM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Subject:** RE: Investigation Request

Hi Ben, we will proceed with the investigation now that we are back. Thank you.

Your case will be assigned to Ms. Maria DeHowitt, our Investigator. I have copied her on this email and she will now be contacting you directly to schedule the interview for your statement.

If you remember, we will notify Ms. Johnson and Mr. Cuthbert after we have done our formal interview with you. Best regards,

*Rufina A. Hernández, Esq.*
Interim Director of Equal Opportunity
303.871.7726

---

**From:** Ben Gerig
**Sent:** Friday, December 22, 2017 3:01 PM
**To:** Rufina Hernández <Rufina.Hernandez@du.edu>
**Subject:** Investigation Request

Greetings Rufina,

I would like to request that you open an investigation into both Kelsey Johnson and Kevin Cuthbert for discrimination, following my disclosure of having a disability to them on August 18, 2017.

Cordially,
Ben

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

connect

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

| | |
|---|---|
| **From:** | Rufina Hernández |
| **Sent:** | Wednesday, January 10, 2018 6:26 PM |
| **To:** | Kelsey Johnson; Kelsey Johnson |
| **Subject:** | Office of Equal Opportunity |
| **Attachments:** | Johnson Notification ltr 1 10 18.docx; 2017-18_eoix_procedures.pdf; Bd apprvd equal_opp_policy_june_2014.pdf |

Dear Ms. Johnson:

We are currently in the process of reviewing a matter that you *may* have violated the University's policies regarding Equal Opportunity. I have attached the relevant policies for your review.

I would like to meet with you to discuss these concerns. Please let me know your availability, at your earliest convenience. Best regards,

*Rufina A. Hernández, Esq.*
Interim Director of Equal Opportunity
University of Denver
2199 South University Blvd.
Denver, CO 80208
303.871.7726
Rufina.Hernández@du.edu
*Preferred Pronouns: her/she*
UNIVERSITY of DENVER
HUMAN RESOURCES & INCLUSIVE COMMUNITY

UNIVERSITY of DENVER
Equal Opportunity

Kelsey Johnson
Transmitted electronically: Kelsey.Johnson@du.edu

January 10, 2018

Dear Ms. Johnson:

I am writing to inform you that we are in the process of reviewing a matter in which you have been named as a Respondent. Specifically, Mr. Ben Gerig, a member of the DU community, has reported concerns that you may have engaged in violations of University Policies related to:

**Prohibited Conduct**

In accordance with the University's Discrimination and Harassment Policy, Section 3.10.010,

**Discrimination**

It is a violation of these Procedures to discriminate in the provision of educational or employment opportunities, benefits or privileges; to create discriminatory work or academic conditions; or to use discriminatory evaluative standards in employment or educational settings if the basis of that discriminatory treatment is, in whole or in part, the person's race, color, national origin, age, religion, disability, sex, sexual orientation, gender identity, gender expression, marital status, or veteran status.

**Harassment**

Harassment on the basis of any legally protected characteristic (i.e. the person's race, color, national origin, age, religion, disability, sex, sexual orientation, gender identity, gender expression, marital status, or veteran status) is a form of discrimination and is likewise prohibited by these Procedures. Prohibited harassment occurs if an environment has been created that is sufficiently severe, pervasive or persistent so as to unreasonably interfere with a person's work, academic performance or participation in University programming/activities.

Prohibited harassment may take the form of (but is not limited to) offensive slurs, jokes, and other offensive oral, written, computer-generated, visual or physical conduct.

Please understand that it is the responsibility of the Office of Equal Opportunity & Title IX to review all matters of this nature, as the University takes all expressions of concern related to policy violations very seriously. The decision to review the matter does not indicate that any findings have been made in the matter, merely that we will be conducting a review. The Office of Equal Opportunity & Title IX acts as a neutral and objective fact finder during the review process. To ensure this neutral and objective review of the facts, DU employs two independent civil rights Investigators to conduct these reviews.

I would like to meet with you to review our Procedures in these matters.

When we meet to review our procedures, you will find that our procedures allow you to respond to concerns expressed regarding the above mentioned possible policy violation. At the conclusion of the review whereby interviews were held with you, the Complainant and possible witnesses, we will provide you with a letter of determination noting whether or not the investigation finds that a University policy violation has occurred.

Please note that the University's Discrimination and Harassment Policy identifies retaliation against anyone for making a report or participating in an investigation pursuant to this policy as prohibited conduct that may be subject to sanctions.

This is a link to the Office of Equal Opportunity and Office of Title IX Policy Statements: http://www.du.edu/equalopportunity/policies/index.html.

This is a link to the Office of Equal Opportunity and Office of Title IX Procedures: http://www.du.edu/equalopportunity/complaints/index.html.

Sections relevant to this review may include:

- Section III. A. Notice of Non-Discrimination and Statement of Compliance with Title IX
- Section V. Prohibited Conduct, Subsections A, B and K
- Section IX. Procedural Options for Resolution of Reports
- Section XIV. for Additional Considerations that include a statement of expectations and your rights and responsibilities

I look forward to hearing from you about your availability to meet with me to discuss this matter.

Sincerely,

Rufina A. Hernández, Esq.
Interim Director of the Office of Equal Opportunity

**From:** Rufina Hernández
**Sent:** Friday, January 26, 2018 8:54 AM
**To:** 'Ben Gerig'
**Cc:** Maria DeHowitt
**Subject:** Office of Equal Opportunity

Dear Mr. Gerig:

Thank you for bringing your concerns to our office regarding possible discrimination. This email is to confirm our conversation this morning in which you advised me that you are choosing to pursue a grievance rather than a complaint in the Office of Equal Opportunity. I did want to reiterate that although we will be closing the matter, you are permitted to reopen the matter at any time of your choosing.

Best regards,

*Rufina A. Hernández, Esq.*
Interim Director of Equal Opportunity
University of Denver
2199 South University Blvd.
Denver, CO 80208
303.871.7726
Rufina.Hernández@du.edu
*Preferred Pronouns: her/she*

UNIVERSITY of DENVER
HUMAN RESOURCES &
INCLUSIVE COMMUNITY

January 12, 2018

Informational Meeting Notes-Kelsey Johnson

Re: Gerig v. Johnson

ID# 870300127

Contact Info: 303-871-2370

Kelsey.Johnson@du.edu

Has worked at DU for 18 yrs.

Dept. – Executive Education /Certificate Programs (they build programs for corporations & have exec. Training)

Advised Respondent that there was an allegation of discrimination due to disability

Reviewed the procedures – Respondent did not have questions regarding the process.

She will hear from us when we are ready to proceed with the actual interview.

**Lloyd Moore**

**From:** Lloyd Moore
**Sent:** Thursday, November 16, 2017 1:40 PM
**To:** Kevin Cuthbert
**Cc:** Kelsey Johnson; Ben Gerig; Elizabeth Cha
**Subject:** RE: Follow up

Kevin,

Thank you for the update. We hope the interactive process was helpful toward determining what is hopefully the most effective accommodation, given Ben's circumstances and needs.

A hard copy of this communication will be placed in Ben's confidential file in the Human Resources office in accordance with all applicable confidentiality requirements.

Please do not hesitate to contact us if we can be of further assistance.

Sincerely,

Lloyd

Lloyd Moore
Director, Benefits Compliance and Operations
ADA Coordinator for Faculty and Staff
Human Resources and Inclusive Community
University of Denver

**From:** Kevin Cuthbert
**Sent:** Thursday, November 16, 2017 12:47 PM
**To:** Lloyd Moore; Elizabeth Cha
**Cc:** Kelsey Johnson; Ben Gerig
**Subject:** Follow up

Lloyd, Elizabeth – sorry for the delayed follow up to our recent meeting.
The day following that, Kelsey and I decided and informed Ben that we are approving his accommodation.
And his moving to suite 304 is in process.
Please let us know if you have any questions.
Thanks
Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University of Denver
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER

# MEMO

**Date:** January 25, 2018
**To:** Kevin Cuthbert
**Cc:** Laura Maresca, Ken Pinnock
**From:** Ben Gerig
**Subject:** Formal Grievance

---

Kevin,

Per my conversation with Ken and the DU employee handbook guidelines, I am submitting this request to you as part of the grievance process.

My request is twofold:

a) Help change my employee designation at DU from "terminated" to "resigned," to allow for future employment at DU.
b) Help facilitate a reassignment to a comparable position at DU.

My rationale for the request includes, but is not limited to, the following:

- I have served DU for more than 5 years across multiple promotions in several divisions and have proven to be a reliable, competent and high performing employee.
- I was a finalist for a Director-level role in GSSW as of December 23, 2016.
- Mistreatment was prevalent throughout my recent termination process and has raised concerns for me about disability discrimination and retaliation.
- My initial documentation of this last statement is below:

<u>In Ben's 1.5 years in Executive Education:</u>

Prior to my request for an office with a window and my communication to Kevin and Kelsey about difficulties with Seasonal Affective Disorder on August 18, 2016, I had received no negative feedback about my work performance (I was diagnosed with SAD in 2000 and relocated to Denver for health reasons). However, after my disclosure, I received an overwhelmingly negative performance report from Kelsey on October 3 (annual DU appraisal). I expressed to both Kelsey and Kevin that I had never heard from either of them that they were dissatisfied in any way with my work.

I felt that my window office request was not taken seriously and was viewed as a ploy of some sort. Therefore, I entered a formal ADA Reasonable Accommodation request for an office change on Oct. 17th. That seemed to make matters worse and I was subjected to overtly critical weekly scrutiny about my work that no other business development colleagues in Executive Education received, ever.

When I received an unexpected Final Written Warning prematurely from Kelsey on December 6 (she and Kevin had verbally informed me that I would have through January to comply with their new work expectations), I provided her this written response chronicling my attempts to keep up with her constantly shifting expectations: "I am currently conducting 8 meetings (8 on avg. per month) with clients and doing my best to comply with your expectations. I try to juggle both new and return clients and then I enter Program Proposal writing and program management mode, and have severely reduced time to be outside meeting "new" clients. I would like to express this to you, however the animosity I experience vis a vis surprise meetings threatening termination and after hour emails indicating performance issues, has precluded me from doing this."

This overall behavior from Kelsey seemed above and beyond the need to "correct" my work performance and escalated during threatening surprise meetings calling for my resignation, which made it difficult for me to do my job to the best of my ability. I directly raised my concerns about this treatment and its retaliatory nature to both Kelsey and Kevin on multiple occasions.

I requested an EO investigation be opened into Kelsey's retaliation on December 22, 2016. I was fired 11 days later at 10 a.m. on January 2.

Additionally, Kelsey's action appears disproportionately severe because I have in my possession a 360 Degree Job performance report (Qualitative & Quantitative) from June 2, 2016, documenting each of my co-workers confirming their satisfaction with my work, efforts, abilities and contributions to Executive Education. The document includes above average reviews from both Kevin and Kelsey, across all competencies.

Kevin met with me on May 31, 2016 and told me that he was pleased with the job that I was doing in Executive Education. Kelsey met with me in June of 2016 and essentially said the same thing. I felt I was on track from there and had no idea my superiors had changed their minds about my job performance. In a matter of three months I went from a valued and performing employee to a terminated one. I don't believe that my performance had changed so as to warrant that treatment at all. I assert that Kelsey's disproportionately critical DU performance appraisal of my work from June 2016 to July 2017 (received Oct. 3, 2017) and later termination is an inconsistent, inaccurate reflection of my actual work performance.

I have received nothing but high marks in all of my former DU performance appraisals, documented in my personnel file, and this experience over the last three months of my employment, all of which ensued after I "came out" as disabled and made a reasonable accommodation request, is an abrupt outlier.

**

Kevin, if you have any questions or concerns about this memo or my requests, please connect with Ken and or Laura, as they can help facilitate the next steps in this process. I look forward to reaching an amicable solution for all of us.

Kindest regards,
Ben

**To:** Ben Gerig[ben.gerig@gmail.com]
**From:** Kelsey Johnson[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=531C80D46771421 5B0B382AEAD3D35D8-KELSEY JOHN]
**Sent:** Wed 1/31/2018 8:48:43 PM (UTC)
**Subject:** RE: Written Grievance

Hello,
Wondering if you are available for a meeting on campus to discuss the requests you have made in the written grievance. We are looking at Monday, 2/5 at 9:30 am or 11:30 am. The meeting will include myself, Yee-Ann Cho, associate dean and COO at Daniels, and Cristina Valencia.

Please let me know at your earliest convenience if one of those times will work for you and I will confirm the location, etc.
Thanks very much,
Kelsey

Kelsey Johnson
Director, Executive Education
Daniels College of Business | University of Denver
Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd
Linked in profile

---

**From:** Kelsey Johnson
**Sent:** Friday, January 26, 2018 4:30 PM
**To:** Ben Gerig <ben.gerig@gmail.com>
**Subject:** RE: Written Grievance

Hello Ben,
Just wanted to confirm that we are working on this and hope to have a response to you early next week.
Thanks very much,
Kelsey

Kelsey Johnson
Director, Executive Education
Daniels College of Business | University of Denver
Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd
Linked in profile

---

**From:** Kevin Cuthbert
**Sent:** Thursday, January 25, 2018 11:53 AM
**To:** Ben Gerig <ben.gerig@gmail.com>; Laura Maresca <Laura.Maresca@du.edu>; Ken Pinnock <Ken.Pinnock@du.edu>
**Cc:** Yee-Ann Cho <Yee-Ann.Cho@du.edu>; Kelsey Johnson <Kelsey.Johnson@du.edu>
**Subject:** RE: Written Grievance

Ben,

By now you will know that I have left DU.
So I am no longer in a position to respond to your requests.

Following a quick conversation with Ken, he has suggested that I forward your document to Kelsey and to Yee-Ann Cho, who now oversees Exec Ed as well as Career Services, Graduate Admissions and OCM.

I trust that you will hear back from them in a reasonable time frame.

Best Regards,

Kevin

**RESPONSE TO GRIEVANCE**

To: Ben Gerig
From: Yee-Ann Cho, Associate Dean and COO, Daniels College of Business
Kelsey Johnson, Interim Executive Director, Executive Education
CC: Laura Maresca, Ken Pinnock, Human Resources
Date: February 5, 2018
Re: Grievance submitted January 24, 2018, to Kevin Cuthbert

Your January 24th grievance was directed to Kevin Cuthbert, who is no longer employed by the University. I have assumed temporary responsibilities for his duties, and Kelsey was your direct supervisor during the relevant time period. As such, this response is being issued by us both.

On January 2, 2018, you were separated from your position with the University for failure to perform your job duties as required. A review of your performance history confirms you were verbally counseled on numerous occasions by both Ms. Johnson and Mr. Cuthbert. In addition, you received an overall Improvement Required evaluation rating on October 3, 2017, and a Written Warning on December 6, 2017.

The focus of your grievance appears to be your belief that you were separated in retaliation for having requested a disability accommodation. In December you were referred to Ms. Rufina Hernandez, Interim Director of Equal Opportunity (EO) for the University. In your grievance, you state, "I requested an EO investigation be opened into Kelsey's retaliation on December 22, 2017. I was fired 11 days later at 10:00a.m. on January 2." Claims of discrimination and retaliation for protected activity can only be investigated by the Office of Equal Opportunity. In speaking with Ms. Hernandez, it is our understanding that you elected not to pursue a charge of discrimination.

You have requested that the separation code be changed from "Terminated" to "Resigned". We are willing to proceed with this change so that your personnel file will include that the resignation was in lieu of termination (RE-EL: released – eligible for rehire).

You have also requested assistance with alternate employment within the University. While there is a career services office that provides this type of assistance, that service is not available to former University employees.

Please let me know within ten (10) days of this response if you would like us to formally change the separation code as stated above to RE-EL. Should you wish to continue in the grievance process, please review the guidelines for the next step to be taken.

**To:** Kelsey Johnson[kjohn198@du.edu]
**From:** Ben Gerig
**Sent:** Tue 9/12/2017 9:23:43 PM (UTC)
**Subject:** RE: desk lamp for Ben

Awesome, thanks. bg

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

---

**From:** Kelsey Johnson
**Sent:** Tuesday, September 12, 2017 3:07 PM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Subject:** RE: desk lamp for Ben

Groovy – it's ordered and looks like it was on backorder until Sept 15th. Bummer! Hopefully they will send confirmation with a tracking code and I will forward that when I get it!!
Thanks - Kels

Kelsey Johnson
Director, Executive Education
Daniels College of Business | University of Denver
Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd
Linked in profile

---

**From:** Ben Gerig
**Sent:** Monday, September 11, 2017 9:59 AM
**To:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** desk lamp for Ben

Hi Kelsey,

After researching, here is the light that seems to fit the best, for my office.

http://www.sunbox.com/shop/10000-lux-bright-lights/special-new-sunbox-sunup-10000-lux-desk-lamp/

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

**To:** Kelsey Johnson[kjohn198@du.edu]
**From:** Ben Gerig
**Sent:** Mon 9/18/2017 8:48:35 PM (UTC)
**Subject:** RE: UPS Ship Notification,Reference Number 1: SU-1304

Awesome, thanks for the intel. Cheers, bg

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

---

**From:** Kelsey Johnson
**Sent:** Monday, September 18, 2017 2:40 PM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Subject:** FW: UPS Ship Notification,Reference Number 1: SU-1304

Looks like the Sunbox is on it's way!

Kelsey Johnson
Director, Executive Education
Daniels College of Business | University of Denver
Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd
Linked in profile

---

**From:** UPS Quantum View [mailto:pkginfo@ups.com]
**Sent:** Monday, September 18, 2017 1:26 PM
**To:** Kelsey Johnson <kjohn198@du.edu>
**Subject:** UPS Ship Notification,Reference Number 1: SU-1304

**You have a package coming.**

**Scheduled Delivery Date:** Thursday, 09/21/2017

**To:** Ben Gerig[Ben.Gerig@du.edu]; Kelsey Johnson[kjohn198@du.edu]
**From:** Kevin Cuthbert
**Sent:** Tue 12/12/2017 4:39:35 PM (UTC)
**Subject:** Re: homework assignment

Thanks for letting us know Ben.

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business |University of Denver
Joy Burns Center | 2044 E. Evans Ave.| Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

connect

---

**From:** Ben Gerig <Ben.Gerig@du.edu>
**Date:** Tuesday, December 12, 2017 at 9:27 AM
**To:** Kevin Cuthbert <Kevin.Cuthbert@du.edu>, Kelsey Johnson <kjohn198@du.edu>
**Subject:** homework assignment

Kevin and Kelsey,

Of the two options that you are requesting I choose from by 10 am today:

A. Proactively partner with you to reach my individual 2018 Exec. Ed. goals and our collective departmental goals.
B. Sign a negotiated resignation document.

I elect option A.

Kind regards,
Ben

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

connect

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

**Ben Gerig**
Program Developer | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. Rm 343, Denver CO 80208
Ben.Gerig@du.edu | Desk: 303.871.3778 | Cell: 303.880.1877

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

---

**From:** Kelsey Johnson
**Sent:** Thursday, August 31, 2017 9:43 AM
**To:** Ben Gerig <Ben.Gerig@du.edu>
**Subject:** RE: Check-In: Ben/Kelsey

Shall I call your office number?

Here's a few things I'd like to cover:

- Expectations for this meeting
- Self-appraisal
- Initial thoughts on new client targets for Sept.
- Office and natural light options

Thanks!!
Kels

Kelsey Johnson
Director, Executive Education
Daniels College of Business | University of Denver

Office: 303.871.2370 | Cell: 720.217.8471
www.daniels.du.edu/ExecEd
<< OLE Object: Picture (Device Independent Bitmap) >>

-----Original Appointment-----
**From:** Ben Gerig
**Sent:** Wednesday, April 5, 2017 8:52 AM
**To:** Ben Gerig; Kelsey Johnson
**Subject:** Check-In: Ben/Kelsey
**When:** Thursday, August 31, 2017 10:00 AM-10:30 AM (UTC-07:00) Mountain Time (US & Canada).
**Where:** Ben or Kelsey's Office

Message

| | |
|---|---|
| **From**: | Kevin Cuthbert [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8EDC812C08F24B589482E58E04B6EBB1-KEVIN CUTHB] |
| **Sent**: | 9/25/2017 8:40:18 AM |
| **To**: | Molly Rossi [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b1e4bf6aea00404280696513d5752386-Molly Rossi] |
| **CC**: | Kelsey Johnson [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=531c80d467714215b0b382aead3d35d8-Kelsey John] |
| **Subject**: | Ben Gerig |

Hi Molly

We've been having some performance conversations with Ben.
Which are not progressing as we had hoped.
And so would like to discuss our options with you.

Thanks
Kevin

Kevin Cuthbert
Assistant Dean | Executive Education
Daniels College of Business | University of Denver
Joy Burns Center | 2044 E. Evans Ave. | Room 309, Denver, CO 80208
Kevin.Cuthbert@du.edu | Mobile: +1 773.517.4400 | Office Direct: +1 303.871.4725

UNIVERSITY of DENVER
DANIELS COLLEGE OF BUSINESS
Executive Education

connect

## Lloyd Moore

| | |
|---|---|
| **Subject:** | ADA Request for Reasonable Accommodations |
| **Location:** | Phone Call |
| **Start:** | Tue 10/24/2017 2:00 PM |
| **End:** | Tue 10/24/2017 2:30 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Organizer:** | Elizabeth Cha |
| **Required Attendees:** | Lloyd Moore; Ben Gerig |

Ben,

Please call my office phone at 303-871-3549.

Thank you,

Elizabeth