**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No: 1:19-cv-00914-CMA-KLM

BENJAMIN L. GERIG,

Plaintiff,

v.

UNIVERSITY OF DENVER,

Defendant.

---

**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, Benjamin Gerig ("Gerig"), through counsel, responds as follows to Defendant's Motion for Summary Judgment:

## I. RESPONSE TO STATEMENT OF UNDISPUTED FACTS

1-6, 10, 12, 13, 16-18, 21, 22, 30, 32-36, 38-40, 44-46, 49, 51. Admit.

7. Gerig denies that the 360-Degree Feedback Report (the "360-Degree Report") was not a performance review. The 360-Degree Report, in fact, was a thorough performance review grading all aspects of Gerig's performance. Feedback was provided by 11 different individuals, including three supervisors, seven peers, and Gerig, on a variety of different performance-related topics. Mov.App. pp. 81-116.

8. Gerig admits that he received the feedback contained in subparagraphs (a), (b), (c) from supervisors; however, these statements taken out-of-context paint a misleading picture of the feedback contained in the 360-Degree Report. The report also contained the following feedback from supervisors:

a. Ben has very solid principles and is honest and responsible. When he does voice concerns is [sic] helps us all better understand where he is coming from and what he cares about. Mov.App. p. 90.

b. Ben works really well with almost anyone and makes connections with people easily. This is incredibly helpful in his current role and as a member of our pretty small team. Mov.App. p. 94.

c. Ben has a gift for language and has an easy communication style with a wide variety of people. Mov.App. p. 97.

d. Ben seems like a very analytical person who is excellent at evaluating a situation, asking good questions, and problem solving in general. Mov.App. p. 99.

e. Ben has learned this business pretty quickly. There can be a lot of nuances that he has yet to experience, but they will add to his knowledge and expertise. Mov. App. p. 100.

f. His analytical nature allows Ben to dig into complex situations well. He may sometimes over think things, but rarely lets this stop his progress. Mov.App. p. 102.

9. Gerig denies this allegation. While Ashley Sodaro testified that she met in late July or early August 2017 with Cuthbert and Johnson to discuss performance issues with Maria McGowan and Gerig, this timeline for Gerig is belied by other evidence. With McGowan's performance issues, Cuthbert involved Human Resources ("HR") on July 24, 2017. Res.App. pp. 35-36. He did not mention performance issues with Gerig at this time. *Id.* Shortly thereafter, HR provided a summary of steps for how to deal with McGowan. Res.App. pp. 37-38. Cuthbert and Sodaro moved forward with addressing the issues directly with McGowan during early August. Res.App. pp. 41-51, 96-97. In contrast, neither Cuthbert nor Johnson discussed Gerig with HR until at least late September or early October 2017. Mov.App. pp. 51-52 – KJ Dep. at 220:13-223:16, p.185, two full months later than the initial contact about McGowan. Nor did either Cuthbert or Johnson

raise performance issues with Gerig directly until after Gerig requested an accommodation on August 18, 2017. Res.App. pp. 31-34 – Gerig Aff. ¶ 9.

11. Admits that on August 18, 2017, Gerig first made a formal request for an accommodation of his disability, Seasonal Affective Disorder, to his supervisors. The details of Gerig's request are fully set forth in the actual email. Mov.App. p. 136.

14. Admit that on August 21, 2017, just three days after Gerig submitted his request for an accommodation, Cuthbert for the first time criticized Gerig's work on a project. Mov.App. 112-115. Deny that there were "egregious" errors in the draft Gerig provided to Cuthbert for his review. Res.App. pp. 31-34 – Gerig Aff. at ¶ 10. Cuthbert was forced to concede that it is possible that Gerig's errors on the project were caused by his inability to concentrate as a result of his SAD. Mov.App. at p. 65 – KC Dep. at 104:9-17.

15. Deny Defendant's characterization of the meeting on August 28, 2017. Gerig understood the purpose of the meeting was to discuss his disability and request for accommodation. The focus of the meeting quickly turned to alleged performance issues. Mov.App. pp. 137-138; Res.App. pp. 31-34 – Gerig Aff. at ¶ 10. Cuthbert and Johnson made clear at the meeting that Gerig's request to move to a vacant office 304 was not an option. Mov.App. at 69 – KC Dep. at 125:5-127:10; Res.App. 31-34 – Gerig Aff. at ¶ 10**.** Cuthbert adamantly opposed Gerig's request, Res.App. at p. 2 – KJ Dep. at 181:20-24.

19. Deny. Johnson and Cuthbert made clear that the requested accommodation – a simple move down the hall to vacant office 304 – was not an option. *See* Res. to Statement of Undisputed Material Fact ("Res. to MF") No. 15 above. Only after Johnson and Cuthbert summarily denied Gerig's requested accommodation, did they present him

with other options. While Gerig continued to insist that office 304 with its access to natural light was the best option, Mov.App. pp. 48-49 – KJ Dep. at 162:25-163:3, 165:21-23, he agreed to try a sunlight lamp. Res.App. pp. 52-55.

20. Deny. While Johnson ordered the sunlight lamp the next day, it was on backorder and did not deliver until on or about September 21, 2017. *Id.*

23. Admit that Gerig received his annual performance review on October 2. Deny that Gerig's overall performance was "Improvement Required." As Johnson was forced to concede, she manipulated the review process to cause Gerig's overall rating to fall into the "Improvement Required" category. Johnson specifically discussed this manipulation with Assistant Dean Cuthbert who acquiesced to this deceitful maneuver. If Johnson had not done this, Gerig's overall review in October 2017 would have fallen in the category of "Solid Performance." Res.App. pp. 56-57, 4-5 – KJ Dep. at 254:23-257:6.

24. Deny this inaccurate characterization of why Johnson went to Valencia in October 2017. Johnson went to Valencia to devise an approach for documenting performance issues "to be able to potentially terminate [Gerig] if he wasn't willing to move on." Mov.App. p. 52 – KJ Dep. at 221:1-222:4.

28. Deny. On October 5, 2017, Gerig went to Hernandez to appeal the summary denial of his accommodation request to Johnson and Cuthbert. Mov.App. pp. 164-66.

29. Deny. Gerig did not meet with Hernandez at this time, but she did refer Gerig to Lloyd Moore who forwarded Gerig the ADA request for accommodation paperwork, which Gerig had not received when his initially requested an accommodation. Mov.App. pp. 163-164; Res.App. pp. 11, 12, 98 – RH Dep. at 62:14-64:24; 68:12-70:9.

31. Deny. The documents speak for themselves. Mov.App. pp. 155-60. This incomplete description of the recommendations by the medical professionals is materially insufficient as it fails to specify that the first physician, Dr. Daniel Jones, indicated that "exposure to sunlight can have a beneficial impact on the course and severity of this problem." Mov.App. pp. 155-156.

37. Deny. While Gerig testified generally that he felt he was able to do his job, he further explained in his initial request for an accommodation that he was suffering from "cognitive energy, focus and sleep disturbances." Mov.App. p. 136. He also explained to Lloyd Moore that SAD was impacting the following essential functions of his job: "concentrating, analysis of written and electronic material, and attendance." Res.App. p. 58. This was confirmed by the medical professionals who opined that Gerig's medical condition substantially limited his ability to concentrate and see. Mov.App. pp. 155-160.

42. Admit that this is what Johnson told Cuthbert, but deny that it was accurate. The direction, as Gerig understood it, had to do with Gerig striving to have a certain number of meetings per week, but individual weeks have more or less meetings. Res.App. 31-34 – Gerig Aff. ¶ 25. Also, as Gerig explained to Johnson, not all of Gerig's meetings were being recorded on the system because of the problems Gerig (and others) were having with SalesForce. *Id.*

43. Deny, See Res. to MF No. 42 above. As to the Enterprise proposal, as Gerig explained to Johnson the needs of the client had changed after the initial meeting and the revised proposal was designed to meet the new requirement. *Id.*

47. Admit that DU terminated Gerig on January 2, 2018. Deny that the stated reason

for the termination was the true reason for the termination, as fully set forth below.

48. Deny that any investigation was conducted. The assigned investigator, Maria DeHowitt, never interviewed Gerig. Res.App. pp. 11, 13 – RH Dep. at 61:19-62:5; 89:12-19; 91:11-19. Nor did she interview anyone else regarding the matter. Res.App. p. 102 – RH Dep. 97:19-98:8. After Gerig was terminated, Hernandez told Gerig regardless of the investigation results, the EEO Compliance office could not reinstate him. Res.App. p. 14 – RH 93:8-96:3; Res.App. pp. 31-34 – Gerig Aff. at ¶¶ 27-28. Hernandez told Gerig that filing a grievance was an option. Res. App. pp. 14 – RH Dep. at 93:21:24; Res.App. pp. 31-34 – Gerig Aff. at ¶ 29. While Ken Pinnock, the Director of People Development, told Gerig DU would continue to investigate his complaint, Res.App. p. 59, DU terminated the investigation without making a determination, Res.App. p. 70.

52. Deny. What was said in response to Gerig's grievance is contrary to what Hernandez told Gerig. Hernandez said that her office could not reinstate him regardless of its findings on discrimination and retaliation, and he could pursue a grievance. Res.App. p. 14 – RH Dep. at 93:21:24; Res.App. pp. 31-34 – Gerig Aff. at ¶¶ 28-29.

## II. STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

1. Gerig began working as a full-time employee at DU in February 2013. From July 2013 to 2016, he was given offices with external windows, which accommodated his disability, Seasonal Affective Disorder ("SAD").[1] He also received uniformly positive reviews for his work. Res.App. pp. 31-34 – Gerig Aff. ¶ 1.

[1] From February 2013 to July 2013, Gerig's office did not have an external window. Given the time of year, spring and summer, Gerig's SAD symptoms were manageable.

2. In the spring of 2016, Gerig applied for, and was offered a position as, a Program Developer with the DU's Daniels College of Business Office of Executive Education ("Ex. Ed."). Res.App. pp. 31-34 – Gerig Aff. ¶ 2. His first year of work went well, and in September 2016 he received a positive Appraisal Report (the "2016 Appraisal Report"), Res.App. App. pp. 71-73, followed in June 2017 by a positive comprehensive review known as the 360-Degree Feedback Report (the "360-Degree Review"), Mov.App. pp. 81-116; Res.App. pp. 31-34 – Gerig Aff. ¶ 2.

3. When Gerig first became Program Developer, he was given an office with an external window. In April 2017, as part of Ex Ed. moving to a new office suite, he was given an office without external windows. Res.App. pp. 31-34 – Gerig Aff. ¶ 3. Gerig asked for an accommodation of an office with a window to address his SAD. Mov.App. p. 136. He explained that the unavailability of natural light was causing "cognitive energy, focus and sleep disturbances." *Id.*

4. With respect to employees requesting accommodations at DU, the DU Employee Handbook gives the following guidelines: "It is the responsibility of the person with the disability to make a timely accommodation request. The request can be made directly to the provider (supervisor, program director, etc.)…" Res.App. pp. 74-75. In compliance, Gerig made his request to his direct supervisor, Kelsey Johnson, and to the person in charge of Executive Education: Cuthbert. Res.App. pp. 31-34 – Gerig Aff. ¶ 4.

5. Per DU's policies, when a supervisor receives a request for accommodation from a subordinate, the supervisor is to refer the request to DU's ADA coordinator for handling. Res.App. p. 16 – LM Dep. at 32:6-1; Res.App. p. 9 – RH Dep. at 34:5-11. This

policy has been in effect since 2017 when Gerig made his request, Res.App. p.16 – LM Dep. at 31:17-32:14, but both Johnson and Cuthbert claim to have been unaware of it. Mov.App. p. 66 – KC Dep. at 108:16-19; Mov.App. p. 40 – KJ Dep. at 123:11-17.

6. In contravention of this policy, neither Johnson nor Cuthbert contacted the ADA coordinator when Gerig made his request. Mov.App. p. 40 – KJ Dep. at 123:22-124:9; Resp. App. p. 26 – KC Dep. at 109:21-110:16.) Rather than giving Gerig's request the attention and consideration it deserved, the Executive Education management team poked fun at Gerig's request. Shortly after Gerig sent his email, Cuthbert – clearly skeptical of the legitimacy of Gerig's request – forwarded Gerig's email to his wife the following comment: "Some of the things I deal with at work. 😊" Res.App. pp. 76-77.

7. Not only did Assistant Dean Cuthbert's behavior in sharing the email with his wife show an extreme lack of professionalism, it also violated DU's confidentiality policy as it relates to accommodation requests. Res.App. p. 17-18 – LM Dep. at 48:11-49:15; Res.App. p. 10 – RH Dep. at 46:1-13.

8. Without engaging in the ADA-mandated interactive process, the Executive Education management team summarily denied Gerig's request to move offices despite there being a vacant office with an external window down the hall. Mov.App. p. 69 – KC Dep. 125:5-127:10**;** Res.App. pp. 31-34 – Gerig Aff. ¶ 5. While Johnson agreed to buy Gerig a lamp for his office, the lamp did not provide the natural light Gerig needed to help reduce or alleviate the symptoms of his disability. Res.App. pp. 31-34 – Gerig Aff. ¶ 5.

9. Accordingly, on October 5, 2017 Gerig contacted Rufina Hernandez, DU's Interim Director of Equal Opportunity, regarding his request for an accommodation. Mov.

App. pp. 151-52. Once Gerig elevated the issue, Hernandez connected Gerig with Lloyd Moore, the ADA coordinator.[2] Moore's office requested that Gerig submit formal paperwork, including the Request for Reasonable Accommodation Form and the completed Physician Questionnaire, which Gerig submitted shortly thereafter. Mov.App. pp. 163-164. Gerig identified in his documentation that his SAD was impacting the following essential functions of his job: (1) concentrating; (2) analysis of written and electronic material; and (3) attendance. Mov.App. pp. 154-160; Res.App. p. 58. Gerig also submitted physician questionnaires from three separate medical professionals. Mov. App. pp. 155-160. All three of the medical professionals agreed that Gerig needed natural light to reduce the severity of his symptoms. *See id.* Gerig, according to the medical professionals, was substantially limited as a result of his SAD in his ability to concentrate and to see. Mov.App. pp. 157, 159.

10. Lloyd Moore acknowledges that the Physician Questionnaires Gerig submitted established that Gerig suffered from SAD, that SAD substantially limited Gerig's ability to perform major life activities, and that access to natural light would help Gerig deal with these issues. Res.App. pp. 20-22 – LM Dep. at 56:9-68:14. And, after engaging in the interactive process (including a meeting on November 9, 2017), Moore specifically recommended to the Executive Education management team that Gerig be allowed to move into the office with the external facing window (office 304). Res.App. pp.

[2] Johnson expressed frustration that Gerig had elevated the issue, indicating that it would have been easier to handle his request if he had come back to Johnson first. Res. App. pp. 3 – KJ Dep. at 202:5-204:5.

23-24: LM Dep. at 95:16-97:5.[3] After the November 9, 2017 meeting, Gerig was notified that his accommodation was being granted and he could move offices, and he ultimately moved sometime during the week of November 27, Res.App. p. 78**,** more than three months after he initially requested an accommodation.

11. Prior to August 18, 2017, Gerig had never been told that his performance was subpar or that he was not meeting his supervisors' expectations. Res.App. pp. 31-34 – Gerig Aff. ¶ 9.

12. But within days of his request his supervisors' attitude towards him changed. On August 28, Gerig met with Johnson and Assistant Dean Cuthbert for the first time after requesting the accommodation. While Gerig understood that this meeting was to be about his disability and accommodation request, it instead focused on supposed work failures. Mov.App. pp. 137-138; Res.App. pp. 31-34 – Gerig Aff. ¶ 10. Gerig received criticisms about such subjective criteria as being insufficiently curious - as an example Johnson said Gerig should ask questions about such things as "how do we think about building custom programs" and "how do we get a better understanding of the needs of client organizations." Mov.App. pp. 137-138. Gerig's supervisors also suddenly expressed concern about such things as the "need to clarify roles and streamline activities with Marketing and Operations." *Id.* He was also attacked for preparing an "incorrect and insufficient SOW" [Scope of Work] for a client named SendGrid, despite the fact that Gerig had been working on SendGrid since June and had not been criticized for his work on it

[3] Johnson disputes that Moore recommended that the accommodation request be granted. Instead, Johnson claims that Moore left it up to Gerig's supervisors to decide. (Johnson Dep. 193:25-194:7.)

before he requested an accommodation. *Id.;* Res.App. pp 31-34 – Gerig Aff. ¶ 9. In a nutshell, the August 28 meeting was contrary to, and inconsistent with, all performance feedback he had received to date.

13. Despite the unfairness of the attacks at the August 28 meeting, Gerig's response to Cuthbert's summation of the meeting was upbeat and positive. Gerig acknowledged that the synopsis that was given "matches my understanding of the conversation." He then stated that he "look[ed] forward to showing more curiosity, getting SendGrid back on track and deploying the new 50/30/20 work focus breakdown ...." Mov. App. 138.

14. Gerig's efforts to respond to the criticisms and return to a good working relationship with his supervisors were futile. Both Cuthbert and Johnson began to display a marked difference in their treatment of him, and he felt as though his work environment had suddenly become hostile. Res.App. pp. 31-34 – Gerig Aff. ¶ 12. Gerig also was retaliated against in numerous ways, both in his day-to-day treatment and his ongoing supervision. For instance, his supervisors (particularly Johnson) would hand Gerig specific emails and documents that, on an almost weekly basis, changed his job performance duties and expectations. *Id.*

15. On October 2, 2017, Gerig received his yearly review. It was scathing. He was given an "Improvement Required" rating. For his supervisors to give him an overall rating of "Improvement Required," Johnson had to manipulate the DU rating system. Res.App. pp. 56-57; Res.App. pp. 4-5 – KJ Dep. at 254:23-257:6. Johnson changed her rating on Gerig under the goals section of the review from "Solid Performance" to

"Improvement Required" to cause Gerig's overall rating to fall to "Improvement Required." Res.App. pp. 56-57; Res.App. pp. 4-5 – KJ Dep. at 254:23-257:6.

16. From late August 2017 until his termination, Gerig's performance was under a microscope. *See, e.g.,* Mov.App. pp. 112, 137-138, 116, Res.App. pp. 56-57, Mov. App. pp. 107-111, 117-18, 119-122, 123-129, 130, 131. Gerig's supervisors raised the following concerns: lack of efficiency, Mov.App. p. 107; "unclear as to where Ben is or what he is working on," Mov.App. p. 108; the proposal by Gerig "does not reflect the original pitch," Mov.App p. 112; Gerig is "far from achieving what we want in terms of meetings, etc.", Mov.App. pp. 117, 121; and Gerig 'is unable to represent the type of work we re capable of doing with clients," Mov.App. p. 121.

17. Importantly, almost all of the identified performance deficiencies occurred after Gerig requested an accommodation for his medical condition, but before the accommodation had been granted. Until late November 2017, Gerig was not permitted to move to the office with natural light and, as a result, during the more than three-month period from mid-August to late November, his SAD was causing problems with concentration, seeing, ability to analyze written and electronic material, and attendance, Mov.App. pp. 154-160; Res.App. p. 58, the precise types of problems that could have caused the performance issues.

18. In moving forward with disciplining and ultimately terminating Gerig, his supervisors failed to appropriately consider whether Gerig's unaccommodated medical disability may have been contributing to the performance issues. Mov.App. 65-66 – KC Dep. at 104:4-106:22; Res.App. pp. 6-7 – KJ Dep. at 273:7-277:22. Johnson simply did

not believe the substantially-limiting symptoms identified by the doctors were in fact substantially limiting Gerig. Res.App. p. 6 – KJ Dep. at 276:6-17.) Cuthbert likewise was suspect. He thought Gerig's request to move offices was unreasonable "[b]ecause he didn't see any evidence of [Gerig's] performance being affected," Mov.App. p. 65 – KC Dep. 102:19-103:1, by his disability.

19. Throughout the fall, Gerig raised with his supervisors that since he had requested an accommodation, he had experienced increasing levels of hostility and retaliation. Res.App. pp. 31-34 – Gerig Aff. ¶ 14. On October 6, 2017 when Gerig raised the issue in a meeting with Cuthbert and Johnson, Cuthbert requested examples. Gerig gave him several including: his poor performance review, a denial of his reasonable office change request; not being permitted to attend Corporate Partners meetings any longer; not being allowed to attend the annual CMED conference in November; and not being allowed to complete his Team-Building event planning commitments to the Executive Education team. Res.App. pp. 31-34 – Gerig Aff. ¶ 14; Res.App. pp. 79-87. Cuthbert did not deny that Gerig was correctly interpreting his experiences. Indeed, Cuthbert stated that he could see how the events Gerig described "would feel like retaliation." *Id.* Nonetheless, in violation of DU policy, neither Cuthbert nor Johnson self-reported Gerig's claim of retaliation to the EEO Compliance office (or elsewhere in HR) so that an investigation could be conducted. Res.App. pp. 100-101– RH Dep. at 72:16-74:22.

20. After Johnson and Cuthbert begrudging (and only after being instructed to do so by ADA Coordinator Moore) granted Gerig's accommodation request, his employment situation continued to deteriorate. Three days after he was granted the

requested accommodation, on November 16, 2017, he was supposed to have a one-on-one meeting with Johnson. Instead, she took him to a surprise meeting with her and Cuthbert in his office. Res.App. pp. 31-34 – Gerig Aff. ¶ 16; Res.App. pp. 79-87. In that meeting, Cuthbert informed Gerig that he (Cuthbert) did not think Gerig's job was a good fit for him and Cuthbert wanted Gerig to think harder about whether he wanted to be there. *Id.* After Gerig explained that he liked his job and wanted to continue working, Cuthbert and Johnson proceeded to threaten Gerig with termination in January of 2018. *Id.*

21. Cuthbert and Johnson then proposed that Gerig take a "buy out" through HR to leave immediately but be paid through Dec. 2017. *Id.* Gerig rejected this offer again indicating that he wanted to stay in his job and perform it to the best of his ability. *Id.*

22. Gerig left the meeting shaken and unclear about the appropriate way to have a transparent performance analysis (and performance improvement, if one were needed). He was a productive and valuable employee until his supervisors, for some unknown reason, reacted badly to his request for a simple accommodation. After Gerig was finally granted the accommodation, his supervisors' hostility increased exponentially, and they essentially told him to quit or get fired. Res.App. pp. 31-34 – Gerig Aff. ¶ 18.

23. Cuthbert refused to take no for an answer. On or about December 11, 2017, Cuthbert again requested that Gerig select, by 10:00 am the next day, to "proactively partner to meet [his] 2018 Exec. Ed. Goals" or "sign a negotiated settlement document." Res.App. pp.31-34 – Gerig Aff. ¶19; Res.App. p.88. Gerig again chose the first option. *Id.*

24. Gerig did not want to quit. He loved the work he was doing, and he needed the job to take care of himself and his wife. Res.App. pp. 31-34 – Gerig Aff. ¶ 20.

25. Not knowing what to do, Gerig continued to work hard at his job and keep his head down to avoid angering his supervisors. He also continued to raise his concerns about discrimination and retaliation. After Gerig again raised his concerns about his recent treatment being retaliation, Johnson – rather than self-report to the EEO compliance office as she should have – advised Gerig that he could reach out to Cristina Valencia with his concerns. Res.App. p. 89. While Valencia was part of HR, she was not in responsible for EEO issues. Res.App. pp. 28-29 – CV Dep. at 106:23-110:10. She, therefore, could not help Gerig with his discrimination and retaliation concerns. This is particularly true given that Valencia was assisting Cuthbert and Johnson on Gerig's performance issues. But despite receiving Johnson's email specifically indicating that Gerig had "reported feeling ambushed, surprised and that [Gerig] attributed our performance management efforts as retaliation for [Gerig's] ADA accommodation request, and listening to Gerig explain his concerns to her, Res.App, pp. 31-34 – Gerig Aff. ¶ 21; Res.App. p. 89, Valencia did not report the matter to Hernandez, the Director of EEO compliance. Res.App. p. 29 – CV Dep. at 110:1-6. Nor did Valencia attempt to determine whether there might have been a connection between the performance issues and the unaccommodated disability. Res.App. p. 29 – CV Dep. at 111:6-113:8.

26. Despite Gerig's efforts to avoid further angering his supervisors, their campaign to get rid him continued. Approximately two weeks after Gerig moved into the new office, on or about December 6, 2017, Gerig was given a four paged, single spaced "Final Written Warning." Mov.App. 119-122.

27. Gerig requested a meeting to discuss the document he had been given. At the meeting, he provided a memorandum that rebutted the criticisms made about him. Res.App. pp. 92-95. The rebuttal fell on deaf ears.

28. Accordingly, on December 11 Gerig reached out Interim Director of Equal Opportunity, Hernandez, and scheduled a meeting to discuss the retaliatory treatment. Mov.App. 167. On December 22, 2017, Gerig requested that Hernandez formally launch an investigation into the retaliatory and discriminatory of him. Mov.App. 168-169.

29. Unbeknownst to Gerig, Cuthbert and Johnson had no intention of allowing Gerig to address the alleged performance issues set forth in the "Final Written Warning." Within days of issuing the "Final Written Warning," on December 19, 2017, Valencia had already drafted and delivered a proposed termination letter to Cuthbert and Johnson for their review. Res.App. pp. 90-91. On the morning of January 2, 2018, Gerig was fired at a surprise meeting with Cuthbert, Johnson and Valencia. Mov.App. 132.

## A. GERIG HAS PRESENTED SUFFICIENT EVIDENCE THAT HE WAS DISCRIMINATED AGAINST BASED ON HIS DISABILITY TO PROCEED TO TRIAL.

In the absence of direct evidence of discrimination, a court uses the *McDonnell Douglas* burden-shifting framework to evaluate an ADA discrimination claim premised on disparate treatment. Hawkins v. Schwan's Home Serv., Inc., 778 F.3d 877, 883 (10th Cir. 2015). The first step of the McDonnell Douglas burden-shifting framework requires the plaintiff to establish a *prima facie* case of discrimination by showing (1) that he is disabled within the meaning of the ADA; (2) that he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was

discriminated against because of his disability. *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1218–19 (10th Cir. 2016). Here, DU has not disputed (and cannot dispute) that Gerig has established a *prima facie* case.

Once Gerig has established a *prima facie* case of discrimination, the burden shifts to DU to articulate a "legitimate, nondiscriminatory reason" for terminating Gerig. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If DU articulates a satisfactory reason, the burden shifts back to Gerig to demonstrate that the employer's stated reason is a pretext for discrimination. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Foster v. Fisk*, 830 F.3d 1178, 1194 (10th Cir. 2016).

Assuming DU's proffered reason for terminating Gerig – performance issues – is a legitimate, non-discriminatory reason, summary judgment should still be denied because the facts suggest that a discriminatory reason more likely motivated Defendant. These facts, which are fully set forth above, include the following:

- Prior to needing to request an accommodation to help him deal with the increasingly serious problems he was having as a result of his SAD (caused by the increasingly shorter days brought on by fall and winter), Gerig had received nothing but positive performance reviews. Statement of Additional Material Facts ("Res. MF") Nos. 2, 11.

- Shortly after Gerig revealed his disability to his supervisors, they, for the first time, raised performance issues with him. Res. MF No. 12.

- After receiving Gerig's accommodation request, Gerig's supervisors failed to turn the matter over to the ADA compliance team, as required of supervisors at DU when requests for accommodation are made. RMF Nos. 5, 6.

- Assistant Dean Cuthbert forwarded Gerig's email requesting an accommodation to his wife with a comment suggesting Assistant Dean Cuthbert felt the Gerig's disability was illegitimate or something to joke about. RMF Nos. 6-7.

- Without engaging in the interactive process, and learning of the medically-documented substantial limitations on Gerig's ability to perform caused by his SAD, Gerig's supervisors summarily denied his request to move to an office with external light. RMF Nos. 8-9.

- Therefore, Gerig was forced to continue to do his best to meet the increasing demands of his supervisors without having the regular access to natural light he needed to perform at 100 percent. RMF Nos. 14-17.

- Johnson manipulated the review process to cause Gerig's overall rating to fall into the "Needs Improvement" category in his October 2, 2017 review. Johnson specifically discussed this manipulation with Cuthbert who acquiesced to this deceitful conduct. If Johnson had not done so, Gerig's overall review in October 2017 would have fallen in the category of "Solid Performance." This manipulation was designed to cause Gerig's overall performance to fall in the lowest category, which would help "paper the file" to support the ultimate termination. RMF No. 15.

- On October 6, 2017, Gerig told Cuthbert and Johnson that he was experiencing increasing levels of hostility and retaliation, and provided several concrete examples. Cuthbert acknowledged that he could see how the events Gerig described would feel like retaliation. Cuthbert not only did not deny the hostility and retaliation, he also failed to take steps any to end the retaliation against Gerig.

- Moreover, in violation of DU's policy requiring supervisors to self-report to the EEO office if claims of discrimination or retaliation are raised with them, neither Cuthbert nor Johnson referred Gerig's concerns to the EEO so that an appropriate investigation could be done. Even after Gerig continued to raise his concerns, Cuthbert and Johnson failed to refer the matter to the EEO. RMF Nos. 19, 24.

- When Gerig was forced to go directly to Human Resources with his request for an accommodation, Johnson was frustrated and felt Gerig should have let his supervisors handle it. Johnson's clear frustration with Gerig provides a motive for the retaliatory treatment. RMF No. 9, FN 2.

- Only after ADA Coordinator specifically told Cuthbert and Johnson that Gerig should be granted his accommodation and allowed to move offices, did Gerig's supervisors allow him to move. The move did not take place until the week of November 27, more than three months after Gerig made his request. RMF No. 10.

- Less than two weeks later, on December 5, 2017, Gerig received a Final Written Warning. All of the alleged performance issues contained in the Final Written Warning occurred between August 18, 2017 when Gerig first requested an accommodation, and the week of November 27, 2017, when Gerig was granted the accommodation and finally allowed to move offices. RMF No. 25.

- After issuing a Final Written Warning, Gerig's supervisors – rather than allow Gerig time to address the alleged performance issues or even discuss them with him – immediately started preparing termination documents. They did not allow time to see if Gerig's performance improved after an accommodation of his disability despite that fact that Cuthbert acknowledged that the unaccommodated disability could have impacted Gerig's performance. RMF No. 28.

## B. GERIG HAS PRESENTED SUFFICIENT EVIDENCE THAT HE WAS RETALIATED AGAINST FOR REQUESTING AN ACCOMMODATION TO PROCEED TO TRIAL.

Because Gerig is relying on circumstantial evidence to prove his retaliation claim, *McDonnell Douglas*'s analytical framework set forth above (see supra pp. 16-17), applies. Under this framework, once the plaintiff establishes a *prima facie* case of retaliation, "the employer has the burden of showing it had a legitimate, nondiscriminatory reason for the adverse action. If the employer does so, the burden [of production] shifts back to the plaintiff to prove pretext, which requires a showing that the proffered nondiscriminatory reason is unworthy of belief." *Foster,* 830 F.3d at 1186 (citations and quotations omitted).

To prove a prima facie case of ADA retaliation, a plaintiff must prove that (1) he "engaged in a protected activity"; (2) he was "subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity"; and (3) there was "a causal connection between the protected activity and the adverse employment action." *Foster,* 830 F.3d at 1187 (citations omitted). DU is forced to concede that Gerig has established the first and second elements. While DU contends that Gerig will be unable to prove the third element – a causal connection between the protected activity and the

termination – DU is incorrect. At the *prima facie* case stage, Gerig may rely solely on temporal proximity to show causation. *Id.* at 1991.

With Gerig, the pattern of retaliation started immediately. On August 21, 2017 – four days after Gerig made his initial request –Cuthbert first chastised Gerig for an alleged performance issue, Mov.App. 112-15. This was followed by repeat efforts to identify and, more importantly, document alleged performance issues, Mov.App. 119-122, 116-18**.** The retaliation efforts became more pronounced after Gerig requested an accommodation directly from HR on October 5, 2017, Mov.App. 151-52, followed by ADA coordinator Moore recommending, on November 9, 2017, that Cuthbert and Johnson reverse their decision and approve the accommodation, Res.App. 21-24 – LM at 95:16-97:5. On December 5, 2017, Gerig received a Final Written Warning, Mov.App. 119-22**,** and on January 2, 2018 he was terminated, Mov.App. 132. This timeline is sufficient to establish causation for purposes of the *prima facie* case. *See, e.g., Goldstein v. Sprint United Mgmt. Co.*, 288 Fed. Appx. 476, 483 (10th Cir. 2008) ("This court has recognized that the 'close temporal proximity' usually necessary to support a retaliation claim 'must not be read too restrictively where the pattern of retaliatory conduct begins ... soon after the filing of [a] complaint and only culminates later in actual discharge.' ") (*quotation cite omitted).*

After establishing a *prima facie* case, the burden shifts back to DU to show that it had a legitimate, nondiscriminatory reason for the termination. Even if DU's proffered reason – alleged performance issues – meets this burden, Gerig will still be able to present his claim to the jury. As fully set forth in Section III(A) above (which is incorporated herein, more than sufficient evidence exists showing that DU's stated reason is pretexual.

Dated this 20th day of November, 2020.

ANDERSON BARKLEY, LLC.

*s/ Jeanine M. Anderson*
Jeanine M. Anderson
Richard P. Barkley
Anderson Barkley, LLC
3900 E. Mexico Ave., Suite 300
Denver, Colorado 80210
Tel.: (720) 506-1766
Jeanine@AndersonBarkleyLaw.com
RichardBarkleyLaw@comcast.net

Attorneys for the Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of November, 2020, a true and correct copy of the foregoing was served via the CM/ECF system on:

Jim Goh
Rayner Mangum
Constangy, Brooks, Smith & Prophete, LLP
600 17th Street, Suite 2700S
Denver, Colorado 80202
jgoh@constangy.com
rmangum@constangy.com

*Attorneys for the Defendant*

*s/ Jeanine M. Anderson*
Jeanine M. Anderson